UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

**<u>REDACTED</u>**

United States of America,       )
                                )
                Plaintiff,      )
                                )
        vs.                     )       File No. 1:16-cr-179
                                )
Lonnie Spotted Bear,            )
                                )
                Defendant.      )


<u>TRANSCRIPT OF DIGITAL RECORDING</u>
<u>ARRAIGNMENT AND DETENTION HEARING</u>


Taken at
United States Courthouse
Bismarck, North Dakota
September 23, 2016


BEFORE THE HONORABLE CHARLES S. MILLER, JR.
-- UNITED STATES DISTRICT COURT MAGISTRATE JUDGE --

APPEARANCES


        MR. JONATHAN J. O'KONEK
        U.S. Attorney's Office
        220 E. Rosser Ave
        P. O. Box 699
        Bismarck, North Dakota 58502-0699


                                    FOR THE UNITED STATES



                    - - - - - - - - -



        MR. THOMAS V. OMDAHL
        Omdahl Law Office
        575 Judd Street
        P. O.  Box 63
        Marine on St. Croix, Minnesota 55047


                                    FOR THE DEFENDANT



                    - - - - - - - - - -

GOVERNMENT WITNESSES

Page No.

Agent Bruce Bennett
    Direct Examination by Mr. O'Konek          7
    Cross-Examination by Mr. Omdahl           13


Travis Hallam
    Direct Examination by Mr. O'Konek         14
    Cross-Examination by Mr. Omdahl           18


Crystal Hallam
    Direct Examination by Mr. O'Konek         20

- - - - - - - - - -


Certificate of Court Reporter - Page 35

- - - - - - - - - -

1          (The above-entitled matter came before the Court, The

2     Honorable Charles S. Miller, Jr., United States District Court

3     Magistrate Judge, presiding, commencing at 2:00 p.m., September

4     23, 2016, in the United States Courthouse, Bismarck, North

5     Dakota.  The following proceedings were had and made of record

6     by digital recording with the defendant and Mr. Omdahl present

7     by video conference.)

8                    - - - - - - - - - - -

9          THE COURT:  Okay.  We'll go on the record in Criminal

10    Number 1-16-179, the *United States of America versus Lonnie*

11    *Spotted Bear*.  Mr. Spotted Bear, along with attorney,

12    Mr. Omdahl, are appearing by video from Stutsman County.

13    Present in Bismarck is the Court and Court staff.  Mr. O'Konek

14    is here representing the United States.  Have I seen

15    Mr. Spotted Bear before?

16         MR. O'KONEK:  No, Your Honor.  He was seen in Montana

17    for --

18         THE COURT:  Oh, okay.  Very good.  So I guess what we

19    need to do first is take up the arraignment.  Sir, you're

20    charged in Counts 1 and 2 of the Indictment with the offense of

21    aggravated sexual abuse of a child under the age of 12.  You

22    are presumed to be innocent of this offense, but what I want to

23    discuss with you briefly are the maximum penalties that you

24    face should at some point you decide to plead guilty or if you

25    are found guilty by a jury.  The actual penalty that you might

4

1   receive could be something less than the maximum, and what the

2   chances for that may be you can discuss with your attorney as

3   the case progresses.

4           First of all, I -- I'll appoint Mr. Omdahl to be your

5   attorney.  Is that satisfactory with you?

6           THE DEFENDANT:  Yeah.

7           THE COURT:  Okay.

8           MR. OMDAHL:  I'm -- I'm privately retained.

9           THE COURT:  Oh, you're privately retained.  Very

10  good.  I didn't realize that.  I'm sorry.

11          MR. OMDAHL:  Yeah.

12          THE DEFENDANT:  I didn't understand him.

13          THE COURT:  This charge carries the 30-year minimum

14  mandatory?

15          MR. O'KONEK:  That's right.

16          THE COURT:  I think what you face here with respect

17  to Counts 1 and 2, sir, is a term of imprisonment that could be

18  up to life.  There's a 30-year minimum mandatory sentence.

19  Following any jail time that the Court might order, the Court

20  would be required to put you on a mandatory term of supervised

21  release of at least five years, but that supervised release

22  could be up to life.

23          There's the possibility of a fine that could be as

24  high as $250,000.  There's a mandatory $100 special assessment.

25  And then there's an additional special assessment that could be

5

1   up to $5,000, I believe, as well given the nature of the

2   charge.  Also, there's the possibility of having to make

3   restitution to any victim if there's been a financial loss.

4   Those are the penalties that you face for these offenses.

5           What I would like to do now would be to take a plea

6   from you to the charges contained in the Indictment, and at

7   this point I can only take a not guilty plea.  If you want to

8   plead guilty, you'd have to do it later and before a different

9   judge, so in that respect it's somewhat of a formality now.

10          Before I take the plea from you, you have the right

11  to have me formally read in open court the charge to you, or

12  you can waive the formal reading and enter your not guilty

13  plea.  Do you want me to read the charge -- charges to you?

14          THE DEFENDANT:  Waive it.

15          THE COURT:  Okay.  Having waived the formal reading,

16  is your plea not guilty at this time?

