UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

<u>REDACTED</u>

United States of America,      )
                               )
               Plaintiff,      )
                               )
      vs.                      )      File No. 1:16-cr-179
                               )
Lonnie Dale Spotted Bear,      )
                               )
               Defendant.      )

<u>TRANSCRIPT OF JURY TRIAL</u>
<u>VOLUME I</u>
<u>Pages 1-204</u>

Taken at
United States Courthouse
Bismarck, North Dakota
September 12, 2017

BEFORE THE HONORABLE DANIEL L. HOVLAND
-- UNITED STATES DISTRICT COURT JUDGE --

<u>APPEARANCES</u>

MR. JONATHAN J. O'KONEK
U.S. Attorney's Office
220 E. Rosser Ave
P. O. Box 699
Bismarck, North Dakota 58502-0699

FOR THE UNITED STATES

- - - - - - - - -

MR. ROBERT V. BOLINSKE
Bolinske Law Firm
402 East Main, Suite 100
Bismarck, North Dakota 58501

FOR THE DEFENDANT

- - - - - - - - -

<u>GOVERNMENT WITNESSES</u>

<u>Page No.</u>

<u>Nxxxx Hxxxxxx Exxxx</u>
  Direct Examination by Mr. O'Konek                111
  Cross-Examination by Mr. Bolinske                131
  Redirect Examination by Mr. O'Konek             137
  Recross-Examination by Mr. Bolinske             139
  Examination by The Court                        140


<u>Ivetta Spotted Bear</u>
  Direct Examination by Mr. O'Konek                141
  Cross-Examination by Mr. Bolinske                159


<u>Sxxxxxx Hxxxxx</u>
  Direct Examination by Mr. O'Konek                175
  Cross-Examination by Mr. Bolinske                190


<u>Travis Hallam</u>
  Direct Examination by Mr. O'Konek                191

- - - - - - - - -

1          (The above-entitled matter came before the Court, The

2     Honorable Daniel L. Hovland, United States District Court

3     Judge, presiding, commencing at 9:00 a.m., Tuesday, September

4     12, 2017, in the United States Courthouse, Bismarck, North

5     Dakota.  The following proceedings were had and made of record

6     in open court with counsel and the defendant present, but out

7     of the presence of the jury panel.)

8               - - - - - - - - - - -

9          THE COURT:  Good morning.  We'll open the record in

09:02    10     the case of *United States of America versus Lonnie Dale Spotted*

11     *Bear*.  All counsel are here, along with the defendant.  We're

12     outside the presence of the jury, I guess, just to talk about a

13     few preliminary matters.

14          First of all, I did send proposed preliminary

09:03    15     instructions out to everybody last week, gave them an

16     opportunity to note any objections, exceptions, red flags.  The

17     government came back in an e-mail with a few minor grammatical

18     changes that were made.  I think Mr. Bolinske didn't have any

19     objections.  But I want to give everybody an opportunity to

09:03    20     voice any formal objections that they may now have after the

21     changes have been made.

22          MR. O'KONEK:  No objections, Your Honor.

23          MR. BOLINSKE:  No objection, Your Honor.

24          THE COURT:  All right.  Very well.  Thank you.  And

09:03    25     in terms of preliminaries and final instructions, I generally

1    track the Eighth Circuit pre-approved standard pattern

2    instructions.

3              In terms of jury selection, even though most federal

4    judges don't give attorneys an opportunity to take part in jury

09:04    5    selection, I have chosen to do so.  I'll give both of you in

6    the range of 15 to 20 minutes to ask questions.  All that I ask

7    is that you don't use that opportunity to try your case.  If

8    there's any -- or are there any questions that either of you

9    would prefer that I ask rather than yourself?

09:04    10             MR. O'KONEK:  None from the United States.

11             MR. BOLINSKE:  I guess, you know, when I've tried

12   cases like this, sensitive matters -- if we get into sensitive

13   matters, you know, cases of this type, if people want to go in

14   the back or however that works so as not to embarrass them, I

09:04    15   don't know how the Court handles that.

16             THE COURT:  I'll tell them -- I'll ask them specific

17   questions about involvement in criminal matters or victims of

18   sex abuse, child abuse.  I'll tell them they can respond

19   privately.  They usually do.  I usually end up going in the

09:05    20   back room with half a dozen prospective jurors.  But sometimes

21   they're willing to talk freely and openly and -- but I remind

22   them that they can always respond privately to any question,

23   but no -- nothing that you would prefer that I ask, Mr.

24   Bolinske?

09:05    25             MR. BOLINSKE:  Nothing, Your Honor.

1          THE COURT:  All right.  In terms of -- well, I'll be

2   asking the jury panel about witnesses, whether they're familiar

3   with any of them on the government's witness list.  But we have

4   these two forensic interviewers, and, Mr. O'Konek, tell me what

09:05   5   your intentions are in terms of calling them and --

6          MR. O'KONEK:  Your Honor, one of them will be called

7   to talk about why children report kind of in a delayed manner

8   and kind of talk about the effects of children of sexual abuse.

9          THE COURT:  The generalities.

09:05   10          MR. O'KONEK:  Generalities, so --

11          THE COURT:  Which the Eighth Circuit has recently

12   said is entirely appropriate.

13          MR. O'KONEK:  Right.  And so at least we'll call at

14   least one of them for that.

09:06   15          In terms of the forensic interviewers, that will only

16   be, as we kind of indicated in our trial brief, if the children

17   were to testify, be nonresponsive, say they don't remember, if

18   there would be a chance that the defense were to open the door

19   by saying that they were lying, if there were prior consistent

09:06   20   statements.

21          THE COURT:  Right.

22          MR. O'KONEK:  We don't intend on calling them unless

23   one of those situations fit, and if we do, we'll obviously

24   request a bench conference to talk about it.

09:06   25          THE COURT:  All right.  And you're not going to be

6

1    saying anything in opening statement about these people -- or

2    these forensic interviewers and what they did, said, so on,

3    heard.

4            MR. O'KONEK:  The only thing I was going to say is

5    that they did a forensic interviewer, not go into the --

6            THE COURT:  Okay.

7            MR. O'KONEK:  -- conduct or the substance of what

8    they were talking about.

9            THE COURT:  And who is the forensic interviewer

10   that's going to testify about general pattern of abuse and when

11   and why children don't report it and things of that sort?

12           MR. O'KONEK:  Christal Halseth.

13           THE COURT:  Okay.  And she's from where?

14           MR. O'KONEK:  She is from the Northern Plains Child

15   Advocacy Center up in Minot.

16           THE COURT:  In terms of the witnesses, Mr. Bolinske,

17   are there any that you believe there's going to be some

18   evidentiary issues that I should be aware of?

19           MR. BOLINSKE:  No, Your Honor, I don't think so.

20           THE COURT:  I don't know anything about this case.

21           MR. BOLINSKE:  No, I don't.

22           THE COURT:  Okay.  Any other general evidentiary

23   issues that I should know about beforehand that you see coming

24   up throughout the trial?

25           MR. O'KONEK:  Your Honor, briefly, just a couple of

7

1    housekeeping items.  There was a stipulation for Indian country

2    and Indian status that we'll probably admit right after opening

3    statements, that the parties have agreed upon that.

4        When we filed our trial brief, we gave 414 notice of

5    -- one of the victims had disclosed additional acts of sexual

6    abuse.

7        THE COURT:  Right.

8        MR. O'KONEK:  And there's the intimidation portion

9    that we talked about where the defendant had -- it's up for, I

10   guess, the jury to decide whether he had intimidated his sister

11   and one of the other guardians of one of these children, so we

12   anticipate that that is going to come in.

13       The only other issue I think that I'd like to raise

14   is just, we've talked with our witnesses about not talking

15   about whether they believe somebody is guilty or not or

16   innocent or whether they believe the child is -- it happened to

17   the child, as well as not bringing in religious beliefs.  We'd

18   just request that if that were to come up, we could have a

19   bench conference or a limiting instruction, I guess, to the

20   jury should that come up.  We've instructed our witnesses that

21   that's not appropriate, but in these types of cases I've --

22   sometimes they say things to try to -- I don't know.  They do

23   it even if we tell them not to, so --

24       THE COURT:  He's a liar.  She's a liar.  He's telling

25   the truth.  She's telling the truth.  Yeah, if it comes up, I

8

1   will give the jury an instruction right away about disregarding
2   that.
3        MR. O'KONEK:  That -- those are the only things from
4   the United States, Your Honor.
09:09
5        THE COURT:  Mr. Bolinske, anything you can foresee?
6        MR. BOLINSKE:  Nothing relating to that.  Maybe this
7   is not the time for this, but I would request witness
8   sequestration.
9        MR. O'KONEK:  And we have -- all of our witnesses
09:09
10  are -- anybody testifying won't be in the courtroom.
11        THE COURT:  All right.  And my practice as a judge is
12  to let attorneys try their case.  I don't usually interfere too
13  much.  Whether I agree or disagree with how things are going,
14  I let people zealously represent their clients as they see fit.
09:09
15        In terms of the length of the case so that I can give
16  the jury some idea how long they can expect to be here to give
17  this case their full attention, what are both of your best
18  estimates?
19        MR. O'KONEK:  We -- I believe if everything goes
09:10
20  according to plan, we would call nine witnesses and that it
21  would -- three of them are probably only in the event of, you
22  know, prior consistent statement.  I think we'll be done by
23  Wednesday, beginning of the afternoon, if I had to guess.
24        MR. BOLINSKE:  And, Your Honor, I guess we've got
09:10
25  potentially three or four witnesses, and they won't take too

9

1    long.

2              THE COURT:  Okay.

3              MR. BOLINSKE:  If Mr. Spotted Bear testifies, it

4    might be a little longer, but, yeah, we can certainly get done

09:10   5    by Thursday.

6              THE COURT:  So you -- Mr. O'Konek, you said nine

7    witnesses.  You got 12 on the list.  Who's not going to be

8    testifying?

9              MR. O'KONEK:  It would depend -- it really depends on

09:10  10    what happens, but I think Shannon Hilfer may not testify

11    depending on what -- the forensic interview of Mxxxx; Special

12    Agent Bruce Bennett, depending on whether -- what comes out;

13    and also Cheyenne Hallam is a rebuttal witness essentially.

14              THE COURT:  All right.  Well, generally I'm able to

09:11  15    get a jury picked by the noon, and sometimes in these types of

16    cases it takes a little bit longer, but I'm hopeful that we can

17    start the afternoon with opening statements.  Both of you are

18    ready to go on that?

19              MR. O'KONEK:  Yes, Your Honor.

09:11  20              MR. BOLINSKE:  Yes, Your Honor.

21              THE COURT:  Any other matters you feel that we need

22    to talk about?

23              MR. O'KONEK:  No, Your Honor.

24              MR. BOLINSKE:  Are you going to play the videos?

09:11  25              MR. O'KONEK:  My intent is to call the children

10

1  first, and then should something come up, I'll request a

2  conference with the Judge to determine if at that point the

3  videos come in.  If the children testify consistently, I don't

4  intend to play the videos.  If something comes up where they

09:11

5  don't remember or they freeze, I'll talk -- I'll ask the Court

6  to do a bench conference.

7          THE COURT:  These are videos of the forensic

8  interviews?

9          MR. O'KONEK:  Right.  Yes, sir.

09:11

10          THE COURT:  And how old are these three kids today?

11          MR. O'KONEK:  Sxxxxxx just turned 13.  Nxxxx is 12.

12  And Mxxxx is 13.

13          THE COURT:  All right.  If there's nothing else,

14  we'll try to start promptly at 9:30.

09:12

15          MR. BOLINSKE:  One thing, I notice on the jury list

16  there's a Bolinske on there, and that's my first cousin.

17          THE COURT:  I haven't seen a jury list.

18          MR. BOLINSKE:  Yeah, so I -- you know, I don't know

19  how the Court does that, but just --

09:12

20          THE COURT:  Is that a relative?

21          MR. BOLINSKE:  It's my first cousin.  It's my dad's

22  brother's daughter --

23          THE COURT:  Oh.

24          MR. BOLINSKE:  -- from Minot, so just to point that

09:12

25  out.

11

1          THE COURT:  Okay.  I haven't seen a list.  So is the

2    panel mostly -- or from all over, Bismarck, Minot?

3          MR. O'KONEK:  It looks like Bismarck, Minot,

4    Williston.

09:12    5          THE COURT:  Okay.  All right.  We'll see everybody at

6    9:30.

7          (A recess was taken from 9:12 a.m. to 9:34 a.m., the

8    same day.)

9          (In open court with the defendant, counsel, and the

09:34    10   jury panel present.)

11         THE COURT:  Good morning.  I want to welcome all of

12   you to the federal district court here in Bismarck.  My name is

13   Dan Hovland.  I'm one of two federal judges in North Dakota.  I

14   live and work here in Bismarck and handle the federal cases

09:34    15   that are venued in central and western North Dakota.  Ralph

16   Erickson is my counterpart in Fargo, and he handles all the

17   criminal and civil cases in the eastern part of the state.

18         But I want to welcome you here.  We are very

19   appreciative of your being here.  I know you have all had to

09:35    20   take time out of your busy lives, but you are here to resolve a

21   dispute between the federal government and the defendant in a

22   criminal case.  The case is entitled *United States of America*

23   *versus Lonnie Dale Spotted Bear*.

24         And the first thing that I will do is have the

09:35    25   attorneys introduce themselves to you, along with those that

12

1   are seated with them at their counsel table.  We'll start with
2   the government, Mr. O'Konek.

3           MR. O'KONEK:  Good morning.  My name is Jonathan
4   O'Konek.  I'm an assistant United States attorney here in

09:35

5   Bismarck, so I'm a federal prosecutor.  Sitting to my right
6   here is Special Agent Bruce Bennett.  He's from the Minot
7   office of the Federal Bureau of Investigation.  Good morning.

8           THE COURT:  Mr. Bolinske.

9           MR. BOLINSKE:  Morning.  My name is Bob Bolinske.

09:35

10  I'm a lawyer in Bismarck, and my client is Lonnie Spotted Bear.

11          THE COURT:  Thank you.  At this time we're going to
12  proceed with jury selection.  I know that all of you have seen
13  a short videotape this morning that explains a little bit about
14  that process.

09:36

15          There are 28 of you that have been first selected for
16  questioning.  And I will be asking most of the questions this
17  morning, but I always give the attorneys an opportunity to ask
18  questions as well when I have finished with mine.  Ultimately
19  in a criminal case we'll end up selecting 12 trial jurors.  And

09:36

20  I will first be asking you a number of questions to find out
21  just a little bit more about your background and life
22  experiences.  Ultimately we're trying to select 12 fair and
23  impartial jurors in this case.

24          After I have finished with my questions, the

09:36

25  attorneys will have 15 to 20 minutes to question you, and then

13

they will use what are called peremptory challenges.  That's just a fancy legal term that means that's their opportunity to strike some of you to narrow down the pool to just 12 trial jurors.

09:37

If you are struck from that list, please don't take it personally.  There's no magic to this jury selection process.  The attorneys have to rely on their experiences as trial attorneys and their familiarity with the case to try to gauge whom they believe would be the most fair and impartial jurors in this particular type of case.

09:37

This is a criminal case.  Again, the name of the case is *United States of America versus Lonnie Dale Spotted Bear*. The defendant, Mr. Spotted Bear, has been charged in a document called an Indictment with four separate counts, and I'll read those to you.

09:37

Count 1 is aggravated sexual abuse of a child under 12 years of age.  Count 2 is aggravated sexual abuse of a child under 12 years of age; Count 3, attempted aggravated sexual abuse of a child under 12 years of age.  And Count 4 is abusive sexual contact of a child under 12 years of age.  Those are the four counts brought by the government against the defendant.

09:38

What you need to know is that the Indictment is simply the formal document that starts the wheels in motion in the criminal justice system.  The Indictment, which contains the charges, isn't -- it's not evidence.  It's not a document

09:38

14

1    that you're going to see in this case.  And the Indictment is

2    simply designed to put a defendant on notice of what he has

3    been charged with by the federal government.

4            What's important for you to know in a criminal case

09:38    5    is that the defendant under our Constitution is presumed to be

6    innocent.  The government has the burden of proof in a criminal

7    case.  The defendant in a criminal case doesn't have to prove

8    or disprove anything.  The burden of proof always rests with

9    the government.  The government is obligated to prove up the

09:39    10    essential elements of these crimes by calling witnesses and

11    presenting evidence.

12            Because the defendant is presumed to be innocent,

13    what that requires of you is to -- you need to set aside any

14    suspicions that you might have about this case simply because

09:39    15    Mr. Spotted Bear has been charged with these offenses and he's

16    sitting here in court to defend himself against these charges.

17    He's presumed to be innocent.

18            I will first be asking you a number of general

19    questions as the group, and my questions are really directed

09:39    20    at, first of all, the 28 of you.  And if your answer to any of

21    my questions is a yes, just raise your hand and I'll probably

22    follow up with some other questions.

23            But my first question to the 28 of you is whether any

24    of you know either of the attorneys or those that were

09:40    25    introduced to you that are seated with them at counsel table.

1    Anybody know these -- let me find my little cheat seat here.

2    And you are Danielle Bolinske, so you're likely a relative, I

3    assume.

4              MS. BOLINSKE:  Yep.

09:40    5              THE COURT:  Well, you're not going to survive this

6    jury selection process, so thank you.  I will excuse you at

7    this time, and you are free to leave.  You don't have to stick

8    around here at all.

9              If we could call a replacement.

09:40   10              THE CLERK:  Would Clarence Laub replace Ms. Bolinske,

11    please?

12              THE COURT:  Are there anyone else -- is there anyone

13    else of the 28 you that knows either of the attorneys or the

14    others that have been pointed out to you here?  The record

09:41   15    should indicate no response to that question.

16              Any of you know anything about this case?  Have you

17    ever heard anything about it, read about it, searched the

18    Internet about it?  And the alleged incidents occurred up in

19    the New Town area, is that correct?

09:41   20              MR. O'KONEK:  Twin Buttes --

21              THE COURT:  Twin Buttes.

22              MR. O'KONEK:  -- North Dakota.

23              THE COURT:  Okay.  Let me read you a name of -- the

24    persons that have been identified as individuals likely to

09:41   25    testify at this trial, and if any of you know these people or

16

related to them, have any connection to them, please raise your

hand.  Christal Halseth with the Northern Plains Children's

Advocacy Center in Minot and a Shannon Hilfer with Dakota

Children's Advocacy Center in Bismarck, any of you know these

individuals?  The record should indicate no response to that

question.

A Travis Hallam, Crystal Hallam, both from New Town;

Ivetta Spotted Bear from Halliday, Meranda Sanderson from

Bismarck, Brad Sanderson from Bismarck, anybody know those

individuals?

MR. NYBERG:  Which Sanderson?

THE COURT:  It's Meranda Sanderson and Brad

Sanderson, both currently from Bismarck, I believe.  The record

should indicate nobody has indicated that they know those

individuals.

And then there's a Cheyenne Hallam from Fargo, North

Dakota.  The record should indicate no response to that

question.

And then the names -- full names of the children

involved are what?

MR. O'KONEK:  Sxxxxxx Hxxxxx, who is approximately --

she just turned 13.  And then there is Nxxxx Hxxxxxx Exxxx, who

is 12, and Mxxxx Sxxxxxxxx, who is 12.

THE COURT:  Anyone recognize those individuals, know

them, related to them?  The record should indicate no response

17

1    to that question.

2            Have any of you ever served as jurors before in any

3    type of a case in state court, federal court, North Dakota or

4    any place outside the state?  All right.  We'll start with the

5    jury box and in the back row, Ms. Brucker.

6            MS. BRUCKER:  Brucker.  I served in district court.

7            THE COURT:  State court?

8            MS. BRUCKER:  Yes.

9            THE COURT:  In Bismarck, or --

10           MS. BRUCKER:  Yes.

11           THE COURT:  And how long ago was that?

12           MS. BRUCKER:  Oh, probably a couple years ago.

13           THE COURT:  And what kind of a case was it?

14           MS. BRUCKER:  It was a drunk driving.

15           THE COURT:  And what did the jury ultimately decide

16   there?

17           MS. BRUCKER:  That the defendant was guilty.

18           THE COURT:  Okay.  Thank you.  Anyone else in the

19   back row there that's served on a jury before?

20           MR. LARSON:  In county court.

21           THE COURT:  And you're Mr. Larson?

22           MR. LARSON:  Yes.

23           THE COURT:  County court in Bismarck, or --

24           MR. LARSON:  Minot.

25           THE COURT:  Okay.

1          MR. LARSON:  Or Ward County.

2          THE COURT:  How long ago?

3          MR. LARSON:  Twenty years.

4          THE COURT:  And what kind of a case was it, if you

09:44   5   can --

6          MR. LARSON:  It was a train hit a truck.

7          THE COURT:  And what did the jury ultimately decide?

8   Was it a civil case where you had to decide liability and

9   damages and --

09:44   10         MR. LARSON:  Some damages, yes.

11         THE COURT:  Okay.  Do you remember what the jury

12   decided in the case?

13         MR. LARSON:  It's been a long time ago.

14         THE COURT:  All right.  And how did you find the

09:44   15   experience to be?  Was it a good one, a bad one, or somewhere

16   in between?

17         MR. LARSON:  No, it was a good experience.

18         THE COURT:  Okay.  Thank you.  And Ms. Pouliot is it?

19         MS. POULIOT:  Yep.

09:44   20         THE COURT:  All right.

21         MS. POULIOT:  I've been on a jury twice in Mercer

22   County.  The first one was a license was suspended, and we

23   found the defendant not guilty.  The second one was a drunk

24   driving case, and in that case we also found the defendant not

09:45   25   guilty.

19

1          THE COURT:  Okay.  So those were probably short

2    trials?

3          MS. POULIOT:  They were one day.

4          THE COURT:  Sure.  And how did you find the

09:45  5    experience to be?

6          MS. POULIOT:  It was very interesting.

7          THE COURT:  All right.  Thank you.  And we'll go to

8    the front row of the jury box.  Mr. Johnson is it?

9          MR. JOHNSON:  I served two times.  The first time I

09:45  10   was selected as a juror, but then they dismissed or they

11   settled the case.  That was a criminal case, a drug case.  The

12   second one was a traffic case that I served on.

13          THE COURT:  Okay.  Thank you.  How do you pronounce

14   your last name?

09:45  15          MS. ANKENBAUER:  Ankenbauer.

16          THE COURT:  Okay.

17          MS. ANKENBAUER:  I served on a county jury duty, and

18   it was a DUI case.  Found him guilty.

19          THE COURT:  What county was that in, and how long ago

09:46  20   was it?

21          MS. ANKENBAUER:  That was in McLean, and probably,

22   gosh, 18 years ago.

23          THE COURT:  All right.  Thank you.

24          MS. HANSON:  It was in 1980.  I'm not sure -- it was

09:46  25   in Bismarck, and I live in McLean County.  A lady was suing the

1  Mandan Mental Health and Retardation Center, and she didn't get

2  what she wanted.

3       THE COURT:  Okay.  So how long did that case last, a

4  couple days?

5       MS. HANSON:  Yeah.

6       THE COURT:  And was she a former resident of --

7       MS. HANSON:  A former client.

8       THE COURT:  Patient?

9       MS. HANSON:  Patient, yeah.

10      THE COURT:  All right.  Thank you.  Then we'll move

11  over to my left side of the courtroom in the front row there.

12  Is any -- any of you served on a jury before?  Mr. Velo -- or,

13  I'm sorry, Mr. Nyberg.

14      MR. NYBERG:  Yes.  I served on a jury in Williams

15  County.  It was a accounting firm that was suing his client

16  that wouldn't pay him.

17      THE COURT:  Okay.  What was the outcome of the case?

18      MR. NYBERG:  Actually, it was a -- it was a counter.

19  They sued back and forth, kind of both directions.  I can't

20  remember what they call it, but we found that he had to pay

21  him, and I think it was like in probably about '84 or '85.

22      THE COURT:  Okay.  Thank you.  Anyone else in the

23  front row on the left side there?  Mr. Peterson?  Oh, I'm

24  sorry.  Mr. Schaaf.

25      MR. SCHAAF:  Yep.  I served as a juror.  It was in

21

1   Morton County, and it was on a construction company doing

2   highway work, and they didn't have any signs on the highway,

3   and a man come over a hill pulling a trailer and collided with

4   an oil -- oiler on the highway.

09:48   5         THE COURT:  Okay.

6         MR. SCHAAF:  And --

7         THE COURT:  Somebody was injured.

8         MR. SCHAAF:  Yes.

9         THE COURT:  And the injured party was suing --

09:48   10         MR. SCHAAF:  Yep.

11         THE COURT:  -- other parties involved in the

12   collision.  Okay.  What was the outcome of that case?

13         MR. SCHAAF:  The man in charge of the construction

14   was -- pleaded guilty.

09:48   15         THE COURT:  Okay.  But did the jury award some -- or

16   was it a criminal case where there was -- or a civil case where

17   you were talking about --

18         MR. SCHAAF:  It was just a criminal case.

19         THE COURT:  Oh, okay.  All right.  Thank you.

09:48   20   Mr. Peterson?

21         MR. PETERSON:  Yes, from Minot, North Dakota.  I

22   served on the county court, Ward County, for a drug deal,

23   accused of doing drugs.  We found him not guilty.

24         THE COURT:  Okay.  How long ago was that?

09:49   25         MR. PETERSON:  About four years.

22

1          THE COURT:  Trial lasted a day or two?

2          MR. PETERSON:  A day, yep.

3          THE COURT:  All right.  Thank you.  And over on the

4     right side of the courtroom?  Mr. Meier, I guess.

5          MR. MEIER:  District court in Bismarck.  It was a bad

6     check charge.

7          THE COURT:  Okay.

8          MR. MEIER:  It lasted about three days, I think.

9          THE COURT:  Three days on a bad check charge?

10         MR. MEIER:  I wouldn't -- I wouldn't give in until

11    the end.

12         THE COURT:  Okay.  And the jury decided what?

13         MR. MEIER:  Not guilty.

14         THE COURT:  Okay.  So the check was good.

15         MR. MEIER:  According to them.

16         THE COURT:  Okay.  All right.  Thank you.  Anyone

17    else?  (No audible response.)

18         Let's talk a little bit about litigation, civil

19    litigation and criminal.  And some of you have served on civil

20    juries, and civil cases are also cases that are handled in both

21    state and federal court.  Civil cases usually involve disputes

22    over money.  It might be a breach of contract or a wrongful

23    termination from a job or a personal injury action arising out

24    of a motor vehicle accident, something of that sort.  It

25    usually involves disputes over money.

1        There's a different burden of proof in a civil case

2   as compared to a criminal case.  In a civil case the plaintiff

3   always has the burden, but it's a much lesser burden; whereas,

4   in a criminal case the plaintiff or the government has the

09:50   5   burden, but the burden is called proof beyond a reasonable

6   doubt.  It's a much higher burden of proof than what exists in

7   a civil case, so keep that in mind if you've served on a civil

8   jury before.  If you're selected as one of the 12 trial jurors

9   in this case, I'll be giving you specific instructions on what

09:51   10   the burden of proof is all about, but please keep that in mind

11   if you've served on a different type of a jury.

12        In terms of the civil lawsuits, among the 28 of you,

13   have any of you been involved in a civil lawsuit, whether a

14   plaintiff or a defendant or a witness in a civil case?  Anyone

09:51   15   fit that mold?  Mr. Nyberg again?

16        MR. NYBERG:  Yeah, I had to -- the company I worked

17   for sued another company that the -- the quality of their

18   inspecting equipment that we bought from them didn't meet the

19   standards, so I was involved in that.

09:51   20        THE COURT:  Did the case ultimately get resolved

21   short of a trial, or did it go to a trial?

22        MR. NYBERG:  No, it went to a trial.  It was about a

23   four-day trial in Minot.

24        THE COURT:  And you testified in the case?

09:52   25        MR. NYBERG:  Yes, I did.

24

1          THE COURT:  All right.  Anyone else had any

2     involvement in civil matters?  Mr. Nagel.

3          MR. NAGEL:  I was in an apartment complex.  I was

4     renting an apartment, and the water pipe burst in my apartment

09:52    5     due to me leaving the window open.  We went to court, and it

6     was a 50/50 joint settlement.

7          THE COURT:  Okay.  The case got settled or they

8     just --

9          MR. NAGEL:  Yeah, it was just for damages.

09:52   10          THE COURT:  Okay.  So you didn't have to pay

11     anything, or you had to pay 50 percent?

12          MR. NAGEL:  I had to pay 50 percent of it.

13          THE COURT:  Okay.  Thank you.  Anyone else been

14     involved in civil disputes of any sort?  The record should

09:52   15     indicate no response to that question.

16          Now I want to talk about criminal matters, and that's

17     a little more sensitive subject.  And I want all of you to know

18     at the very outset that if you would prefer to respond to

19     any -- any of my questions privately, you're free to do that.

09:53   20     I'm not here, nor are the attorneys here to embarrass anybody.

21     And we're not going to delve into everything that's gone on in

22     your life, but this is a criminal case, and I need to ask some

23     questions about criminal matters.

24          And my first question is -- and, again, if you want

09:53   25     to respond privately, just raise your hand.  We'll go back

25

1   behind these walls with an attorney and a court reporter, and

2   you can respond privately rather than in open court, but I'll

3   leave that to your discretion.

4          But my question is whether you or any members of your

5   immediate family -- by "immediate family" I mean spouses,

6   children, not distant cousins or relatives, but have you been

7   involved in any criminal matters over the course of your

8   lifetime, whether a defendant in a criminal case, whether a

9   witness in a criminal case, or a victim of a criminal offense?

10  Any of you fit that mold?  We'll start in the back row with

11  Mr. Nichols.

12         MR. NICHOLS:  Yeah, in California I was a witness for

13  a wrongful death suit for the company I worked with.

14         THE COURT:  Okay.  What kind of a case was it?

15         MR. NICHOLS:  Two gentlemen entered a manhole 27-foot

16  deep and both died from asphyxiation.

17         THE COURT:  And you were an eyewitness to that.

18         MR. NICHOLS:  Yes.

19         THE COURT:  Were there criminal charges that arose

20  out of that as well as civil?

21         MR. NICHOLS:  At first they tried to proceed that way

22  toward the company, but then they switched over to more of a --

23  to be a refunded amount.

24         THE COURT:  Okay.

25         MR. NICHOLS:  It did go to two separate trials.

26

1          THE COURT:  And did you testify in both of the

2   trials, or --

3          MR. NICHOLS:  Yes.

4          THE COURT:  Okay.  Just as a outsider, eyewitness?

09:55   5          MR. NICHOLS:  I worked for the company.  I did

6   witness the two gentlemen that were in there.

7          THE COURT:  All right.  Thank you.  Anyone else?

8   We'll move over to Ms. Pouliot.

9          MS. POULIOT:  My son -- well, it's still going -- was

09:55   10   a victim of simple assault.  He was at a party with someone and

11   he got punched.

12          THE COURT:  Oh, okay.

13          MS. POULIOT:  And so that case goes to trial on

14   November 2nd.

09:55   15          THE COURT:  Oh, in town here, or --

16          MS. POULIOT:  In Mercer County.

17          THE COURT:  Okay.

18          MS. POULIOT:  So that one hasn't been resolved yet,

19   whether or not it goes to trial, but it hasn't gone -- it

09:55   20   hasn't been settled yet.

21          THE COURT:  So have you appeared at any hearings or

22   -- of any sort in that case, or --

23          MS. POULIOT:  Well, I work at a place where I go to

24   court watch, so I -- I've been there, but the defendant hasn't

09:56   25   been at the court.  He's just going through the lawyer and

27

1    going through the court, so I haven't seen him at the court,

2    and I'm not involved in it at all except for my son.