17          THE DEFENDANT:  Yes, not guilty.

18          THE COURT:  The trial date that I've been -- that

19  I've been given is November 15th, beginning at 9:30 in the

20  morning in Bismarck before Judge Hovland.  The case is set for

21  three days.

22          The Court will enter the standard order for pretrial

23  motions and discovery.  Mr. Omdahl, pretrial motions are due 28

24  days prior to trial.  If the trial date gets extended, which

25  very often happens -- we probably have 15 or 20 cases set for

1    November 15th, so they're not all going to go on that date, but

2    if the trial date gets extended, it's always 28 days prior to

3    the last scheduled trial date for pretrial motions.  And we do

4    use in many cases the standard discovery order, and you can see

5    that, and you're entitled to motion for any other discovery you

6    think might be due.

7              Let's turn to the issue of release or detention.  The

8    Court's received a copy of the pretrial services report, and

9    that will be made a part of the record.  Mr. O'Konek, you may

10   proceed.

11             MR. O'KONEK:  Yes, Your Honor.  The United States

12   calls Special Agent Bruce Bennett.

13                       AGENT BRUCE BENNETT,

14   having been first duly sworn, was examined and testified as

15   follows:

16                       DIRECT EXAMINATION

17   BY MR. O'KONEK:

18   **Q.**   Special Agent Bennett, I just want to go over a little bit

19   about your background information.  Where are you currently

20   employed?

21   **A.**   I'm currently employed with the Federal Bureau of

22   Investigation as a special agent.  I work out of the Minot

23   office, and I investigate violent crimes on Fort Berthold

24   Indian Reservation.

25   **Q.**   How long have you been an FBI agent?

7

1   **A.**    I've been with the FBI since 1999.

2   **Q.**    And you had mentioned that part of your duties are to

3   investigate violent crime that occurs on the Fort Berthold

4   Indian Reservation, so I want to talk to you a little bit about

5   the case of Lonnie Spotted Bear.  How did that case come to

6   your attention?

7   **A.**    I was informed that there were two victims that were going

8   to be given a forensic interview on March 25, 2016.

9   **Q.**    And those two individuals -- I'll just use their initials

10  -- are S.H. and then N.H.E.?

11  **A.**    Correct.

12  **Q.**    Can you briefly describe what each of these girls had

13  described had happened to them during their forensic interview

14  in March of 2016?

15  **A.**    The first victim, initials S.H., when she was six years

16  old, sometime during the summer, she visited her cousin's

17  house.  While at that house Spotted Bear asked her if she

18  wanted to go with him to his house to look for an iPad.  She

19  went with him to his house.  While at that house, Spotted Bear

20  pushed the victim down to the floor with his hands.  He pulled

21  down her leggings that she was wearing and her underwear, and

22  he licked her vagina.  The victim fought back, scratching,

23  hitting, struck him, and Spotted Bear stopped and eventually

24  left.

25  **Q.**    Agent Bennett --

1   **A.**   A separate victim with the initials N.H.E., when she was

2   five years old she was staying at her cousin's house in Twin

3   Buttes.  At this time Spotted Bear was also staying at the

4   house.  Our second victim was sleeping in the living room on a

5   mattress near the couch.  She went to sleep approximately at

6   10 o'clock.

7           A couple hours later she was awoken by Spotted Bear

8   pulling off her pajama pants.  He was able to get her pajama

9   pants down and her underwear down.  He placed his stomach on

10  her legs and held her down and grabbed her arms with his arm,

11  and then he licked her vagina.  Approximately two to five

12  minutes later, he stopped.  She commented that during the time

13  that he was doing that, I believe he was laughing and he told

14  her to calm down.

15          A second incident with our second victim was when she

16  was nine.  She was doing some work with Spotted Bear at his

17  workshop north of Halliday.  Inside the workshop Spotted Bear

18  picked her up and put her on a tire and started to pull down

19  her pants.  Believing that he was doing or attempting to do the

20  same thing, she reached for her cell phone out of her pants,

21  where she struggled with him, and called her other grandpa on

22  the speed dial.  She believes that once the grandfather

23  answered the phone is the reason why Spotted Bear stopped.  And

24  that's -- that's roughly what happened on the forensic

25  interviews.

1   **Q.**   And just to go back briefly, Agent Bennett, so the first

2   victim, initials S.H., that incident occurred approximately

3   between August 23, 2010, and August 23, 2011?

4   **A.**   Yes.

5   **Q.**   And then for N.H.E., the first incident you described when

6   she was five years old, that had occurred between December 16,

7   2009, and December 16, 2010?

8   **A.**   Correct.

9   **Q.**   And when N.H.E. was nine, in that instance when in

10  Halliday at the workshop when Spotted -- Mr. Spotted Bear put

11  her on a tractor tire, that had occurred between December 16,

12  2013, and approximately December 16, 2014?

13  **A.**   Yes.  All of that is based on birth dates, of course.

14  **Q.**   And I want to talk to you a little bit about what happened

15  after these interviews.  At any point did Mr. Spotted Bear

16  contact Ivetta Spotted Bear, the grandmother of N.H.E.?