3              THE COURT:  And you -- you work for what did you say,

4    court watch?

09:56   5         MS. POULIOT:  Well, I work for the Women's Action and

6    Resource Center, which is a domestic violence --

7              THE COURT:  Oh, okay.

8              MS. POULIOT:  -- simple assault center, and so we go

9    to court in cases --

09:56   10             THE COURT:  Sure.

11             MS. POULIOT:  Cases for domestic violence, so we go,

12   and so he could have appeared and I could have been there, but

13   he never did appear.

14             THE COURT:  And where is the entity that you work

09:56   15   for?  Where are they based out of?

16             MS. POULIOT:  Mercer County, Beulah.

17             THE COURT:  In Beulah.  Okay.  And your son is how

18   old?

19             MS. POULIOT:  Nineteen.

09:56   20             THE COURT:  Okay.  Do you think there's anything

21   about that incident or your work that would make it difficult

22   for you to serve as a trial juror in this case?

23             MS. POULIOT:  I don't think so.  I don't -- you know,

24   I'm a certified advocate, so I don't --

09:57   25             THE COURT:  Sure.

28

1          MS. POULIOT:  I don't think so, but, you know, that's

2     what I do.

3          THE COURT:  Okay.  Thank you.  Anyone else in the

4     jury box that's been involved in criminal justice system in any

09:57    5     capacity?  Mr. Johnson.

6          MR. JOHNSON:  I have represented the federal

7     government and financial institutions into federal court cases.

8     One was in Manhattan, and one was in Fargo, and those are

9     approximately 20, 25 years ago.

09:57   10          THE COURT:  Okay.  And in what capacity did you --

11          MR. JOHNSON:  I was presenting evidence in both cases

12     of -- the one in New York was a RICO action related to

13     fraudulent loans that were created, and I represented the

14     resolution trust corporation.

09:57   15          THE COURT:  Okay.

16          MR. JOHNSON:  The second time was a fraud claim

17     against a client in a bank case, and I just -- and I presented

18     the loan documents as evidence.

19          THE COURT:  Okay.  All right.  Thank you.

09:58   20          MS. HANSON:  Can I talk to you in private?

21          THE COURT:  You wish to respond privately?  All

22     right.  That's fine.  Let me take care of others that -- in

23     response to the question.  Is there anyone on the -- either

24     side of the front rows of the courtroom that's been involved in

09:58   25     the criminal justice system in any capacity?

29

1          MR. MUNDAHL:  I've been convicted as a defendant in a

2    DUI case and misdemeanor drug offenses.

3          THE COURT:  Okay.  In North Dakota?

4          MR. MUNDAHL:  In North Dakota, Bismarck here, yes.

09:58   5          THE COURT:  All right.  What was the last incident?

6          MR. MUNDAHL:  It would have been 2013 --

7          THE COURT:  Okay.

8          MR. MUNDAHL:  -- roughly.

9          THE COURT:  Where was that at?

09:58  10          MR. MUNDAHL:  Bismarck here.

11          THE COURT:  Okay.  Any of those prosecutions in

12    federal court?

13          MR. MUNDAHL:  No.

14          THE COURT:  All in state court.

09:58  15          MR. MUNDAHL:  State district court.

16          THE COURT:  Okay.  And do you feel with that life

17    experience, that it would make it hard for you to serve as a

18    juror in this case?

19          MR. MUNDAHL:  Not necessarily, no.

09:59  20          THE COURT:  All right.  I guess my follow-up question

21    to that is whether you -- is there any animosity, bad feelings

22    of any sort that you may have against law enforcement officers

23    or prosecutors that might carry over into this case?

24          MR. MUNDAHL:  No.

09:59  25          THE COURT:  All right.  Thank you.  And Mr. Nagel.

30

1              MR. NAGEL:  I testify in district court through my

2    work as probation officer for North Dakota.

3              THE COURT:  And who are you employed by?

4              MR. NAGEL:  The Department of Corrections.

09:59    5         THE COURT:  Okay.  As a state --

6              MR. NAGEL:  State probation officer.

7              THE COURT:  So you get involved in revocation

8    hearings and things of that sort.

9              MR. NAGEL:  Correct.

09:59   10         THE COURT:  How long have you worked in that

11   position?

12              MR. NAGEL:  2008, nine years.

13              THE COURT:  So you probably know most of the federal

14   probation officers in Bismarck, I would assume?

10:00   15         MR. NAGEL:  I do.  We have a golf tournament this

16   weekend.

17              THE COURT:  All right.  So do you feel that if you

18   were selected as a trial juror, that it would make it difficult

19   for you to serve in that capacity, or --

10:00   20         MR. NAGEL:  I don't see why I couldn't be impartial.

21              THE COURT:  All right.  Your job requires that you be

22   fair and impartial and --

23              MR. NAGEL:  Correct.

24              THE COURT:  All right.  Thank you.  Anyone else?  (No

10:00   25   audible response.)

31

1      Before I take Ms. Hanson back, let me follow up with

2   a related question to the criminal -- subject of criminal

3   matters.  And my question is whether you, the 28 of you, or any

4   members of your immediate family have ever been involved in a

10:00   5   situation where maybe it didn't result in a criminal case, but

6   that you or a member of your immediate family was a victim of a

7   sex offense of any sort or somebody was accused of assaulting

8   someone in a sexual manner, whether it was adult or a child?

9   Anyone fit that scenario, been a victim of or in some way

10:01  10   involved in any sex offenses of any sort?  And, again, you can

11   respond privately if you wish to do so.

12      MS. YEARSLEY:  It was just my mom who was like

13   sexually assaulted like as a kid.

14      THE COURT:  Okay.  That's something that she told you

10:01  15   and --

16      MS. YEARSLEY:  Yep.

17      THE COURT:  And any criminal charges ever arise out

18   of that?

19      MS. YEARSLEY:  I don't think so, no.

10:02  20      THE COURT:  All right.  Were there any specifics

21   about whether it was a friend or a family member or a relative?

22      MS. YEARSLEY:  It was a friend of hers, yeah.

23      THE COURT:  Okay.

24      MS. YEARSLEY:  She was -- I think she was at a party

10:02  25   or like at a friend's house, and then it happened there, yeah.

32

1          THE COURT:  All right.  Do you feel that that would

2   put you in a difficult position if you were selected as a trial

3   juror in this case with the allegations that are made?

4          MS. YEARSLEY:  I don't think so, no.

5          THE COURT:  All right.  You feel that you could be

6   fair and impartial and listen to the evidence objectively

7   and --

8          MS. YEARSLEY:  Yep.

9          THE COURT:  All right.  Fair enough.  Anyone else

10  that has -- Ms. Velo.

11         MS. VELO:  It was my daughter.

12         THE COURT:  Okay.

13         MS. VELO:  She was molested by my brother.

14         THE COURT:  And how long ago was that?

15         MS. VELO:  About 15 years ago.

16         THE COURT:  And she would have been approximately

17  what age?

18         MS. VELO:  I don't even remember.

19         THE COURT:  Okay.

20         MS. VELO:  She was young.

21         THE COURT:  Were there criminal charges that arose

22  out of that incident?

23         MS. VELO:  No.

24         THE COURT:  Was the matter reported to any law

25  enforcement?

33

1        MS. VELO:  Yes.

2        THE COURT:  Okay.  And was that in North Dakota?

3        MS. VELO:  Yes.

4        THE COURT:  And you've heard what the charges are in

5   this case, and these are just allegations that are made by the

6   government in the Indictment, but knowing the type of case that

7   this is, do you feel it would make it difficult for you to

8   serve as a trial juror if you were selected as such?

9        MS. VELO:  Very.

10        THE COURT:  All right.  I'm going to excuse you under

11   the circumstances.  And I appreciate your honesty, and so you

12   are free to leave, ma'am.  Thank you again.

13        THE CLERK:  Would Michael Friesz take that spot?

14        THE COURT:  Following up on my last set of questions,

15   I want to make sure that I've had an opportunity to identify

16   anybody that's been involved in the criminal justice system or

17   you or a member of your immediate family ever having been

18   involved in any incidents or allegations or charges or

19   accusations of a sex offense.  Anyone else that I might have

20   overlooked?  The record should indicate no further response to

21   that question.

22        Ms. Hanson, we'll take you back and give you an

23   opportunity to respond privately.  And while -- this won't take

24   but a few minutes.  You're free to stand and stretch if you

25   wish.  You don't have to remain seated.

34

1          (In Court chambers with counsel and the defendant

2     present, but out of the presence of the jury panel.)

3          THE COURT:  We are back in the jury room, outside the

4     presence of the rest of the jury panel, along with counsel --

5     both counsel and the defendant.  We're here with Juror

6     Number 75, Ms. Hanson, who wished to respond privately to my

7     question about involvement in the criminal justice system.

8     I'll just let you tell us what your involvement has been.  And

9     if the attorneys wish to ask you any questions, I'll give them

10    that chance to.

11         MS. HANSON:  Okay.  My granddaughter was sexually

12    abused while she was in daycare.  She was four years old at the

13    time.  She's five now, and so I think it was the State was

14    charging this child -- this boy that was, I think, like 15 for

15    the sexual abuse of her.  And it was a case that -- it was

16    McLean County, but it was tried here, and he was found not

17    guilty, which I did not agree with.

18         THE COURT:  So it was a juvenile matter in Burleigh

19    County, is where it was tried?

20         MS. HANSON:  Mm-hmm.

21         THE COURT:  Okay.  How long ago was that?

22         MS. HANSON:  It was like a year ago that it happened,

23    but it was just tried in May, May or June.

24         THE COURT:  It was tried to a judge then?

25         MS. HANSON:  Yeah, not a jury.

35

1          THE COURT:  It wasn't tried to a jury because it was
2    a juvenile matter.
3          MS. HANSON:  Yep.
4          THE COURT:  Okay.  So would that make it difficult
10:07   5    for you to sit as a trial juror in this type of a case with
6    these types of allegations being made by the government?
7          MS. HANSON:  Yeah, I think so.  The Judge said that
8    since she didn't know the dates that it happened, he couldn't
9    find him guilty, which I think a four-year-old is not going to
10:07   10   remember dates.
11         THE COURT:  Right, usually the critical -- dates are
12   not a critical point.
13         MS. HANSON:  I had a hard time with that, yeah.
14         THE COURT:  Well, I'm -- under the circumstances,
10:08   15   unless either counsel objects, I'm going to excuse you from
16   these proceedings, but I assume neither counsel has any
17   objection to that.
18         MR. O'KONEK:  No, Your Honor.
19         MR. BOLINSKE:  No, we don't.
10:08   20         THE COURT:  All right.  Well, thank you for your
21   honesty, and hopefully your daughter can -- granddaughter can
22   get help and --
23         MS. HANSON:  Yeah, I really had a hard time with
24   that.
10:08   25         THE COURT:  Are you from up in the Beulah area?

36

1          MS. HANSON:  Wilton.

2          THE COURT:  So you are excused.  If you -- I don't

3    know if you left anything in your chair, but --

4          MS. HANSON:  No.

10:08    5          THE COURT:  -- you're free to leave.  You don't have

6    to go back in the courtroom if you don't want to.

7          MS. HANSON:  Thank you.

8          THE COURT:  Thank you.

9          (In open court with the defendant, counsel, and the

10:09   10   jury panel present.)

11          THE COURT:  We'll continue in just a few moments.

12   I've got to get my clerk in here to call another juror.

13          THE CLERK:  Would Sara Gebhardt step forward to Ms.

14   Hanson's chair here?

10:10   15          THE COURT:  Ms. Gebhardt, you've been seated here

16   throughout the morning, correct?

17          MS. GEBHARDT:  Yep.

18          THE COURT:  Any questions that I've asked so far that

19   have raised any red flags in your mind about being involved in

10:10   20   this case?

21          MS. GEBHARDT:  No.

22          THE COURT:  Okay.  You don't know anything about the

23   case?

24          MS. GEBHARDT:  Nope.

10:10   25          THE COURT:  You didn't recognize -- can we get her a

37

1    microphone?  You didn't recognize any of the witnesses whose

2    names I read off?

3              MS. GEBHARDT:  No.

4              THE COURT:  All right.  And in terms of your life

10:11   5    experiences and involvement in the civil litigation or criminal

6    matters, do you have any such experiences?

7              MS. GEBHARDT:  None.

8              THE COURT:  All right.  Have any of the 28 of you or

9    members of your immediate family ever served as law enforcement

10:11  10    officers in any capacity, state or federal or local level?

11    Mr. Johnson?

12              MR. JOHNSON:  Yep.  My wife is the chief deputy for

13    Renville County Sheriff's Department.

14              THE COURT:  Okay.  And that's located in what

10:11  15    community?

16              MR. JOHNSON:  Mohall.

17              THE COURT:  All right.  How long has she been in that

18    position?

19              MR. JOHNSON:  Thirty years, I suppose, something like

10:11  20    that.

21              THE COURT:  Anything about that -- her involvement, I

22    should say, that would make it difficult for you to serve as a

23    juror in a criminal case, do you feel?

24              MR. JOHNSON:  No.

10:12  25              THE COURT:  All right.  Do you feel you could be fair

38

1   and impartial to both sides of this dispute?

2            MR. JOHNSON:  Yes.

3            THE COURT:  Thank you.

4            MS. KREIN:  My brother is a former Morton County

10:12   5   Sheriff.

6            THE COURT:  Okay.  When did he retire from that work?

7            MS. KREIN:  Pardon me?

8            THE COURT:  When did he retire from that work?

9            MS. KREIN:  He was not re-elected, and I think that

10:12   10   was two or three years ago.

11            THE COURT:  Okay.  Anything about that -- your

12   brother's involvement in the criminal justice system as a law

13   enforcement officer that would make it difficult for you to

14   serve as a juror here?

10:12   15            MS. KREIN:  No.

16            THE COURT:  All right.  Thank you.  Anyone else?

17   We'll move over to Mr. Ternes there.

18            MR. TERNES:  Yeah, I have a son-in-law who's a

19   probation officer -- federal probation officer in Denver,

10:13   20   Colorado.

21            THE COURT:  Okay.  How long has he been doing that

22   kind of work?

23            MR. TERNES:  About four years.

24            THE COURT:  Anything about that work that you feel

10:13   25   would put you in a difficult position if you're selected as a

39

1    trial juror?

2              MR. TERNES:  No.

3              THE COURT:  Very well.  Thank you.

4              MR. NAGEL:  Myself and my wife are both licensed

10:13    5    peace officers in North Dakota.

6              THE COURT:  Okay.  What does your wife do?

7              MR. NAGEL:  She's a probation officer as well.

8              THE COURT:  At the state level.

9              MR. NAGEL:  State level.

10:13   10              THE COURT:  Oh, okay.  Is that how you two of you

11   met, or --

12              MR. NAGEL:  Yeah.

13              THE COURT:  Okay.

14              MR. NAGEL:  She was my intern.

10:13   15              THE COURT:  All right.  But she works in Bismarck as

16   well?

17              MR. NAGEL:  She works in Mandan.

18              THE COURT:  Doing strictly supervision, or is she --

19              MR. NAGEL:  Strictly supervision, correct.

10:13   20              THE COURT:  All right.  Thank you.  Anyone else that

21   I might have missed?  Mr. Meier.

22              MR. MEIER:  Son-in-law is chief of police of Spring

23   Grove, Minnesota.

24              THE COURT:  Okay.  Where's Spring Grove, down by The

10:14   25   Cities, or --

40

1          MR. MEIER:  About as far south and far east as you

2    can get in Minnesota.

3          THE COURT:  Okay.

4          MR. MEIER:  And my nephew is a deputy in -- outside

5    of Minneapolis.

10:14

6          THE COURT:  All right.  Any of those connections to

7    law enforcement, do you feel they'd put you in a difficult

8    position if you're selected as a trial juror?

9          MR. MEIER:  No, sir.

10:14

10          THE COURT:  You could be fair to both sides?

11          MR. MEIER:  I can be fair to both sides.

12          THE COURT:  Very well.  Thank you.  Have any of the

13    28 of you ever been involved in any disputes of any sort with

14    any federal governmental agency?  It doesn't necessarily have

10:15

15    to be something that resulted in a lawsuit or even a formal

16    claim, but any disputes with any federal governmental agencies

17    that you or members of your immediate family have ever been

18    involved in, Department of Labor, Internal Revenue Service, any

19    other of the multitude of hundreds of federal agencies?  The

10:15

20    record should indicate no response to that question.

21          Do any of you know of or can you think of any reason

22    that simply the nature of the charges, the type of case that

23    this is would make it difficult for you to serve as a trial

24    juror?  And, again, these are four allegations of child sex

10:15

25    offenses, but is there anything about the charges that I read

41

1   to you that you feel would make it difficult for you to serve

2   as trial jurors?  The record should indicate no response to

3   that question.

4           Mr. Spotted Bear is a Native American, I believe --

10:16   5       THE DEFENDANT:  Yes.

6       THE COURT:  -- correct?  And do any of you feel that

7   you may be prejudiced for or against the defendant or for or

8   against the government because of the defendant's race as a

9   Native American?  To put it another way, have any of you had

10:16   10  any experiences in your life, good, bad or otherwise, that

11  leads you to believe that you could not be fair and impartial

12  to the defendant in this case because of his race?  The record

13  should indicate no response to that question.

14          Have any of you, the 28 of you, ever worked on --

10:16   15  worked at any of the reservations here in North Dakota or any

16  other reservations or been involved in some type of work or

17  have some personal connection to individuals that live on any

18  of the reservations here in North Dakota?  Ms. Pouliot.

19          MS. POULIOT:  Well, I worked at Job Service for

10:17   20  25 years, and I would go down to Standing Rock, and I would

21  also go to White Shield quite often to work with the students

22  and the schools and the individuals looking for work.

23          THE COURT:  Anything about that experience that you

24  feel might in some way taint your view of the evidence in this

10:17   25  case?

42

1              MS. POULIOT:  No.

2              THE COURT:  All right.  Thank you.  Anyone else whose

3    work or life experiences have put them on any of our

4    reservations to any great extent?  Mr. Baarstad is it?

10:18    5         MR. BAARSTAD:  Baarstad.

6              THE COURT:  Baarstad.  I'm sorry.

7              MR. BAARSTAD:  That's all right.  I'm a musician, and

8    I performed in New Town a few times.

9              THE COURT:  Okay.

10:18   10         MR. BAARSTAD:  So, I mean --

11             THE COURT:  Play in a band here locally?

12             MR. BAARSTAD:  Up in Minot, yep, a couple different

13   bands, so --

14             THE COURT:  What do you -- what do you play?

10:18   15         MR. BAARSTAD:  I am a drummer and a singer.

16             THE COURT:  Okay.  Anything about that experience

17   that you've had playing music in different venues on the

18   reservations that make -- would make it difficult for you?

19             MR. BAARSTAD:  No, I would say not.

10:18   20         THE COURT:  All right.  Thank you.  Mr. Nichols.

21             MR. NICHOLS:  Yes, I work in Parshall, North Dakota,

22   at the grain elevator on the reservation.

23             THE COURT:  How long have you been up in the Parshall

24   area working?

10:18   25         MR. NICHOLS:  Four years now.

                                   43

1          THE COURT:  Okay.  Anything about that work

2     experience that leads you to believe that it may be difficult

3     for you to serve as a trial juror?

4          MR. NICHOLS:  No.

10:19    5          THE COURT:  Thank you.  I got a few more on the left

6     side of the courtroom here.

7          MR. NYBERG:  We worked on the reservations a lot.

8     I'm in pipe inspection, so it's oil field.  We worked on

9     reservations a lot.  It was just both over in Montana and North

10:19   10    Dakota, but it was real difficult because they had a lot of

11    regulations we had to follow, but it just seemed like it was

12    real difficult work.

13         THE COURT:  Mm-hmm.  Anything about that that might

14    carry over into your --

10:19   15         MR. NYBERG:  I would hope not.

16         THE COURT:  -- assessment of the evidence in this

17    case?

18         MR. NYBERG:  I would hope not, but I'm not -- I'm not

19    sure.

10:19   20         THE COURT:  Well, all we're asking for is -- trying

21    to select 12 people that could be fair and impartial, that

22    would listen to the evidence in this case and make their

23    decision based solely on the evidence presented in this

24    courtroom, not on other outside experiences that they may have

10:20   25    had, good, bad or otherwise.  Do you feel you --

44

1          MR. NYBERG:  I would certainly try, yes.

2          THE COURT:  All right.  Thank you.

3          MR. CVANCARA:  I am the program administrator for

4  development disabilities, infant development, which covers from

10:20    5  the Four Bears, over McKenzie County, Williams and Divide.

6          THE COURT:  Okay.  You work for the State of North

7  Dakota then, or --

8          MR. CVANCARA:  Yep.

9          THE COURT:  Department of Human Services?

10:20    10          MR. CVANCARA:  Yep.

11          THE COURT:  Okay.  Based in Bismarck, but --

12          MR. CVANCARA:  Williston.

13          THE COURT:  Oh, okay.

14          MR. CVANCARA:  But we cover the three counties.

10:20    15          THE COURT:  Sure.

16          MR. CVANCARA:  And then I lived -- I grew up just

17  north of New Town, and I lived on -- right by Scenic 23 for two

18  or three years.

19          THE COURT:  Mm-hmm.  Anything about that experience

10:20    20  in your life that would somehow affect your ability to make

21  decisions in this case?

22          MR. CVANCARA:  No.

23          THE COURT:  All right.  Thank you.

24          MR. PETERSON:  Hi.  My name is Scott Peterson.  I

10:21    25  officiate high school basketball, boys and girls, and I also

45

1    coach at Our Redeemers, the girls program, so I've officiated

2    out in New Town, Parshall, White Shield, Mandaree, and I've

3    also -- my teams have also played Parshall, New Town.

4            THE COURT:  All right.  Anything about that life

5    experience --

6            MR. PETERSON:  No.

7            THE COURT:  -- that carries over into this case?

8            MR. PETERSON:  No.

9            THE COURT:  Thank you.  Anyone that I missed?

10   Mr. Laub is it?

11           MR. LAUB:  Yep.  I'm a former sales agronomist for

12   Wilbur-Ellis, and I live in Elgin, North Dakota, and we do a

13   lot of work there and with the -- in the Sioux Tribe down

14   there, so I had a lot of producers down there.  Be down there

15   frequently, you know, working with people and, you know,

16   working the fields and stuff.

17           THE COURT:  Okay.  Any -- any of that work experience

18   that would impact your ability to assess the evidence in this

19   case?

20           MR. LAUB:  No.

21           THE COURT:  Thank you.  The record should indicate no

22   further response to that question.

23           This case is expected to last approximately three

24   days.  We believe that we -- at least the attorneys and I

25   believe that we'll probably be done presenting the evidence by

46

1    the end of Wednesday, maybe Thursday morning.  Is that a fair

2    assessment, counsel?

3              MR. O'KONEK:  Yes, Your Honor.

4              MR. BOLINSKE:  That sounds about right.

10:22    5              THE COURT:  And I would guess, based on that, that

6    we'll -- you'd probably be listening to closing arguments and

7    begin your deliberations on this case sometime Thursday.  The

8    hours that I keep are, generally we'll start trials at

9    9 o'clock in the morning, and I'll try to conclude matters by

10:23   10    about 4:30.  I usually am able to keep pretty good control of

11    that.  We'll take about an hour break for lunch and a 15- to

12    20-minute break midafternoon and midmorning.

13              But knowing that and knowing how long this case is

14    likely to last -- and, of course, it could -- there's always

10:23   15    the possibility it could carry over into Friday.  But do any of

16    the 28 of you have any problems with that schedule, whether

17    they're work problems, family problems, medical issues, medical

18    appointments, weddings, trips, anything at all that you feel

19    would prevent you from being here for the next several days and

10:23   20    listening to the evidence and giving this case your full

21    attention?  If you've got a conflict, now is your opportunity

22    to tell me about it.  Mr. Johnson.

23              MR. JOHNSON:  My wife and I have a trip planned out

24    to Las Vegas, and we leave Thursday evening, and we come back

10:24   25    Sunday evening.

47

1          THE COURT:  Well, all you're going to do is spend a

2     lot of money, and --

3          MR. JOHNSON:  I know, for a concert.

4          THE COURT:  I can save you all of that.  Well, I

10:24   5     better excuse you under the circumstances, sir, because there's

6     never any clear guarantees about when cases are going to be

7     done, so you are excused.  Thank you.

8          THE CLERK:  Would Barbara Chase step forward and take

9     Mr. Johnson's chair?

10:25   10         THE COURT:  Ms. Chase, how are you today?

11         MS. CHASE:  I'm good.  Thank you.

12         THE COURT:  You've been here throughout the morning

13    and listened to all the questions that I've asked so far,

14    correct?

10:25   15         MS. CHASE:  Yes, sir.

16         THE COURT:  Know anything about this case?

17         MS. CHASE:  I do not.

18         THE COURT:  Do you know the attorneys, those seated

19    with them, or any of the witnesses whose names I previously

10:25   20    read off?

21         MS. CHASE:  No, sir.

22         THE COURT:  All right.  Any questions that I've asked

23    that have raised any concerns in your mind about serving as a

24    trial juror in this case if you're selected?

10:25   25         MS. CHASE:  I do have some concerns I'd like to talk

48

1    to you in private about.

2            THE COURT:  Okay.  That would be fine.  Let me --

3    before we do that, let me get back to my question to the 28

4    about whether anyone has any conflicts with this case and

10:26    5    giving it your full attention for the next three, possibly four

6    days.  Mr. Laub.

7            MR. LAUB:  I own and operate Midwest Metal Art, and I

8    do have a show in Dickinson this weekend, and setup starts on

9    Friday afternoon, so that would be the only thing if it would

10:26    10    go into Friday.

11            THE COURT:  What time does that start?

12            MR. LAUB:  I believe -- I'd have to look at the

13    schedule, but I believe setup would start up around 6 o'clock

14    in the evening.

10:26    15            THE COURT:  All right.  Thank you.  Anyone else

16    that's got conflicts with this trial?  (No audible response.)

17            Ms. Chase, we'll visit behind these walls with you,

18    and I'll let you respond privately to whatever question it was.

19            (In Court chambers with counsel and the defendant

10:27    20    present, but out of the presence of the jury panel.)

21            THE COURT:  We are here outside the presence of the

22    jury panel with both counsel and the defendant, here with Ms.

23    Chase, who's -- who asked to respond privately to one of my

24    questions previously presented, so I'll just let you tell us

10:28    25    what --

49

1          MS. CHASE:  Okay.  My son was charged with assaulting

2    a minor, and my ex-husband is currently incarcerated in

3    Gillette, Wyoming, for sexually assaulting his daughter.

4          THE COURT:  Your daughter?

5          MS. CHASE:  No, his daughter.

6          THE COURT:  Okay.

7          MS. CHASE:  I don't think that that would have any

8    impact on this case.  I believe that everybody deserves a fair

9    trial, but I'm not quite sure, so I kind of have mixed feelings

10   about it.

11         THE COURT:  Sure.  Tell me about your -- it's your

12   son, you said, that has been charged?

13         MS. CHASE:  Yeah, my oldest son.

14         THE COURT:  In what county?

15         MS. CHASE:  In Burleigh County.

16         THE COURT:  And how old is he?

17         MS. CHASE:  He's now 31.

18         THE COURT:  Okay.

19         MS. CHASE:  He was 17, and it was a minor, a

20   14-year-old girl, and he just happened to turn 18 and was

21   charged.

22         THE COURT:  Okay.  It took this long to charge it

23   out?

24         MS. CHASE:  No, it's been many years, so --

25         THE COURT:  The case has been resolved, or --

50

1          MS. CHASE:  Yes, it is resolved.

2          THE COURT:  So what was the outcome?

3          MS. CHASE:  He ended up doing a plea, and he has one

4    more year to register.

10:29   5          THE COURT:  As a sex offender?

6          MS. CHASE:  Yeah.

7          THE COURT:  But he didn't serve any time?

8          MS. CHASE:  No.

9          THE COURT:  Just on paper for two or three years.

10:29  10          MS. CHASE:  Correct.  Yep.

11          THE COURT:  Register for ten years, or --

12          MS. CHASE:  Yep, and he's got all his gun rights and

13    everything back now.

14          THE COURT:  Okay.  So he's off supervision now too

10:29  15    entirely?

16          MS. CHASE:  Completely.

17          THE COURT:  Yeah, and he lives in town here?

18          MS. CHASE:  He does.  He lives in Bismarck.

19          THE COURT:  Okay.

10:29  20          MS. CHASE:  He's trying to become a pastor.

21          THE COURT:  Okay.  Well, I'll -- you know, everybody

22    has got wrinkles in their past and life experiences --

23          MS. CHASE:  Right.

24          THE COURT:  -- that may taint their view about

10:29  25    things, but, you know, all that we're trying to find is people

51

1    that can listen to the evidence in this case and make a

2    decision based solely on that evidence.  Do you feel that you

3    could do that?

4              MS. CHASE:  I do.

5              THE COURT:  All right.  Mr. O'Konek, you may inquire

6    if you wish.

7              MR. O'KONEK:  No questions, Your Honor.

8              MR. BOLINSKE:  I just have a couple.  And I don't

9    mean to pry, but were you married to your husband at the time

10   that the allegations and the case was going on against him?

11             MS. CHASE:  No, sir.  I was divorced for 27 years.

12             MR. BOLINSKE:  Okay.  So --

13             MS. CHASE:  I do have contact with him and, you know,

14   maintained a relationship with him as far as a friendship.  His

15   kids are my -- I consider my step-kids.  They're amazing, and I

16   just -- I just believe that everybody deserves a fair trial, as

17   well as them, and as well as this gentleman, so --

18             MR. BOLINSKE:  Were you married to him at the time

19   the allegations occurred?

20             MS. CHASE:  Absolutely not.

21             MR. BOLINSKE:  So you were separated or divorced,

22   whatever?

23             MS. CHASE:  Been divorced 27 years.  These are very

24   recent charges.

25             MR. BOLINSKE:  Okay.  And, I mean, you just said it,

52

1   but everybody is entitled to a fair trial and listen to the

2   evidence, and that wouldn't taint you at all?

3           MS. CHASE:  Not at all.

4           MR. BOLINSKE:  Okay.  Thank you so much.

10:31   5           THE COURT:  Either counsel request a strike for cause

6   here?

7           MR. O'KONEK:  No, Your Honor.

8           MR. BOLINSKE:  No, Your Honor.

9           THE COURT:  All right.  Thank you for your honesty.

10:31   10           MS. CHASE:  You're welcome.

11           THE COURT:  You can go back in the same chair you

12   came from and we'll continue.

13           (In open court with the defendant, counsel, and the

14   jury present.)

10:32   15           THE COURT:  We're back on the record.  What I'm going

16   to do now is -- with the 28 of you that have been selected for

17   questioning is we're just going to go around the room, and I'm

18   simply asking that each of you just share a little bit of

19   background information about yourselves, such as where you

10:32   20   live, where you have grown up and attended school, what your

21   family consists of, what kind of work that you're currently

22   involved in, what your interests are outside of work.  If you

23   forget any of those areas, I'll probably follow up and ask some

24   questions.

10:32   25           And the attorneys always have an opportunity to ask

53

some questions of you, but the reason that we do that is that these attorneys know very little about you.  They have a copy of the juror information form that you filled out, but all that tells them is your name and address and how long you've lived in the state.  And it doesn't tell them a whole lot, so they need to try to intelligently use these peremptory challenges, so learning a little bit more about what your background is helps them to do that.

So nobody has to stand.  Nobody has to give a long summary of their life history, but we'll just go around the room.  We'll start with Mr. Nichols only because you're closest to the microphone, sir, if you could just tell us a little bit about yourself, and then we'll move on down the line.