17  **A.**   He attempted to.  After the forensic interviews, a short

18  time afterwards, Spotted Bear traveled to Ivetta Spotted Bear's

19  house, where one of the victims was staying.  They were all

20  inside.  The screen door was locked.  The front door was open a

21  few inches.  Spotted Bear knocked on the door or rang the

22  doorbell, and they -- they didn't want to answer the door.

23         After a while Spotted Bear knelt down and pushed open

24  the door with reaching through the -- through the front door.

25  Ivetta Spotted Bear was standing in the hallway and noticed

1   that the room had gotten lighter, and she surmised that it was

2   from opening the door, so she came out of the hallway and

3   approached the door.  Spotted Bear said that he wanted to talk.

4   She said no, and she shut the door and locked the door.  He

5   eventually took off.

6   **Q.**   And was there another time when a Mr. Travis Hallam, who

7   is the father of S.H. -- did Mr. Spotted Bear contact him about

8   the investigation?

9   **A.**   Yes.  A while after the forensic interviews on March 25th,

10  Travis Hallam received a telephone call from Spotted Bear.

11  Mr. Hallam described the call as being aggressive in nature,

12  and it appeared that it was an attempt to intimidate him.

13  Spotted Bear wanted to know on the -- on the telephone call he

14  wanted to know the name of the other child who made allegations

15  against him.  During the conversation Spotted Bear didn't deny

16  the allegations, but only said that the allegations could send

17  him to prison.

18          In my conversation with Mr. Hallam, he expressed

19  concern for his daughter if Spotted Bear was to be released.

20  In part out of their fear of him having contact with her, they

21  moved her to New Town.

22  **Q.**   Where was S.H. previously living?

23  **A.**   Prior to that, I believe Twin Buttes area.

24          MR. O'KONEK:  One moment, Agent Bennett.  Those are

25  the only questions I have for Agent Bennett, Your Honor.

11

1          THE COURT:  Mr. Omdahl, you may examine.

2          MR. OMDAHL:  Can I -- can I just take a second and

3    consult with my client?

4          THE COURT:  Yes.

5          (A brief discussion was had off the record.)

6          MR. OMDAHL:  I have no questions.

7          THE COURT:  Okay.  Agent Bennett, if you know -- and

8    if you don't know, just tell me -- is S.H. still residing in

9    New Town, or is she back in Twin Buttes, or do you know where

10   she prefers to live or the family prefers to have her live?

11         MR. O'KONEK:  One of the next witnesses we'll call --

12         THE COURT:  Okay.

13         MR. O'KONEK:  -- should explain that better, Your

14   Honor.

15         THE COURT:  Forget it.  I guess we have another

16   witness who can explain that, so thank you, Agent Bennett.

17         MR. O'KONEK:  Actually, I have one question about the

18   other --

19         THE COURT:  Go ahead.

20   Q.   (MR. O'KONEK CONTINUING)  Agent Bennett, just briefly,

21   N.H.E., where does she currently live?

22   A.   I don't know.

23   Q.   Is she going to -- is she staying in Twin Buttes, but

24   going to school in Killdeer?

25   A.   I believe so.

1      MR. O'KONEK:  That would be the only question I had.

2      THE COURT:  All right.  Anything else, Mr. Omdahl, of

3  this witness?

4      MR. OMDAHL:  Well, just about that, N.H., where she

5  lives.

6                    CROSS-EXAMINATION

7  BY MR. OMDAHL:

8  Q.   She's going to school in Killdeer.  How far is Killdeer

9  from Twin -- Twin Buttes?

10 A.   I (inaudible) information.  I don't have that information.

11     MR. OMDAHL:  Okay.  (Inaudible.)

12     THE COURT:  Thank you, Agent Bennett.  Do you have

13 any more witnesses you're calling?

14     MR. O'KONEK:  Yes, Your Honor.  The United States

15 would call Mr. Travis Hallam.

16     THE COURT:  Come forward.  The clerk will swear you,

17 and then you can have a seat here.

18                    TRAVIS HALLAM,

19 having been first duly sworn, was examined and testified as

20 follows:

21     THE WITNESS:  Can I make any type of a statement too?

22     THE COURT:  Why don't Mr. O'Konek ask you some

23 questions, but, yes, you're free to make a statement if you

24 wish.

25     ///

13

1                    <u>DIRECT EXAMINATION</u>

2    <u>BY MR. O'KONEK</u>:

3    **Q.**    Now, Mr. Hallam, I just have a couple of background

4    questions.  Now, you're the -- the father of S.H.?

5    **A.**    Yes.

6    **Q.**    How old is S.H.?

7    **A.**    Twelve.  She just turned 12.

8    **Q.**    Now, what is the -- what is her current living

9    arrangements?

10   **A.**    Right now she's living with me.  When he was out, she was

11   living with her mom because he doesn't know where her mom

12   lives.  It's a -- she wants to stay with me because (inaudible)

13   Wi-Fi, and that's the deciding factor, but she's afraid to stay

14   in that house because he knows where that house is.

15   **Q.**    And just to back you up a little bit, when you say

16   (inaudible), is that in New Town?