MR. NICHOLS:  I'm from Minot, North Dakota.  I've been in northern -- or North Dakota for four years now.  I moved up from California.  Originally from there -- I'm from Alaska.  My dad was stationed in the Army, so we got deported from Chicago, all the way to Alaska, so spent most of my childhood days in Alaska and most of my adult years in California, working heavy construction.  Now I'm working in Parshall as a grain elevator attendant, so it's a big difference in work from what I was used to.

THE COURT:  And do you have a family, sir?

MR. NICHOLS:  Yes, I'm married.  I have six boys.

THE COURT:  Okay.  All -- some of them still school

54

1   age and --

2              MR. NICHOLS:  All adults.

3              THE COURT:  Okay.  And in terms of your interests

4   outside of work, what do they consist of?

10:34  5          MR. NICHOLS:  Arts and crafts, woodworking,

6   motorcycle riding, fishing, hunting.

7              THE COURT:  All right.  Thank you.  We'll move on

8   down the line.  Ms. Brucker.

9              MS. BRUCKER:  I grew up in Mandan, and then I was

10:34  10  married and moved to Bismarck for the last 25 years.  I have

11  two children, both college age.  And I enjoy walking with my

12  puppy and movies and hanging out with friends and family.

13             THE COURT:  And your children are boys, girls,

14  or both?

10:35  15         MS. BRUCKER:  A boy and a girl.

16             THE COURT:  Okay.  And both in college, correct?

17             MS. BRUCKER:  Yes.

18             THE COURT:  Thank you.

19             MR. BAARSTAD:  I'm Kyle Baarstad.  I -- I'm a school

10:35  20  teacher at Minot.  I teach science.  I've been doing it for

21  like 20 years.  And I had a question for you.  One of the

22  witness names kind of popped up in my head.  Was it a Christal

23  Halseth?

24             THE COURT:  Crystal Hallam, H-a-l-l-a-m.

10:35  25         MR. BAARSTAD:  Oh, you had me worried for a minute

55

1    because that's a different person then.

2         MR. O'KONEK:  There's also a Christal Halseth as

3    well.  There's two Crystals, Your Honor.

4         THE COURT:  Oh, I'm sorry.  Yeah, there's a Christal

10:35   5    Halseth.

6         MR. BAARSTAD:  Is she an eighth grade science teacher

7    at Ramstad?

8         MR. O'KONEK:  She is not.

9         THE COURT:  She's a child forensic interviewer with

10:36   10   the Northern Plains Children's --

11         MR. BAARSTAD:  I heard you say that, and I was a

12   little concerned.  I thought, well, I don't know that, but I do

13   -- there is another Crystal Halseth that is an eighth grade

14   science teacher in Minot.  I was a little concerned maybe I did

10:36   15   know who that was, but it might be kind of a common name, so I

16   guess I don't know that other person.

17         THE COURT:  Okay.

18         MR. BAARSTAD:  But anyway, back to myself, I'm

19   married.  I got three kids.  My oldest is 30, and my youngest

10:36   20   is -- how old is she now, 17?

21         THE COURT:  High school senior?

22         MR. BAARSTAD:  Well, she's a junior --

23         THE COURT:  Okay.

24         MR. BAARSTAD:  -- this year, but, yeah.  I don't know

10:36   25   what else.

56

1          THE COURT:  What are your interests outside of work?

2          MR. BAARSTAD:  Just as a musician.

3          THE COURT:  Okay.  Thank you.

4          MR. BAARSTAD:  I said it already.

10:36   5          MR. LARSON:  I'm Roger Larson from Minot, North

6    Dakota.  I'm an electrical contractor.  I'm married, have five

7    children.  I like the outdoors, hunting, fishing.  Hunting is

8    kind of -- it used to be, you know.  I like to travel, and

9    that's about it.

10:37   10         THE COURT:  And does your wife work outside of the

11   home, or --

12         MR. LARSON:  At the where?

13         THE COURT:  Does she work outside the home, and --

14         MR. LARSON:  Yeah, she's retired.  She was with the

10:37   15   school system --

16         THE COURT:  Okay.

17         MR. LARSON:  -- in Minot.

18         THE COURT:  Thank you.

19         MS. CHASE:  My name is Barbara Chase.  I'm originally

10:37   20   from Montana.  I lived in the Seattle-Tacoma area for 27 years.

21   I have been in North Dakota for two years.  I'm a restaurant

22   and bar owner.  I have two adult boys, 30 and 31, and that's

23   about it.

24         THE COURT:  Your outside interests consist of what?

10:37   25         MS. CHASE:  I like to fish and hunt.

57

1          THE COURT:  And where do you live now?

2          MS. CHASE:  I live in New Salem, North Dakota.

3          THE COURT:  Okay.  Thank you.

4          MS. LEBLANC:  I'm Jenny LeBlanc.  I live in Bismarck

5    and have all my life.  I work at Enable, and my husband is an

6    occupational therapist at Missouri Slope.  We have two dogs.

7    Those are our children.  I volunteer at an animal rescue, and I

8    also like doing crafts.

9          THE COURT:  So where did you -- you attended high

10   school in Bismarck?

11         MS. LEBLANC:  I did, yep.

12         THE COURT:  Pursue any further schooling beyond that?

13         MS. LEBLANC:  I went to BSC as well.

14         THE COURT:  Okay.  Thank you.

15         MS. POULIOT:  I grew up in North Dakota.  I've been

16   in the Beulah area for 19 years.  I'm married.  My husband

17   works for Dakota Gasification.  I have two kids, 19 and 20.

18   They're both college students.  I work at the Hazen Public

19   School as the alternative school supervisor.  And then I work

20   at the Women's Action Resource Center as a direct advocate and

21   a grant writer.  Outside of work I like to travel.  I have four

22   pets, so I'm active with them.  I'm very involved in the

23   community.

24         THE COURT:  How many students are there at the

25   alternative school?

58

1          MS. POULIOT:  I have seven right now.

2          THE COURT:  Okay.  Thank you.

3          MR. LILL:  I'm from up in the New Rockford country.

4    I'm a farmer, and I'm single, and I like to play golf and hunt.

10:39    5          THE COURT:  How long have you lived up in New

6    Rockford area?

7          MR. LILL:  Forever.

8          THE COURT:  Okay.  Did you go to school there too --

9          MR. LILL:  Yes.

10:39   10          THE COURT:  -- as a youngster?

11          MR. LILL:  Yes.

12          THE COURT:  All right.  Thank you, sir.

13          MS. KREIN:  Kathy Krein, originally from the

14    northwest part of the state, and I -- we live in Bismarck right

10:39   15    now.  Something I forgot to mention on that law enforcement, my

16    husband is a woodworking production manager at Roughrider

17    Industries out at the state penitentiary.

18          THE COURT:  Okay.

19          MS. KREIN:  And my nephew is a CO out there.

10:39   20          THE COURT:  All right.  How long has your husband

21    worked up at the state pen?

22          MS. KREIN:  Eleven years.

23          THE COURT:  All right.

24          MS. KREIN:  So now you know about my husband.  I have

10:40   25    two grown children, 23 and 20, and lots of animals.

1          THE COURT:  All right.  Thank you.

2          MR. JOHNSON:  I'm Brian Johnson.  I live in Mohall.

3    I farm, two kids.  One is a nurse, and one is at home still.

4    And the wife is a deputy for the Renville County Sheriff's

10:40    5    Department.

6          THE COURT:  Been a farmer all of your life?

7          MR. JOHNSON:  Yeah.

8          THE COURT:  What do you enjoy doing when you have

9    some free time?

10:40    10          MR. JOHNSON:  A little bit of hunting.

11          THE COURT:  Okay.  Thank you, sir.

12          MS. BALLARD:  My name is Alexia Ballard.  I live in

13    Bowman, North Dakota.  I'm a marketing manager for five John

14    Deere dealerships in the state of North Dakota and one in South

10:40    15    Dakota.  I'm not married.  I don't have children.  I do have a

16    large family.  I'm the oldest sibling of -- three younger than

17    me and then two steps that are younger than me.  I enjoy

18    camping, being outdoors and crafting.

19          THE COURT:  So did you grow up in Bowman?

10:41    20          MS. BALLARD:  I'm originally from Beach, North

21    Dakota.  My parents divorced when I was 12.  I lived in Montana

22    and Idaho and then moved back to Bowman my senior year and

23    graduated from Bowman.

24          THE COURT:  Did you go on and pursue further

10:41    25    schooling?

60

1          MS. BALLARD:  Yep, I actually went to hair school up

2     here in Bismarck, at Paul Mitchell School, did hair for a while

3     here in Bismarck, and moved back to Bowman when I was 21.

4          THE COURT:  All right.  Thank you.

10:41    5          MR. JOHNSON:  I'm Ross Johnson.  I reside in Minot.

6     I've had about a 30-year career in the financial services

7     industry.  I'm single.  I have a college-age daughter.  And I

8     guess my other background or passion is, I also operate a

9     family farm.

10:41   10          THE COURT:  All right.  Thank you.

11          MS. ANKENBAUER:  I'm Brenda Ankenbauer.  I'm from

12     Washburn, North Dakota, and I've been happily married for

13     38 years.  I'm retired.  I used to work at a credit union for

14     quite a few years.  And I have three beautiful daughters and

10:42   15     grandchildren.  And my pastimes are enjoying my grandchildren.

16          THE COURT:  Do they -- your daughters all live in

17     the --

18          MS. ANKENBAUER:  They all live in Bismarck.

19          THE COURT:  Okay.

10:42   20          MS. ANKENBAUER:  Yep.

21          THE COURT:  All right.  Thank you.

22          MS. GEBHARDT:  My name is Sara Gebhardt.  I am

23     originally from Devils Lake.  I went to college in Grand Forks

24     for nursing.  I moved here after that.  I've been here 16

10:42   25     years.  I am currently a nursing instructor at the University

1   of Mary.  I -- my husband works for the DOT.  He's a mechanic.

2   We have two boys, 14 and 11.  Outside interests basically

3   revolve around chasing their sports.

4        THE COURT:  Right.  Okay.  Thank you.  We'll move

10:43   5   over to the back corner over there.

6        MR. FRIESZ:  I'm Michael Friesz, and I'm married

7   31 years, and I have three children, 14, 18 and 21.  I've -- I

8   live in Mandan.  I did move to California for 15 years, moved

9   back in 2001.  And I enjoy hunting, fishing.  Ice fishing is my

10:43   10   favorite, and camping.

11        THE COURT:  What kind of work are you involved in,

12   sir?

13        MR. FRIESZ:  I'm a welder at Bobcat.

14        THE COURT:  All right.  And does your wife work

10:43   15   outside the home?

16        MR. FRIESZ:  She works at Aetna.

17        THE COURT:  All right.  Thank you.

18        MR. TERNES:  Hi.  My name is Jerry Ternes.  Jerel is

19   my formal name.  I just recently retired from Specialties

10:44   20   Construction Company.  I was president of the company for

21   15 years.  I have two children, a son who's out in San Diego,

22   California, a daughter down in Denver.  I enjoy golfing,

23   exercise, jogging, things like that.

24        THE COURT:  And where do you live now?

10:44   25        MR. TERNES:  I live in Bismarck.  I grew up in

62

1   Linton, North Dakota.

2          THE COURT:  Okay.  Thank you.

3          MR. PETERSON:  Hi.  My name is Scott Peterson.  I'm

4   from Minot, North Dakota.  I grew up on a family farm, third

5   generation, by Makoti.  I've been married for 25 years, got

6   three kids, 18, 16 and 6.  And I work at Minot State University

7   as a supervisor of operations, and I also coach high school

8   basketball.  I've been doing that for 17 years, and I've refed

9   for over 20 years, so -- and I enjoy doing that.  In my off

10  time I like to golf and play basketball.

11         THE COURT:  What school do you coach at?

12         MR. PETERSON:  At Our Redeemers.

13         THE COURT:  Okay.

14         MR. PETERSON:  And my wife, she works at Marketplace.

15  She's a produce supervisor.

16         THE COURT:  All right.  Thank you.

17         MR. SCHAAF:  I'm Joseph Schaaf.  I'm a foreman --

18  manufacturing foreman at Hebron Brick Company.  And my wife is

19  a nurse, LPN.  I have four kids, two boys, two girls -- two

20  boys and two girls, and --

21         THE COURT:  Are they all school age, or are they --

22         MR. SCHAAF:  They're -- my youngest one is 21.

23         THE COURT:  Okay.

24         MR. SCHAAF:  And my oldest boy is 30.  And I have a

25  daughter, 34, and a daughter, 36.  And both of my daughters are

63

1    LPNs also at the Glen Ullin Marian Manor.

2          THE COURT:  Okay.

3          MR. SCHAAF:  And I like fishing, and I'm a drummer in

4    a band.  I like music a lot.  And other than that --

10:46    5          THE COURT:  How long have you worked at Hebron Brick?

6          MR. SCHAAF:  Thirty-nine years, yep.

7          THE COURT:  Okay.  Thank you.

8          MR. CVANCARA:  Jaret Cvancara.  I grew up south of

9    Ross, between Ross and New Town.  I graduated at Minot State.

10:46    10   I got a social work degree.  I've worked for the State for 20

11   years with developmental disabilities and infant development.

12   I also ranch.  I'm married.  I have four -- I have one child

13   that passed away young, so five, but I got four kids living,

14   last one's a high school senior.

10:46    15         THE COURT:  Okay.

16         MR. CVANCARA:  And one in college and two kind of

17   still at home.

18         THE COURT:  So did you start with the State right out

19   of college?

10:47    20         MR. CVANCARA:  I went to New Town and worked for a

21   big rancher and farmer down there for a couple years, then for

22   fertilizer plant.

23         THE COURT:  Thank you, sir.

24         MS. BLINSKY:  I'm Barb Blinsky, and I grew up by

10:47    25   Beulah, Zap and graduated from there.  I went to the University

of Mary.  Worked for MDU for 30-some years.  I am retired now.

My husband also worked for MDU.  He's also retired.  We have

two boys, 25 and 23, engineers.  And I guess I golf and go to

the gym, do volunteer work at the churches, that type of thing.

10:48          THE COURT:  What positions did you hold at MDU?

MS. BLINSKY:  I was a senior systems analyst.  I was

a computer programmer analyst and project leader.

THE COURT:  And that was -- your undergraduate degree

was in --

10:48          MS. BLINSKY:  It was in computer science and

business.

THE COURT:  Okay.  Thank you.

MR. NYBERG:  My name is Greg Nyberg.  I grew up in a

little town called St. Thomas on the eastern part of the state.

10:48  Moved over to Williston in 1979 and worked in pipe inspection

ever since.  I've got -- I'm married, and have one daughter

that lives in Grand Forks.

THE COURT:  And what do you enjoy doing in your free

time, sir?

10:48          MR. NYBERG:  Shooting and golfing.

THE COURT:  All right.  Thank you.

MR. LAUB:  Clarence Laub.  I went to school in Grant

County High School in Elgin, went to college at Bismarck State.

Currently I farm and ranch and operate two businesses on my

10:49  own.  And my wife just graduated last year from Dickinson

65

1    State, is working at Dakota Community Bank in Elgin and is

2    pursuing her Master's degree.

3            THE COURT:  And your free-time activities are what?

4            MR. LAUB:  Hunting and working on different things I

10:49    5    have going on in my businesses, so --

6            THE COURT:  And cheering for the Minnesota Vikings?

7            MR. LAUB:  Nope.

8            THE COURT:  No?  I see.

9            MR. LAUB:  Nope, sure not.

10:49   10            THE COURT:  All right.  Thank you.

11            MR. MEIER:  I grew up in Tuttle, North Dakota.  I've

12    been in Bismarck most of my life.  I worked Bismarck Lumber for

13    35 years, three children; youngest, 30.  Hobbies, giving Vegas

14    my extra earnings and playing bingo.

10:49   15            THE COURT:  All right.  Thank you, sir.

16            MR. MUNDAHL:  Nathan Mundahl, 25 years old, born and

17    raised in Bismarck, BHS, BSC alumni.  Been working for about

18    eight years now as an automotive mechanic.  Single, no kids.

19            THE COURT:  Where do -- who do you work for in town?

10:50   20            MR. MUNDAHL:  Pro Tune Plus.

21            THE COURT:  Okay.

22            MR. MUNDAHL:  Private business.

23            THE COURT:  And your -- what you enjoy doing in your

24    free time is what?

10:50   25            MR. MUNDAHL:  A little bit of golf, working on cars,

66

1    just staying busy.

2            THE COURT:  What kind of car do you drive?

3            MR. MUNDAHL:  I've got a Chevrolet right now, a

4    Chevrolet Colorado pickup truck.

10:50   5            THE COURT:  Okay.  Thank you.

6            MR. STAHL:  My name is Chris Stahl.  I graduated from

7    Linton High School.  I've been a UPS employee for 14 years.  I

8    have four daughters, ages 12, 11, 10 and 8, that are my entire

9    world.  And in my spare time I enjoy going to all their

10:51  10    activities very much and golfing and camping and smoking meat

11    on my smoker.

12            THE COURT:  And where do you live?

13            MR. STAHL:  Bismarck.

14            THE COURT:  In Bismarck?

10:51  15            MR. STAHL:  Yes.

16            THE COURT:  Okay.  Thank you.

17            MR. NAGEL:  My name is Lee Nagel.  I also graduated

18    from Linton, North Dakota.  I graduated from University of

19    North Dakota.  I have been working with the State for 12 years.

10:51  20    In my free time -- I'm married, two children.  My daughter is

21    two-and-a-half, and my son is ten months.  In my free time we

22    enjoy camping, swimming, fishing, hunting.

23            THE COURT:  So are you doing all supervision, or do

24    you also do any writing of presentence reports and --

10:51  25            MR. NAGEL:  No, we don't do PSIs.

67

1          THE COURT:  Okay.  Thank you.

2          MR. DVORAK:  Yes, I'm James Dvorak.  I live in

3    Gladstone, North Dakota.  Born and raised in Dickinson,

4    graduated high school in Glendale, Arizona; two years, DSU.

10:52    5    Attended peace -- peace officer training in Devils Lake, North

6    Dakota.  Graduated.  Didn't pursue a career in law enforcement.

7    Right now I'm a part-time merchandise stocker at Menards in

8    Dickinson.  Previously I worked in transportation, security

9    companies.  I was a bar and grill owner in Gladstone, North

10:52    10   Dakota, for seven years.  Single, no kids.  Free time, I like

11   to spend time with my folks and brother who also live in

12   Gladstone, and attend church activities and bible studies,

13   out -- outdoors, yard work and stuff like that.

14         THE COURT:  Okay.  Thank you, sir.

10:52    15         MS. YEARSLEY:  My name is Emily Yearsley.  I'm 21.

16   I've lived in Bismarck for eight years, but before that I grew

17   up in St. George, Utah.  And we moved a lot kind of, so I lived

18   in Arco, Idaho, for a while and then Las Vegas, Nevada, and

19   then so here's -- Bismarck is the longest I've lived somewhere.

10:53    20   I have five brothers and one sister.  My dad is a doctor.

21         THE COURT:  In Bismarck?

22         MS. YEARSLEY:  Yep.

23         THE COURT:  What's his specialty?

24         MS. YEARSLEY:  He's a plastic surgeon.

10:53    25         THE COURT:  Okay.

68

1          MS. YEARSLEY:  Yep.  And then my mom, she's my

2     step-mom.  My mom lives in Utah, and then my step-mom lives

3     here with my dad.  I have my own apartment.  I live by myself,

4     and then I work at Best Buy in the warehouse.  And then in my

10:53   5     spare time I'm -- I draw, I paint sometimes, and I'm a comic

6     collector, so --

7          THE COURT:  A comic collector?

8          MS. YEARSLEY:  Yep, I collect comics and figures and

9     stuff.

10:54   10          THE COURT:  Interesting.

11          MS. YEARSLEY:  I don't know.  I'm an outdoorsy

12     person, so --

13          THE COURT:  All right.  Thank you.  That completes

14     all of my questioning.  At this time I'm going to turn it over

10:54   15     to the attorneys, and I'll give them a brief opportunity to ask

16     some questions if they wish.  We'll start with Mr. O'Konek.

17          MR. O'KONEK:  Thank you, Your Honor.  Since you've

18     all shared a little bit about yourselves -- I appreciate that

19     -- I'll share a little bit just briefly about me.  My name is

10:54   20     Jonathan O'Konek.  I'm an assistant United States attorney here

21     in Bismarck.  I primarily cover the Fort Berthold Indian

22     Reservation for the major crimes, usually violent crimes and

23     sexual abuse cases.

24          Before I was in this job, I was a captain in the

10:55   25     United States Army for six years.  I was a lawyer in the Army.

69

1   I've been stationed all over the place, Alaska, Afghanistan,

2   Texas.  I'm married.  My wife is -- works down in Standing Rock

3   as a tribal prosecutor.  And I have an eight-month-old

4   daughter, who is a handful and takes up most of my time when

10:55   5   I'm not at work.

6        My biggest -- my biggest interests are, I'm a huge

7   Milwaukee Brewers fan, a Green Bay Packers fan, so please don't

8   hold that against me because I'm sure a lot of people here are

9   Twins fans or Vikings fans.

10:55   10        So I just have a couple of brief questions.  I ask

11   that if you have any positive responses, just raise your hand.

12   So as Judge Hovland will explain to you later in this trial,

13   the way our system is set up is that the Judge interprets the

14   law of the case and the jury -- you, as the jury, interpret the

10:55   15   facts.  And throughout the trial the Judge is going to give you

16   instructions as to what the law is and what law you are to

17   apply to the facts.  Mr. Nichols, if I may pick on you briefly.

18        MR. NICHOLS:  Yes.

19        MR. O'KONEK:  Sir, if you're selected as a juror in

10:56   20   this case, do you understand that you're going to decide the

21   facts, but not the law?

22        MR. NICHOLS:  Yes.

23        MR. O'KONEK:  And in other words, if you're sworn in

24   as a juror, it's going to be your obligation to accept the law

10:56   25   as the Judge tells you that it is.  Would you be willing to do

1   that?

2          MR. NICHOLS:  Yes, I will.

3          MR. O'KONEK:  Even if you didn't agree with the law?

4          MR. NICHOLS:  Yes.

10:56   5          MR. O'KONEK:  Thank you.  Is there anyone here who

6   would not accept the law as it was given to you by Judge

7   Hovland?  And that's a negative response from all members.

8          I work for a law enforcement agency, the U.S.

9   Attorney's Office, so some of my questions that are going to

10:56   10   come up are about your potential interactions with those

11   agencies.  Has anybody had a negative experience -- a

12   particularly negative experience with any law enforcement

13   officials or officers that we haven't already discussed here

14   today?

10:57   15          Okay.  Any bad experiences with the federal

16   government?  Is there anybody here that has had any bad

17   experiences with the federal government, whether it was civil,

18   criminal, anything of those natures?  Negative response from

19   all members.

10:57   20          In North Dakota you, as the jurors, decide the facts

21   of the case.  You are not to decide what the punishment is to

22   be imposed if there were a conviction.  That's going to be up

23   to the Court at a later date if the person were found guilty.

24   Now, would anyone here have a problem serving as a juror

10:57   25   knowing if the defendant were convicted, you would not have a

71

1    say in the sentence?  Negative response from all members.

2         In this case you're going to hear testimony about

3    instances of child sexual abuse.  Does anyone here think that

4    all sexual assaults are reported?  Anybody here think all of

10:58    5    them are reported?  Negative response from all members.

6         And can you please raise your hand if anyone here can

7    think of a reason why a child victim of sexual assault might

8    not report a crime?  Anybody can think of a reason why a child

9    victim -- all right.  I'll pick -- is that Ms. -- I'm going to

10:58   10    -- I apologize if I get your name wrong.  Is it Pouliot?

11             MS. POULIOT:  Pouliot.

12             MR. O'KONEK:  Pouliot.  Now, you rose your hand and

13    said that you could think potentially of a reason why a child

14    victim might not report a crime.  Could you just give one for

10:58   15    us?

16             MS. POULIOT:  Well, trying to protect somebody,

17    whether it's a family member or -- or they're afraid, they're

18    afraid of whatever they told them not to report.  You know,

19    they could have threatened them, or whatever.

10:58   20             MR. O'KONEK:  And do you think that that could impact

21    why they might not disclose?

22             MS. POULIOT:  Oh, absolutely.

23             MR. O'KONEK:  And I'm going to ask -- Mr. Lill is it?

24             MR. LILL:  Yes.

10:59   25             MR. O'KONEK:  Do you agree that that might be a

72

1   reason why a child victim of sexual abuse might not report?

2          MR. LILL:  Yes, I do.

3          MR. O'KONEK:  Now, does anyone here think that being

4   extremely young when sexual abuse happens to them, that that

5   might affect when a person discloses, that there are --

6   somebody is sexually abused when they're young, they disclose

7   later in life?  Does anybody feel that the age of when the

8   incident happened would affect the disclosure?  A positive

9   response.  I'm going to -- your name was, ma'am?

10         MS. BALLARD:  Alexia.

11         MR. O'KONEK:  Alexia Ballard?

12         MS. BALLARD:  Ballard, yes.

13         MR. O'KONEK:  And can you just say, why do you think

14  that that would impact them, when a child victim might

15  disclose?

16         MS. BALLARD:  Because when children are younger,

17  they're a lot more influenced to do as people tell them.  And

18  if someone has told them not to report it or to stay quiet,

19  they're a lot more likely to stay quiet than an adult, who

20  maybe has their own opinion.

21         MR. O'KONEK:  And is it possible that as a young

22  child, they may not understand what is actually happening to

23  them?

24         MS. BALLARD:  Absolutely.

25         MR. O'KONEK:  Thank you.  Does anybody -- does

73

1   anybody here believe it might be hard to disclose sexual abuse
2   if it was -- happened at the hands of a close relative?  Raise
3   your hands.  And, Ms. Gebhardt, I'm going to ask you that
4   question.  Why do you think it would be hard to disclose sexual
5   abuse if it was a close relative who was the perpetrator?
6           MS. GEBHARDT:  Because you're scared.  You don't want
7   to incriminate someone.
8           MR. O'KONEK:  And do you also agree -- I believe --
9   and I apologize, Ms. Pouliot, how she said it might be hard on
10  the family unit or it might be embarrassing?
11          MS. GEBHARDT:  I would agree.
12          MR. O'KONEK:  And my last set of questions, does
13  anyone here believe that a victim of sexual abuse must sustain
14  physical injuries before you can say that they're sexually
15  assaulted?  Does anybody believe that there has to be injuries
16  before a sexual assault occurs?  Negative response from all
17  members.
18          Does anybody ever believe that a victim of sexual
19  abuse -- a child sexual abuse ever deserves or is responsible
20  for what happens to them?  Negative response from all members.
21          Does anyone here believe that only strangers can
22  commit child sexual abuse?  Put another way, would anybody here
23  believe that it's only strangers who commit sexual abuse?
24  Negative response from all members.
25          And the last question I have, and I appreciate your

11:00
11:00
11:01
11:01
11:01

74

1    patience, is does anyone here have any moral objection or

2    religious objection to serving as a juror?  All right.  A

3    negative response from all members.  Thank you.

4        THE COURT:  Does the government pass for cause, Mr.

11:01  5    O'Konek?

6        MR. O'KONEK:  Yes, Your Honor.

7        THE COURT:  All right.  Mr. Bolinske, you may inquire

8    if you wish.

9        MR. BOLINSKE:  Okay.  I guess as earlier stated, my

11:02  10   name is Bob Bolinske.  I'm a lawyer in Bismarck.  I've been a

11   lawyer here about 17 years.  And even though I'm older, I've

12   got a one-year-old and a three-year-old.  So like Mr. Nagel

13   over there, I certainly understand.

14       And so, you know, I'm going to get right to the point

11:02  15   here.  Does anyone think that because Mr. Spotted Bear has been

16   charged with a crime or with crimes and we're in this fancy

17   courtroom and there's all these people here, that he must be

18   guilty?  Anybody, just show of hands, because of this big

19   process?  Does anyone think that?

11:02  20       Okay.  There were a number of connections to law

21   enforcement that people had.  And, Ms. Krein, is your brother

22   Dave Shipman?  Is that -- is that right?

23       MS. KREIN:  (Nodding.)

24       MR. BOLINSKE:  Okay.  I sort of assumed that.  And I

11:02  25   know Dave, and I'm, I guess, friends with Dave, but --

75

1          MS. KREIN:  Yes.

2          MR. BOLINSKE:  -- does that relationship or the

3     relationship with your family, with law enforcement officers,

4     would that make it hard for you to serve on a -- as a juror?

11:03     5          MS. KREIN:  No, it would not.

6          MR. BOLINSKE:  And would you tend to believe -- or do

7     you think you would tend to believe police officers or law

8     enforcement more than you would believe, you know, Mr. Spotted

9     Bear, me, normal people?

11:03    10          MS. KREIN:  No.

11          MR. BOLINSKE:  Okay.  Does anyone here -- okay.

12     Mr. Johnson, because your wife is an officer, a chief -- she's

13     a police chief?

14          MR. JOHNSON:  She's chief deputy.

11:03    15          MR. BOLINSKE:  Or chief deputy.  Would that be hard

16     for you, if your wife was in law enforcement, to go home and

17     explain to her if you found someone not guilty --

18          MR. JOHNSON:  No.

19          MR. BOLINSKE:  -- do you think?

10:11    20          MR. JOHNSON:  What's that?

21          MR. BOLINSKE:  Do you think it would be hard for you,

22     if you were to find someone not guilty, to go home to your

23     wife?  I mean, she tries to put people in jail or solve crimes.

24          MR. JOHNSON:  No.

11:03    25          MR. BOLINSKE:  And would you tend to believe, do you

76

1   think, officers over people like you and I or Mr. Spotted Bear

2   or other non-law enforcement witnesses, do you think?

3          MR. JOHNSON:  Can you repeat that again?

4          MR. BOLINSKE:  Do you think that you would believe

11:04   5   law enforcement officers or give them more credibility than you

6   would, say, Mr. Spotted Bear?

7          MR. JOHNSON:  No.

8          MR. BOLINSKE:  Does anyone have -- I sometimes get

9   the military people, and I love the military.  My wife is a

11:04   10   captain in the Army, but does anyone believe law enforcement or

11   think law enforcement personnel are more truthful or more

12   credible than normal people, as I refer to them?  Just show of

13   hands.  No one.

14          This is a strange one, and I usually get a lot of

11:04   15   interesting responses, but by show of hands, has anyone here

16   ever in their life been accused of something they didn't do?  I

17   mean, you know, we all sort of have.  Mr. Nichols, I'll start

18   with you.  You're over there.  Do you remember what it was that

19   you were accused of or -- or pick one that kind of, you know,

11:05   20   made you upset or affected you, or --

21          MR. NICHOLS:  Yes, my first wife accused me of having

22   an affair, and I moved on to my second wife.

23          MR. BOLINSKE:  That's not a fair question.  How did

24   that make you feel?

09:54   25          MR. NICHOLS:  At the time I was angry.

77

1           MR. BOLINSKE:  And was it true?

2           MR. NICHOLS:  No.

3           MR. BOLINSKE:  And, I mean, but you were probably

4    sort of convicted in her mind without even a trial or evidence

5    or just speculation or conjecture, right?

6           MR. NICHOLS:  Definitely.

7           MR. BOLINSKE:  And was the situation resolved, or

8    what?