17   **A.**    Yeah, I have a residence in New Town.

18   **Q.**    And where would she live otherwise?  Would that be with

19   your --

20   **A.**    She'd be with her mom in New Town as well.

21   **Q.**    And who is her mother?

22   **A.**    Crystal Hallam.

23   **Q.**    And can you explain what -- kind of the living

24   arrangements?  You mentioned she was afraid of the house.

25   Which house were you referring to?

                                14

1   **A.**   The house that I acquired from my mother, (inaudible)

2   Dakota Drive, New Town.  She likes that house because, like I

3   said, we have Wi-Fi.  The kids want to spend the daytime

4   (inaudible), but she was afraid to spend the night there

5   because he knew where the residence was, so she would stay with

6   her mom.  Since he's been incarcerated, she's moved in and

7   stayed with me, so that's where she's staying now, but if he is

8   released, she'll go back and stay with her mom then.

9   **Q.**   Where -- where does her mom live?

10   **A.**   She lives in New Town, on the other side of town.  I don't

11   know what (inaudible).

12   **Q.**   Okay.  Without going into the physical address.  Now I

13   want to talk to you a little bit about that phone call that

14   Mr. Spotted Bear had made with you.  Can you just describe a

15   little bit about what happened?

16   **A.**   Yeah, he called and started asking what she said, and I

17   explained to him that we didn't report it.  We -- we didn't

18   press charges.  We were taking her to counseling because she

19   was victimized, and the counselors had mandatory reporting, and

20   we didn't come forward and say anything.  And then I don't --

21   why we're not together, but I don't want that public

22   humiliation, seeing my child go through that and being a victim

23   again in the courtroom.

24          But he started to get aggressive in his manner when

25   he started asking about the other child.  And he's one of the

1   toughest guys I've ever met in my whole life, and he's never

2   had anybody stand up to him.  (Inaudible) has never stood up to

3   him.  I've never stood up to him.  None of us have ever stood

4   up to him, and as I've gotten older, it isn't out of fear, it's

5   out of respect for him.  But in that conversation, that was the

6   first time in my life I ever stood up to him as far as meeting

7   his temperament with equal temperament, so when he got

8   aggressive with me as far as his nature of it being sort of

9   threatening on the phone, I responded in kind.

10           And then he brought it down.  I brought it down.  We

11  ended the conversation basically civilly, to the best we could.

12  But I told him, I said I'm not here to help him.  You know,

13  that's not mine -- I'm not pressing charges, but I'm not here

14  to assist him.

15  Q.   And I guess I should back up.  What is your relationship

16  to Mr. Lonnie Spotted Bear?

17  A.   He's my godfather.  My middle name is named after him.

18  He's the closest in age to my -- my mother.  He's my neighbor.

19  I would have done anything for him.  I flew -- I drove him down

20  to Texas and then flew him down to my home because his wife

21  asked that he, you know, not drive down there.  He lost a

22  little bit of peripheral vision.  And, I mean, I've always been

23  very, very close to him.  He's one of the few people in the

24  world I could trust with my daughter.

25  Q.   And asking just one follow-up question, is he also S.H.'s

1    godfather?

2    **A.**    No, he's -- he's my godfather.  His wife is my oldest

3    daughter's godmother.

4    **Q.**    And ultimately I want you just to briefly describe the

5    fear that S.H. has.  Is that something that is concerning to

6    you if --

7    **A.**    Yes.

8    **Q.**    -- Mr. Spotted Bear were to be released?

9    **A.**    Yes, and as I explained, when -- when I asked her about

10   how she felt about him being incarcerated, she wasn't

11   vindictive.  She just said she (inaudible) feel safer knowing,

12   you know, he's locked up and she doesn't have that fear.  And

13   when I said it really doesn't matter whether there's, you know,

14   just perceived or if there is a real threat if he's released,

15   if he's released, she still feels that same fear inside her

16   head.  That doesn't change anything.  So if he's released, she

17   is fearful, and that's one of the reasons she won't stay with

18   me.

19           Now, me as my own person, I don't object to him being

20   on house arrest, but I do object for my daughter because that

21   won't change her perception.

22           MR. O'KONEK:  And those are the only questions I have

23   for this witness, Your Honor.

24           THE COURT:  Okay.  Mr. Omdahl, you may examine.

25           MR. OMDAHL:  Yes, I just have a couple questions.

                                   17

1                          CROSS-EXAMINATION

2    BY MR. OMDAHL:

3    **Q.**   First, Mr. Travis -- what was the last name again?

4    **A.**   Hallam.

5    **Q.**   Hallam?

6    **A.**   Yes.

7    **Q.**   Okay.  Okay.  Mr. Hallam, I understood that S.H. --

8    allegations against S.H. occurred in 2009 to 2010, is that

9    correct?

10   **A.**   I don't have the information.

11   **Q.**   Oh, I'm sorry.

12   **A.**   You have the information, I don't.

13   **Q.**   Yeah, 2010 to 2011, would that -- would that seem to be

14   about correct, the time, date?