9           MR. NICHOLS:  Oh, yeah, it was resolved.

10          MR. BOLINSKE:  That's not -- yeah.  All right.

11   Favorably or unfavorably or perspective?  What --

12          MR. NICHOLS:  I didn't come out ahead.  Put it that

13   way, so --

14          MR. BOLINSKE:  Okay.  And I'm not making light of

15   this at all, but that wasn't true and it affected you.  And she

16   just had, what, speculation or conjecture or assumptions, or --

17          MR. NICHOLS:  Yes.  Hearsay, probably.

18          MR. BOLINSKE:  Okay.  Thank you very much.  Well, why

19   don't I just continue a little bit.  You understand or agree

20   with me that the stakes here, not minimizing your life, but are

21   very, very high.  This is a criminal case, and the government

22   has the burden of proof, what's called beyond a reasonable

23   doubt.  And would you under these circumstances, these high

24   stakes, hold the government or think you would hold the

25   government to their burden of proof?

78

1          MR. NICHOLS:  I believe I could agree with that, yes.

2          MR. BOLINSKE:  Okay.  Anyone else I forgot, accused

3  of something they didn't do?  I'm sure it was a lot of people,

4  but show of hands.  Ms. Gebhardt, I see you're -- anything come

5  to mind that --

6          MS. GEBHARDT:  This is ridiculous, but last night my

7  son accused me of lying to him.

8          MR. BOLINSKE:  And did you?

9          MS. GEBHARDT:  He had his facts mixed up.

10          MR. BOLINSKE:  All right.  And so how did that make

11  you feel?

12          MS. GEBHARDT:  I was angry.

13          MR. BOLINSKE:  And could you sort of prove your way

14  out of it, or, you know, what -- what did you do?

15          MS. GEBHARDT:  I just explained to him the sequence

16  of events, and then he understood.

17          MR. BOLINSKE:  So he ultimately agreed that your

18  facts were more correct or correct?

19          MS. GEBHARDT:  Yes.

20          MR. BOLINSKE:  Okay.  Anyone else accused of, you

21  know, major things they didn't do?  I'm not saying crimes, just

22  things in life that come up.  I think I saw Ms. Ballard, did

23  you have your hand up?

24          MS. BALLARD:  Well, my siblings have accused me of a

25  lot of things, but when I was school, I was accused of bullying

79

1    a girl.

2              MR. BOLINSKE:  Okay.

3              MS. BALLARD:  And it was definitely not true.

4              MR. BOLINSKE:  And did something happen to you as a

5    result, or did you have to go talk to authority people?

6              MS. BALLARD:  I just had to talk to the principals

7    and --

8              MR. BOLINSKE:  And did they believe you at first?

9              MS. BALLARD:  Not at first.  Eventually they did.

10             MR. BOLINSKE:  And did you sort of have to go gather

11   evidence or say, "No, I didn't," "Yes, you did," you know?

12             MS. BALLARD:  Yeah, I had to -- other people who seen

13   that it wasn't me being the bully had to come forward, and,

14   yeah, had to --

15             MR. BOLINSKE:  Okay.  And was it resolved quickly,

16   just with a quick --

17             MS. BALLARD:  It was resolved quickly after they

18   talked to everyone, yeah.

19             MR. BOLINSKE:  Did you have to go gather up evidence,

20   or did you just give them your side of the story, and, you

21   know --

22             MS. BALLARD:  Well, I had to tell them, the people

23   that were there, to tell them my side of the story, that -- you

24   know, eyewitnesses I guess you could say.

25             MR. BOLINSKE:  Okay.  And, again, I know the answer,

80

1  but how did that make you feel being accused of that that you

2  didn't do?

3          MS. BALLARD:  Not good.

4          MR. BOLINSKE:  And you wished or was it your hope

11:08   5  that before you were accused of something, there should be a

6  thorough investigation?

7          MS. BALLARD:  Yes.

8          MR. BOLINSKE:  And that may have prevented what

9  happened to you.

11:08  10          MS. BALLARD:  Yes.

11          MR. BOLINSKE:  Okay.  Interview witnesses?

12          MS. BALLARD:  Sorry?

13          MR. O'KONEK:  They should have interviewed, you know,

14  witnesses --

11:08  15          MS. BALLARD:  Yes.

16          MR. BOLINSKE:  -- things like that.  Okay.  Thank

17  you.  Anyone else had their -- how about Mr. Johnson?  You ever

18  been accused of something you didn't do that sticks out?

19          MR. JOHNSON:  As a school age, yeah, you're accused

11:09  20  of cheating or something like that, which wasn't true.  Nothing

21  as an adult, I guess, that comes to mind.

22          MR. BOLINSKE:  Did you have to sort of like go to the

23  principal's office, or anything, or --

24          MR. JOHNSON:  Oh, yeah.  They round up five or six

11:09  25  kids, and the usual thing, and try to make -- crack one of

81

1    them, you know.

2              MR. BOLINSKE:  Were you exonerated, or what happened?

3              MR. JOHNSON:  Yeah, at the end of the day, but yeah.

4              MR. BOLINSKE:  Okay.  And how did that make you feel?

09:45    5     MR. JOHNSON:  Of course you don't like to be accused

6    of anything you didn't do and especially if it's material, at

7    least at that stage in your life.

8              MR. BOLINSKE:  Right.  And would you agree, and I

9    talked to Mr. Nichols about this, that the stakes are so high

11:09   10   here, this is a big deal, should be very thorough, get our

11   ducks in a row and make sure we get it right?

12             MR. JOHNSON:  Yeah, absolutely.  Yes.

13             MR. BOLINSKE:  Thank you, sir.  I'll just stay with

14   you.  You said you represented the federal government in some

11:09   15   sort of capacity in the New York state's --

16             MR. JOHNSON:  Yeah, I was -- through the savings and

17   loan crisis, the government came in and seized my employer,

18   which was a savings and loan, and then I stayed on there kind

19   of as a contract employee.  And part of that process was that

11:10   20   institution had acquired loans from various places in the

21   country, and one of those institutions they acquired loans from

22   was basically a front for a racketeering type organization, and

23   so I had to testify in Manhattan court.  I was escorted by the

24   FBI to be a witness.

11:10   25   MR. BOLINSKE:  So was that a criminal type thing?

82

1          MR. JOHNSON:  Yes, it was a RICO case.

2          MR. BOLINSKE:  Oh, sure.  Okay.  All right.  So I

3   guess I'll ask you, when you hear the phrase "proof beyond a

4   reasonable doubt" -- and the Court will define that, what that

5   is, what the law says it is.  What does that mean to you, or

6   what -- tell us what you think of proof beyond a reasonable

7   doubt.

8          MR. JOHNSON:  Oh, I believe we're a nation of laws.

9   We have the -- as citizens, we have the responsibility to try

10  to adhere to the laws and rules of our nation, and so I guess I

11  would start with that.  It's not up to us here to maybe

12  interpret those laws.  That's for the legislatures and the

13  higher courts to decide.

14         MR. BOLINSKE:  But I guess when you hear the phrase

15  "proof beyond a reasonable doubt," so if you have a doubt and

16  it's reasonable, say in this case or in any case, what do you

17  think your obligation is as a juror, to find the person guilty

18  or not guilty?

19         MR. JOHNSON:  I would say that you have to balance

20  the facts that -- to say that all the I's are dotted and T's

21  are crossed by both sides here, you're going to weigh in the

22  preponderance -- in my viewpoint, a preponderance of where the

23  evidence is.  Does every single box have to be checked by

24  either side?  I don't think so.

25         MR. BOLINSKE:  Okay.  And I think I'm gathering what

83

1  you're saying.  If the Judge instructs you of proof beyond a

2  reasonable doubt -- now, you just mentioned a preponderance.

3  That's the civil standard of proof in civil court, more likely

4  than not, greater than 50 percent.  If the Judge tells you that

11:11  5  proof beyond a reasonable doubt means that if you have a doubt

6  and it's reasonable, you must find the defendant not guilty --

7       MR. JOHNSON:  I will follow the Judge's instruction.

8       MR. BOLINSKE:  Okay.  And you touched on another

9  thing, weighing what the government presents and what I

11:12  10  present.  If the Judge instructs you that the defense, Lonnie

11  Spotted Bear and I, have no burden of proof, we don't have to

12  prove anything, that the burden rests with the United States

13  government, would you follow the Judge's instruction on that?

14       MR. JOHNSON:  Yes.

11:12  15       MR. BOLINSKE:  Do you think that -- and this isn't me

16  talking.  This is the law, but if the Judge tells you we don't

17  have to prove anything, would you require us to prove things?

18  It doesn't mean we're not going to, but --

19       MR. JOHNSON:  Other than to sit through a trial and

11:12  20  understand as the evidence is presented and each piece of

21  evidence would be presented, that -- I guess I view it as my

22  obligation to sit here and make a decision that I -- I feel is

23  the decision I have to make following the Judge's instructions.

24       MR. BOLINSKE:  Okay.  Would you want to know the

11:13  25  defendant did it or have a pretty good idea before you

84

1    convicted someone of a serious crime, do you think?

2            MR. JOHNSON:  I think that's the purpose of the court

3    proceedings --

4            MR. BOLINSKE:  Sure.

5            MR. JOHNSON:  -- is to present both sides.  That's

6    your job and their job.

7            MR. BOLINSKE:  Okay.  Thank you so much.  Mr.

8    Baarstad, same kind of line of questions.  I mean, what is

9    proof beyond a reasonable doubt?  You're a teacher.  Does that

10   -- what does that mean to you?

11           MR. BAARSTAD:  Well, to me that just means you got to

12   be -- you have to prove, you know, and there shouldn't be any

13   doubts in my mind, that there shouldn't be any -- I mean, if I

14   had a doubt, then -- you know, then that should be brought up

15   and -- you know, with 12 people, talked about, you know, as a

16   discussion.  You know, that's the way I look at it.

17           MR. BOLINSKE:  Okay.  And do you agree with me, if

18   the Judge instructs you that the law is -- and the law is that

19   the government has the burden of proof, that they got to prove

20   all this stuff?

21           MR. BAARSTAD:  Yeah.

22           MR. BOLINSKE:  Do you agree with that?

23           MR. BAARSTAD:  I get that, yeah.

24           MR. BOLINSKE:  And the U.S. Constitution says that

25   the defense doesn't have to prove anything.  It doesn't mean we

85

1    won't, but we don't have to.  That's the system that --

2              MR. BAARSTAD:  Right.  Yeah, I understand that.

3              MR. BOLINSKE:  Okay.  And would you -- if you went

4    back and you were a juror in this case and said, "Boy, I'm just

5    not sure; there's some bad stuff here that everybody is talking

6    about" -- and it is bad stuff.  These are bad crimes.  Our

7    position is it didn't happen, but if you went back and, boy,

8    I'm not quite sure here, how would you vote?  And I know you

9    haven't heard the evidence, but --

10             MR. BAARSTAD:  Right.  Well, if I -- you know, if you

11   have doubts, then that should be brought up, definitely.  I

12   would bring my doubts forward and then have everybody else

13   discuss that too.  You know, it should be a discussion we all

14   should have.

15             MR. BOLINSKE:  Okay.  And if you had a doubt and it

16   was reasonable, it wasn't some, well, that's pretty farfetched,

17   and the law was that you had to find someone guilty, proof

18   beyond a reasonable doubt --

19             MR. BAARSTAD:  I'm a very reasonable person.  I teach

20   science and --

21             MR. BOLINSKE:  Okay.

22             MR. BAARSTAD:  -- physics and chemistry, so --

23             MR. BOLINSKE:  Sure.  And that's more of a rigid

24   type --

25             MR. BAARSTAD:  Yeah, it is.  It is, but, I mean -- I

86

1   mean, that's my reason -- reasoning.

2          MR. BOLINSKE:  Sure.  Sure.  Okay.  So you would

3   want, okay, science, physics, things like that, proof, solid

4   proof.

5          MR. BAARSTAD:  Yeah.

6          MR. BOLINSKE:  Is that fair?

7          MR. BAARSTAD:  That would -- that's what I would want

8   before I would accept anything.

9          MR. BOLINSKE:  Okay.  Thank you very much.  I'll just

10  stay kind of in the same area.  I guess it's just easier.

11  Mr. Nichols, proof beyond a reasonable doubt, what's that sound

12  like?

13         MR. NICHOLS:  Well, you'd have to have almost a

14  hundred percent evidence that it was the facts that were there.

15         MR. BOLINSKE:  Okay.  Because we talked about the

16  stakes are really high here.  It's not Thanksgiving dinner.

17  It's not a family member accusing somebody, even though that's

18  high stakes, but it's a big deal here.  You want to get it

19  right.

20         MR. NICHOLS:  Definitely.  I'd want to hear all the

21  evidence on both sides.

22         MR. BOLINSKE:  Okay.  Thank you.  Does anyone

23  disagree with or have positions on -- that we need to kind of

24  explore what we've been talking about up here?  Anyone?  Show

25  of hands, anyone?  I guess I'd like to talk to Mr. Nagel for a

87

1    couple minutes, if that's okay, because he's in the system, so

2    to speak.  So you -- you've been a probation officer for how

3    long?

4              MR. NAGEL:  Adult probation officer for nine years.

11:16   5          MR. BOLINSKE:  Okay.  And, you know, I've done this a

6    long time too.  I hear all sorts of stories.  I'm sure you hear

7    all sorts of stories too.

8              MR. NAGEL:  Absolutely.

9              MR. BOLINSKE:  And it makes a person kind of cynical.

11:16   10   You just kind of never know what is going on.  Does that sound

11   right?  Well, you --

12             MR. NAGEL:  Not really.  I mean, I get both sides.  I

13   get -- I read the court stuff, and I also get the defendant's

14   version as well, so -- and a lot of times they -- they don't

11:17   15   admit, you know, and they claim their innocence, but they still

16   took the plea and they just did it because it was easier in

17   court, and I get that.

18             MR. BOLINSKE:  And what is proof beyond a reasonable

19   doubt?  What do you -- I mean, you deal with this, but what

11:17   20   does it mean to you?

21             MR. NAGEL:  Beyond a reasonable doubt is making me

22   believe that he actually 100 percent did it.

23             MR. BOLINSKE:  Okay.  And so it sounds to me like you

24   would make the government uphold their burden of proof.

11:17   25             MR. NAGEL:  Absolutely.

88

1          MR. BOLINSKE:  Try to be fair?

2          MR. NAGEL:  Yes.

3          MR. BOLINSKE:  And have you ever been accused of

4     something you didn't do that you can recall?

11:17     5          MR. NAGEL:  Yeah, small stuff when I was a kid.

6          MR. BOLINSKE:  Okay.  And how did that make you feel?

7          MR. NAGEL:  I didn't like it.

8          MR. BOLINSKE:  And you work, I guess, for the

9     government, right, as a -- it's not a private --

11:17     10          MR. NAGEL:  No, for the State of North Dakota.

11          MR. BOLINSKE:  State of North Dakota.  And if the

12     Judge instructs you and you're on this jury that you -- that

13     the government has the burden of proof, that they got to prove

14     all this stuff, would you hold them to that burden of proof?

11:17     15          MR. NAGEL:  Absolutely.

16          MR. BOLINSKE:  Do you think you could do that, and if

17     you had a doubt and it was reasonable, how would you vote?

18          MR. NAGEL:  Not guilty.

19          MR. BOLINSKE:  Okay.  Thank you very much.  I just

11:18     20     want to make sure that -- and I know the Judge asked this

21     several times.  It's a very sensitive type case, to be talking

22     about things that aren't fun to talk about, that aren't

23     pleasant to talk about, that are, in fact, terrible to talk

24     about.  Anyone, just second or third chance to raise your hand,

11:18     25     because of the subject matter don't think they should be, just

1    don't want to be here?  I won't ask you in public here, but

2    anybody?  Talking about alleged sexual abuse of five- to

3    six-year-old children, I just need to know to, you know, weed

4    out people that just can't handle the subject matter.

11:18    5    MS. ANKENBAUER:  I guess I have grandchildren.

6    MR. BOLINSKE:  Okay.

7    MS. ANKENBAUER:  And I'm very close to my

8    grandchildren, so --

9    MR. BOLINSKE:  Sure, and just even --

11:18    10    MS. ANKENBAUER:  And I --

11    MR. BOLINSKE:  Go ahead.  I'm sorry.

12    MS. ANKENBAUER:  Children in general.  I mean, I'm --

13    I'm a mom.  I'm a grandma.  I'm kind of sensitive to that

14    stuff, I guess.

11:19    15    MR. BOLINSKE:  Okay.  And is it something that you --

16    I mean, nobody wants to sit through it, but is it something you

17    think you could be fair and impartial?  Or tell me about that.

18    MS. ANKENBAUER:  Yes, I feel like I could be

19    impartial, but, you know, like I said, it's just -- it's a --

11:19    20    it's a little sore spot.

21    MR. BOLINSKE:  How old are your grandchildren, what

22    age rage?

23    MS. ANKENBAUER:  Six and three.

24    MR. BOLINSKE:  Okay.

11:19    25    MS. ANKENBAUER:  Two three-year-olds.

90

1          MR. BOLINSKE:  And if the age range is right in that

2    area, five- to six-year-old, things like that, is it a little

3    too close to home, do you think?

4          MS. ANKENBAUER:  That would be a little too close to

11:19   5    home for me.

6          MR. BOLINSKE:  And it probably wouldn't be something

7    you wanted to pass judgment on or think about or hear?

8          MS. ANKENBAUER:  That's right.  In all fairness to

9    Mr. Spotted Bear, yeah.

11:19   10          MR. BOLINSKE:  Okay.  Well, thank you so much for

11    your honesty.  Appreciate it.  I guess I'm through.

12          THE COURT:  Does defense pass for cause?

13          MR. BOLINSKE:  I would --

14          THE COURT:  Well, let me ask you a few questions --

11:20   15          MR. BOLINSKE:  Sure.  Go ahead.

16          THE COURT:  -- ma'am.  All we're trying to do in this

17    case is to find 12 people that can --

18          MS. ANKENBAUER:  Yeah.

19          THE COURT:  -- to the best of their ability be fair

11:20   20    and objective in listening to the evidence and base their

21    decision solely what's on -- what's presented on the witness

22    stand and in other forms of evidence.  I have kids.  I am -- a

23    lot of people here have kids, and, of course, that always

24    weighs on people's minds.  But in this case do you feel that

11:20   25    you could be fair and objective to both sides, listen to the

91

1  evidence, wait to make your decision until you've heard all of

2  the evidence?

3            MS. ANKENBAUER:  Yes.  Yes, and I would.  I would,

4  yes.

5            THE COURT:  All right.  Anything else?

6            MR. BOLINSKE:  Nothing, Your Honor, no.  And I would

7  ask for cause.

8            THE COURT:  All right.  But otherwise pass for cause

9  on the other --

10           MR. BOLINSKE:  Yes, Your Honor.

11           THE COURT:  Okay.  Well, your request is noted and

12  overruled, and I'm going to allow these 28 people to be

13  assessed and reviewed and analyzed by the attorneys, and we'll

14  go from there.

15           That completes all of the questions that are going to

16  be asked of the 28 of you.  What's going to happen now is that

17  the attorneys will have an opportunity to use these peremptory

18  challenges where they can arbitrarily strike some of you from

19  the panel of jurors, and ultimately we'll be selecting 12 trial

20  jurors.

21           While they're doing that, all that is going on is

22  they'll be passing a sheet between them with your names on it.

23  And they each have a certain number of strikes that they can

24  use for whatever reason that they wish.

25           While they're doing that, you don't have to remain

92

1   seated.  If any of you need to use the restroom, you're free to

2   do that.  But please come back quickly to the -- and return to

3   the seat that you're in, but you can stand and stretch while

4   this process is going on.  It's not going to take too terribly

11:22   5   long to complete these strikes, but you're free to stand and

6   move about as that goes on.  Thank you.

7          (A recess was taken from 11:22 a.m. to 11:35 a.m.,

8   the same day.)

9          THE COURT:  We're back on the record.  At this time

11:35   10   I'm going to ask that the clerk please read the names of the

11   jurors who have not been selected as trial jurors during this

12   process.  So if your name is read off, that means that you were

13   not selected as a trial juror, and I would ask that you take a

14   seat near the back of the courtroom, please.

11:35   15          THE CLERK:  Barbara Chase, Lee Nagel, Nathan Mundahl,

16   Dennis Meier, Gregory Nyberg, Jaret Cvancara, Scott Peterson,

17   Cathy Krein, Brian Johnson, Alexia Ballard, Ross Johnson,

18   Brenda Ankenbauer, Linda Pouliot, Jennifer LeBlanc, Roger

19   Larson, and Kyle Baarstad.

11:36   20          THE COURT:  If your name was not read off, that means

21   that you were selected as one of the 12 trial jurors.  I would

22   ask that you take a seat in the jury box, and I'd like to have

23   six people in the front row and six people in the back row,

24   please, six and six.  Mr. O'Konek, are you satisfied that these

11:37   25   are the 12 individuals selected as trial jurors in this case?

93

1            MR. O'KONEK:  Yes, Your Honor.

2            THE COURT:  Mr. Bolinske?

3            MR. BOLINSKE:  Yes, Your Honor.

4            THE COURT:  Very well.  Then I would ask that the 12

11:37    5   of you please stand and we'll have you sworn in as trial

6   jurors.

7            THE CLERK:  If you could raise your right hand,

8   please.

9            (The 12-person trial jury is duly sworn.)

11:38   10            THE COURT:  Please be seated.  To those of you that

11   were not selected as trial jurors, you are now excused, but I

12   do want to thank you for being a part of this process.  I know

13   that it's been an inconvenience for you to have to take time

14   off from work and elsewhere to be here, but we sincerely

11:38   15   appreciate your showing up today and your patience throughout

16   the morning, but you are excused at this time.

17            If you have any questions, Ms. Schafer is in the back

18   of the courtroom there.  She can answer any questions that you

19   might have, but you are no longer obligated to remain here.

11:38   20   Thank you.

21            To those of you that were selected as trial jurors,

22   we will take a break here, and we'll return after the noon

23   hour.  We'll come back at 1:15, but I need all of you to hang

24   on for about five to ten minutes while my law clerks visit with

11:39   25   you about where you'll need to report after lunch.  We're going

94

1    to get you security badges so that you can get through security

2    quicker and just give you some general instructions about where

3    you need to show up.

4         When we come back at 1:15, what I'm going to do is

5    first read to you what are called the Preliminary Instructions.

6    They're just designed to give you some guidance about what your

7    role is as a juror.  They're standardized instructions, but

8    they're required to be read to you, and you'll have a set of

9    the instructions.  You can follow along.  It will probably take

10   me ten minutes at the most to read those to you.

11        When I finish reading those to you, then the

12   attorneys will have a chance to present their opening

13   statements to you, and then we'll start hearing from witnesses.

14   And, again, we'll go until about 4:30, somewhere in that

15   timeframe, but we'll be hearing from witnesses this afternoon.

16   So please stick around for just a few moments, and then you can

17   venture off for lunch.

18        All that I'll tell you now is that you can certainly

19   tell your employer, whomever you wish to tell that you've been

20   selected as a trial juror, but you'll get more detailed

21   instructions about that, what -- essentially you can't talk to

22   anyone once the trial starts.  You can't talk to them about the

23   witnesses or anything else, nor can you be doing any of your

24   own research on the Internet about this case or anything that

25   you hear related to this case.  But my instructions after lunch

95

1   will be a little more detailed to that, but we'll just keep you

2   for another five, ten minutes.  Then you can move on for your

3   lunch break.  Thank you.

4            (A lunch recess was taken from 11:41 a.m. to 1:16

01:16

5   p.m., the same day.)

6            THE COURT:  Good afternoon.  We are back on the

7   record in the case of *United States versus Lonnie Dale Spotted*

8   *Bear*.  All parties are present.  At this time, members of the

9   jury, I'm going to read to you what are called the Preliminary

01:17

10  Instructions.  You've got a set there with you, and please feel

11  free to follow along.  The law requires that they be read to

12  you in open court, so please bear with me as I read the

13  instructions to you.

14           (The Judge reads the Preliminary Instructions in open

01:17

15  court.)

16           THE COURT:  Mr. O'Konek, you may make your opening

17  statement at this time.

18           MR. O'KONEK:  Thank you, Your Honor.  May it please

19  the Court, counsel.

01:31

20           This is a case about Mr. Spotted Bear gaining access

21  to, isolating, and finally molesting three different girls over

22  a five-year time period.  These girls have names.  Their names

23  are Nxxxx Hxxxxxx Exxxx, Sxxxxxx Hxxxxx, and Mxxxx Sxxxxxxxx.

24  You're going to hear from these girls.  They're going to tell

01:31

25  you about what Mr. Spotted Bear did to them.  And each of these

96

girls is related to Mr. Spotted Bear in one way, shape or form.
He is Nxxxx and Sxxxxxx's godfather, and all three of the
children consider Mr. Spotted Bear to be their grandfather.
All three girls are related.

What you will learn in this case is during the time
of the abuse, the defendant lived in Twin Buttes, North Dakota.
Now, Twin Buttes is a small town located on the Fort Berthold
Indian Reservation.  And you're going to learn that Mr. Spotted
Bear is an elder and well represented member of the Twin Buttes
community, and he has a large extended family.

Members of Mr. Spotted Bear's extended family,
including Nxxxx, Sxxxxxx and Mxxxx, would frequently visit him
on his property.  He has a large amount of property, and some
of them at that time lived as close neighbors.

During these visits Nxxxx, Sxxxxxx and Mxxxx's
families would come to Twin Buttes, hang out with family, and
the girls would spend time at the lake that was located near
Mr. Spotted Bear's property.  Specifically, the girls would
come over to visit with Mr. Spotted Bear and their cousin,
Haylon.

You'll also hear that there was a time when Mr.
Spotted Bear -- his home that they would visit had burned down
in February of 2016.

And as you listen to the testimony in this case, I
ask that you pay close attention to three items.  One is the

97

1   age of the girls both now and when it happened.  I ask that you

2   consider the access that Mr. Spotted Bear had to these girls.

3   And I ask that you pay attention to how Mr. Spotted Bear

4   accosted these three girls.

01:33   5        First let's talk about the age of the girls.  Well,

6   currently Nxxxx is 12 years old, Sxxxxxx is 13 years old, and

7   Mxxxx is 13 years old.  You will hear from them today or

8   tomorrow as this case progresses.  When Mr. Spotted Bear abused

9   the girls, you'll learn that Nxxxx was five and nine years old,

01:34   10   respectively; Sxxxxxx was six years old; and Mxxxx was seven

11   years old.

12        In terms of access that Mr. Spotted Bear had to these

13   girls, there were times when Mr. Spotted Bear -- or, excuse me.

14   There were times when the guardians of Nxxxx, Sxxxxxx and Mxxxx

01:34   15   would leave the girls alone with Mr. Spotted Bear.

16        And you're going to hear a lot of names.  You're

17   going to hear testimony from people.  Names will be kind of

18   thrown around, but to give you kind of a road map of what to

19   expect, you're going to hear from Nxxxx's grandmother, who used

01:34   20   to be her guardian.  Nxxxx's grandmother's name is Ivetta.

21   Ivetta Spotted Bear, she's the sister of the defendant.

22        She'll tell you that Nxxxx used to spend the night

23   with Mr. Spotted Bear, that he would come over often, ask her

24   to come visit and play with Haylon, her cousin.  He would offer

01:34   25   to buy her gifts.  And on one of the occasions she specifically

98

1    remembers him asking her to go and do some work with him at one

2    of his workshops, which was located on his property kind of

3    near his house.

4            You'll hear from Sxxxxxx's father, Travis, and

5    mother, Crystal.  They would leave Sxxxxxx alone with Mr.

6    Spotted Bear.  Travis will also tell you that Mr. Spotted Bear

7    would ask Sxxxxxx to come to his home in Twin Buttes to visit

8    Haylon.  Haylon lived not far away from Mr. Spotted Bear in the

9    Twin Buttes area.  And you'll also hear that in 2009 the

10   parents of Sxxxxxx left Sxxxxxx in the custody of Mr. Spotted

11   Bear when they went to Cancun, in Mexico.

12           You'll hear from Mxxxx's father, Brad, and her

13   mother, Meranda.  And you'll hear that at a point -- there was

14   a time when Mxxxx and Brad were visiting Mr. Spotted Bear at

15   his home.  It was roughly hunting season, deer hunting season,

16   and they left her in the custody of Mr. Spotted Bear.

17           And let's talk about the accosting of the girls.

18   Nxxxx, she's going tell you that when she was five, between

19   2009 and 2010, she was visiting her cousin -- excuse me, her

20   cousin, Haylon, at Mr. Spotted Bear's house in Twin Buttes

21   North Dakota.  She'll tell you that she was sleeping on a

22   mattress on the floor in the living room, and during the night

23   Mr. Spotted Bear got next to her, went under the covers and

24   licked her vagina.  You'll hear her talk about it.

25           You'll also hear that when she was nine, 2013 to

2014, Mr. Spotted Bear asked Nxxxx to do some work with him at
his workshop in Twin Buttes.  This is the incident that Ivetta
will tell you about, that she remembers Mr. Spotted Bear asking
her to do some work for him.  She -- Nxxxx will tell you that
when they were alone in his workshop, he pulled down her pants.
At first he put her on a tractor tire, I should say first.  He
pulled down her pants, and she got scared and thought he was
going to do something again.  Luckily she had her phone with
her, and she had an app that was able to call her grandfather,
and as soon as she called, he stopped, and she drove him -- he
drove her home.

You're also going to hear that when she was six,
between 2010 and 2011, Mr. Spotted Bear would drive a truck,
that he would place Nxxxx on his lap, and that while he was
driving, he would let her steer the wheel, pretend to drive as
he operated the pedals, and he would place his hand underneath
her clothing and touch her vagina, skin to skin.

You'll hear from Sxxxxxx.  She's going to tell you
when she was six, between the ages of 2010 and 2011, she was
visiting her cousin, Haylon, in Twin Buttes, North Dakota.
Haylon lived in a house near Mr. Spotted Bear.  She's going to
tell you that Mr. Spotted Bear told her that they needed to
find her iPad -- a missing iPad, and Mr. Spotted Bear said it
might be at his home.  So he drives her to his house in Twin
Buttes and helps her look for the iPad, and when they arrive at

100

his house, Mr. Spotted Bear pushes down Sxxxxxx, pulls down her
leggings and her underwear and licks her vagina.

You'll hear from Mxxxx, when she was seven, 2009,
2011, she was visiting her uncle, Daylon, and her cousin,
Haylon again.  And her mom ultimately was not there, but her
father went on a hunting trip.  It was deer hunting season, and
he went hunting with one of his relatives, and she was left
alone with Mr. Spotted Bear and her cousin, Haylon.

And they all wrestled, but at some point Mr. Spotted
Bear took her upstairs to the living room, and when they got
upstairs, Mr. Spotted Bear placed his hand on top of her
shorts, on the vagina, and tried to put his hand underneath to
penetrate her.  She pushed him away, and he stopped.

And in terms of when the girls disclosed, this is a
historical child sexual abuse case.  The girls disclosed a
substantial time later, in some cases three years, in some
cases five years.  Nxxxx and Sxxxxxx, in late 2015 they were
spending time together at the Boys and Girls Club on Fort
Berthold.  And Sxxxxxx trusted Nxxxx and had told her and
confided in her that she had been molested.  To Sxxxxxx's
surprise, Nxxxx said that Mr. Spotted Bear did the same thing
to her.

And in December of 2015, when Sxxxxxx is in Cancun
with her family, her mom, her dad, her sister, sister's
boyfriend, she confides in her sister's boyfriend and her

101

1  sister, Cheyenne, that Mr. Spotted Bear had molested her.

2         And in February of 2016, shortly thereafter,

3  Sxxxxxx's father, Travis, who did not want law enforcement to

4  get involved -- he just wants to get his daughter some help.

5  He takes her to a therapist, but before they can even meet, he

6  tells the therapist, "My daughter has been molested."  She's a

7  mandated reporter, and it gets reported to the FBI.