15   **A.**   Like I said again, I'm really not -- I don't want to know

16   the information.  As a father I want to know very little about

17   that as I can, so I don't know the specific dates, but I do

18   know she was interviewed.  She gave those, and you should have

19   those dates, yourself.

20   **Q.**   Yeah.  Yes, I do.  And the only reason that I'm bringing

21   it up is that it appears to be a rather long time ago.  And I

22   just wanted to know, since 2011, has S.H. been around

23   Mr. Spotted Bear?

24   **A.**   Yes, a few times, and then she's had bizarre reactions,

25   which we didn't catch at the time.  Like she didn't want to go

1   to basketball practice, even though she wanted to go, because

2   he was there.  These are things we found out in hindsight.

3   When you start looking for these things, you notice them.  So,

4   yeah, she had been, but there's things -- many things like

5   that.  But like I said, these are things I don't want to hear

6   because I'm a father.  I do want -- do not want to hear these

7   details.  This is --

8   Q.   Well, and I'm not asking -- I'm not asking --

9   A.   I'm trying to explain that this is very little -- we found

10  out this year -- or I shouldn't say this year, but basically

11  close to the New Year.  We immediately moved her away from the

12  residence once we had an idea.  But again, I didn't want this

13  to play out.  I didn't want people to know about this.  I don't

14  want my daughter to be victimized again in a social setting.

15  Q.   I understand.

16  A.   And I didn't write down the timelines.  I didn't want -- I

17  don't even want to think about this subject.  It's hard to

18  understand, but I don't even want to think about this.

19            MR. OMDAHL:  Thank you.  I have no further questions.

20            THE COURT:  Mr. O'Konek, anything further?

21            MR. O'KONEK:  No, Your Honor.

22            THE COURT:  Thank you, sir.  Any other witnesses you

23  would like to call?

24            MR. O'KONEK:  Briefly, yes, Your Honor.  We would

25  call Crystal Hallam, please.

<u>CRYSTAL HALLAM,</u>

having been first duly sworn, was examined and testified as

follows:

<u>DIRECT EXAMINATION</u>

<u>BY MR. O'KONEK:</u>

**Q.**   Now, Ms. Hallam, could you say and spell your name for the

record?

**A.**   Crystal Hallam, C-R-Y-S-T-A-L, H-A-L-L-A-M.

**Q.**   Now, you are the mother of S.H.?

**A.**   Yes.

**Q.**   And I want to ask you briefly, do you feel that if

Mr. Spotted Bear would be released, does that cause fear in

your child and to you as well?

**A.**   Yes.

**Q.**   Can you describe what you're basing that off of?

**A.**   Well, I've witnessed her -- well, when somebody knocks on

the door, she'll just hide, like she'll just run until she

knows it's safe to come home, so it's hard to watch.  I do tell

her he's not out of jail.  I know I just -- I just have -- I

just wrote some things down here that I just -- that I don't

(inaudible) released for my daughter and for myself.  We are in

constant worry knowing he could possibly be released at any

point because (inaudible).  I don't personally know how he

reacts.  He could be unpredictable.  He doesn't (inaudible).

He shows passive-aggressive behavior.

1          Now that this has come out, I have fears that he

2   would show up at my house when my children and I are at home.

3   As it is now, if anyone knocks on the door, like I stated,

4   Sxxxxxx will run and hide.  I feel because he was arrested for

5   three counts of child molestation and has to -- has to sit in

6   jail for my child speaking out.  As Travis stated, we didn't

7   press the charges.  I wanted Sxxxxxx to be -- to feel safe in

8   her mind.  We took her to -- towards herself, what happened to

9   her, and we took her to the therapy.  I just fear that he's

10  unpredictable and vengeful.  I'm just kind of terrified.  More

11  than I feel, I just -- I'm scared.  I (inaudible).  I work in a

12  public building.

13  **Q.**   To back up a little bit, what is your relationship to

14  Mr. Spotted Bear?

15  **A.**   He's my ex-husband's uncle.

16  **Q.**   And is he a respected member of the community?

17  **A.**   Yes, he is.

18  **Q.**   In that community in Twin Buttes?

19  **A.**   Yes.

20  **Q.**   And what kind of a place is Twin Buttes?  How big is it,

21  approximately?

22  **A.**   It's not very big.  It's a little over a hundred people in

23  the community.

24  **Q.**   How far away is it from, let's say, New Town?

25  **A.**   It's about a little under a two-hour drive.

1   **Q.**   And what about to, let's say, Bismarck?

2   **A.**   About a two-hour drive.

3   **Q.**   And so it's a pretty remote area?

4   **A.**   Yes.

5   **Q.**   Just the last few questions I have, you talked about being

6   afraid.  Does that have anything to do with not just you, but

7   also your daughter, S.H.'s reactions, like you explained

8   earlier?

9   **A.**   Yes.

10              MR. O'KONEK:  Well, I don't have any other questions

11   for you, ma'am.  I'll turn it over to defense.

12              THE COURT:  Mr. Omdahl?

13              MR. OMDAHL:  I have no questions.

14              THE COURT:  I have a couple questions, ma'am.  Where

15   are you currently living?