8         As far as Mxxxx, she had told her mother that Mr.

9  Spotted Bear molested her when she was ten years old,

10 approximately three years after she was molested.  And it was

11 during a time when her mother was talking to her about places

12 on the body people aren't supposed to touch.  She was giving

13 her a lesson because somebody else had been molested and was

14 telling her daughter, "There are certain places on your body

15 you can't be touched."  And you'll hear from Meranda, the

16 mother of Mxxxx, that Mxxxx started to cry and disclosed that

17 Lonnie had touched her.

18        Finally, they did not report the incident right away

19 to law enforcement because they were scared of Mr. Spotted

20 Bear's status in the community, and they didn't want to get

21 anybody involved because they thought that was the best thing

22 for Mxxxx.  And this only came to law enforcement's attention

23 after Nxxxx and Sxxxxxx disclosed.

24        And this is just a road map of -- what you'll hear

25 from the Judge is that opening statements, what the lawyers say

1   is not evidence.  It's what we think that the evidence is going

2   to be, and giving you a road map will allow you to understand

3   exactly what these witnesses are going to talk about, because

4   you're going to hear from these girls.

01:40   5           They're going to come in here in this courtroom.

6   They're going to sit in that witness chair in front of

7   strangers and tell you about what happened.  They may be

8   scared.  They may be hesitant.  It might be an experience that

9   is difficult, but you're going to have to evaluate their

01:41  10   credibility, their testimony.  You're going to have to evaluate

11   whether they have any motivations to lie.  That's up to you as

12   the jury, to evaluate the facts in this case, and I ask that

13   you do that.

14           And you're going to hear that after these allegations

01:41  15   came out, approximately in March or April of last year, Mr.

16   Spotted Bear went and found out that these girls had reported

17   what had happened.  So he called Travis, who is Sxxxxxx's

18   father, and angrily asked him who the other girl was that had

19   reported sexual abuse against him.  And you'll hear that he

01:41  20   tried to break into his sister, Ivetta's, home, the guardian of

21   Nxxxx, in order to confront her, to talk about what had

22   happened.

23           And a lot of times in this case you may hear us

24   reference Indian status and Indian country.  These aren't terms

01:42  25   that we, as the parties, have created.  They're legal terms

that were created by Congress, by the federal court system.  It
gives the federal government jurisdiction over certain major
crimes, to include sexual abuse cases involving children.  So
any time we reference those terms, it's only a jurisdictional
matter.  It has nothing to do with us wanting to use the word
"Indian" or "Indian country."

You'll also hear from a child forensic interviewer
about certain aspects of child sexual abuse cases.  She'll tell
you about how children of sexual abuse often don't report the
abuse right away because they're scared, they don't understand
what's going on because they're too young, they think people
might not believe them, and they usually care about the person
who has abused them and are hesitant to talk about it to break
up the family.

And the United States will be upfront with you that
we will not be presenting evidence of injury, DNA evidence.
There won't be an eyewitness that saw this because when Mr.
Spotted Bear accosted these children, he did it in private,
because as you'll hear, he had access to these children alone.
He did it when nobody else was watching, and he was able to get
them alone because he was their godfather or grandfather and he
-- they trusted him.

And as you go through this case, I ask that you pay
attention to those three things I stated earlier, the age of
the children when this happened and now, when they testify; the

104

1   access Mr. Spotted Bear had to the children; and specifically

2   how Mr. Spotted Bear accosted these children.

3          And I ask that you would -- you consider the

4   testimony of these children.  You ask, what is their motivation

5   to lie?  Why are they telling this -- that this happened to

6   them?  And I also ask that you consider that this happened in

7   private and that the evidence will demonstrate that these

8   children were molested by Mr. Spotted Bear when he gained

9   access to them alone because they trusted him.  Thank you.

10          THE COURT:  Mr. Bolinske.

11          MR. BOLINSKE:  Your Honor, may it please the Court,

12   counsel.  This isn't fun stuff to talk about.  This is horrible

13   stuff to talk about, but the reality is here, and I think the

14   evidence will show that Lonnie Spotted Bear is not guilty of

15   any of these offenses he's charged with.  He didn't do them,

16   and I can look you in the eye and tell you that he didn't do

17   them, and he will testify to that too.  He'll look you in the

18   eye and tell you that none of this occurred.

19          The evidence in this case -- and I don't mean this

20   sarcastically.  I'm using that term, in my opinion, lightly.  I

21   will call them the stories in this case, and at least one of

22   the alleged victims called them that, the stories.  Grandma,

23   what story am I supposed to tell?  Which story?  Is this the

24   story I'm supposed to tell to the interviewers?

25          This case, although it looks bad and sounds bad, I

105

1  submit the evidence will show is a house of cards.  When things

2  get pulled out, it will fall.  The time, the lack of evidence,

3  the lack of corroboration and all of those things, please pay

4  attention to that.  These stories that one of these alleged

01:45   5  victims tells -- all of the alleged victims tell aren't true.

6  The government's own evidence will be that these

7  stories keep changing, that they have some -- what they think

8  is evidence, and then they go get some more, and then they

9  change.  Then they tell this interviewer this.  Then they tell

01:45   10  this interviewer that, that things just keep changing.  As Mr.

11  O'Konek says, there is very little, if any, corroborating

12  evidence.  There are assumptions and conclusions and statements

13  from years and years ago.  That is their evidence.

14  The evidence will also be that the FBI, along with

01:46   15  other agencies in this case, in their investigation went and

16  got these conclusions, these assumptions, this conjecture and

17  then stopped.

18  Mr. O'Konek mentioned credibility and truthfulness.

19  Those are big deals in this case.  That's everything in this

01:46   20  case.  One would think, and I think the evidence will show,

21  that once they got these conclusions and these statements of,

22  yeah, he did some bad stuff, they stopped or -- and, I guess,

23  when they got evidence that showed that, you know, if he

24  doesn't have the propensity to do that, he didn't do that, they

01:46   25  didn't write it down.  They didn't like it.  They didn't follow

1   it.  They didn't follow those leads.  They didn't go down that

2   road, and you'll have to just wait and see to watch that when

3   everyone testifies as to what I'm talking about.

4        In the forensic interviews that Mr. O'Konek talks

5   about where these kids go in and tell what purportedly happened

6   to them, they mention names of friends, they mention different

7   dates, times, things like that.  One of those witnesses that

8   was mentioned right in the government's hands -- they had the

9   name of these people, of some of the best friends of at least

10  one of these purported victims.  Didn't go talk to him.  Didn't

11  go make a report.

12       The evidence will be that we had an investigator

13  spend very little time, found huge credibility issues with

14  these stories, and there will be evidence of that.  We will

15  present that, again, conclusion driven.  They didn't pursue

16  this evidence.  They stopped.  They didn't go down that road,

17  and the evidence will show that or lack of evidence -- or our

18  evidence will show that.

19       And it keeps changing.  When the alleged victims went

20  in and gave these interviews, it appears that they thought the

21  case wasn't strong enough, so rather than go get credibility

22  evidence and talk to friends and teachers and counselors and do

23  things like that to corroborate the stories, they simply get

24  them back in there and sort of imply, isn't there more, maybe

25  there's more, and get them to say more stuff.  Again,

1   conclusory, no corroboration, no DNA, no forensics, no

2   eyewitnesses, no nothing to support it other than the

3   statements.

4          The evidence will also be -- I'm going to shift to

5   Lonnie's father (sic) now.  He's a good man.  He's a decent

6    man.  He's a kind man.  He's got a ranch.  He's got kids.

7   He's got people out there all the time.  Even after these

8   things allegedly happened, people kept coming.  People kept,

9   "Well, we're going to go to Cancun.  We'll leave them at

10  Lonnie's place.  We're going to" -- even after some of the

11  accusations surfaced, "Well, Lonnie has got four-wheelers, he's

12  got a lake by, he's got a boat, he's got all this stuff.  We'll

13  drop the kids off and we'll go do this stuff right at his

14  place."  People were there.  Nobody saw anything.  Nobody

15  thought anything.  It was just -- it just continued.

16         In the end Lonnie Spotted Bear will look you in the

17  eye and say, "No, this didn't happen.  I was with these kids.

18  These kids are great.  These kids are -- I have nothing against

19  these kids.  I don't know why they're saying these things."

20         He's got a sister, Ivetta Spotted Bear, that one of

21  these kids lives with.  There's some family kind of thing going

22  on there, some motivation for his sister to be sort of feeding

23  kids information to get something from Lonnie.

24         The stuff about Lonnie breaking into a house or

25  threatening a witness in the case, they can get up here and

talk about that.  I'm happy that they will.  It's, again,
conclusory.  It's conjecture.  It's a little bit of, well,
Lonnie is a bad guy, he's really threatening, you know, we're
not going to talk to him about this stuff.  The FBI didn't even
talk to Lonnie because they said he was too threatening.  The
information they had was conclusory again.

I mean, the evidence will be if somebody is accused
of something, they should go ask the person.  That's one of the
first things they should do.  That's what investigators do.
They try to get somebody to talk.  They didn't do that.  The
evidence will show that.

In the end, after all of the evidence or lack thereof
is heard, I will come back.  There will be a bunch of witnesses
on.  Then I get to give a closing argument.  In that closing
argument I will ask you to find, based upon the evidence or
lack thereof, Mr. Spotted Bear not guilty of these offenses.
Thank you.

THE COURT:  Mr. O'Konek, you may call your first
witness.

MR. O'KONEK:  Your Honor, before we do that, I'd ask
the Court to admit three exhibits that go to the stipulation of
Indian country status, a map that demonstrates the boundaries
of Fort Berthold, and then the defendant's Certificate of
Indian Blood.  They're Government's Exhibit 1, 2, and 11
previously shown to the defense.

1          MR. BOLINSKE:  That's true.  No objection.

2          THE COURT:  Exhibits 1, 2 and 11 will then be

3     received in evidence.

4          MR. O'KONEK:  Permission to publish the stipulation

01:51     5     by reading it?

6          THE COURT:  You may.

7          MR. O'KONEK:  As you see the stipulation, you can

8     read it while it's on the screen.  In terms of the first page,

9     it says, "The United States of America, by Christopher Myers,

01:51     10    the United States Attorney for the District of North Dakota;

11    Jonathan O'Konek, Assistant United States Attorney; and the

12    defendant, Lonnie Dale Spotted Bear, individually and through

13    his counsel, Robert Bolinske, Junior, hereby stipulate and

14    agree that the defendant, Lonnie Dale Spotted Bear, is an

01:51     15    Indian for the purpose of criminal jurisdiction.

16         "The offenses charged, if you find that they were

17    committed at all, were committed within Indian country; that

18    is, within the exterior boundaries of the Fort Berthold Indian

19    Reservation, which is a federally recognized tribe and within

01:51     20    the Court's jurisdiction.

21         "And the above stipulated information may be read to

22    the jury at the time of trial or a copy thereof can be filed as

23    an exhibit, and there is no need to call any enrollment records

24    custodian or boundaries technicians from the Fort Berthold

01:52     25    Indian Reservation to testify of the above information," signed

1  myself, Assistant United States Attorney Jonathan O'Konek; the

2  defendant, Lonnie Dale Spotted Bear; and the attorney for the

3  defendant, Robert Bolinske, Junior.

4  　　　　And, Your Honor, the United States would call Nxxxx

01:52  5  Hxxxxxx Exxxx.

6  　　　　　　　　　　NXXXX HXXXXXX EXXXX,

7  having been first duly sworn, was examined and testified as

8  follows:

9  　　　　　　　　　　DIRECT EXAMINATION

01:52  10  BY MR. O'KONEK:

11  Q.　　Nxxxx, I just have a few background questions.  Can you

12  please state your full name?

13  A.　　Nxxxx Cxxxx Hxxxxxx Exxxx.

14  Q.　　Okay.  And do you understand the difference between a

01:54  15  truth and a lie?

16  A.　　Yes.

17  Q.　　And you promised to only tell the truth here in these --

18  in this case?

19  A.　　Yes.

01:54  20  Q.　　So if I were to tell you that this pen is red, what would

21  you tell me?

22  A.　　It's blue.

23  Q.　　And so it's a lie --

24  A.　　Yeah.

01:54  25  Q.　　-- if I would say it's red.  Okay.  So I have a couple of

1    background questions.   How old are you?

2    **A.**    I'm 12 years old.

3    **Q.**    And what's your date of birth?

4    **A.**    12/16/04.

01:54    5    **Q.**    Okay.  And where do you currently live?

6    **A.**    Twin Buttes, North Dakota.

7    **Q.**    Okay.  Where do you go to school?

8    **A.**    Marty Indian School.

9    **Q.**    And when you say "Marty Indian School," where is that

01:54    10    located?

11    **A.**    Marty, South Dakota.

12    **Q.**    Okay.  What kind of a school is that?

13    **A.**    It's a boarding school.  You dorm -- like you sleep over

14    there.

01:55    15    **Q.**    And how long have you been -- is it something where -- you

16    say you dorm.  Have you been living in Marty, North Dakota --

17    or South Dakota to go to school?

18    **A.**    No, not really.

19    **Q.**    But you've been staying there for --

01:55    20    **A.**    Yeah, I've been staying there, but I don't live there.

21    **Q.**    Right.  And so tell me a little bit about school.  What's

22    your -- what grade are you in right now?

23    **A.**    Seventh.

24    **Q.**    And what's your favorite subject?

01:55    25    **A.**    Math.

1  **Q.**   Why do you like math?

2  **A.**   It's easy to do.

3  **Q.**   Okay.  What -- what about -- what about it is easy?  I

4  would say math isn't easy, so what do you think is easy about

01:55    5  it?

6  **A.**   The equations are easy.

7  **Q.**   Okay.  And so before you went to school in Marty, where

8  did you go to school prior to that?

9  **A.**   Killdeer.  It's -- it's in North Dakota.

01:55   10  **Q.**   And how long did you go to school in Killdeer?

11  **A.**   A year.

12  **Q.**   Okay.  And what about before you went to school in

13  Killdeer?  What school did you go to?

14  **A.**   Twin Buttes.

01:56   15  **Q.**   And for how long were you going to school in Twin Buttes?

16  **A.**   A year.

17  **Q.**   Okay.  At some point I want to talk to you about kind of

18  where you lived.  Did you used to live in Twin Buttes?

19  **A.**   I -- I do live in Twin Buttes.

01:56   20  **Q.**   Oh, you -- okay.  So you live in Twin Buttes, but you go

21  to school in Marty.  Who do you live with?

22  **A.**   My grandma, Ivetta; my grandpa, David; my cousin, Avery;

23  and my sister, Kia (ph).

24  **Q.**   Okay.  And what kind of house do you live in?

01:56   25  **A.**   Like it's not big.

113

1   **Q.**   It's not big.   A small kind of house?

2   **A.**   Yeah.

3   **Q.**   And what are some of the things you like to do for fun?

4   **A.**   Go on my phone, watch TV.

01:56   5   **Q.**   You like Harry Potter too?

6   **A.**   Yeah.

7   **Q.**   Okay.   And so have you read all of the books yet?

8   **A.**   I still have one more book.

9   **Q.**   Okay.   So I want to talk a little bit about the people

01:57   10   that are in your family, and you mentioned some of them

11   already.   You mentioned Ivetta Spotted Bear.   Who -- who is

12   she?

13   **A.**   She's my grandma.

14   **Q.**   Okay.   And for how long would you say you've lived with

01:57   15   Ivetta?

16   **A.**   Eleven years.

17   **Q.**   Okay.   And you mentioned -- and I think you might have

18   mentioned this, but David Holding Eagle, who is he?

19   **A.**   He's my grandpa.

01:57   20   **Q.**   Okay.   Do you have any brothers or sisters?

21   **A.**   Yeah, Kia --

22   **Q.**   And how --

23   **A.**   -- and Anthony.

24   **Q.**   How old are they?

01:57   25   **A.**   Kia is 15 years old, and my brother, Anthony, is 19.

114

1   Q.   What about cousins?  I know you have probably a lot of

2   cousins, but do you have a cousin named Sxxxxxx?

3   A.   Sxxxxxx, she's 13.

4   Q.   Okay.  But she's a cousin of yours?

01:57   5   A.   Yeah, she's a cousin.

6   Q.   And Mxxxx Sxxxxxxxx is one of your cousins, or she's a

7   relative of yours in some way?

8   A.   Yeah, in some way.

9   Q.   And Haylon Spotted Bear, is he a cousin of yours?

01:58   10   A.   Yes.

11   Q.   And is he somebody that you've hung out with in the past?

12   A.   Yep.

13   Q.   How often?

14   A.   I'd say probably like two times a week when I was four

01:58   15   through six.

16   Q.   Okay.  And so when you say like two times a week, at that

17   time when you were like four or six, where were you living?

18   A.   Twin Buttes.

19   Q.   And were you still -- were you living with Ivetta at the

01:58   20   time?

21   A.   Yes.

22   Q.   How far -- like where was Haylon living?

23   A.   He was living about a mile or two, three or two miles

24   away.

01:58   25   Q.   Okay.  And who did he live with?

**A.**   He lived with his, I think, grandma and grandpa, Diana and Lonnie.

**Q.**   Okay.  And so when you say you lived about two or three miles away from Haylon, you also kind of lived two or three miles away from Lonnie at that time.

01:58

**A.**   Yes.

**Q.**   I want to talk a little bit about Lonnie.  Who -- who is Lonnie?  Is -- how are you related to Lonnie?

**A.**   He's my grandma's brother, so he was my godfather.

01:59

**Q.**   Godfather.  And Diana Spotted Bear, who is she?  I know you mentioned her before, but who is she?

**A.**   She's Lonnie's wife, so she was my godmother.

**Q.**   We talked a little bit about Twin Buttes.  How big is Twin Buttes?

01:59

**A.**   It's not that big at all.

**Q.**   Is it less than a thousand people?

**A.**   Yes.

**Q.**   And what are some of the things that you can do for fun in Twin Buttes?

01:59

**A.**   You could go to the Memorial Hall and like do basketball and volleyball.  You can go to Boys and Girls Club.  You could go to a park.  That's probably about it.

**Q.**   Okay.  And you mentioned kind of where Lonnie had lived with Haylon.  Did he live near a lake?

02:00

**A.**   Yes, but not very close.

116

1    **Q.**    But it was kind of near his property?

2    **A.**    Yeah.

3    **Q.**    And would you spend time out at the lake?

4    **A.**    Yeah.

02:00    5    **Q.**    And how often would you say you did that?

6    **A.**    I'd say often.

7    **Q.**    And how often would you say you visited with -- you

8    mentioned you visited Haylon two or three times a week from

9    four to six.  How often during that timeframe would you see

02:00    10    Lonnie or would Lonnie come and talk with you?

11    **A.**    Probably the times I'd go there.

12    **Q.**    Okay.  So when you went and saw Haylon, you would also see

13    Lonnie.

14    **A.**    Yes.

02:00    15    **Q.**    Okay.  And would you ever stay in Lonnie's house during

16    this timeframe?

17    **A.**    Yes.

18    **Q.**    Alone, without Ivetta?

19    **A.**    Yes.

02:00    20    **Q.**    And during the times that you would stay alone, without

21    Ivetta, would you be visiting Haylon?

22    **A.**    Yes.

23    **Q.**    What sort of things would you and Haylon do together?

24    **A.**    We would play on his Xbox or P.S.  We would go outside, go

02:01    25    on the trampoline.  Yeah, we'd go on the trampoline.  We'd hang

117

1   out.  Like we'd play toys.  We'd go downstairs, just -- they

2   had a -- we just went downstairs and just hung out.

3   **Q.**   And so you kind of describe a little bit about the layout

4   of the house.  Describe to us what Lonnie's house was like back

02:01   5   when you were four or six.

6   **A.**   It was bigger than mine.  The living room was spacious.

7   It was fairly big.  They had a downstairs.  They had a hallway,

8   which that's where they slept.  They had a fairly big kitchen,

9   yeah.

02:01   10   **Q.**   Okay.  And does Lonnie still live in that house?

11   **A.**   That house burned down, so they rebuilded a new one, I'm

12   pretty sure.

13   **Q.**   And that happened -- when did that happen, would you say,

14   that house burned down?

02:02   15   **A.**   Probably a year or two.

16   **Q.**   Now, whenever you guys -- when you would go over and spend

17   time with Lonnie, did Lonnie ever come to your home, Ivetta's

18   home?

19   **A.**   Yeah, to pick me up.

02:02   20   **Q.**   To pick you up.  Where was he going to take you?

21   **A.**   To -- Haylon was with him, so to Haylon's house to hang

22   out.

23   **Q.**   So let me ask you this.  If you were going to go see

24   Haylon, how would you normally get to go and see him?

02:02   25   **A.**   Probably like we'd go to church, and he'd want me to hang

1   out with him, so I'd go home with Haylon.

2   **Q.**   And who would want you to hang out with Haylon?

3   **A.**   Haylon.

4   **Q.**   Haylon would want you to hang out with him, so you went

5   over there.

6   **A.**   Yes.

7   **Q.**   But sometimes Lonnie would pick you up and drive you

8   there?

9   **A.**   Yes.

10  **Q.**   And how would you get home if you went to go see Haylon?

11  **A.**   Lonnie would drive me home.

12  **Q.**   Now, Nxxxx, when you would spend time with Haylon, tell me

13  about what Lonnie did to you.

14  **A.**   So I couldn't sleep with Haylon because he wanted to sleep

15  with his grandma, so they set up a mattress in their living

16  room, so I slept over in -- like on the mattress.

17  **Q.**   And so when you say you slept on the mattress, so you were

18  like on the ground, but there was a mattress?

19  **A.**   Yeah, there was.

20  **Q.**   And just take me through where -- where were you sleeping

21  at this time?  Where was this mattress located?

22  **A.**   In the living room.

23  **Q.**   Okay.  And what happened when you were in the -- on the

24  mattress in the living room?  What did Lonnie do?

25  **A.**   Could you explain again?

119

1   **Q.**   So can you just -- you mentioned -- you started explaining

2   about what had happened.  Can you just continue?

3   **A.**   I was sleeping, and then he walked in, in the living room

4   and he -- he pulled down my pants and my underwear, and he was

02:04   5   touching me down by the private area.

6   **Q.**   Okay.  And I know this is going to be difficult to talk

7   about, but I'm going to go back and go in a little bit more

8   detail.  So you mentioned that he came into the living room.

9   Who was -- was that Lonnie?

02:04   10   **A.**   Yeah, that was Lonnie.

11   **Q.**   And so did Lonnie -- was he the person that pulled down

12   your pants?

13   **A.**   Yes.

14   **Q.**   And so at this time, how old would you have been?

02:04   15   **A.**   Four.

16   **Q.**   Four.  And do you remember anything else about the

17   timeframe, about when this would have happened?

18   **A.**   No.

19   **Q.**   So you mentioned that Lonnie had come in and pulled your

02:05   20   pants.  You mentioned he touched your private parts.  Take me

21   through how that happened.  What did he do?

22   **A.**   He'd -- he'd touch around my private areas.  He'd touch

23   down there.

24   **Q.**   Okay.  And I have to go -- unfortunately, I got to go into

02:05   25   some detail.  I'm sorry, but when you said, "He touched down

120

1   there," did he touch your vagina?

2   **A.**   Yes.

3   **Q.**   And what did he touch your vagina with?

4   **A.**   His hands.

02:05   5   **Q.**   Did he ever touch you with his tongue?

6   **A.**   Yes.

7         MR. BOLINSKE:  Objection, leading.

8         THE COURT:  Overruled.

9   **Q.**   (MR. O'KONEK CONTINUING)  So just to go back, you

02:05   10   mentioned he touched you down there, and that was the vagina?

11   **A.**   Yes.

12   **Q.**   And he had touched your vagina with his hands and tongue.

13   **A.**   Yes.

14   **Q.**   And you said you were roughly about four.  What's going

02:05   15   through your mind when this is happening?

16   **A.**   I can't move.  It's uncomfortable.  I don't like the

17   feeling.  I can't move.  I can't do anything.

18   **Q.**   Okay.  And when he's doing this, do you understand what

19   he's doing or understand what's going on at the time?

02:06   20   **A.**   No, not really.

21   **Q.**   And did Lonnie say or do any -- did he say anything or

22   make any noises while he was doing this?

23   **A.**   No.

24   **Q.**   And do you remember what he was -- what you were wearing

02:06   25   at the time?  I think you mentioned pants?

121

**A.**   I was wearing just probably like a white t-shirt and just

regular pajama bottoms.  They were long, long ones.

**Q.**   And when Lonnie had come in, you said you were asleep?

**A.**   Yes.

02:06   **Q.**   And at this time who else was staying in the house?

**A.**   Diana and Haylon.

**Q.**   And Diana was -- is Mr. Spotted Bear's wife?

**A.**   Yes.

**Q.**   And Haylon, obviously, is your cousin.  Where were both of

02:07   them when this was going on, do you know?

**A.**   They were sleeping in Diana's room.

**Q.**   Was Lonnie doing anything with his hands or legs or body

weight to you?

**A.**   No.

02:07   **Q.**   Okay.  How long would you think that this had lasted?

**A.**   Probably like a minute.  A minute.  Yeah, a minute or two.

**Q.**   So when he was -- I'm sorry to be vulgar, but when he was

licking your vagina, did you do anything to him?  Did you harm

him in any way?

02:08   **A.**   No.

**Q.**   And why didn't you do that?

**A.**   I didn't understand what was happening at the moment.

**Q.**   And so what made Lonnie stop?  What made Mr. Spotted Bear

stop?

02:08   **A.**   Diana came in and she said, "What were -- what are you

122

1    doing?"  And he said, "I was waking her up.  I was trying to

2    wake her up."

3    **Q.**   And then after that had happened, did Lonnie go back into

4    the -- his bedroom?

02:08    5    **A.**   Yes.

6    **Q.**   Now, was that the only time that Lonnie had touched you?

7    **A.**   No.

8    **Q.**   I want to talk to you a little bit about something -- did

9    he touch you when you were nine?

02:08    10   **A.**   Yes.

11   **Q.**   Can you tell us what happened?

12   **A.**   I was in my room, and my grandma came in and said that

13   Lonnie wanted me to help him with his tractor.  I didn't want

14   to go because I had my reasons.  So I went with him.  We worked

02:09    15   on his tractor for about two hours.

16            Then we -- we were out at the field, and then he

17   wanted me to help him with another tractor, so we went back to

18   his house and down to his workshop area.  And probably like a

19   half an hour of doing that, I was getting up to leave.  Like I

02:09    20   was on my phone, and then he came up to me and he pushed me

21   down on the tire and he took -- like he pulled down my shorts

22   and my underwear and molested me.

23   **Q.**   Okay.

24   **A.**   What he did when I was four.

02:09    25   **Q.**   Okay.  And I want to talk to you a little bit about that

123

1   incident.  So you said that you were going to go visit -- or

2   help Lonnie work, is that right?  How did that all come about?

3   A.   Like --

4   Q.   How did -- did he invite you out there?  Did somebody tell

5   you to go with him?

6   A.   My grandma suggested me to go because he is my godfather,

7   and she told me I should do it, so I did.

8   Q.   And where is the workshop located between where you and

9   Ivetta were living and -- where's the workshop, how far away?

10   A.   It was by his house.  It was close by his house.

11   Q.   Okay.  And when you say "it was close by his house," was

12   that something that you walked to or that you took a four-

13   wheeler, something --

14   A.   You could walk.

15   Q.   And do you remember how you got there that day?

16   A.   We went down in his car.

17   Q.   Okay.  And what were you -- you said you were working on

18   tractors.  Take us through what you were -- what you were

19   working on specifically.

20   A.   I don't remember, but it was under where they -- yeah, but

21   it was under the tractor.  I know that.

22   Q.   So I guess I'm confused.  When you say you're working

23   under the tractor, are you like changing the oil, are you just

24   tinkering?  Do you remember kind of what you were doing?

25   A.   We were working on the blades, I think.

124

1  Q.   Okay.  And this was Lonnie's tractor?

2  A.   Yes.

3  Q.   And so what happened -- you said that -- something about a

4  tire.  What happened after you were working on the blades for

02:11  5  the tractor?

6  A.   We were done, so after we were done, we -- like I was

7  going on my phone, and then that's when he came along.

8  Q.   Okay.  You were going on your phone, and you said he came

9  along.  Are you talking about Lonnie?

02:11  10  A.   Yes.

11  Q.   And take me through -- what did Lonnie specifically do?

12  A.   He pushed me down on the tire that I was sitting on.  Like

13  he put me on my back.  He was -- he was -- he was pulling down

14  my pants, but I was trying to pull them up.

02:11  15  Q.   How were you trying to pull them back up?

16  A.   Like I was grabbing the tops of them and trying to pull

17  them back up.

18  Q.   And you mentioned that you kind of were -- you had your

19  reasons for going -- you didn't want to go to see Lonnie.  Were

02:12  20  you scared he might do something to you again?

21  A.   Yes.

22  Q.   And so as you're holding up your pants and he's trying to

23  pull them down, what -- what's going through your mind?

24  A.   I was -- I was saying "stop" this time.  I -- I got on my

02:12  25  phone.  I called my grandpa the first time, and he didn't

1   answer.  But then I called him again, and then this time he

2   answered, and then he stopped.  Lonnie stopped.

3   **Q.**   And so where was your phone located?

4   **A.**   It was in my back pocket.

02:12   5   **Q.**   And how were you able to call your grandfather?

6   **A.**   I grabbed it out before -- when he was pulling them down,

7   I grabbed it out.

8   **Q.**   And what kind of way was it -- did you have to dial a

9   number, or is there a just a button you can push?  How did you

02:12   10   call?

11   **A.**   It was a contact number.

12   **Q.**   Okay.  So something where you can just push a button and

13   it calls your grandfather?

14   **A.**   Yeah.

02:12   15   **Q.**   And you had mentioned that you were scared he was going to

16   do something else where -- when he was pulling down your pants.

17   Was Lonnie saying anything to you when he was doing this?

18   **A.**   No.

19   **Q.**   What happened -- after he's pulling down your pants and

02:13   20   you're holding them up, what happened after that, after you

21   were, you know, having your phone and stuff like that?

22   **A.**   He stopped and he just walked away and just went back into

23   his house.  And I was talking -- I actually hung up on my

24   grandpa after that, and I pulled back up my shorts, and I just

02:13   25   walked back up to the house.

1   **Q.**   And when Lonnie had pulled down your pants, did he touch

2   you in any way?

3   **A.**   No.

4   **Q.**   Okay.  So he didn't touch you on your private areas at

02:13   5   all?

6   **A.**   No.

7   **Q.**   But you were scared he might because he pulled your pants

8   down?

9   **A.**   Yes.

02:13   10   **Q.**   And after he had -- you guys had left, how did you get

11   back to your -- to your home?

12   **A.**   I -- my grandpa called again, and I told him that I wanted

13   to be picked up again, so he came five minutes after I called

14   him.  He came and picked me up.

02:14   15   **Q.**   And did Lonnie ever give you any money for working that

16   day?

17   **A.**   Yes.

18   **Q.**   Do you remember how much?

19   **A.**   Fifty.

02:14   20   **Q.**   And when this all happened -- maybe I should go into a

21   different incident.  You talked about how Mr. Spotted Bear had

22   -- he would sometimes come and pick you up to go and see Haylon

23   in his vehicle?

24   **A.**   Yes.

02:14   25   **Q.**   What kind of a vehicle did Mr. Spotted Bear drive?

1   **A.**   It was a -- it was a pickup.  It was a dark gray or gray.

2   **Q.**   In a pickup.  Like a pickup truck?

3   **A.**   Yeah.

4   **Q.**   Did it have like -- there's different pickup trucks.  Was

02:15   5   it something that had an enclosed back or a back that was open,

6   like a tailgate?