16              THE WITNESS:  In New Town.

17              THE COURT:  Okay.  Anything further?

18              MR. O'KONEK:  No, Your Honor.

19              THE COURT:  You may be excused.  Thank you, ma'am.

20              MR. O'KONEK:  That was the last witness of the United

21   States, Your Honor.

22              THE COURT:  Okay.  You indicated that somebody was

23   going to clarify where -- okay.  (Inaudible.)

24              Well, let me ask this of S.H.'s parents.  Is there

25   any reason why she would want to now live where you would have

1  her live with you in the Twin Buttes area as opposed to New

2  Town?

3           MR. HALLAM:  Well, one, she doesn't want to be near

4  it because of that.

5           THE COURT:  Right, but, I mean, assuming if, for

6  example, the defendant was detained and so he was locked up,

7  would she then live in Twin Buttes or would she be living in

8  New Town?

9           MR. HALLAM:  She likes coming back to stay, but she

10 hasn't come back until he's been locked up.  And then since

11 then she's come back to Twin Buttes and stayed with me on

12 weekends, but during the week we go back to New Town because

13 she goes to school there.

14          THE COURT:  Okay.

15          MR. HALLAM:  But she won't come back to Twin Buttes,

16 and she does want to come back because we've had puppies, and

17 stuff, but she doesn't want to come back if he's out and about.

18          THE COURT:  But during the week she's in --

19          MR. HALLAM:  She goes to school in New Town.

20          THE COURT:  Got you.  Okay.

21          MR. HALLAM:  But that is the reason we moved her to

22 New Town.  We told people something different, but the primary

23 reason was because of that.  We wanted to distance her as far

24 as we could.

25          THE COURT:  Have you caught that, Mr. Omdahl?

1          MR. OMDAHL:  I have.  I've heard it all.

2          THE COURT:  Do you have any questions as a result of

3   that?

4          MR. OMDAHL:  I do not.

5          THE COURT:  Okay.  Anything further, Mr. O'Konek?

6          MR. O'KONEK:  No, Your Honor.

7          THE COURT:  Okay.  Thank you.

8          Why don't you go ahead and present your argument,

9   Mr. O'Konek, and then I'll turn to Mr. Omdahl for any evidence

10  he wants to proffer and his argument.

11         MR. O'KONEK:  Yes, Your Honor.  Now, this is an

12  unusual request from the United States, (inaudible) somebody

13  who is 72 years old and historical sexual abuse allegations,

14  you might be asking for something different, but based upon the

15  fear that he has instilled in both the family of N.H.E. and

16  S.H., it causes the United States to have pause.

17         Additionally, he is not just fear -- irration -- it's

18  not irrational fear.  He's actually taken steps which family

19  members have perceived to be an attempt to intimidate or

20  influence.

21         The United States' biggest factor is we -- we want to

22  protect the safety of both N.H.E. and S.H. and also to ensure

23  that there's not a chilling effect.  These types of cases, if

24  Mr. Spotted Bear were to attempt to do anything, it could have

25  a disastrous effect on the entire case by our -- S.H. or N.H.E.

1    not wanting to testify, not wanting to go forward.

2            And understanding his age and his medical conditions,

3    those are factors that the United States weighed.  However,

4    based upon the threat to the safety of the two children, as

5    well as his threats and attempts to barge into a family

6    member's house where one of the children was staying at, it

7    gave us pause to request detention, and for those reasons we --

8    we believe specifically the intimidation factor would require

9    detention prior to trial and show that no condition or

10   supervision or release would protect the safety of these two --

11   these two children and their families.

12           THE COURT:  Mr. Omdahl, you can proffer any evidence

13   that you wish to present.  You can present testimony, and then

14   you can make your argument.

15           MR. OMDAHL:  Your Honor, I'm just going to make my

16   argument.

17           THE COURT:  Okay.  Go ahead.

18           MR. OMDAHL:  The argument, Your Honor, is -- well, as

19   I understand it for release here is concerning the fear, and so

20   I'll address that first.  And it occurs to me that these fear

21   allegations are based on -- on something that occurred in March

22   of this year, which is a substantial amount of time ago, and

23   that nothing has occurred since then.

24           And if the Court will look at this, the investigation

25   was occurring, and -- and Mr. Spotted Bear just wanted to find

1    out what the allegations were all about.  He wasn't there to

2    intimidate, or there wasn't any -- anything pending at that

3    time.  There was just some forensic interviews that had

4    occurred, and yet he knew nothing about it, so he was just

5    seeking some clarification or information when he contacted

6    Travis Kailen (ph) --

7             UNIDENTIFIED SPEAKER:  Hallam.

8             MR. OMDAHL:  Hallam.  I'm sorry, Hallam.  And

9    Mr. Hallam had --

10            UNIDENTIFIED SPEAKER:  Hallam.

11            MR. OMDAHL:  And Mr. Hallam has -- has stated that it

12   did occur.  There was a civil conversation when they ended.

13   They are very close.  He's his godfather, so contact was not

14   extraordinary or any type of -- done in any type of vein of

15   intimidation or trying to create some kind of fear.