7   **A.**   It was -- I don't know.

8   **Q.**   Okay.  But at a certain point Lonnie would -- would he

9   pick you up in this truck?

02:15   10   **A.**   Yes.

11   **Q.**   And at any time did he ever touch you when you were in the

12   truck?

13   **A.**   Yes.

14   **Q.**   Can you -- how old were you when this would happen?

02:15   15   **A.**   Five.  Five or six.

16   **Q.**   Take me through what happened.  What would Lonnie do?

17   **A.**   We'd -- when I was done hanging out with Haylon, I'd --

18   when I was done hanging out with Haylon, they would both -- no,

19   he would just drive me home, and I got to drive home.  Like I

02:15   20   -- he was sitting down.  He was controlling the pedal.  I got

21   to go in between his legs and control the steering wheel, and

22   he'd touch me with his fingers.

23   **Q.**   Okay.  And when you say that you would drive, so would

24   Lonnie put you on his lap?

02:16   25   **A.**   In between his lap.

128

1  **Q.**  In between his lap.  And how were you steering?  What were

2  you using, your hands?

3  **A.**  Yeah.

4  **Q.**  And where was he taking you?

5  **A.**  Home.

6  **Q.**  And when he would do this, you said he would touch you.

7  Where would he touch you?

8  **A.**  My vagina area.

9  **Q.**  And what would he use to touch you?

10  **A.**  His hands.

11  **Q.**  Okay.  And how often would this happen?

12  **A.**  That was the one time.

13  **Q.**  Okay.  Did it ever happen more than once where he would

14  touch you?

15  **A.**  Yes.

16  **Q.**  Okay.

17       MR. BOLINSKE:  Your Honor, he keeps leading.  I'm

18  going to have to object.

19       THE COURT:  Sustained.  Let's just try to ask

20  nonleading questions.

21       MR. O'KONEK:  Your Honor, we'd ask, since this is a

22  child victim, that we be given latitude with leading questions.

23       THE COURT:  Well, this young lady is 12 years old,

24  and you have not attempted to ask a nonleading question --

25       MR. O'KONEK:  Yes, Your Honor.

129

1   THE COURT:  -- to find out how she responds, so --

2   MR. O'KONEK:  Yes, Your Honor.

3   **Q.**   (MR. O'KONEK CONTINUING)  Now, you had mentioned that he

4   had touched you more.  Did he ever touch you in the same sort

5   of way in the truck?

6   MR. BOLINSKE:  I guess, Your Honor, she's already

7   testified to that.

8   THE COURT:  Overruled.

9   **Q.**   (MR. O'KONEK CONTINUING)  Did he ever touch you in that

10   way again in the truck or in another vehicle?

11   **A.**   Yeah, in -- in the truck.

12   **Q.**   So take me through what happened on that time.

13   **A.**   It happened again one time.  Haylon and his friends, which

14   were my friends, would be in the back, like in the tailgate.

15   Like the tailgate was closed, but they were in that back area,

16   and I was the one that was steering the wheel again, and he'd

17   touch me around my vagina area.

18   **Q.**   Who would touch you?

19   **A.**   Lonnie.

20   **Q.**   And what would he touch you with?

21   **A.**   His hands.

22   **Q.**   And where was his -- where would his hands touch?

23   **A.**   My vagina.

24   **Q.**   Now, when this all happened, these three different things

25   we were talking about, did you ever tell anybody at the time

130

1    that it had happened?

2    **A.**    No.

3    **Q.**    Why not?

4    **A.**    I was too afraid.

02:18    5    **Q.**    Why were you afraid?

6    **A.**    I was afraid because I couldn't explain it in a way, and I

7    thought something bad would -- was going to happen.

8    **Q.**    Is it something where -- what were you -- you said

9    something bad might happen.  Can you describe, what were you

02:18    10    afraid might actually happen?

11    **A.**    That he'd get mad at me.

12    **Q.**    Were you afraid of anything else?

13    **A.**    No.

14    **Q.**    Now, as we stand here today -- when this happened, you

02:19    15    loved your grandfather, Lonnie?

16    **A.**    Yes.

17    **Q.**    And this is something difficult for you to do?

18    **A.**    Yes.

19         MR. O'KONEK:  Those are the only questions I have,

02:19    20    Your Honor.

21         THE COURT:  Mr. Bolinske, you may inquire if you

22    wish.

23                    <u>CROSS-EXAMINATION</u>

24    <u>BY MR. BOLINSKE:</u>

02:19    25    **Q.**    Nxxxx, do you remember going to a place for what's called

131

1   a forensic interview?  Have you heard that word before?

2   **A.**   No.

3   **Q.**   Do you remember going to a room with some chairs and a

4   lady asked you some questions about what you said happened to

02:19   5   you?

6   **A.**   Yes.

7   **Q.**   And do you remember them telling you that there was a

8   microphone in that room and things were being recorded?

9   **A.**   Yes.

02:19   10   **Q.**   And, in fact, if you know, were things recorded?  Was

11   there a videotape or a CD made of that interview?

12   **A.**   I'm pretty sure.

13   **Q.**   And have you seen or reviewed any videos or a video like

14   that in this case?

02:20   15   **A.**   No.

16   **Q.**   And do you remember talking to a lady in a room about this

17   stuff?

18   **A.**   Yes.

19   **Q.**   And at that time, just like this time, you were asked to

02:20   20   tell the truth.  Do you remember that?

21   **A.**   Yes.

22   **Q.**   And in the room at that time, did you tell the truth?

23   **A.**   Yes.

24   **Q.**   And did you tell them at that time everything that you

02:20   25   claim had happened to you?

132

1   A.   Yes.

2   Q.   And as we come here then today, you've added some more

3   things that you didn't tell those people, right?

4   A.   Yes.

02:20   5   Q.   And was that after meeting with these people at the table

6   that I'm pointing to?

7   A.   What do you mean?

8   Q.   Did you meet with any investigators in this case after

9   that forensic interview, do you remember?

02:21   10   A.   Yeah.

11   Q.   And do you remember who you met with, their names?

12   A.   No.

13   Q.   Do you remember what they might look like?  Do you

14   recognize them as the people sitting to my right here?

02:21   15   A.   Yes.

16   Q.   And they met with you, and you added to your story, right?

17   A.   Yes.

18   Q.   Okay.  And, again, these things were videotaped so we have

19   them to show the jury, right?

02:21   20   A.   Yes.

21   Q.   And you said that while this stuff was going on in the

22   shop, that you grabbed your cell phone and called who?

23   A.   My grandpa.

24   Q.   And his name is what?

02:22   25   A.   David.

1   Q.   What's his last name, please?

2   A.   Holding Eagle.

3   Q.   And so did anyone ever ask you to look at your phone that

4   you had at that time?

02:22   5   A.   No.

6   Q.   Did anyone ever, do you know, get any records relating to

7   that phone?

8   A.   No.

9   Q.   Did you -- you called Mr. Holding Eagle, your grandfather,

02:22   10   to come pick you up, right?

11   A.   Yes.

12   Q.   And you said that a couple of times you tried to call and

13   he didn't answer, is that right?

14   A.   Yes.

02:22   15   Q.   And all this is while Mr. Spotted Bear is doing this bad

16   stuff to you, right?

17   A.   Mm-hmm.

18   Q.   And did Mr. Spotted Bear grab your phone?

19   A.   No.

02:22   20   Q.   Did he take your phone?

21   A.   No.

22   Q.   Did he say, "Who are you calling?"

23   A.   No.

24   Q.   Did he try to say, "Don't tell anyone about anything

02:22   25   related to this"?

134

1    **A.**    No.

2    **Q.**    And you testified at the forensic interview that -- and

3    I'm sorry to have to do this, but that your pants were down,

4    right, at that -- at the time that you were trying to get your

02:23   5    phone?

6    **A.**    Yes.

7    **Q.**    And the phone was in your back pocket.  Where did you keep

8    your phone?

9    **A.**    In my back pocket.

02:23   10    **Q.**    And you've also testified in the forensic interview that

11    Mr. Spotted Bear laid on top of you, right?

12    **A.**    No.

13    **Q.**    This tractor tire stuff, where was Mr. Spotted Bear?

14    **A.**    My bottom half.

02:23   15    **Q.**    Okay.  And you're sitting on a tractor tire?

16    **A.**    I'm laying down.

17    **Q.**    And while he's doing this, then you reached down on the

18    ground, or something, while this is happening?

19    **A.**    No.

02:23   20    **Q.**    Your phone was in your back pocket, right?

21    **A.**    He was trying to pull them down.  I was pulling them up.

22    **Q.**    Okay.  And did you have a conversation with Mr. Holding

23    Eagle then about what was occurring?

24    **A.**    No.

02:23   25    **Q.**    Did you actually physically speak with him?

1   **A.**   No.

2   **Q.**   He came and picked you up, right?

3   **A.**   Yes.

4   **Q.**   So at some point you must have gotten a hold of him.

02:24   5   **A.**   He called back when I was in the house.

6   **Q.**   Okay.  And so would he be then someone to ask about

7   picking you up?

8   **A.**   No, he called, and I told him, "Can you please pick me

9   up?"  And he came around and picked me up.

02:24   10   **Q.**   And so his phone would show some calls then from you?

11   **A.**   Yes.

12   **Q.**   And he would come in here and testify then that you tried

13   to reach him several times and --

14        MR. O'KONEK:  Objection, speculation, what somebody

02:24   15   else would testify to.

16        THE COURT:  Overruled.

17   **Q.**   (MR. BOLINSKE CONTINUING)  Would he be the person to ask

18   about phone records or coming to pick you up?

19   **A.**   I don't know.

02:24   20   **Q.**   Would he have information about that if it occurred?

21   **A.**   Yes.

22        MR. BOLINSKE:  Thank you.  That's all I have.

23        THE COURT:  Mr. O'Konek, anything else?

24        MR. O'KONEK:  Yes, Your Honor, briefly.

02:25   25        ///

1                    <u>REDIRECT EXAMINATION</u>

2  <u>BY MR. O'KONEK:</u>

3  **Q.**   Now, I'm sorry, Nxxxx.  I just have a couple more

4  questions.  Now, ultimately when you spoke to the individual --

02:25   5  I think it was March -- with this forensic interview, you

6  testified on cross-examination you remembered that?

7  **A.**   A what?

8  **Q.**   That you remembered speaking with a person with couches,

9  what we've been referring to as a forensic interview?

02:25   10  **A.**   Yes.

11  **Q.**   Now, at that time did you know law enforcement were going

12  to be involved in this case or what was going to happen?

13  **A.**   No, not really.

14  **Q.**   And when this had all come out, had you spoken with

02:25   15  anybody about this incident?  Had you talked with anybody prior

16  to that forensic interview?

17  **A.**   No.

18  **Q.**   You hadn't?  And at some point, though, did -- you spoke

19  with Sxxxxxx Hxxxxx?

02:26   20  **A.**   Yes.

21  **Q.**   And where did you speak with her?

22  **A.**   It was before all of this happened.  She had told me what

23  happened.

24  **Q.**   Without going into what she told you, what did you tell

02:26   25  Sxxxxxx?

137

1    **A.**   I just told her that it happened to me also.

2    **Q.**   And after going into that -- once that had come out, you

3    ended up speaking with this individual during your forensic

4    interview, right?

02:26   5    **A.**   Mm-hmm.

6    **Q.**   And at some point you also -- when you had spoke -- I'm

7    going to go back a little bit.  I apologize.  When you had

8    spoken with Sxxxxxx, was it after you spoke with her that

9    somehow the forensic interviewer -- a meeting took place.  It

02:27   10   was after that?

11   **A.**   Yeah.  No, it was before.

12   **Q.**   So you talked with Sxxxxxx, and then there was this

13   forensic interview.

14   **A.**   No, it was way -- it was probably like three or four

02:27   15   months before the interview.

16   **Q.**   That you had spoken with Sxxxxxx?

17   **A.**   Yeah.

18   **Q.**   And ultimately did you know, when you told Sxxxxxx then,

19   that you'd be speaking with a forensic interviewer or that this

02:27   20   would go to court?

21   **A.**   No.

22          MR. O'KONEK:  I don't have any further questions,

23   Your Honor.

24          THE COURT:  Anything else?

02:27   25          MR. BOLINSKE:  Just a couple.

138

1                          <u>RECROSS EXAMINATION</u>

2     <u>BY MR. BOLINSKE:</u>

3     **Q.**   You reported this or told someone about this after Sxxxxxx

4     told you what she says happened to her, right?

02:28   5     **A.**   No.

6     **Q.**   You had said something before that?

7     **A.**   Well, could you explain?

8     **Q.**   Okay.  If I understand this right, were you at a camp, or

9     something, and Sxxxxxx said, "Something happened to me," and

02:28  10     then after she said that, did you say, "Something happened to

11     me too"?  Does that sound right?

12     **A.**   Yes.

13     **Q.**   And prior to that had you said anything to anyone else?

14     **A.**   No.

02:28  15     **Q.**   And at this forensic interview, do you remember telling

16     them that you had told Haylon something had happened to you?

17     **A.**   I did tell him something when I was five.  I told him,

18     "Your grandpa touched me in a way," and he laughed.  He thought

19     it was a joke.

02:29  20     **Q.**   Okay.  And have you talked to Haylon about this since?

21     **A.**   No.

22     **Q.**   Do you know if he remembers that?

23     **A.**   No.

24     **Q.**   And you indicated that -- if I understood this right, that

02:29  25     prior to this -- we keep calling it a forensic interview -- no

1   one had talked to you about what to say or how to talk at that?

2   **A.**   No.

3   **Q.**   You didn't talk to Ivetta, your grandmother, about that?

4   **A.**   No.

02:29   5   **Q.**   You didn't talk about -- what did you tell her about this

6   incident?

7   **A.**   I didn't tell her.

8   **Q.**   You didn't tell her?

9   **A.**   Sxxxxxx -- Sxxxxxx's dad called her and told, because I

02:29   10   told Sxxxxxx, and Sxxxxxx told her dad, and her dad came up to

11   our house and told my grandma.

12   **Q.**   Okay.  So your grandma never asked you anything about

13   this.

14   **A.**   No.

02:30   15   **Q.**   You've never talked to her about this?

16   **A.**   About what?

17   **Q.**   About what you say happened to you.

18   **A.**   No.

19        MR. BOLINSKE:  Okay.  Thank you.  That's all I have.

02:30   20        THE COURT:  Just one question for you.

21        <u>EXAMINATION</u>

22   <u>BY THE COURT</u>:

23   **Q.**   This -- how do you spell Haylon's name, the first name?

24   **A.**   H-a-y-l-o-n.

02:30   25   **Q.**   All right.  And so when you were four or five, he was

1   about what age?

2   **A.**   The same age.

3          THE COURT:  Okay.  All right.  Thank you.  Are there

4   any other questions?

02:30   5          MR. O'KONEK:  No, Your Honor, and we'd request that

6   she be excused.

7          MR. BOLINSKE:  No questions.  Thank you.

8          THE COURT:  Any objection to this witness being

9   excused from these proceedings?

02:30   10          MR. BOLINSKE:  No, Your Honor.  No.

11          THE COURT:  Thank you.  You may step down, and you

12   are excused.  That means you're free to leave.

13          You may call your next witness, Mr. O'Konek.  We'll

14   go for another 15 minutes, or so, and then we'll take a break.

02:30   15          MR. O'KONEK:  Yes, Your Honor.  The United States

16   would call Ivetta Spotted Bear.

17                          IVETTA SPOTTED BEAR,

18   having been first duly sworn, was examined and testified as

19   follows:

02:31   20                          DIRECT EXAMINATION

21   BY MR. O'KONEK:

22   **Q.**   Ma'am, I just have a few background questions for you.

23   Can you first just state your name for the jury?

24   **A.**   Ivetta Spotted Bear.

02:32   25   **Q.**   Okay.  And where do you currently live?

1   **A.**    In Twin Buttes.

2   **Q.**    And Twin Buttes, is that on the Fort Berthold Indian

3   Reservation?

4   **A.**    Yes, it is.

02:32   5   **Q.**    What kind of a town -- how big is Twin Buttes?

6   **A.**    It's probably the smallest community on the Fort Berthold

7   Reservation.  We're on the south side of the lake, split up

8   from the rest of the reservation.

9   **Q.**    Approximately how many people would you say live in Twin

02:33   10   Buttes?

11   **A.**    Approximately 250 to 300 in the community.

12   **Q.**    And can you briefly take the jury through who's all in

13   your family, I guess who you're married to and children,

14   grandchildren?

02:33   15   **A.**    I'm married to -- my husband's name is David Holding

16   Eagle.  We were married in October 16, 1998, and David -- we

17   were both previously married, so David had four children from

18   his previous marriage, and I had one son that was -- he was

19   older already at the time when we got married.

02:33   20       After David and I were married in '98, we moved to --

21   my mom used -- I used to take care of my mom.  She was elderly,

22   and she lived with I and my husband most of the time during the

23   winter.  And then in the summer she would go back to Twin

24   Buttes, to her place.  And in the year of 2000 she was

02:34   25   diagnosed with cancer, and so we lived in New Town up until

142

1    then.  And then that's how we moved back to Twin Buttes, to my

2    mom's place, and that was in 2000.

3          My husband worked for the railroad, so he traveled

4    around.  And I had been injured in a motorcycle accident, and

02:34    5    so I wasn't working at the time.  And so when my mom was

6    diagnosed with cancer in 2000, at that time I moved her back

7    home to Twin Buttes, to her place, and that's how we ended up

8    moving to Twin Buttes in 2000.  That was a -- we both grew up

9    there.  We were -- we lived there, went to grade school there

02:34    10   in our younger years and then had left there.

11   Q.   And Lonnie Spotted Bear, what relation is he to you?

12   A.   Lonnie is my brother.

13   Q.   And I want to talk to you a little bit about Nxxxx Hxxxxxx

14   Exxxx.  Now, she is your granddaughter?

02:35    15   A.   Yes, she is my step-daughter's daughter, and in -- do you

16   want me to tell how I --

17   Q.   Yes, please.

18   A.   -- got her?  Okay.  In -- my husband worked for the

19   railroad, and so he traveled around.  He was like on what they

02:35    20   call a gang and that, and so he would be gone -- usually leave

21   on Sunday, and he'd come back on Fridays.  Well, I had traveled

22   with him to -- he was working out in Hungry Horse, Montana, in

23   June of 2006, and it was the first time -- one of the first

24   times I'd got to travel with him because our -- I raised my

02:35    25   stepson, who was David, Junior.  He kind of came with his dad

143

1   when we -- when I and his dad got together.  His son was seven

2   years old, and so he moved in with us shortly after.

3          But he had just -- he had just turned 18, and he

4   had -- was -- he wasn't living with us.  And I had a call from

02:36   5   my step-daughter, who was living in Fargo, and asked me, "Could

6   you take my babies?  I've got -- I'm in jail."  And I told

7   her -- you know, I said, "I'm with your dad.  We're in Montana,

8   but as soon as I get back, you know, we'll go get them."

9          And so we got back from Hungry Horse like about

02:36   10   4 o'clock in the morning, and slept for a few hours, and then

11   we left and we met the other -- his ex-wife, and she brought

12   the three -- there were three grandkids.  She brought them to

13   Steele.  We met them, and so we took them home with us.

14          They came basically with -- Nxxxx (sic) was a year

02:36   15   old at the time, and all she had was a big deal of Pampers, and

16   the other kids just had -- really didn't have anything with

17   them.  And we didn't know if we would have them for a year or

18   -- I mean, we didn't know if we'd have them a week, a month, or

19   whatever.  We were looking -- I was thinking maybe two weeks to

02:37   20   a month.

21   **Q.**   And for how long did Nxxxx live with you?

22   **A.**   From the time she was one years old then.  We ended up

23   just -- the mom never -- the mom ended up going to jail, and

24   she was going to be there for about 18 months, or so, and so we

02:37   25   had the kids from June of 2006.

1   **Q.**   And what is Nxxxx's age today?

2   **A.**   Nxxxx is 12 today.

3   **Q.**   And do you know her date of birth off the top of your

4   head?

02:37   5   **A.**   Oh yeah, December 16, 2004.

6   **Q.**   And where is Nxxxx currently living?

7   **A.**   Well, she is in our household, but -- I mean, she's part

8   of our household, but this year she went to school in boarding

9   school in Marty, South Dakota.

02:37   10   **Q.**   Okay.  Approximately how far is that away from Bismarck?

11   **A.**   It's right down by the Nebraska border, so I'd -- from

12   Twin Buttes, where we live, it's probably eight, nine hours.

13   **Q.**   And what are some of Nxxxx's favorite activities?

14   **A.**   Oh, Nxxxx is -- she loves to read.  She likes to be

02:38   15   outside.  She likes to hike.  She likes to camp.  She's just --

16   likes music, likes to listen to music, just pretty much normal.

17   **Q.**   And when we talk about where you live in Twin Buttes, take

18   us through -- how far is that away from where Lonnie lives?

19   **A.**   Lonnie lives at our old -- where we grew up, where -- as

02:38   20   children, our old place, so from -- and I moved into where my

21   mom was living, which is probably maybe three, four miles on

22   the highway.  It's, I would say, maybe about four miles from

23   our house.

24   **Q.**   And at the time, roughly, let's say -- at some point did

02:39   25   Lonnie's house burn down?

1    **A.**    Yes.

2    **Q.**    And when did that occur?

3    **A.**    Last February.

4    **Q.**    And prior to that, where was Lonnie living?

02:39    5    **A.**    In his -- at his place.  In his house.

6    **Q.**    At that time how far away were you and Nxxxx living from

7    Mr. Spotted Bear?

8    **A.**    Four or five miles.  About maybe four miles, you know.  I

9    don't know exactly, but just straight across country, maybe a

02:39    10   mile-and-a-half.  But, you know, the highway, it's probably

11   about four miles, or so.

12   **Q.**    And what are -- what is Nxxxx's relationship to Lonnie

13   Spotted Bear?

14   **A.**    We had -- my brother, Lonnie, and my sister-in-law are her

02:39    15   godparents, and so she usually called him either Grandpa or

16   Papa Lonnie or Godfather.

17   **Q.**    And you mentioned, I think, earlier that he -- Lonnie had

18   land on the lake.  How much land does Lonnie own?

19   **A.**    Oh, I don't know exactly, but I know my mom had -- we all

02:40    20   had kind of heirship land, and I think when I was in my very

21   early twenties, my mom had asked all of us to turn all of our

22   heirship land over to Lonnie, and so we all signed our land

23   over at that time.  And I think my husband had -- my first

24   husband, who I was married to at that time because it was in my

02:40    25   early twenties, I think he said it was around 60-some acres

146

1   that we were -- because he said, "Do you know how much land

2   you're giving?"  I said, "Well, it's what my mom wanted us to

3   do."

4   **Q.**   Did he have land that was by a lake, by any chance?

5   **A.**   Oh, yeah.  Well, he has land going down to the lake, and

6   then around the lake it's Corps land, but his land is -- you

7   know, you pass through the Spotted Bear land, or whatever, on

8   the way to the lake.

9   **Q.**   Would Mr. Spotted Bear ever have any family gatherings?

10  Would people ever go and visit Mr. Spotted Bear?

11  **A.**   Well, it kind of became -- there's a -- it's a campsite, a

12  camp area, and it's just called Spotted Bear Camp, and other

13  people that use the lake kind of know the area as Spotted Bear

14  Bay.  And, yeah, I'm not sure how many years ago it was set up,

15  but family, you know, gathered there in the summertime, Fourth

16  of July, Memorial Day, Labor Day weekend, different -- on

17  holidays like that, a lot of family members go down to the camp

18  there or family friends, relatives.

19  **Q.**   And --

20          THE COURT:  Mr. O'Konek, we're going to take our

21  mid-afternoon break here, so we will recess for 20 minutes,

22  convene -- reconvene about five minutes after 3:00.  Please,

23  members of the jury, don't visit amongst yourselves about this

24  case, and we will see everyone back in about 20 minutes.

25          (A recess was taken from 2:41 p.m. to 3:07 p.m., the

147

1   same day.)

2          THE COURT:  Welcome back.  We are back on the record.

3   We'll continue with the questioning of Ms. Spotted Bear.

4          MR. O'KONEK:  Thank you, Your Honor.

03:08   5   **Q.**   (MR. O'KONEK CONTINUING)  Ms. Spotted Bear, I just have a

6   couple of questions to kind of get back in the rhythm.  Now,

7   Travis Hallam, do you know a Travis Hallam?

8   **A.**   Travis is my nephew.

9   **Q.**   Okay.  And Crystal, how do you know Crystal Hallam?

03:08   10   **A.**   Crystal is Travis's wife.

11   **Q.**   And do you know a Brad Sanderson?

12   **A.**   Or excuse me.  I should say ex-wife.  Yes, I've known Brad

13   since he was just a little guy.

14   **Q.**   And what is his relationship to you?

03:08   15   **A.**   He's not really related to me.  He's my brother's nephew.

16   **Q.**   Okay.  And Meranda Sanderson, do you know her?

17   **A.**   Yes, Meranda is related to me, and she married Brad.

18   **Q.**   And Mxxxx Sxxxxxxxx is their daughter.  What is her

19   relationship to you?

03:08   20   **A.**   Well, Mxxxx would be a granddaughter, in our culture, to

21   me.  Her mom would be my niece.

22   **Q.**   And Sxxxxxx Hxxxxx, the daughter of Travis and Crystal,

23   what is her relationship to you?

24   **A.**   In our culture she would also be my granddaughter, but I

03:09   25   think she mostly calls me Auntie because her dad calls me

148

1    Auntie.

2    **Q.**   And I want to talk a little bit about going into -- you

3    were talking about, people from the family would visit Lonnie

4    on his property.  Do you remember that?

03:09    5    **A.**   Yes.

6    **Q.**   And when we -- when I use the word "family," who all would

7    go to Lonnie's property?

8    **A.**   Oh, whoever could make it.  I mean, there would maybe at

9    times be probably 50, 60 people that would go down there, so we

03:09    10    come from a very large family.  I'm not sure if we -- there

11    were 13 children in our family, so I had -- there were nine

12    girls and a foster sister, so it was like ten girls and four

13    brothers and a couple foster brothers.

14    **Q.**   And so they would all bring their families?

03:09    15    **A.**   Yeah, everybody would, whoever -- whoever could make it

16    would.  We'd all go down to Spotted Bear Camp.  That was the

17    big thing for the summertime.  We'd go down there for, like I

18    said, Memorial Day, Fourth of July weekend, Labor Day weekend

19    and just have a big family -- family gatherings or, you know,

03:10    20    picnics and boating, and whatever, water -- swimming.

21    **Q.**   And when you would have these family gatherings, would

22    Sxxxxxx Hxxxxx and her parents be there?

23    **A.**   On occasion.  You know, not -- not always, but, yeah,

24    there are times.  I mean, Travis had his boat and fishing and

03:10    25    things like that, so, yeah, they were -- they were there a lot.

1  **Q.**   And what about Mxxxx Sanderson's family?  Would she and

2  her family be out at Mr. Spotted Bear's property?

3  **A.**   Oh, yeah, and probably more times than I would know

4  because there -- the Sanderson is related to Lonnie's -- to my

03:10  5  sister-in-law, on that side of the family, to Lonnie's wife.

6  **Q.**   And during these times would -- would there be times where

7  Nxxxx, going back to her, she would spend time with the

8  defendant alone?

9  **A.**   Not that, you know, we ever -- could you make it more

03:11  10  clear?

11  **Q.**   Were there ever times where Nxxxx was spending time with

12  Haylon?

13  **A.**   With Haylon, yes.

14  **Q.**   So take me through -- who is Haylon?

03:11  15  **A.**   Haylon is Lonnie's grandson.  He's the same age as Nxxxx.

16  **Q.**   Okay.  So --

17  **A.**   Well, he's actually maybe about six months older than

18  Nxxxx.

19  **Q.**   So he would be 13?

03:11  20  **A.**   Yes, Haylon is 13 now.

21  **Q.**   And how often would Nxxxx or -- Nxxxx go over and hang out

22  with Haylon?

23  **A.**   Well, not at the camp.  You know, at the camp everybody is

24  all together, kids are all together, but at their place,

03:11  25  numerous, multiple times.  Lonnie would call and ask if Nxxxx

1  could come and play with Haylon or, you know, they could -- he

2  could take her down to the lake with them and, you know, on

3  Sundays after church or they -- she's went on ski trips with

4  them.  They've taken her on ski trips with them.  She's went on

5  birthday parties with them, to the state fair with them, so

6  there were multiple, multiple times where they took Nxxxx

7  along.

8  Q.   And so when you say "they took Nxxxx along," are you

9  referring to Mr. Spotted Bear and his wife?

10  A.   The family, family things.  Yeah, family.

11  Q.   And would Mr. Spotted Bear, your brother, ever come over

12  to the house and pick up Nxxxx?

13  A.   Oh, yes, that's -- he would call and ask if they could

14  take Nxxxx down to the lake or if Nxxxx could go with them to

15  someplace.  He usually -- he was the one who always came.

16  Diana, my sister-in-law, never, ever came and picked her up.

17  It was Lonnie and sometimes Lonnie and Haylon or, you know,

18  other ones, but he was the one who always picked her up and

19  always brought her home.

20  Q.   And when -- kind of directing your attention to when Nxxxx

21  would have been four or five, six range, were you still living

22  at that four-mile away from where Lonnie was?

23  A.   Yes.  Yes.

24  Q.   And when Lonnie would come and get her, did you ever know

25  exactly where they were going to be going, or was it something

151

1    where he'd --

2    **A.**    Oh, yes.

3    **Q.**    -- call ahead of time, or --

4    **A.**    Yeah, we always knew.  I mean, if he said they were going

5    to the lake, then I figured they were going to the lake.  If

6    they're going to the fair or if they're going skiing, yes, we

7    always -- you know, if they were just going to his -- you know,

8    take them back to his place to spend the day with Haylon, or

9    whatever.  But, I mean, yeah, it wasn't just to pick her up.

10   We always, you know, knew that -- where she was supposed to be.

11   **Q.**    And did you trust Lonnie to watch Nxxxx?

12   **A.**    Oh, totally.  It was her godfather, you know.  We

13   totally -- totally.  That's the only place that we ever really

14   let her go.  You know, we trusted him totally.

15   **Q.**    And when I -- I'm going to give you the name of Daylon.

16   Who is Uncle Daylon?

17   **A.**    Uncle Daylon is Lonnie's oldest.  He's got -- he's my

18   nephew, so Lonnie has two boys.  Daylon is the oldest, and then

19   Morley is Haylon's dad.

20   **Q.**    And where does Daylon live in Twin Buttes?

21   **A.**    Just a little ways from his dad.  His house is not too far

22   from his dad's, from Lonnie's house, right over -- maybe a half

23   mile from his dad's house.

24   **Q.**    Now, when Nxxxx was nine, do you ever remember an incident

25   where the defendant asked for Nxxxx to work with him at his

1  shop?

2  A.   Yes, I -- well, it wasn't so much to work with him.  He

3  came over and he asked -- he said he needed some help on -- for

4  somebody to hold a wrench or hold a tool.  And generally

5  Nxxxx's brother, Anthony, was the one who -- he went and helped

6  Lonnie a lot.  He would do fencing for him, or whatever.  If

7  Lonnie needed something -- you know, needed Anthony to drive a

8  vehicle for him, or something, Anthony usually went and helped

9  Lonnie all the time.

10  Q.   And so -- but at some point when Nxxxx was nine, did he --

11  Lonnie ever ask for Nxxxx?

12  A.   Well, he came, and I -- he didn't ask for Nxxxx.  He asked

13  for Anthony to come and help him with something, but Anthony

14  wasn't home.  And I don't remember exactly if I said -- you

15  know, if Nxxxx could go or if he asked for Nxxxx to go.  I

16  don't -- you know, that's not, you know, real clear in my mind.