16            Ever since he's had zero contact with his godson, and

17   I think that goes a long way to assure the Court that he's not

18   going to be having any type of an intimidation conduct, that

19   he's -- that occurred that one time, and then the one time at

20   the house where he went to talk.  And those two things were a

21   long time ago, and this -- these people are close.  So to say

22   that he's going to intimidate or cause fear in these children

23   when he has not done so since March of this year, I don't know

24   if there's a lot of basis for that.

25            Also, I understand that because they came out in the

1    forensic interview -- they came out with this, now the fear is

2    there, but yet there was no fear of being around Mr. Spotted

3    Bear prior to coming -- making the allegations.  The fear has

4    come out with the children -- or with S.H. just because of her

5    -- of her disclosure.  And that is understandable, that because

6    she disclosed, now she's fearful and because he -- of some type

7    of intimidation or reaction to her coming out or making these

8    allegations.

9           So I would ask that the Court can take some steps to

10   make conditions that prevent him from contacting them and that

11   he be restricted to his farm.  It's very critical that he get

12   back to his farm.  He's a rancher.  He has 200 -- and I think

13   you have it before you, he has 200 head of cattle, which are

14   cows, and then he's got another 150, or so, calves.  He's got

15   50 horses.  He's got to put up another crop of hay.  It's -- he

16   runs this ranch with his sons, so it's important that he get

17   out to be able to support his family.  He's critical to that

18   operation.

19          And I do not see the fear.  He's certainly not a risk

20   to flee.  He -- the only thing is the fear that he's going to

21   intimidate.  I would ask that that's not well-founded and that

22   the Court allow him to be released.  Thank you.

23          MR. HALLAM:  If I may, Your Honor?

24          THE COURT:  Yes.

25          MR. HALLAM:  I just wanted to add one thing.  He knew

27

1   already with the questions he was asking.  He didn't randomly

2   call me.  He knew it was my daughter, and he knew it was the

3   other child when he asked these questions, so it wasn't just --

4   just a routine, you know, inquiry.  He knew the answers before

5   he called.

6            THE COURT:  Well --

7            MR. HALLAM:  And, again, it's not my fear.  It's my

8   daughter's perceived fear.

9            THE COURT:  No, I understand.

10           Well, these are very tough cases, and I've had,

11  unfortunately, way too many of them.  And as Mr. O'Konek may

12  have alluded to, in most -- in past cases, most of the time

13  I've been able to -- I'm able to fashion conditions of release

14  that I think can protect the community, and in each instance

15  when I've done so, we have not had an issue or a problem.

16           Now, I can't guarantee that that will always be the

17  case in every situation.  But I've had cases very similar to

18  this where I've issued -- where I released the defendant on

19  very stringent conditions of release, and we've not had an

20  issue, and that's probably what Mr. O'Konek was referring to in

21  that.

22           I want everybody to understand here what my role is

23  and what my -- what governs what I must do here is that even

24  though there is substantial weight of evidence against this

25  accused, there is a Constitutional right to bail, not in all

28

1   situations, but that's a Constitutional right that applies to

2   each and every -- that each and every one of us has.

3           It's not something that's absolutely guaranteed.  I

4   can conclude that there are no conditions of release that I

5   think can be imposed and can detain somebody in custody, but

6   I -- I have to be convinced that there are no conditions of

7   release that I can impose before I can do that, and that is a

8   function of the rights that all of us have.

9           Secondly, I -- it's not my job to determine the guilt

10  or innocence of this individual.  That's for a jury perhaps

11  later on down the road.  My function here is simply to

12  determine whether or not the defendant should be released from

13  custody or not, and if I do release him, what conditions I

14  should impose.

15          I want to take just a second and to visit with the

16  pretrial services officer.  Just a moment.  Everybody can

17  remain at least.

18          (A brief recess was taken.)

19          THE COURT:  You're charged with a crime, and I read

20  the penalties to you.  You face a 30-year minimum mandatory

21  sentence if you're convicted, and that -- the judge doesn't

22  really have any discretion as to what charge is brought or what

23  sentence is given if you're convicted.  If you're convicted,

24  you get the 30-year minimum mandatory sentence.  Judge Hovland,

25  if he tries the case, isn't -- isn't going to have any

1   discretion.

2           All of the discretion in terms of what you may be

3   facing in your future rests with this gentleman and his office,

4   the United States Attorney's Office.  And if you get convicted,

5   unless your genes are better than mine, you're going to die in

6   jail.  Do you understand what I'm saying?

7           THE DEFENDANT:  Yes, Your Honor.

8           THE COURT:  Okay.  If I release you and there's any

9   bit of a problem while you're on release, a couple things are

10  going to happen.  First of all, you would be immediately

11  remanded to custody, and there isn't going to be any argument

12  over that.  That would be the first thing that would happen.

13          But secondly, if we do have a problem with you on

14  release, there is no incentive on the part of the U.S.

15  Attorney's Office here later on to work out any possible deal

16  for somewhat of a lesser sentence.  Do you understand what I'm

17  saying?