17  But I do know that, you know, he took Nxxxx to help him with

18  something.  It was supposed to be to hold a wrench, or

19  something, so he could do some work on a -- I don't know if

20  it's a tractor or whatever it was he was working on, but he

21  needed somebody to hold a tool for him.

22  Q.   And when Lonnie would come to your house, would he ever

23  pick up -- would he ever pick up Nxxxx to drive her somewhere?

24  A.   Are you talking in general, or --

25  Q.   I guess what I'm asking is, was there ever a time where

1    Mr. Spotted Bear drove Nxxxx places, to and from?

2    **A.**   Well, like I said, he -- he always was the one who came

3    and picked her up.  He was usually the one that always called

4    and asked, you know, if she could go spend the day with Haylon

03:16   5    or go to the lake with them, and, you know, so it was nothing

6    unusual.  I mean, it was always Lonnie that always asked to --

7    for her to go along.

8    **Q.**   Did you ever find out whether or not anything was ever

9    going inappropriate in a vehicle with Lonnie and Nxxxx?

03:17   10    **A.**   Could you repeat that?

11    **Q.**   Yeah, I know it's kind of a -- kind of an odd question,

12    but was there ever a time when you learned about Nxxxx

13    potentially sitting on Mr. Spotted Bear's lap?

14    **A.**   Oh, yes.  There were a couple instances when Nxxxx -- it

03:17   15    was at nighttime, evening when Nxxxx had come back.  And I know

16    she was, you know, quite small, maybe six, seven, or so, where

17    she told me she drove home.  And I said, "What do you mean, you

18    drove home?"  And she said, "I got to sit on Papa Lonnie's lap

19    or Godfather's lap and -- and he let me drive.  He let me

03:17   20    steer."

21        And I know, you know, I didn't feel -- I like kind of

22    didn't have a good feeling about it.  I didn't really like it,

23    I mean, in my mind.  And then I just thought, well, you know,

24    maybe I'm just, you know, being narrow-minded.  I shouldn't

03:18   25    think like that, but I -- it didn't make me feel very good, and

154

1    I remember that happened on a couple occasions, that she said

2    she got to drive home.

3    Q.    And have you noticed any effects on Nxxxx, any changes in

4    behavior?

5    A.    Oh, it was probably maybe around -- maybe around nine or

6    ten, but, yes, some very, very -- she would go in her room and

7    close the door.  She would be rude.  There were times where she

8    would make me cry, and I'd -- I'd say, you know, "I don't know

9    what's -- you know, why you treat me this way, why you make me

10   feel like you hate me," you know, and so -- you know, and my

11   husband and I just thought, you know, it's a phase that she

12   must be going through.  You know, so she became very withdrawn

13   and, like I said, you know, we just thought it was a stage that

14   she was probably going through.  But, yeah, just mean.

15          I mean, and we have another -- we're raising a niece

16   that's eight years old.  She became more mean to our -- the

17   youngest one, Avery, and that's what I -- you know, I said it

18   made me feel like she didn't like Avery anymore, you know, or

19   didn't like -- so there was -- there was a lot of things that

20   were going on that I didn't -- you know, didn't know why, what

21   was going on.

22   Q.    And I want to kind of fast-forward to April of last year.

23   Did Lonnie ever try to come and talk to you at your home in

24   Twin Buttes?

25   A.    Yes, after -- when we were in -- in March, when we were

155

informed by Travis that the FBI wanted to talk to us, that they
wanted to speak with us, and when he told us it was because
Nxxxx had been molested, you know, we were really shocked.  And
then when we met with the FBI, the FBI had -- we went and --
well, the first day when Travis told us, that night, when I
went -- and after Travis left, I went to Nxxxx's room and I sat
down on the bed and I asked her.  I asked her if she knew why
Travis was there, and she said no.  And I said, you know,
he'd -- he told us that she had been molested and that -- I
said, "Is it true?  Did something happen?"  And she just -- she
just turned away from me and she started crying, and so I just
took her and I just held her and I just -- we both cried.

        And the FBI -- the next day then I called the FBI --
or, no, I guess the next day I went to our pastor and his wife
and I talked to them.  I mean, I just bawled and bawled and
told them.

        And then the next day I called the FBI, the number
they gave me to call.  And then when we met with them, the FBI,
they told us we were not -- not to have any contact at all, and
I said, "Well, that means we can't go to church anymore,"
because we -- Lonnie and his family were always -- we went to
the same church and so we saw them every Sunday all the time,
and so we didn't go to that church.

        That first Sunday was Easter Sunday, and then the
next -- for three Sundays then we had missed church without any

156

1  -- well, the pastor knew, and I had told the pastor we won't be

2  at church for a while, you know, and so our pastor and his wife

3  knew.

4           Then the third Sunday when we didn't go to church, we

5  were -- we were just trying to deal with everything.  And,

6  anyway, we were keeping our doors locked.  We were keeping our

7  windows drawn.  And, anyway, we had our outside door locked on

8  -- our screen door locked, but our inside door was open a

9  little bit.

10           And we -- somebody was at our door.  And my husband

11  looked out and he said, "It's Lonnie."  And he wanted to go,

12  and I wouldn't let him go to the door.  We just -- we didn't

13  answer.  We wouldn't answer the door, and then we saw it.  Our

14  inside door, we -- it swung open, and my husband was going to

15  go out there, and I just told him I thought -- I thought Lonnie

16  had came in because we knew he was out at the door.  We could

17  see him from our bathroom window that he was out there.

18           And, anyway, when the -- we saw the door swing open,

19  and we could see the light into the kitchen.  And my husband

20  was going to go there, and I wouldn't let him because I knew

21  what would happen if he went.  And I just said, "Let me handle

22  it."

23  Q.   And so after you see the -- you notice that Lonnie is at

24  the door, what did you do?

25  A.   Well, yeah, he -- and I went in there.  Well, I saw he

1   didn't get in the house, but he had reached down and -- we have

2   a doggy door, and he had reached in and he had pushed our

3   inside door open, but he couldn't get in because our outside

4   door was still locked.  And I just told him he couldn't be

5   there.  I said, "You got to leave," I said, "otherwise" -- I

6   said I can't -- he said he just -- he said, "I just want to

7   talk to you."  He said, "Just talk to me."  And I said, "No, we

8   can't talk to you."  I said, "You have to leave or else I have

9   to call the cops," because they told me that I needed to notify

10  the police if he came over or anything.

11          And so he didn't leave for a long time.  He -- I just

12  closed the door on him, and he stood outside on the deck for a

13  while.  And then he went and got back in his truck, and he sat

14  in his truck for quite awhile, and then he slowly pulled out of

15  the driveway and -- and left then.

16  Q.   The last questions I have go to Nxxxx.  You've -- Nxxxx

17  has lived with you almost all of her life, right?

18  A.   Yes.

19  Q.   And you've gotten to know her throughout the years?

20  A.   I know her probably better than anyone else.

21  Q.   And just a yes or no on this.  In your opinion, is Nxxxx a

22  truthful person?

23  A.   Nxxxx is a very truthful, very honest person.

24          MR. O'KONEK:  Thank you.

25          THE WITNESS:  We --

158

1      MR. O'KONEK:  Thank you.  No further questions.

2      THE COURT:  Mr. Bolinske.

3                          CROSS-EXAMINATION

4  BY MR. BOLINSKE:

03:25  5  **Q.**  If I can ask -- and this is a strange question, but what

6  is your age, Ms. Spotted Bear?

7  **A.**  My age?

8  **Q.**  Yeah.

9  **A.**  I'm 65.

03:25  10  **Q.**  And how far are you and Lonnie apart?  Lonnie is your

11  brother, right?

12  **A.**  Yes.  Let me see.  I always have to stop and think because

13  there were -- there were 13 kids.

14  **Q.**  Are you a younger sister?

03:25  15  **A.**  Yes.

16  **Q.**  And is Lonnie like 72?  Does that sound right, something

17  like that, 73?

18  **A.**  Okay.  Yeah, I was going to say 73, 74, around there.

19  **Q.**  Okay.  So seven, eight years younger you are, correct?

03:25  20  **A.**  Yes.  Yes.

21  **Q.**  Okay.  And have you lived around Lonnie or, you know, been

22  around he and his family and your family a lot of his life and

23  your life?

24  **A.**  Well, not -- you know, when I was younger, since he was

03:25  25  older -- you know, the older ones were gone pretty much when I

1   was growing up.  And then, you know, we would see each other

2   holidays and stuff, but probably not really lived around until

3   we moved back to Twin Buttes in 2000.

4   **Q.**   Okay.  So for --

03:26   5   **A.**   We'd see each other on like holidays when we'd -- our

6   family would get together, and that.

7   **Q.**   Okay.  So from 2000 to, say, 2016, in that timeframe you

8   did things together?  You'd go to the Spotted Bear Bay and

9   stuff like that?

03:26   10   **A.**   Spotted Bear Camp.

11   **Q.**   Spotted Bear Camp.  Okay.  And you had -- describe your

12   relationship.  Did you have a fairly decent relationship, a bad

13   relationship?  Describe that.

14   **A.**   Oh, I think we had a great relationship.  Like I've always

03:26   15   said, you know, he was my older brother and I looked up to him

16   my whole life.  You know, whenever we needed any help, you

17   know, or if they needed anything done, you know, we -- we --

18   and he would come over if my husband needed something or if

19   Lonnie needed help.  I said we -- you know, we were very close.

03:26   20   **Q.**   Okay.  And I think you said earlier, and correct me if I'm

21   wrong, that you had never had any reason not to trust him.

22   **A.**   No, we trusted him completely.

23   **Q.**   And you remember a few times Nxxxx talking about riding on

24   grandpa's lap or driving a car or something like that?

03:27   25   **A.**   Sitting on his lap.

1   **Q.**   Okay.

2   **A.**   Yeah, that he let her -- he had her sit on his lap and let

3   her drive home.

4   **Q.**   Okay.  And I did that as a kid.  Did you do that as a kid?

03:27   5   I mean, kids do that, right?

6   **A.**   No, I -- that's why I didn't feel good about it.  You

7   know, first off, not only is it dangerous, you know, I -- I

8   just -- I didn't get to sit on anybody's lap and drive when I

9   was growing up, and I didn't -- you know, I have a son.  I

03:27   10   didn't let my son sit on my lap and -- and drive.  You know, I

11   don't think that that's a good practice.

12   **Q.**   So you've not heard of or seen kids sitting on laps, just

13   kind of steering, driving?  I'm not talking highway.  I'm just

14   talking, you know, playing around.

03:28   15   **A.**   Oh, yeah, certainly I've heard of it.  But like I said,

16   you know, it's not something that we've ever practiced.

17   **Q.**   Okay.  And at some point then you described Nxxxx made

18   accusations against Lonnie, right?

19   **A.**   No, I said we were not -- we were -- we did not know until

03:28   20   we were informed that we needed to go -- that the FBI wanted to

21   talk to us, and it wasn't until that time when I asked Nxxxx.

22   But up until the time when I asked her if something had

23   happened, she had not revealed anything to us.

24   **Q.**   Okay.  And so how did you -- you heard from Travis, is

03:28   25   that right?

1  **A.**   That's right.

2  **Q.**   And what -- what did you hear?

3  **A.**   Travis called up one evening.  Well, I remember exactly.

4  It was on Monday after Palm Sunday.  I was fixing supper, and

03:29  5  Travis called and asked if David was home, my husband was home,

6  and I said yes.  And he said, "I need to speak to you and David

7  together."  And he said, "I'll be -- I'll be right over," and

8  so I said okay.

9         Travis came over, and my husband was in the bedroom,

03:29  10  and so Travis said, "Can we go talk to him in there?"  And I

11  said yes, and so we went in there.  You know, I said, "What's

12  this about?"  And that's when he said -- he gave us a phone

13  number and he said, "The FBI wants you to call them."  And I

14  said, you know, "About what?"  And he kind of hesitated, but he

03:29  15  said, "Nxxxx was molested."  And he didn't want to tell us by

16  who.  He wanted the FBI to tell us, but I told him -- I said,

17  "Travis, you can't -- you can't leave this house until you tell

18  me."

19  **Q.**   So Travis kind of got this thing started then with the

03:30  20  FBI?

21  **A.**   I have no -- all he -- he gave us the number that we were

22  to call, the FBI.

23  **Q.**   Okay.  And who's -- who -- Travis, whose parent is he?

24  **A.**   Sxxxxxx's.

03:30  25  **Q.**   Okay.  And so you -- Travis tells you the FBI wants to

1   talk to you and that Nxxxx had been -- so he's telling you then

2   that your granddaughter had been molested, right?

3   **A.**   Yes.

4   **Q.**   Telling you, right?

5   **A.**   Yes.

6   **Q.**   Doesn't say there's accusations.  He says this has

7   happened, right?

8   **A.**   He just -- yeah, he said Nxxxx has -- Nxxxx was molested.

9   **Q.**   Okay.  And does that information then, I take it, probably

10  come from Sxxxxxx, right?

11  **A.**   Probably.

12  **Q.**   And so then at some point Lonnie finds out about this,

13  right, that he's being accused of stuff?

14  **A.**   I have no idea, because when we talked to the FBI, they

15  just asked me -- they said, "Can you maintain your normal

16  relationship without him -- without Lonnie knowing what you

17  know?"  And I said, "No, I cannot do that."  And so they said,

18  "Okay, then you need to not have any contact."  And so I said,

19  "Well, then we cannot have any contact."  I said, "That means

20  we can't go to church anymore."

21  **Q.**   Okay.  And just to re-establish -- prior to that you had

22  gone to church together, he'd worked on your house, you had no

23  reason not to trust him, things were, you know, normal, right?

24  **A.**   Oh, yes.  Yes.

25  **Q.**   And so you're friends.  You and Lonnie are friends.

163

1    You're brother and sister.  You're friends, right?

2    A.   Oh, like I said, he was my big brother.  I looked up to

3    him my whole life.

4    Q.   And so when he shows up at your house and it's locked and

5    you won't talk to him, how do you think that made him feel?

6    A.   I could tell how he felt.  I could see the look on his

7    face.  You know, I was actually worried about him.  He looked

8    sick.  He looked like -- you know, I just -- I was -- I

9    actually was a little bit worried about him that day.

10   Q.   He had been accused of terrible things, right?

11   A.   I did not know that he knew yet.

12   Q.   But he had been accused of terrible things, right?

13   A.   I did not know if he knew that he was accused.  I didn't

14   -- all I knew is we did not go to church for Easter Sunday and

15   the next two Sundays, and I -- I figured he must have heard

16   something, that's why he had came over.

17   Q.   And if you were accused of terrible things, would you want

18   to get to the truth?

19   A.   Certainly.

20   Q.   And if Lonnie had accused you of terrible things, would

21   you try to maybe talk to Lonnie and say, "Hey, this didn't

22   happen, this did happen," things like that?

23   A.   Could you repeat that?

24   Q.   If Lonnie accused you of bad things, do you think you

25   might want to talk to Lonnie about it?

164

1   **A.**   Oh, yes, but when Lonnie came to the house, I mean, he --

2   okay.   When he came, he didn't say what he wanted to talk

3   about.   He just said, "Just talk to me, just talk to me."   But

4   he did not say about what he wanted to talk to us about or what

03:33   5   he wanted to talk to me about.   He didn't say anything that he

6   had been accused of any -- he didn't mention anything that he

7   had been accused of.

8   **Q.**   Okay.   But he -- he didn't make any threats at that time,

9   did he?

03:33   10   **A.**   No, he just -- he just wouldn't leave.   He just was

11   staying at the door.   He just --

12   **Q.**   And he didn't try to intimidate anyone.   He just wanted to

13   talk, right?

14   **A.**   Well, I think by not leaving -- you know, that was kind of

03:34   15   an intimidation, by not leaving our door and by pushing the

16   inside door open, you know.   If I would have went to his place

17   and knocked and nobody answered, I think I would have left.

18   **Q.**   Okay.   And he left, and he left slowly.   He didn't peel

19   out or pound earth, anything like that, did he?

03:34   20   **A.**   No.   Like I said, he stood on the deck for quite a while.

21   Then he went and he sat in his truck for quite a while, and

22   then he drove out of the yard very slowly.

23   **Q.**   Okay.   And do you remember talking to the FBI or somebody

24   at the FBI about this incident?

03:34   25   **A.**   Yes, I text -- do I say the name?   I text Paula Bosch, the

1   FBI agent, the advocate from Minot, and I said -- told her --

2   because this was on a Sunday, and I said I felt that he may be

3   suicidal and I didn't know what to do.  And so she just

4   instructed me to call the local authorities and tell them to do

03:35  5   a welfare check.

6   **Q.**   Okay.  And you had -- who's Paula?

7   **A.**   Paula Bosch is the FBI agent from Minot, victims -- or the

8   victims advocate, or something.

9   **Q.**   And you had a cell phone number for her, or something?

03:35  10  **A.**   Yes.

11  **Q.**   And would you two text back and forth?

12  **A.**   No, not -- not back and forth.  And I still have the text

13  on my phone, I'm sure.  I -- she gave me her number in case I

14  needed to get a hold of her for anything.  And this was on a

03:35  15  Sunday, and so I did text her, but I don't -- you know, we

16  don't text back and forth, no.

17  **Q.**   Okay.  Was there just that one text, or were there more

18  that you recall?

19  **A.**   I think that was just the one.  She just told me to

03:36  20  contact the local authorities and do a welfare check, and that

21  was it.

22  **Q.**   Okay.  And do you remember telling the agent that you do

23  not believe Lonnie will attempt to contact or intimidate the

24  girls?  Do you remember telling them that?

03:36  25  **A.**   Yes, because, you know, my husband would never stand for

1  anything like that, you know, for anyone to intimidate, you

2  know, our children or our grandchildren.

3  **Q.**   Okay.  And is it fair to say that at that time you told

4  the agent that you're not afraid of Lonnie?

03:36   5  **A.**   No, I'm not.  I'm not afraid of Lonnie, and I've never --

6  I've never been afraid of him.

7  **Q.**   Okay.  And you've talked to Nxxxx about what she's saying

8  happened to her, right?

9  **A.**   Minimal.

03:36   10  **Q.**   How many times have you talked to her?

11  **A.**   You know, I've -- from when she told me what happened, you

12  know, I said right away, "I don't need to hear any details."

13  You know, I know that something happened, but I don't -- I

14  didn't need to hear any details, and so, you know, I never did

03:37   15  ask her any of the details.

16  **Q.**   So you know that something happened.

17  **A.**   Yes.

18  **Q.**   And that's knowledge from Travis?

19  **A.**   No, from Nxxxx.  From Nxxxx.

03:37   20  **Q.**   Okay.  But you've talked to her minimally?

21  **A.**   Well, we've never gone into detail.  You know, I went --

22  when I went in and I asked her, "Did something happen," and

23  when she turned away and started crying, I knew immediately

24  that something had happened because she -- otherwise she would

03:37   25  have looked at me in the face and said, no, nothing happened.

1  Q.   Well, something happened.  Lots of things happen to people

2  in life, right?

3  A.   Oh, yeah.

4  Q.   And you -- this was all on Lonnie, right?

03:38   5  A.   Just for something to -- like this, yes, it's -- you know,

6  I knew that something had happened when she started crying and

7  didn't want to look at me.  I knew something had happened, and

8  I told her then, you know, I knew something happened and she

9  didn't have to go into any detail.  She didn't have to tell me

03:38   10  any details.

11  Q.   Okay.  Do you know what a forensic interview is?

12  A.   Basically.

13  Q.   Have you been to a forensic interview?

14  A.   Not for myself, no.

03:38   15  Q.   Have you been to one in general?

16  A.   No.

17  Q.   Have you been to a building where they're conducted?

18  A.   I believe -- I don't know if that's what -- no, I guess I

19  don't know for sure what you're getting at.

03:39   20  Q.   Okay.  Do you remember a room where they put Nxxxx in and

21  recorded an interview of her talking about what she says

22  happened?

23  A.   Yes.

24  Q.   Were you at that event?

03:39   25  A.   Well, I was not in the room with her.  I was in another

1   room.

2   **Q.**   Were you listening on an earpiece?

3   **A.**   No.

4   **Q.**   Were you -- where -- where was this at?

03:39   5   **A.**   It was in the Minot Children's Advocacy Center.

6   **Q.**   Okay.  Were you at other forensic interviews or just hers?

7   **A.**   Just hers.

8   **Q.**   And --

9   **A.**   I mean, I wasn't in the room with her.  I was in a

03:39   10   different room, so I did not hear what Nxxxx said.  I did not

11   see who was even in the room with her.  All I knew, she was in

12   a different room, and I was in another room.

13   **Q.**   Have you -- do you know that that was recorded?

14   **A.**   Nxxxx's?

03:39   15   **Q.**   Right.

16   **A.**   I would assume it would be, but I did not know and I never

17   did ask.

18   **Q.**   So you haven't seen the forensic interview in this case?

19   **A.**   Never.  I haven't seen or heard or -- anything.

03:40   20   **Q.**   So you haven't seen the report prepared from that

21   interview either?

22   **A.**   No.

23   **Q.**   So you're not aware of what she -- Nxxxx said at --

24   **A.**   No.

03:40   25   **Q.**   -- the interview?

**A.**   I've told the FBI agents immediately that, like I told

Nxxxx, I did not need to hear any details.

**Q.**   Do you remember calling Agent Bennett on March 30, 2017?

**A.**   March 30, 2017.  Well, I remember calling Agent Bennett at

03:40   different times, but I don't remember exactly.

**Q.**   Do you remember calling him and indicating that Nxxxx had

told you that she hadn't been truthful?

**A.**   Oh, yes.  Yes, I remember that.

**Q.**   And that she had told you -- what had she told you?

03:41   **A.**   Well, we had been up, I think, to see -- we had been to

Bismarck, I think, to see Jon, the U.S. attorney there.  And I

wasn't in the room with them when they talked to Nxxxx.  Like I

said, you know, I didn't need any details, but when we -- I had

heard that -- well, Nxxxx -- it's kind of difficult, how to --

03:41   to be careful how to say.

        But Nxxxx was with her sister and my other little

girl, the granddaughter.  They were outside playing a game,

truth or something.  And Nxxxx was talking to them, and then

she started crying.  And then she came in and she told me she

03:42   hadn't been truthful with me about everything.  And so I said,

"What do you mean?"  And she said, "I only told you about the

first and the last time it happened."  She said, "There were

multiple times in between."

        And so I don't know if it was -- I think the next day

03:42   is when I called Agent Bennett and told him what Nxxxx had --

170

1   what Nxxxx had told me, that it was more than just -- she only

2   told me the first and the last time, and I -- and there were

3   multiple times in between.  And I asked her, you know, why, and

4   she said because she didn't want to go into detail on

03:42    5   everything, so she only told about the first and the last time.

6   Q.   And she said that she had -- this had happened eight to

7   ten more times than what she had reported, right?

8   A.   Yes, than what she had originally said, that there were

9   many times it had happened.

03:42   10   Q.   And this had gone on for over a year at that point, right,

11   the whole investigation?

12   A.   Oh, from the time it originally started, yes.  Yeah,

13   almost.

14   Q.   Okay.  And maybe you don't know, but at the forensic

03:43   15   interview she indicated that she had told the truth there.  Are

16   you aware of that, that Nxxxx had?

17   A.   Oh, yeah.  Yeah.

18   Q.   And so there was a lot more truth to tell?  Is that kind

19   of what's going on here?

03:43   20   A.   Yes, I would say there was more truth to tell, that she

21   did not want to reveal all the different -- all the times --

22   the multiple time that things happened.

23   Q.   Okay.  And these eight to ten more times, were they

24   investigated?

03:43   25   A.   I don't know.  I'm not -- I mean, I told Bennett --

1   Officer Bennett or Agent Bennett what she had told me, but we

2   did come back up.  I know we had meetings with them, but I'm --

3   like I said, I don't go in.  I'm not in the meetings with them.

4   **Q.**   Do you know where these eight to ten times took place?

5   **A.**   She said almost every time that -- or most of the times

6   when he picked her up, so like I said, I don't -- I didn't ask

7   her questions, and I didn't ask her details on any of them.

8   **Q.**   Okay.

9   **A.**   She just said there were a lot more times.

10   **Q.**   So she just reported to you that all these different

11   things happened in minimal conversations?

12   **A.**   No, she -- she said -- she told when the first time

13   happened and then when the last time, when she was nine, and

14   then the times in between -- I mean all the years in between.

15   I said I wanted to believe it was only two times.  You know,

16   I -- I didn't -- you know, I didn't question her on, you know,

17   were there other times because I think I wanted to believe that

18   it was only two times.

19   **Q.**   But in fairness to Lonnie, you'd like to get to the truth,

20   right?

21   **A.**   Yes, very much so.

22   **Q.**   And figure out if there's corroboration or any other

23   evidence to support these allegations, true?

24   **A.**   Oh, I believed her totally.  She told me that -- the

25   different times, you know, sometimes in the vehicle or, you

03:44
03:44
03:44
03:45
03:45

172

1   know, whenever he would pick her up or bring her back.  She

2   said there were many times, and, I mean, I totally believed

3   her.  I know she had nothing to lie about.  Why would she lie

4   about them?  And, I mean, I told you before, I don't -- I did

03:45   5   not ask details, exactly what happened, you know.  She said

6   something happened.  I believe her that something happened.

7   **Q.**   And so if she indicated that she had never discussed any

8   of this with you, that just wouldn't be true, would it?  If

9   Nxxxx indicated she's never talked to you about this, that

03:45   10   wouldn't be true, would it?

11   **A.**   I don't understand what you're --

12   **Q.**   You talked to Nxxxx about this, and you're just --

13   described it, right?

14   **A.**   Yes, I talked to Nxxxx.

03:46   15   **Q.**   And if Nxxxx said that she has never discussed any of this

16   with you, Nxxxx wouldn't be telling the truth, would she?

17   **A.**   Well, she's discussed some, but I would never -- she's

18   discussed -- I mean, I can say some -- I can tell you the

19   detail that I do know of what happened, if you would like me to

03:46   20   tell you that.

21   **Q.**   Well, let's just do it this way.  You've discussed all

22   this stuff with her, right?

23   **A.**   Not all the stuff.  I said we don't go into details on it,

24   but I can tell you the one detail she did tell me if you would

03:46   25   want me to.

1   **Q.**   She's discussed things with you about this case, yes or

2   no, Nxxxx?

3   **A.**   Yes, we have discussed the -- some of the -- what -- the

4   times, you know, it happened, but we've not gone into detail on

03:46   5   it.  We don't sit down and talk because it's upsetting for both

6   of us.

7            MR. BOLINSKE:  Okay.  I'll do that with the agent.

8   Thank you very much.  That's all I have.

9            THE COURT:  Anything else, Mr. O'Konek?

03:47   10            MR. O'KONEK:  No, Your Honor.

11            THE COURT:  Pardon?

12            MR. O'KONEK:  No, Your Honor.

13            THE COURT:  All right.  Thank you, ma'am.  You may

14   step down.  And may this witness be excused?

03:47   15            MR. O'KONEK:  Yes, Your Honor.

16            MR. BOLINSKE:  No objection.

17            THE COURT:  So you are excused from these

18   proceedings.  You're free to stay or free to leave.

19            You may call your next witness.

03:47   20            MR. O'KONEK:  United States would call Sxxxxxx

21   Hxxxxx.

22                      <u>SXXXXXX  HXXXXX</u>,

23   having been first duly sworn, was examined and testified as

24   follows:

03:47   25       ///

174

<u>DIRECT EXAMINATION</u>

<u>BY MR. O'KONEK</u>:

Q.   Sxxxxxx, I just have a couple of background questions.
Can you just state your full name for the Court?

03:49    A.   Sxxxxxx Hxxxxx.

Q.   And can you pull that microphone a little bit closer?

THE COURT:  Pull that microphone closer to you,
please.  Thank you.

Q.   (MR. O'KONEK CONTINUING)  And I apologize.  We just need
03:49    to speak up because obviously it's a big room.

Now, I just have a couple of questions.  Now, you
understand the difference between a truth and a lie, right?

A.   (Nodding.)

Q.   Is that a yes?

03:49    A.   Yes.

Q.   And you know you're only supposed to talk about things
that are the truth here.  Do you understand that?

A.   Yes.

Q.   So if I were to say that this pen was blue -- or that this
03:49    pen -- excuse me.  If I was to say that this pen was red, what
would you say?

A.   It's blue.

Q.   So saying that it's red would be a lie.

A.   (Nodding.)

03:49    Q.   Is that a yes?

1   **A.**   Yes.

2   **Q.**   I apologize.  Any time --

3       THE COURT:  And I'll remind you that you have to

4   answer verbally rather than nodding your head so the court

5   reporter here can take down everything.

6   **Q.**   (MR. O'KONEK CONTINUING)  Okay.  Sxxxxxx, let's talk a

7   little bit about you.  How old are you today?

8   **A.**   Thirteen.

9   **Q.**   And what's your date of birth?

10  **A.**   August 23, 2004.

11  **Q.**   All right.  And where do you live?

12  **A.**   Fargo.

13  **Q.**   And who do you live with in Fargo?

14  **A.**   My sister and her boyfriend.

15  **Q.**   And what are their names, your sister and her boyfriend?

16  **A.**   Cheyenne Hallam and Cole Brewer (ph).

17  **Q.**   Okay.  And how old is your sister?

18  **A.**   She's 22.

19  **Q.**   And how long have you lived in Fargo?

20  **A.**   Like a month, I think.

21  **Q.**   Okay.  And do you go to school in Fargo?

22  **A.**   Yes.

23  **Q.**   Where do you go to school?

24  **A.**   At Cheney, I think it's called.

25  **Q.**   At where was that?

1   **A.**   Cheney.

2   **Q.**   Okay.  And is that a one-through-twelve school, middle

3   school, high school?

4   **A.**   Middle school.

03:50   5   **Q.**   Okay.  And what grade are you in specifically?

6   **A.**   Eighth.

7   **Q.**   What's your favorite subject?

8   **A.**   Earth science.

9   **Q.**   Okay.  I'm going to ask you some questions about earth

03:51   10   science.  What do you like about earth science?

11   **A.**   I like how they teach us about like tornados and like

12   rocks and minerals, and stuff.

13   **Q.**   Okay.  And before you were in Fargo -- you mentioned you

14   only lived there about a month -- where did you live?

03:51   15   **A.**   In New Town.

16   **Q.**   Okay.  And for how long did you live in New Town?

17   **A.**   Like three years.

18   **Q.**   Who did you live with when you were in New Town?

19   **A.**   My sister and her boyfriend.

03:51   20   **Q.**   Okay.  And who is your sister?  Is it the same --

21   **A.**   Yes.

22   **Q.**   Okay.  And at any point did you ever live in Twin Buttes?

23   **A.**   Yes.

24   **Q.**   And when did you live in Twin Buttes?

03:51   25   **A.**   Since like ten and-a-half and since I was like a baby.

1    Q.    So just to clarify, since you were a baby to when you were

2    ten-and-a-half.

3    A.    Mm-hmm.

4    Q.    Okay.  And who did you live with in Twin Buttes when you

03:51    5    lived there?

6    A.    My dad and my sisters -- or sister, until my sister moved

7    to New Town, and my mom.

8    Q.    Okay.  And I'll talk a little bit about the people in your

9    family.  You mentioned your dad.  Who's your dad?

03:52    10    A.    Travis Hallam.

11    Q.    Okay.  And who's your mom?

12    A.    Crystal Hallam.

13    Q.    Okay.  We talked about Cheyenne.  Do you have any other

14    sisters?

03:52    15    A.    Bheri.