18          They hold the keys to your future here if you're

19  convicted.  And if you screw up on release, they may very well

20  go forward with the charge that's on the books with a 30-year

21  minimum mandatory, and you're going to die in jail.  Now, that

22  -- the United States may insist on proceeding with that charge

23  going forward, and that may be the consequence.  That's up to

24  the United States Attorney's Office.

25          But your one hope of trying to convince someone that

30

1   perhaps some leniency in terms of somewhat lesser charge may be
2   -- still may mean some -- may mean prison, but some lesser
3   charge is going to rest with this gentleman and his office and
4   your behavior.  Am I communicating with you?
5            THE DEFENDANT:  Yes.  You won't have no problem with
6   me.
7            THE COURT:  I'm going to release you subject to the
8   standard conditions of release, which are that you not commit
9   any crimes while on release, federal, state or local; that you
10  appear for all future court appearances.  Those are the
11  standard conditions of release.
12           In addition to the standard conditions of release,
13  I'm going to impose the following special conditions:  First of
14  all, your release will be subject to supervision by the federal
15  pretrial services officer, and you're going to report as they
16  direct you to report.
17           Secondly, I'm going to order that you not possess any
18  firearms, weapons or dangerous devices.  I'm going to order
19  that -- and if you have those things available to you at your
20  ranch, you're going to have to make other arrangements for
21  them.
22           I'm going to order that you be confined to your
23  ranch, subject to electronic monitoring.  I'm not going to
24  release you until that monitoring system is in place.  That
25  means you're going to remain in jail here until -- until the

1   monitoring system is in place.  You'll only be permitted to

2   travel outside the ranch for purposes specifically authorized

3   by the pretrial services officer.

4           I'm going to order a search provision, which subjects

5   your person, your personal effects and any place where you may

6   be staying subject to a search by pretrial services to verify

7   compliance with these conditions.

8           I'm going to order that you have no contact with the

9   alleged victims here.  And the family members here, do you want

10  contact or not?  I know some of you are related, and I'll

11  respect your wishes on that regard.  Starting with you, sir.

12          MR. HALLAM:  I want no contact.

13          MS. HALLAM:  No contact.

14          THE COURT:  I'm going to have -- I'm going to order

15  that you not have any contact with the two victims in their --

16  in this case and their parents.  No contact, that means no

17  contact directly by telephone, no contact in person.  Obviously

18  you're not going to be able to have that contact anyway in

19  person, and no indirect contact.  And by "indirect contact," I

20  mean, for example, talking to one of your sons and having your

21  sons initiate that contact on your behalf.  Do you understand

22  what I'm saying?

23          THE DEFENDANT:  Yes, Your Honor.

24          THE COURT:  Anything -- any other conditions that

25  pretrial services would recommend in view of the direction I'm

1  going here?

2          THE PROBATION OFFICER:  Not at this time, Your Honor.

3          THE COURT:  Anything else?  Anything else from the

4  United States?

5          MR. O'KONEK:  No, Your Honor.

6          THE COURT:  I'm going to sign an order for your

7  release subject to these conditions.  On the last page of the

8  order is a detailed paragraph that spells out all of the

9  penalties that apply should you violate the conditions of

10  release.  They are very severe.  They call for the additional

11  -- possibility of additional jail time; though, really that's

12  probably academic because you're facing more than enough here.

13          But more importantly, if there's any hint of a

14  problem, that you'll be immediately remanded to custody, and --

15  and I've described for you what the likely outcome is if you're

16  found guilty later.  You might as well plan to spend the rest

17  of your life in a federal penitentiary if you're convicted.

18          Let me say this, and I -- I very much appreciate and

19  -- the concerns of your daughter, and I want you to communicate

20  to her that I would not order this if I didn't feel confident

21  that with the professionals in place, the electronic monitoring

22  in place, that your daughter is going to be relatively safe.  I

23  want you to say that Judge Miller said that to her.  Now, I

24  understand and appreciate that's not the same thing as being

25  locked up and that is not going to, from her standpoint maybe,

33

1    be sufficient or, ma'am, from your standpoint.  I don't want to

2    be not sensitive to your feelings.

3              But I -- these are difficult cases.  I have a

4    responsibility that I have to fulfill as well through my office

5    and (inaudible) the rights of everybody, and I have to balance

6    those and -- and make a difficult decision here.  But I'm

7    confident that with these procedures in place, that -- that

8    this will work, particularly with all the defendant has to lose

9    if there's a hint of a problem here.

10             MR. HALLAM:  We respect your decision.

11             THE COURT:  Okay.  If there's nothing further, court

12   is adjourned.

13             (Proceedings concluded at 2:45 p.m., the same day.)

14                       - - - - - - - - - -

15

16

17

18

19

20

21

22

23

24

25

<u>CERTIFICATE</u>

State of North Dakota  )

                            ) ss

County of Burleigh     )


       I, Sandra E. Ehrmantraut, do hereby certify that the foregoing and attached typewritten pages contain an accurate transcription, to the best of my ability, of said digital recording made at the time and place herein indicated.

       Dated:  August 11, 2017


                        <u>/s/ Sandra E. Ehrmantraut</u>