16    Q.    And how old is she?

17    A.    She's 18.

18    Q.    Okay.  And what about cousins?  Do you have a cousin named

19    Nxxxx?

03:52    20    A.    Yes.

21    Q.    And Mxxxx?

22    A.    Yes.

23    Q.    And Haylon?

24    A.    Yes.

03:52    25    Q.    Okay.  Now I want to talk a little bit about some

1    activities.  What are some of the things you like to do for fun

2    when you're not at school looking at earth science stuff?

3    **A.**   I like to go on my phone and play with my dog and like

4    draw.

03:52    5    **Q.**   Okay.  What do you like to draw pictures of?

6    **A.**   I try drawing animals, but I'm kind of bad at it.

7    **Q.**   Okay.  What's the hardest part about drawing a picture of

8    an animal?

9    **A.**   Like the shading of trying to get like the -- like the way

03:53    10   their face is.

11   **Q.**   I want to talk a little bit about Lonnie Spotted Bear.

12   What's his relationship to you?

13   **A.**   He is my grandma's brother.

14   **Q.**   Now, do you consider him to be your grandfather?

03:53    15   **A.**   (Shakes head.)

16   **Q.**   You don't, but he's somebody that you -- that you knew

17   growing up?

18   **A.**   Yes.

19   **Q.**   And I want to talk a little bit about -- you said you

03:53    20   lived in Twin Buttes.  How big is Twin Buttes?

21   **A.**   It's small.

22   **Q.**   Smaller than Fargo?

23   **A.**   Very small.

24   **Q.**   And how -- when you were living in Twin Buttes, how far

03:53    25   did you live away from Lonnie?

**A.**   He was my neighbor, I think, but there was like trees

between the houses.  Like it was pretty far away, but --

**Q.**   And I want to ask you about some other names.  When I say

"Uncle Daylon," who's Uncle Daylon?

03:53   **A.**   He is Lonnie's son.

**Q.**   Okay.  Now, would you ever go, when you were living in

Twin Buttes -- you said you lived there from when you were a

baby until about ten.  Did you ever go and visit your cousin,

Haylon?

03:54   **A.**   Yes.

**Q.**   How often would you say you did that?

**A.**   Once a month, maybe.

**Q.**   Okay.

**A.**   Twice.  I don't know.

03:54   **Q.**   What kind of things would you guys do together?

**A.**   We used to play on 3DS's or watch TV or go outside too

sometimes.

**Q.**   What's a 3DS?

**A.**   It's like a little video game thing.

03:54   **Q.**   Okay.  Is it something you -- handheld, or is it something

that you like --

**A.**   Yeah.

**Q.**   -- sit down and play with?

**A.**   You can hold it.

03:54   **Q.**   Okay.  Kind of like a Game Boy?  You might not know Game

180

1   Boy.

2   **A.**    Yes.

3   **Q.**    Okay.  Now, where Lonnie had lived, did he live near a

4   lake, by any chance?

03:54   5   **A.**    Yes.

6   **Q.**    Did you ever go and play on the lake?

7   **A.**    Yes.

8   **Q.**    When would you do that?

9   **A.**    In the summer.  Like maybe once in the winter.

03:55   10   **Q.**    Okay.  And who else would play on the lake with you?

11   **A.**    Some of my cousins.

12   **Q.**    And would your cousins be Haylon?

13   **A.**    Yes, and other ones too like Cooper and her brothers and

14   sisters.

03:55   15   **Q.**    Would Sxxxxxx -- or excuse me.  Would Nxxxx ever hang out

16   with you in the lake?

17   **A.**    Yes.

18   **Q.**    And that house that Lonnie was living in, is that still

19   standing or did something happen to it?

03:55   20   **A.**    It burned down.

21   **Q.**    And do you remember when that was?

22   **A.**    No, but it was, I think, like a month before I started

23   school in New Town.  I don't really remember.

24   **Q.**    Okay.  But over a year ago?

03:55   25   **A.**    Yes, I think.

1    Q.    And I want to talk to you a little bit about times when

2    you would play with your cousin, Haylon.  Would you ever go and

3    play with Haylon at Uncle Daylon's house?

4    A.    Rarely, but I did, yeah.

03:56    5    Q.    Okay.  So you did.  And where is Uncle Daylon's house in

6    relation to where Lonnie's house was?

7    A.    It's like -- I don't really know how far away it is, but

8    it's not like on the other side of town.  It's kind of like a

9    neighbor, I guess, but the houses are like spread out.

03:56    10    Q.    If you had to drive, how long would it take you, do you

11    think?

12    A.    Like a minute, maybe.

13    Q.    Okay.

14    A.    Two.  I don't know.

03:56    15    Q.    Now I want to talk to you about Lonnie.  At any time did

16    Lonnie touch you inappropriately?

17    A.    Yes.

18    Q.    And can you take us through when -- how old you were when

19    it happened?

03:56    20    A.    I think I was six or five.

21    Q.    Okay.  And can you just kind of take us through, what were

22    you doing?  Where were you staying at that time that this

23    happened?

24    A.    I was staying in Twin Buttes.

03:56    25    Q.    Okay.  Who were you staying with?

1   **A.**   My dad, my mom, my sisters.

2   **Q.**   Okay.  And what happened -- where were you when this --

3   when Lonnie had touched you inappropriately?

4   **A.**   In his house.

03:57   5   **Q.**   Okay.  What were you doing before that?

6   **A.**   I was at Daylon's with Haylon, but Haylon wanted to grab

7   his iPad, and so Lonnie asked me to go over to his house to

8   find it, and I said sure.

9   **Q.**   Okay.  So I just kind of want to back up a little bit.  So

03:57   10   you were originally at Uncle Daylon's house?

11   **A.**   Yes.

12   **Q.**   And you were playing with Haylon.

13   **A.**   Yes.

14   **Q.**   What was it about the iPad?  I guess I was unclear, but

03:57   15   what was going on with the iPad?

16   **A.**   He just wanted his iPad.  I think he was bored, or

17   something.  I don't know.  He just wanted it.

18   **Q.**   Okay.  And so after Haylon wanted his iPad, what happened?

19   **A.**   Lonnie said he was going to grab it, and then he kept

03:57   20   asking me to come with, and I said no.  And then like the

21   seventh time I think -- I think I said sure because he kept

22   asking.

23   **Q.**   Okay.  And what was he asking you to do?  Where did he

24   want you to look for it?

03:58   25   **A.**   He just wanted me to help find it.

183

1  **Q.**   Okay.  What happened after he asked -- you said eventually

2  sure, so what happened next?

3  **A.**   So then we drove over to his house, and I was going to

4  look for the iPad, and then he pushed me.

03:58  5  **Q.**   Okay.  And I want to talk a little bit about that.  So

6  where -- you said it took about a minute to get from Uncle

7  Daylon's to his house.  How did you get to his house?  Who took

8  you?

9  **A.**   Lonnie.  We drove.

03:58  10  **Q.**   Okay.  And so take me through what first happens once you

11  get in the house.  What happens?  Are you looking for the iPad?

12  **A.**   Yes.

13  **Q.**   And take me through how you're looking for it.

14  **A.**   I'm looking in the living room.

03:58  15  **Q.**   It's okay.  Just take me through what you were doing.

16  **A.**   I was looking in the living room.  There's like a TV

17  stand, and I was going to look above there.  I looked back

18  because he wasn't really helping looking, and then he pushed

19  me.

03:58  20  **Q.**   Okay.  And so how did he push you?  What did he push you

21  with?

22  **A.**   He pushed me with his hands.

23  **Q.**   And what part of your body did he push you on?

24  **A.**   Right here on my shoulders.

03:59  25  **Q.**   Okay.  And what happened after Lonnie pushed you?

1    **A.**    And then he grabbed my leggings and pulled them down.

2    **Q.**    Okay.  And how did he pull them down, with what part of

3    his body?

4    **A.**    His hands.

03:59    5    **Q.**    And after Lonnie pulled your legging down with his hands,

6    what did Lonnie do?

7    **A.**    He licked me.

8    **Q.**    And where did he lick you?

9    **A.**    The vagina.

03:59    10    **Q.**    Okay.  And what is going through your mind when this is

11    happening?

12    **A.**    I just wanted to leave.  Like I was screaming, kicking --

13    or trying to kick anyways, like trying to hit him.

14    **Q.**    And so when this is going on -- I kind of want to back up

03:59    15    a little bit.  You mentioned that he had pushed you down.

16    **A.**    Mm-hmm.

17    **Q.**    Was -- where was his body in relation to yours?

18    **A.**    Like by my legs.

19    **Q.**    What was by your legs?

03:59    20    **A.**    Like -- his like shoulder and head, like --

21    **Q.**    And when you say that he had licked your vagina, how long

22    did that last?

23    **A.**    I don't know.  Like 30 seconds, maybe.  I don't --

24    **Q.**    And what did you do after he was -- you said that you

04:00    25    started to hit him.  How did you hit him, with what part of

1   your body?

2   **A.**   Like my arms I tried hitting him, but like I couldn't

3   really move my legs.

4   **Q.**   Okay.  And you mentioned that you couldn't move your legs.

04:00   5   Why not?

6   **A.**   Because they were like underneath him, like on the ground.

7   My arms were free.

8   **Q.**   And where in the house was this going on?

9   **A.**   Like in the living room.  Like right when you get into the

04:00   10   living room.

11   **Q.**   Can you describe kind of the house, the layout for me just

12   briefly?

13   **A.**   It's a living room, a kitchen, and there's a hallway.

14   **Q.**   And this was -- you said it was all happening in the

04:00   15   living room?

16   **A.**   Yes.

17   **Q.**   And you mentioned that you'd also kicked him?

18   **A.**   I think I hit him in the face, or I was trying to at

19   least.

04:01   20   **Q.**   Okay.  And what made Lonnie stop doing what he was doing

21   to you, licking your vagina?

22   **A.**   I don't know.

23   **Q.**   Okay.  Was he saying anything when he was licking your

24   vagina?

04:01   25   **A.**   Nope.

1   **Q.**   Did he make any noises?

2   **A.**   He laughed.

3   **Q.**   What do you mean, he laughed?

4   **A.**   He laughed.  He chuckled.  I don't know.

04:01   5   **Q.**   And at a certain point when this happened, were you

6   scared?

7   **A.**   Yes.

8   **Q.**   Did you know what was going on?

9   **A.**   I knew it was bad, and I knew that it wasn't supposed to

04:01   10   happen.

11   **Q.**   Okay.  And at some point, though, Lonnie had stopped

12   licking your vagina?

13   **A.**   Yes.

14   **Q.**   What happens after that?

04:01   15   **A.**   Then I get up and pull my leggings up.  And I don't really

16   remember what happened after that.  Like I think I asked him,

17   drive me home, or I walked home.  I don't really remember.

18   **Q.**   Okay.  And during this time do you remember what Lonnie

19   was wearing, whether he was wearing clothes or no clothes?

04:02   20   **A.**   He was wearing clothes.

21   **Q.**   And so at some point when this happened -- did you tell

22   anybody right away when this had happened?

23   **A.**   No.

24   **Q.**   So I want to talk to you a little bit about how this came

04:02   25   up.  Did you ever have a conversation with Nxxxx in -- I think

1   it was in New Town?

2   **A.**   No, it was in Twin Buttes --

3   **Q.**   Okay.

4   **A.**   -- like after Boys and Girls Club.  I think in sixth

5   grade, like the end, going into summer.  I don't remember, but,

6   yeah, I told her.

7   **Q.**   Okay.  And how did -- like what did you tell Nxxxx?

8   **A.**   I told her what happened.

9   **Q.**   And that what happened was that Lonnie had licked you,

10   your vagina?

11   **A.**   Yeah.

12   **Q.**   And what did Nxxxx say?

13   **A.**   She said that it happened to her too.

14   **Q.**   Okay.  And then at some point did you ever go on vacation

15   to Cancun, in Mexico?

16   **A.**   Yes.

17   **Q.**   And when was that about?

18   **A.**   Like in like January, February, when I had been going to

19   like Christmas.

20   **Q.**   Okay.  And at some point when you were in Cancun, did you

21   tell anybody about what happened?

22   **A.**   Yes, I told my sister and my dad and my other sister --

23   **Q.**   Okay.

24   **A.**   -- and my sister's boyfriend, because -- like I told them

25   because I felt like I could really trust them, so I went into

1    their room and told them what happened, and then my sister --

2    Cole, he said, "This is a family business.  I shouldn't be in

3    this," so he told -- so Cheyenne told me to go to dad's room

4    because dad's room is like right next-door in the hotel, and

04:03    5    then we told him what happened.

6    Q.    And just to go back, when Lonnie had licked your vagina,

7    you think you were six years old?

8    A.    Yes.

9    Q.    And it was at his house in Twin Buttes?

04:03    10    A.    Mm-hmm.

11    Q.    When all of this came up, at some point did you have to go

12    and talk about what happened in front of a person who asked you

13    some detailed questions about this?

14    A.    Yes, like they made me go to like a therapist.

04:04    15    Q.    Okay.  And at some point, though, did you speak with --

16    like at a forensic interview, where an individual asked you

17    about questions and they let you know things might be recorded

18    and monitored?

19    A.    Oh, yeah.

04:04    20    Q.    Okay.  And so I just have -- the last question I have is,

21    why didn't you tell anybody before you told Nxxxx?

22    A.    I told two of my friends in third grade.

23    Q.    Okay.  But let me ask it this way, were you scared to tell

24    anybody?

04:04    25    A.    Yes, I didn't know if they would think I was telling the

1   truth or not.

2          MR. O'KONEK:  Thank you.  Those are the only

3   questions I have, Your Honor.

4          THE COURT:  Mr. Bolinske.

5                    CROSS-EXAMINATION

6   BY MR. BOLINSKE:

7   Q.   Sxxxxxx, you're saying that this happened when you were

8   how old?

9   A.   I think I was six years old, six or five.

10  Q.   Okay.  And was it between 2010 and 2011?  Does that sound

11  right?

12  A.   I just remember being six or five.  I don't remember what

13  year it was.

14  Q.   Okay.  And you were looking for Haylon's iPad, is that

15  right?

16  A.   Yes.

17  Q.   And that was at Lonnie's house, this iPad, or you thought

18  it was?  Somebody thought it was?

19  A.   Yes.

20  Q.   Okay.  And your version of events relating to this stuff,

21  this incident, has remained the same throughout, right?

22  A.   Yes.

23  Q.   And it hasn't wavered?

24  A.   Nope.

25  Q.   It hasn't varied?

04:04 (line 5)
04:05 (line 10)
04:05 (line 15)
04:05 (line 20)
04:05 (line 25)

1    A.    Nope.

2    Q.    And you haven't told any of your friends anything

3    inconsistent with what you're saying here today, have you?

4    A.    What?

04:05    5    Q.    Have you ever told a different version of events to

6    anyone?

7    A.    No.

8    Q.    Okay.  No?

9    A.    (Shakes head.)

04:06    10           MR. BOLINSKE:  Okay.  Thank you.  That's all I have.

11           THE COURT:  Mr. O'Konek, anything else?

12           MR. O'KONEK:  No, Your Honor.

13           THE COURT:  All right.  Thank you.  You may step

14    down, and you are excused.  Thank you.

04:06    15           You may call your next witness.

16           MR. O'KONEK:  United States calls Travis Hallam.

17                     TRAVIS HALLAM,

18    having been first duly sworn, was examined and testified as

19    follows:

04:06    20                  DIRECT EXAMINATION

21    BY MR. O'KONEK:

22    Q.    Sir, can I have you please state your full name for the

23    Court?

24    A.    Travis Dale Hallam.

04:08    25    Q.    And you are the father of Sxxxxxx Hxxxxx.

1  **A.**   Yes.

2  **Q.**   And if I could have you back just a little bit away from

3  the microphone, I just have a couple of background questions.

4  How are you related to Mr. Lonnie Spotted Bear?

04:08  5  **A.**   He's my uncle, my godfather and my middle namesake, and

6  that's where I get Dale from.

7  **Q.**   Okay.  And can you talk to us briefly about -- who are the

8  people that are in your family?  Can you just give us the names

9  and ages?

04:08  10  **A.**   I have my oldest daughter, Cheyenne Rain Hallam.  She's

11  22; Bheri Rose Hallam, she's 18; and Sxxxxxx Sxxxxx Hxxxxx,

12  who's 13, all girls.

13  **Q.**   And Sxxxxxx just recently had a birthday here in August?

14  **A.**   Yes.

04:09  15  **Q.**   And what is your kind of living situation with Sxxxxxx?

16  Who is -- who is she living with currently?

17  **A.**   She just moved to Fargo to live with her sister -- her

18  older sister and go to school there, and it's -- being kids,

19  it's kind of because of what's there.  She gets her own floor

04:09  20  of the apartment, her own wash machine, bathroom, everything,

21  so -- but before that she was staying mostly with me.  We built

22  her own bedroom on the extension of the house in New Town, and

23  she moved up there and was staying there.

24  **Q.**   And prior to living in New Town, did you live in Twin

04:09  25  Buttes?

1   A.   Yeah, she lived in Twin Buttes, though, before then.

2   Q.   And what were her ages, do you think, when she lived in

3   Twin Buttes?

4   A.   From zero to basically around eleven.

04:09   5   Q.   And I want to talk about a couple of other people.  What

6   is your relationship to Ivetta Spotted Bear?

7   A.   She's my aunt.

8   Q.   And Nxxxx Hxxxxxx Exxxx?

9   A.   My aunt's granddaughter.

04:10   10   Q.   And Brad Sanderson?

11   A.   He's a friend through my Uncle Lonnie's nephew, so I've

12   known him since -- he's a few years younger than me, but I've

13   known him since he's a little guy.

14   Q.   Meranda Sanderson, what's your relationship to her?

04:10   15   A.   We're shirttail relatives on the Baker side, and the same

16   thing, I've known her for a long time through that side of the

17   family, so we've been friends for -- since she was little as

18   well.

19   Q.   And Mxxxx Sxxxxxxxx, what's her relationship to you?

04:10   20   A.   Meranda's daughter.  I really don't have much to do with

21   Meranda's kids other than, you know, her older son.

22   Q.   And what -- what kind of a relationship did you have with

23   Lonnie growing up?

24   A.   He was, you know, my uncle.  He was, you know, the

04:10   25   biggest, toughest guy I knew growing up, a real hard man, but

1   he was the one that -- you know, we all listened to him.  He

2   was kind of like the patriarch of the family in a way.

3   Q.   What's his kind of status or standing in the Twin Buttes

4   community?

5   A.   He's like a highly respected elder now, but, you know, he

6   was always one of the foremost guys in the community as far as,

7   you know, he demanded a certain level of respect and, you know,

8   people gave it to him.

9   Q.   And when you and Sxxxxxx were living in Twin Buttes, did

10  you guys ever go out and hang out with Lonnie Spotted Bear?

11  A.   I wouldn't say we went and hung out with him.  His

12  grandson and my daughter were best friends.  They were, you

13  know, within a month of each other growing up and my next-door

14  neighbor, so they lived, you know, a couple hundred yards away

15  from each other and they just grew up as best friends.

16  Q.   And to stop you there, was that person -- is that Haylon?

17  A.   Yes.

18  Q.   And that's Sxxxxxx's cousin?

19  A.   Yes.

20  Q.   And you mentioned how close you lived.  Can you kind of

21  give us more detail about how close you lived to --

22  A.   It's rural, but I could hit their house with a nine iron.

23  We'll put it that way.

24  Q.   And was -- is Lonnie living with Haylon at this time?

25  A.   No, he has his place roughly a mile from my house as the

194

1    bird flies.

2    Q.   But Haylon was living with whom at the time?

3    A.   Haylon lived with Lonnie most of the time.  He liked

4    staying over there.  And then Haylon's sister didn't like to,

04:12    5    so she'd stay at the house next to us.

6    Q.   Okay.  And going into certain things, would the families

7    have like family gatherings out at the lake?

8    A.   Oh, yes, we have a lake spot, and we'd have huge family

9    reunions at different times of the year, anywhere from Memorial

04:13   10    Day to Labor Day.

11    Q.   And kind of describe what kind of -- what were people

12    doing on the lake when these family gatherings would happen?

13    A.   The younger group like myself and my younger nephews, a

14    lot of them -- or cousins, we didn't drink, so we did a lot

04:13   15    more recreational stuff, so we'd be fishing, playing

16    horseshoes, volleyball, whatever.

17           And the kids -- the younger kids would be running

18    around, a lot of times lighting fireworks, and stuff, playing

19    on a trampoline.

04:13   20           And then the older ones, depending on who they were

21    -- you know, some of them would, you know, just be kicking back

22    at the lake, drinking and then being argumentative, but not

23    hostile.  It's just sort of our nature, that there was a lot of

24    discussions that -- you know, we'd get some people heated, but

04:13   25    it was never that heated for our family.

1  **Q.**   And would there be times where Sxxxxxx, Nxxxx and Mxxxx

2  would all swim together at the lake?

3  **A.**   Yeah, there would be times they'd be together and jumping

4  on the trampoline and playing with the other kids, and stuff.

5  MR. O'KONEK:  Okay.  May I approach, Your Honor?  I'm

6  handing the witness Government's Exhibit 3.

7  **Q.**   (MR. O'KONEK CONTINUING)  Do you recognize that

8  photograph?

9  **A.**   Yes.

10  **Q.**   And how do you recognize it?

11  **A.**   I have it on my computer at home, and then I've also got

12  it on my cell phone.  And it's the girls on the trampoline

13  behind Lonnie's trailer at the campsite down there.

14  **Q.**   So this -- just to be clear, when you say "the girls,"

15  which girls are in the photograph?

16  **A.**   Mxxxx, Sxxxxxx, and Nxxxx.

17  **Q.**   And this photograph is on Mr. Spotted Bear's property?

18  **A.**   Yeah, this is right where we always have our summer

19  hangouts, and stuff.

20  **Q.**   Okay.  And how old -- how old do you imagine Sxxxxxx was

21  in that photograph?

22  **A.**   Probably I'd say close to five or six.  I would estimate

23  this to be the summer of '10 or summer of '11, one of the two.

24  MR. O'KONEK:  At this time, Your Honor, we'd offer

25  Government's Exhibit 3 into evidence.

196

1          MR. BOLINSKE:  No objection.

2          THE COURT:  Exhibit 3 is received.

3          MR. O'KONEK:  Permission to publish.

4          THE COURT:  You may do so.

04:15   5   Q.   (MR. O'KONEK CONTINUING)  And I want you just -- can you

6   go from left to right and identify who the girls are there in

7   the photograph?

8   A.   Okay.  Mxxxx Sxxxxxxxx; my daughter, Sxxxxxx Sxxxxx; and

9   Nxxxx Hxxxxxx Exxxx.

04:15  10   Q.   And you mentioned that they were all on the trampoline.

11   Whose vehicle is that in the -- the white vehicle that's behind

12   the three girls?

13   A.   I believe that one is mine.

14   Q.   And do you notice any sort of trailer or anything in the

04:15  15   photograph as well?

16   A.   Yeah, there's a -- like a little -- you can see the side

17   of the trailer right there on the side behind that tree, and I

18   believe that would be his, but it could be somebody else's.  At

19   that angle I can't really say for sure.

04:16  20   Q.   But this was -- this photograph was taken on Mr. Spotted

21   Bear's property?

22   A.   Yeah, this is his land right -- we call it Spotted Bear

23   Camp.

24   Q.   Thank you.  Now, sir, I just have a couple of more

04:16  25   questions.  At any time -- you go to Cancun, Mexico, sometimes?

197

A.    Yeah, we have a timeshare down there.

Q.    And how often would you say you go down to Cancun?

A.    We go down every year, sometimes more than once a year depending on the situation, but normally it's once a year.

Q.    Okay.  In 2009, approximately -- excuse me.  In 2011 did you go down to your timeshare with your wife, Crystal?

A.    Yes, I believe so.

Q.    And where was Sxxxxxx at that time?

A.    I don't keep exact track, but I know there's times we had her, you know, stay with him, and that's probably where she was at that time.

Q.    And when you say "stay with him," who are you referring to?

A.    With Lonnie, and it was because -- you know, the difficulty here is she used to stay with my mother most of the time, but if my mom wasn't available, she was off -- out of state, then we had to find somebody else, and so him being our neighbor -- and, like I said, at that time, you know, we trusted him.  You know, we trusted him immensely, and I thought that was the one place I could take her and leave her and have her be safe.

Q.    And at certain times you'd mentioned that her cousin, Haylon, and Sxxxxxx were very close?

A.    Yes.

Q.    And how often would they hang out with one another?

198

1    A.   Somewhat frequent.  I would say maybe a couple times a
2    month.  I don't know specifically.  I just knew they were kids
3    and that was friends.  Whether it was Head Start or school or
4    whenever, you know, they -- they would see each other.  We'd
5    always have to get him something from Cancun.  She insisted on
6    buying him something as a gift.
7    Q.   Would there be times where Mr. Spotted Bear -- Lonnie
8    Spotted Bear asked Sxxxxxx to come play with Haylon?
9    A.   Yeah, and he did that several times, saying Haylon wants
10   to come over.  And I didn't think much of it at the time
11   because Haylon was always quiet, so I didn't -- wasn't
12   surprised to have Lonnie make the phone call.
13   Q.   And when all of this had occurred, you had initially --
14   you had found out from Sxxxxxx roughly about the time you were
15   in Cancun about an outcry of sexual abuse?
16   A.   Yes, you could roughly say New Year's Day 2016, right
17   around then.
18   Q.   And --
19   A.   The first -- January 1, '16, would have been about it.
20   Q.   And when you got this information, what steps did you
21   take?
22   A.   Originally I didn't take any.  When they told me, I didn't
23   want to respond.  I was an EMT for about 18 years, and a lot of
24   people thought I was the best EMT where I worked, but it was
25   mostly because of my staying calm.

199

**Q.**   Can you pull the microphone back just a little bit?

**A.**   Okay.  Pull it back more.  So, anyways, I would tend to stay calm in situations like that, so I knew if I reacted emotionally or did something, then the kids would think they had to react, so I tried to be strong and not really have any reaction for it and just said okay.  But then I went off to my room and I broke down and cried.  And I'm well aware of the odds that one out of every three girls is going to be molested, and I felt like I failed as a father because that was the one thing I was never going to let happen to my kids.

**Q.**   And at some point, though, did you want to get help for your daughter?

**A.**   Afterwards, yeah.  Like I said, I -- I was distraught, but, you know, then I started praying on it, and I kind of -- and I'm not a religious man, but I prayed and I had sort of a calming sense that things would just be okay.  And so I started carrying on like nothing had happened because I didn't want to pursue this because I understand once you're a victim, you become victimized again once you try to address it.

But my cousin's wife said, "You have to take kids to counseling or else they'll act out and become promiscuous and do things, not understanding and thinking that's the way they have to express emotions, by acting inappropriately physically."

**Q.**   And at some point you did take Sxxxxxx to counseling?

200

1   **A.**   Yeah, after she talked to me, I went and took her to

2   counseling, and I explained to the counselor we didn't -- you

3   know, we weren't trying to press charges, or anything.  We just

4   wanted help for my daughter, but then after talking to her,

04:21   5   they said there was mandatory reporting.

6   **Q.**   Okay.  And that's how law enforcement got involved?

7   **A.**   Yes.

8   **Q.**   Because initially, like I think you said, you didn't want

9   law enforcement involved.

04:21   10   **A.**   Yes.  Yes, we had -- after this happened, I was -- I

11   wasn't with my wife anymore.  Once we got this information, it

12   was the dividing factor of a split because she was mad at me

13   saying, "Why didn't you want people to know what your uncle did

14   to your daughter?"  And she would sort of blame me for it as

04:21   15   far as not trying to blast it and put it out there, but like I

16   said, I didn't want people to know.

17   **Q.**   And at a certain point when this information kind of got

18   out there and you had spoken with the FBI, did Lonnie ever call

19   you over the phone?

04:22   20   **A.**   Yeah, I was surprised.  He did call me after they tried to

21   interview his biological granddaughter.

22   **Q.**   And can you pull just a little bit back?  I'm sorry.

23   **A.**   Okay.  Yeah, he called me the day after they tried to

24   interview his biological granddaughter and he started

04:22   25   questioning me about everything.

201

1   Q.   And did -- what was his tone when he was talking with you?

2   A.   His tone was aggressive, but that's normal.  He's always

3   fairly aggressive and real assertive in his demeanor.

4   Q.   And did he ask you anything about -- what did he want to

5   know?

6   A.   He wanted to know what she said, and then he wanted to

7   know who the other kid was.  And I told him he knew already,

8   that, you know, he knew.  And he asked what they said -- they

9   did, and I said he knows what he did.  And I basically told

10  him, I said, "I'm not going to help you on this."  And then it

11  was the first time I ever stood up to him in a -- in a

12  conversation where I met his aggression with basically a

13  similar aggression in a phone call, and I got very upset as

14  well.  And then we both toned it down and ended the

15  conversation.

16  Q.   Did you feel at that time that he was trying to intimidate

17  you?

18  A.   Yeah, but that's his demeanor.  But, yeah, I felt that's

19  what he was trying to do as far as -- you've got to remember,

20  he's been intimidating me my whole life, and this is the first

21  time I ever stood up to him like that.  But that was his way of

22  getting information, being very assertive and more of a

23  demanding tone.  But I just was frustrated, and I was trying to

24  stay out of it and not get caught up in it, but like I said, I

25  wasn't going to be there to help him.

1  **Q.**   And kind of going back to Sxxxxxx, have you noticed any
2  changes in Sxxxxxx's demeanor?
3  **A.**   Yeah.  You look at that picture, you see that smile on her
4  face, and that's the way she was all times.  She was, you know,
5  a little extroverted.  She was happy camper.  She was silly.
6  She did all kinds of crazy things, but then she become more
7  reserved and more introverted and just -- I think she pulled
8  back a little bit, you know, from people.
9  **Q.**   And when you were speaking with -- I'm going back to
10 Lonnie.  At any point did he ever say he didn't do --
11 **A.**   No, he didn't say that.  He just, you know, was wanting to
12 know who the other kid was.  He wanted to know what they said
13 and things along that line, but --
14 **Q.**   And the last question I have is, now, you've known Sxxxxxx
15 all of her life, and just kind of a yes -- or just a one-word
16 answer.  Based upon the times that you've grown up with
17 Sxxxxxx, do you believe that she's a truthful person?
18 **A.**   Yeah, she was -- basically, you know, all my kids are
19 truthful.  I would call them truthful, but she is the most
20 truthful, to the point where when she messed up as a child,
21 she's almost proud of it.  So when she'd do something, she was
22 like, "I did it," and she'd be happy to confess to anything.
23 And, yeah, she's always been truthful.
24         MR. O'KONEK:  Okay.  Thank you.  Those are the only
25 questions I have, Your Honor.

203

1          THE COURT:  Mr. Bolinske, we're going to break for

2    the day rather than drag this on long beyond 4:30.  The jury

3    has been sitting a long time today.  It started early, and so

4    we're going to recess for the day.  We'll reconvene tomorrow

04:25    5    morning at 9 o'clock.

6          Members of the jury, please don't visit with anyone

7    about this case this evening.  Please don't go on the Internet

8    and start doing your own research into this case or anyone

9    involved with the case.  I'll repeatedly remind you of that,

04:25    10   but I'm really required to remind you of that.  We just can't

11   have people making decisions based on matters that have not

12   been presented in this courtroom.  So have a pleasant evening.

13   We'll see you back tomorrow morning and continue with the

14   questioning of Mr. Hallam.

04:27    15        (A recess was taken from 4:27 p.m., Tuesday,

16   September 12, 2017, to 8:54 a.m., Wednesday, September 13,

17   2017.)

18                    - - - - - - - - - -

19

20

21

22

23

24

25