UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

<u>REDACTED</u>

United States of America,      )
                               )
                Plaintiff,     )
                               )
        vs.                    )        File No. 1:16-cr-179
                               )
Lonnie Dale Spotted Bear,      )
                               )
                Defendant.     )

<u>TRANSCRIPT OF JURY TRIAL</u>
<u>VOLUME II</u>
<u>Pages 205-434</u>

Taken at
United States Courthouse
Bismarck, North Dakota
September 13 and 14, 2017

BEFORE THE HONORABLE DANIEL L. HOVLAND
-- UNITED STATES DISTRICT COURT JUDGE --

<u>APPEARANCES</u>

MR. JONATHAN J. O'KONEK
U.S. Attorney's Office
220 E. Rosser Ave
P. O. Box 699
Bismarck, North Dakota 58502-0699


                                        FOR THE UNITED STATES



                    - - - - - - - - -



MR. ROBERT V. BOLINSKE
Bolinske Law Firm
402 East Main, Suite 100
Bismarck, North Dakota 58501


                                        FOR THE DEFENDANT

                    - - - - - - - - -

## GOVERNMENT WITNESSES

Page No.

Travis Hallam
   Cross-Examination by Mr. Bolinske          212


Crystal Hallam
   Direct Examination by Mr. O'Konek           215
   Cross-Examination by Mr. Bolinske          223


Cheyenne Hallam
   Direct Examination by Mr. O'Konek           224
   Cross-Examination by Mr. Bolinske          228


Mxxxx Sxxxxxxxx
   Direct Examination by Mr. O'Konek           229
   Cross-Examination by Mr. Bolinske          240


Meranda Sanderson
   Direct Examination by Mr. O'Konek           242
   Cross-Examination by Mr. Bolinske          247
   Redirect Examination by Mr. O'Konek         248


Brad Sanderson
   Direct Examination by Mr. O'Konek           249


Christal Halseth
   Direct Examination by Mr. O'Konek           252
   Cross-Examination by Mr. Bolinske          273
   Redirect Examination by Mr. O'Konek         277


Shannon Hilfer
   Direct Examination by Mr. O'Konek           280
   Cross-Examination by Mr. Bolinske          289

- - - - - - - - - -

DEFENSE WITNESSES

                                                        Page No.


Agent Bruce Bennett
    Direct Examination by Mr. Bolinske              295
    Cross-Examination by Mr. O'Konek               311


Sommer Cummings
    Direct Examination by Mr. Bolinske              317
    Cross-Examination by Mr. O'Konek               325
    Redirect Examination by Mr. Bolinske           330


Kelly McGrady
    Direct Examination by Mr. Bolinske              332
    Cross-Examination by Mr. O'Konek               336
    Redirect Examination by Mr. Bolinske           337


Lonnie Spotted Bear
    Direct Examination by Mr. Bolinske              339
    Cross-Examination by Mr. O'Konek               344


Jada Appel
    Direct Examination by Mr. Bolinske              374

- - - - - - - - - -


Certificate of Court Reporter - Page 434


- - - - - - - - - -

1          (The above-entitled matter came before the Court, The

2     Honorable Daniel L. Hovland, United States District Court

3     Judge, presiding, commencing at 8:54 a.m., Wednesday, September

4     13, 2017, in the United States Courthouse, Bismarck, North

5     Dakota.  The following proceedings were had and made of record

6     in open court with counsel and the defendant present, but out

7     of the presence of the jury.)

8                    - - - - - - - - - - -

9          THE COURT:  We'll open the record in this case,

10    *United States of America versus Lonnie Dale Spotted Bear*.  All

11    counsel are present, along with the defendant.  We're outside

12    the presence of the jury.  I guess, Mr. O'Konek, you wanted to

13    visit?

14         MR. O'KONEK:  Yes, briefly, Your Honor.  Myself and

15    Special Agent Bennett were going in the elevator today, and one

16    of the jurors -- I believe it was Juror Number 10 -- was in

17    there, and we -- I just had said hello, not realizing who he

18    was until he signed in over here.  I wanted to just report

19    incidental contact.  We didn't talk about anything regarding

20    the case.

21         THE COURT:  It happens.

22         MR. BOLINSKE:  One juror said hello to me, and I

23    nodded and smiled, so --

24         THE COURT:  Okay.

25         MR. O'KONEK:  And then just another housekeeping

209

1   matter, we'll be requesting to play the forensic interviews of

2   at least two of the children.  Those interviews together would

3   be about 55 minutes.  There's one more interview that we may

4   play, but that will depend on how the third child testifies.

08:55   5            THE COURT:  All right.

6            MR. O'KONEK:  Just -- and I don't think that adds too

7   much.  I think we'll still be done today with the evidence, but

8   just wanted to give the Court a heads-up.

9            THE COURT:  And that's the interviews in their

08:55  10   entirety?

11            MR. O'KONEK:  We've redacted them down to just the

12   relevant portions to also get rid of any additional uncharged

13   misconduct or any hearsay statements, so they're about -- each

14   of the two that we play is about 30 -- 20 to 30 minutes apiece

08:56  15   or an hour.

16            THE COURT:  And under the rule of completeness,

17   Mr. Bolinske, was there anything else that you wanted to --

18            MR. BOLINSKE:  Well, I guess --

19            THE COURT:  -- show from the videos, or --

08:56  20            MR. BOLINSKE:  I guess I'll have to see because I got

21   the list of the redactions.  I haven't seen the videos with the

22   redactions, but I have the list of what was redacted, and it

23   wasn't like a bunch.  It was just like a few statements, right?

24            MR. O'KONEK:  It was -- some of what we had redacted

08:56  25   was, we didn't -- we redacted some of the statements between --

1   what they were saying about what the other children would have

2   said because we didn't know how it was going to play out.

3   There's also allegations from the children saying that one of

4   the other -- another child may have been molested.  We want to

5   take that out because that's uncharged misconduct.  Those --

6   there's talk in, I think, one of them about a potential plea

7   agreement.  Under 410 we can't talk about that, so I -- we

8   tried to make it so that it wasn't anything that would --

9        THE COURT:  All right.

10        MR. O'KONEK:  -- influence the jury in opposition to

11   the defendant.

12        THE COURT:  But you expect that you'll be done

13   approximately what part of the day?

14        MR. O'KONEK:  I would say we'd probably be done

15   shortly after lunch.  I would say maybe by 2 o'clock.

16        THE COURT:  Okay.  And do you intend to call

17   witnesses then today, Mr. Bolinske?

18        MR. BOLINSKE:  I do, Your Honor, yes.

19        THE COURT:  And how many do you have, approximately?

20        MR. BOLINSKE:  Three to four.

21        THE COURT:  Okay.  They're all relatively short?

22        MR. BOLINSKE:  Should be, yes.  Yep.

23        THE COURT:  All right.  If there's nothing else,

24   we'll bring the jury in.

25        MR. O'KONEK:  If we can get one second just to make

1    sure to recall -- I think we were in the middle of a witness.

2            THE COURT:  Mr. Hallam was on there.

3            (The jury enters the courtroom.)

4            THE COURT:  Good morning, members of the jury.  We'll

08:59    5    go back on the record in this case, *United States versus Lonnie*

6    *Dale Spotted Bear*.  When we left yesterday, Mr. Hallam was --

7    had just finished responding to questions from Mr. O'Konek on

8    behalf of the government.  Mr. Bolinske -- you had completed

9    your questioning?

09:00   10            MR. O'KONEK:  That's correct, Your Honor.

11            THE COURT:  All right.  Mr. Bolinske, you may inquire

12    on cross-examination.

13            MR. BOLINSKE:  Okay.  Very briefly.

14                            CROSS-EXAMINATION

09:00   15    BY MR. BOLINSKE:

16    **Q.**   You agree with me, wouldn't you, that these allegations

17    are very serious against Mr. Spotted Bear?

18    **A.**   Yes.

19    **Q.**   And because they're so serious and the stakes are so high,

09:00   20    you'd obviously want to get to the truth, wouldn't you?

21    **A.**   I wish I would be allowed to make the statements of the

22    truth that couldn't be taken out of context.  Yes, I do wish --

23    **Q.**   Well, you've already -- you've already testified, right,

24    and they asked you a bunch of questions?

09:00   25    **A.**   I've answered yes and no answers, but I've never been able

                                    212

1   to really give what my version is as far as my opinion as to

2   how this played out.  I'd love an opportunity to give a

3   statement.

4   **Q.**   Well, you had your chance.  They asked you all the

09:01   5   questions they wanted to ask you, right?

6   **A.**   I had a chance to answer questions, but I was not allowed

7   to give my perspective on this.

8   **Q.**   Okay.

9   **A.**   It was very limited.

09:01   10   **Q.**   Okay.  And would you agree with me that the credibility of

11   the people accusing Mr. Spotted Bear of things is very

12   important?

13   **A.**   Yes, and I don't like their credibility being attacked.

14   **Q.**   And that's fair, and I understand that, but you agree that

09:01   15   it's important, right?

16   **A.**   Yes.  Yes, I'll agree with that.

17   **Q.**   And consistency in the versions of what happened, that

18   would be important too, wouldn't it?

19   **A.**   Yes, and the consistency of the fact that there's three

09:01   20   young girls making the same accusations, yes.

21   **Q.**   And has Sxxxxxx's version of events changed at all

22   throughout this process?

23   **A.**   I've said this before.  As a father, I don't want to know

24   what happened.  I don't want to think about what happened.  I

09:02   25   don't want to accept what happened.  It just empowers it, so my

213

1   knowledge of this was the one-time deal.  I've never focused on

2   it.  I've never dwelled on it.  I just try to move past it.

3   Q.   And I respect that and understand that, but credibility is

4   important, right?

09:02   5   A.   Yes.

6   Q.   Consistency is important, right?

7   A.   Yes, and I'd also say the credibility of those trying to

8   accuse or otherwise is important, and I don't think that will

9   come up.

09:02   10   Q.   And if there are several stories or several versions,

11   that's important, isn't it?

12   A.   Yes, and that's, again, part of my frustration, because I

13   know how this is going to play out.

14   Q.   Well, we want to get to the truth.  You've already said

09:02   15   that, right?

16   A.   Yes, and I think there's going to be half-truths spoken

17   against her, manipulations, and I don't appreciate that.

18          MR. BOLINSKE:  Okay.  Thank you, sir.  That's all I

19   have.

09:02   20          THE COURT:  Mr. O'Konek, anything further?

21          MR. O'KONEK:  No, Your Honor.

22          THE COURT:  All right.  Thank you, Mr. Hallam.  You

23   may step down.  You are excused.

24          THE WITNESS:  Thank you, Your Honor.

09:02   25          THE COURT:  You may call your next witness.

214

1     MR. O'KONEK:  The United States would call Crystal

2  Hallam.

3                    CRYSTAL HALLAM,

4  having been first duly sworn, was examined and testified as

09:03    5  follows:

6                   DIRECT EXAMINATION

7  BY MR. O'KONEK:

8  Q.   Good morning.  Can I ask you to please state your full

9  name before the court?

09:04   10  A.   Crystal Hallam.

11  Q.   And you're the mother of Sxxxxxx?

12  A.   Yes.

13  Q.   Can you briefly just take us through who's all in your

14  family -- in your immediate family?

09:04   15  A.   It's myself; Travis, her father; Cheyenne, her older

16  sister; Bheri Rose, her other -- another older sister; Alex,

17  her older brother.

18  Q.   And Travis -- you and Travis were at one point married?

19  A.   Yes, we were married.

09:04   20  Q.   And we've previously heard from Travis about some things,

21  but I'd like to go over them with you.  How old is Sxxxxxx?

22  A.   Sorry?

23  Q.   How old is Sxxxxxx?

24  A.   She's 13.

09:05   25  Q.   Are you a little bit nervous today?

                              215

1   **A.**   Yes.

2   **Q.**   Okay.  What is her -- Sxxxxxx's date of birth?

3   **A.**   8/23/2004.

4   **Q.**   And where does Sxxxxxx currently live?

09:05   5   **A.**   She's in West Fargo.

6   **Q.**   Who does she live with?

7   **A.**   She lives with her older sister, Cheyenne, currently.

8   **Q.**   And where does she go to school?

9   **A.**   At Cheney Middle School.

09:05   10   **Q.**   And what grade is she in?

11   **A.**   Eighth grade.

12   **Q.**   What are some of the things that Sxxxxxx likes to do for

13   fun?

14   **A.**   She has a pet, Loki (ph).  That's -- he keeps her

09:05   15   occupied.  She feeds him and walks him and likes to hang out

16   with him.  She -- when she's with me, we go to the lake.  We'll

17   watch movies.  She just enjoys just hanging out and just

18   relaxing and --

19   **Q.**   Okay.  And, now, what is your relationship to Ivetta

09:06   20   Spotted Bear?

21   **A.**   She is Travis's aunt.

22   **Q.**   Okay.  And Nxxxx Hxxxxxx Exxxx, what is your relationship

23   to her?

24   **A.**   Her grandfather, who's married to Ivetta, is -- we're

09:06   25   distantly related.

216

1   **Q.**   And what is your relationship to Brad Sanderson?

2   **A.**   No relation.  It's through marriage.

3   **Q.**   And what about Meranda Sanderson?

4   **A.**   Through marriage.

09:06   5   **Q.**   And Mxxxx Sxxxxxxxx, the same sort of way?

6   **A.**   Correct.

7   **Q.**   What is your relationship to the defendant, Lonnie Spotted

8   Bear?

9   **A.**   He is Travis's uncle.

09:06   10   **Q.**   And what is his relationship -- Mr. Spotted Bear's

11   relationship to Sxxxxxx?

12   **A.**   He is her grandfather, her -- I don't know how --

13   **Q.**   Feel free to say.  Is he grandfather, godfather, something

14   else?

09:06   15   **A.**   It's -- her grandmother, Travis's mother, Alice, it's

16   Alice's brother, but they all call -- everybody calls him

17   Grandpa.

18   **Q.**   Is he also Sxxxxxx's godfather?

19   **A.**   No.

09:07   20   **Q.**   Okay.  And at some time before Sxxxxxx lived in New Town

21   or Fargo, did she ever live in Twin Buttes?

22   **A.**   Yes.

23   **Q.**   And from what ages, do you remember?

24   **A.**   From newborn until the age of 11.

09:07   25   **Q.**   Okay.  And in Twin Buttes, how close did you live from

217

1  Lonnie Spotted Bear?

2  A.   It was less than a mile away.

3  Q.   Now, would Sxxxxxx ever spend time with one of her

4  cousins, Haylon?

09:07  5  A.   Yes.

6  Q.   And where did Haylon live at this time?

7  A.   For the most part of it with his Grandma Diana and his

8  Grandpa Lonnie.

9  Q.   Okay.  And how often would you say that Sxxxxxx and Haylon

09:08  10  would hang out together in Diana and Lonnie's house?

11  A.   It could vary.  It could be once a month.  It could be

12  twice a week.  It just depends.  It's usually when Haylon

13  wanted to hang out with her.  He would call or have his grandpa

14  stop by and pick her up.

09:08  15  Q.   And Haylon and Sxxxxxx are around the same age?

16  A.   Yes, six months apart.

17  Q.   Did Mr. Spotted Bear ever ask you to have Sxxxxxx play

18  with Haylon?

19  A.   He would just stop over and say -- or call and say Haylon

09:08  20  wanted Sxxxxxx to come over and play.

21  Q.   And take me through how this would come about.  You said

22  he just kind of stopped over.  Was that stopping over at your

23  house?

24  A.   Yes.

09:08  25  Q.   And how often would this happen?

218

1    **A.**    Like I said, it could be anywheres from two days a week,

2    or it could be once a month.  It could be -- it was just

3    randomly.

4    **Q.**    And at some point your family goes to Cancun?

09:09    5    **A.**    Yes.

6    **Q.**    Approximately 2011 timeframe, did you go to Cancun with

7    Travis?

8    **A.**    Yes.

9    **Q.**    And where was Sxxxxxx at this time?

09:09    10   **A.**    She was with Lonnie and Diana and Haylon.

11   **Q.**    Okay.  And this would have been, I think, approximately

12   April of 2011?

13   **A.**    Around, yes.

14   **Q.**    And why did you leave Sxxxxxx with Lonnie and Diana?

09:09    15   **A.**    We thought they were the most safe people that we could

16   keep her with.  She got along with Haylon.  She had a playmate.

17   They were responsible to take her to school, make sure she got

18   home from school, to feed her.  Diana was a very good caretaker

19   of children.

09:09    20   **Q.**    And were there any other times that you left Sxxxxxx alone

21   with Haylon, Diana or Lonnie?

22   **A.**    At the -- during the summertime all the kids and the

23   family, aunts, uncles, children would go to the lake.  And it

24   could be Fourth of July or Labor Day or -- and a lot of them

09:10    25   just -- will just go down there and just spend the weekend.

1    MR. O'KONEK:  Okay.  Now, if I may, Your Honor,

2    permission to publish Government's Exhibit 3?

3    THE COURT:  To publish what?

4    MR. O'KONEK:  Government's Exhibit 3 briefly.

09:10    5    THE COURT:  Sure.

6    Q.   (MR. O'KONEK CONTINUING)  And if you don't know the

7    answer, you can say you don't know, but yesterday we admitted

8    this photograph through Travis.  And can you just identify the

9    people that are in the photograph?

09:10    10   A.   Mxxxx is on the left.  Sxxxxxx is in the middle, and Nxxxx

11   is on the right.

12   Q.   Okay.  And if you know, do you have an approximate time of

13   when the three of them would have been together?

14   A.   According to her missing teeth, she would have been right

09:11    15   around five years old.

16   Q.   And what do you mean, "according to her missing teeth"?

17   A.   She had them pulled, and they took a while to grow back

18   in, so they were -- they're not grown in yet.  She's still

19   pretty young.

09:11    20   Q.   So based upon the fact --

21   A.   Between five, six years old.

22   Q.   So based upon the fact that she's missing teeth, you can

23   identify that she's about five or six years old?

24   A.   Yes.

09:11    25   Q.   Okay.  And where was this photograph taken, do you know?

1    A.    Down at the lake.  I could see campers.  I could see the

2    picnic table, Lonnie's camper.  I'm not sure whose truck that

3    it is, and a couple tents, and they're standing on the

4    trampoline.

09:11    5    Q.    And when you say "the lake," was this the lake near or on

6    Mr. Spotted Bear's property?

7    A.    Yes.

8    Q.    Okay.  Thank you.  And based upon that photograph, I think

9    you've already talked about it, but some of Sxxxxxx's cousins

09:12    10    or family members would spend time at the lake with her?

11    A.    Yes.

12    Q.    I want to talk a little bit about December of 2015, end of

13    December or early January.  Were you in Cancun, Mexico, during

14    that time?

09:12    15    A.    I was.

16    Q.    In 2000 and -- it would have been December 2015, January

17    2016?

18    A.    Yes.

19    Q.    At that time did Sxxxxxx disclose to you that Mr. Spotted

09:12    20    Bear had sexually abused her?

21    A.    No.

22    Q.    When did she ultimately talk to you about that?

23    A.    It was in January, early January.  I actually left a few

24    days early.  I needed to get back for work, so I left the

09:12    25    family a few days early and came back to North Dakota.  Once --

1   Cheyenne and Cole, her boyfriend for years, they stopped by and
2   they just -- Sxxxxxx wasn't with them.  She was at her dad's
3   house, and they just said, "Mom, I have some -- something to
4   tell you that's pretty bad."  And I just -- I was like, "What
09:13   5   happened?"  And she said -- she said, "Sxxxxxx was molested."
6   And I said, "What?  What are you talking about?"  And she told
7   me that Sxxxxxx told Cole and her while they were in Cancun,
8   after I had left, that her Grandpa Lonnie molested her.

9           And I -- all I could do was just sit and cry, and I
09:14   10  just -- I didn't want to believe it, but I know Sxxxxxx.  She's
11  -- she would not lie about something like that.  She's a very
12  honest little girl, and she doesn't -- she's not exposed to
13  things like that where she could come out and say something --
14  **Q.**   And --
09:14   15  **A.**   -- that awful like so --
16  **Q.**   And, ma'am, have you noticed any changes or differences in
17  Sxxxxxx in the last few years?
18  **A.**   Yes.  She's a little more closed off, a little more quiet.
19  She's scared of -- she's scared of men.  She -- and when she
09:15   20  was at my house, anybody who would knock on the door that
21  wouldn't call beforehand, she would run and hide, and I would
22  have to go look for her and tell her, you know, who it was, you
23  know, it was safe.

24          She hid -- she hid a knife.  I was looking for a
09:15   25  knife, and I couldn't find it, so -- and I was looking all

1   over, and she asked what I was looking for.  I told her I was

2   looking for a knife.  And she's like, "Oh, I have that in my

3   room."  And I didn't ask her.  I knew why she would hide a

4   knife.  She's scared.  She's fearful, just -- she'd always look

09:16  5   for me and make sure I was visible.  Anybody she was with, she

6   was that way.

7   Q.   And was Sxxxxxx scared to come and testify here yesterday?

8   A.   She's -- she's scared, but she knows that what happened

9   wasn't her fault.  She knows, when I was talking to her, what

09:16  10  she had to do is the right thing to do.

11        MR. O'KONEK:  Those are the only questions I have,

12  Your Honor.

13        THE COURT:  Mr. Bolinske.

14                        CROSS-EXAMINATION

09:16  15  BY MR. BOLINSKE:

16  Q.   Just to clear up a couple of points, Sxxxxxx told Cole

17  about this, is that accurate?

18  A.   Correct.

19  Q.   And this was not when you were in Cancun?

09:16  20  A.   No.

21        MR. BOLINSKE:  Okay.  Thank you.  That's all I have.

22        THE COURT:  Anything else?

23        MR. O'KONEK:  No, Your Honor.

24        THE COURT:  All right.  Thank you, ma'am.  You may

09:17  25  step down, and you are excused from these proceedings.

223

1     MR. O'KONEK:  The United States would call Cheyenne

2  Hallam.

3                          CHEYENNE HALLAM,

4  having been first duly sworn, was examined and testified as

5  follows:

6                          DIRECT EXAMINATION

7  BY MR. O'KONEK:

8  **Q.**   Cheyenne, I just have a couple of questions to go into

9  your background.  Can you first just state your name for the

10  Court?

11 **A.**   Yes, Cheyenne Hallam.

12 **Q.**   Okay.  And how old are you today?

13 **A.**   Twenty-two.

14 **Q.**   And where do you live?

15 **A.**   Fargo, North Dakota.

16 **Q.**   And who lives with you?

17 **A.**   Cole Brewer and Sxxxxxx Hxxxxx, my sister.

18 **Q.**   And who is Cole Brewer?

19 **A.**   My boyfriend.  We've been together for almost four years

20 now.

21 **Q.**   And you mentioned Sxxxxxx also lives with you.

22 **A.**   Yes.

23 **Q.**   Who's Sxxxxxx to you?

24 **A.**   She's my younger sister.

25 **Q.**   Okay.  And what -- where does Sxxxxxx go to school?

1   A.   Cheney Middle School.  It's only like a block down from

2   us.

3   Q.   And just to go into background pretty quickly, your father

4   is Travis Hallam?

5   A.   Yes.

6   Q.   Mother is Crystal Hallam?

7   A.   Yes.

8   Q.   And you have a sister, Bheri, I believe?

9   A.   Yeah, Bheri Rose.

10  Q.   Okay.  And what is your relationship to Mr. Lonnie Spotted

11  Bear?

12  A.   He's my grandma's brother.

13  Q.   Now I want to talk a little bit about Cancun, December

14  of 2015.  Were you in Cancun during that timeframe?

15  A.   Yeah.

16  Q.   Take us through why you guys went there and who all went

17  with you.

18  A.   We go there each year.  My dad took my mom, I believe,

19  when she was pregnant with me, or something like that, for

20  their honeymoon.  And every year since then he took us kind of

21  as a family tradition type of thing.

22  Q.   And so when you say -- who all went with you on that year,

23  December of 2015?

24  A.   Cole, Sxxxxxx, me, Bheri, my dad.  My mom stayed back in

25  New Town that year.

09:19

09:19

09:19

09:20

09:20

**Q.** Okay.  And so at some point while you were in Cancun, did Sxxxxxx disclose that Mr. Spotted Bear had molested her?

**A.** Yeah.

**Q.** And can you briefly take us through where you were, who was with you when this happened?

**A.** We were in me and Cole's hotel rooms.  Me and Cole were sitting on the bed talking, and Sxxxxxx come up and asked us if she could tell us something.  Cole got worried and he said yeah.  And she said that Lonnie molested Nxxxx, that he touched her, and I -- I'll admit I was kind of shocked.  I was like, "Sxxxxxx, you don't" -- I was like, "You shouldn't say stuff like that."  I was like, "Are you sure?"  And she's like, "Yes," and she's like, "because it happened to me," and I started crying.

And then Cole asked what happened, and I had to sit there and I had to listen to her as she -- basically as she told me that she was hanging out, I believe, at my Uncle Daylon's house with Haylon.  And, anyways, Lonnie kept asking her to come back to the house because Haylon needed to find his tablet.  And Sxxxxxx kept saying no, she didn't want to go, and he kept asking, so finally she's like, "Okay, fine, I'll go."

He took her back to his house and they were looking for it for a little bit, and she said that he pushed her down and he took down her leggings and her underwear and he -- he licked her.  And she was yelling.  I think she said that she

1    kicked him in the face, and he laughed.  He laughed, and then

2    he -- when he got up, he opened up his jacket and she saw the

3    tablet, and she asked if it was -- if it was there the whole

4    time.  She can't -- I don't even know what happened.  She can't

09:22   5    remember if she walked home, if she got drove home.  She can't

6    even remember what happened.

7    **Q.**   And this is what she had told you back in December

8    of 2015?

9    **A.**   My dad?

09:22   10   **Q.**   No, this is what Sxxxxxx had told you in December of 2015?

11   **A.**   Yeah, me and Cole.  And then Cole told us that we needed

12   to go tell my dad, and we walked over to his room because we

13   were both -- we were both scared.  I don't know how you tell my

14   dad something like that.  I don't know how you tell any dad

09:22   15   something like that, and she -- she told him, and my dad just

16   sat there and he told her it wasn't her fault, that she didn't

17   do anything wrong, that she needed to understand that she was a

18   little kid.  She was like five.

19   **Q.**   What was -- what was Sxxxxxx's demeanor when she was

09:23   20   talking with you?

21   **A.**   She was crying the entire time.  She was scared.  She

22   didn't know how I was going to react, but she was more looking

23   at Cole because she was scared.

24         MR. O'KONEK:  Those are the only questions I have.

09:23   25   Thank you.

227

1        THE COURT:  Mr. Bolinske.

2                    CROSS-EXAMINATION

3    BY MR. BOLINSKE:

4    **Q.**   This Cancun trip, was this 2015, early part of 2016?

5    **A.**   I can't remember.  I remember who was there.  I remember

6    we were in a hotel room.

7    **Q.**   Okay.  And the allegations that Sxxxxxx is talking about

8    were from what year?

9    **A.**   I don't know.  All I know is that she -- she said she was

10   like five or six.  I don't -- I'm not going to ask her what

11   year.

12   **Q.**   Okay.  So it was five to six years earlier than when you

13   were told or Cole was told that this allegedly occurred?

14   **A.**   That's not going to be going through my mind right then.

15   **Q.**   I'm just asking if that's when it was.

16   **A.**   I don't know.  Yeah, it would have to be six, possibly.

17   Anywhere from five to seven, so I'd say six.

18   **Q.**   Okay.  And at that time either you or Cole was -- were

19   told something about opening a jacket and a tablet?

20   **A.**   Yeah, she explained that, because that's the part that

21   bothered her.  That's basically being premeditated.

22   **Q.**   Okay.  And do you know if that statement or that version

23   of reality has remained consistent throughout this process?

24   **A.**   Yes, it has.

25   **Q.**   Okay.  And so Sxxxxxx you think has reported that fact or

1    this version to everyone involved in this process?

2    **A.**   You know what, she probably did.  I mean, when things like

3    that happen, are you really -- things will probably come in and

4    out.  But, yes, if she did remember, she would say that.

09:25   5         MR. BOLINSKE:  Okay.  Thank you.  That's all the

6    questions I have.

7              THE COURT:  Anything else?

8              MR. O'KONEK:  No, Your Honor.

9              THE COURT:  Thank you, Cheyenne.  You may step down,

09:25  10    and you are excused.

11             You may call your next witness.

12             MR. O'KONEK:  United States calls Mxxxx Sxxxxxxxx.

13                  <u>MXXXX SXXXXXXXX</u>,

14    having been first duly sworn, was examined and testified as

09:26  15    follows:

16                  <u>DIRECT EXAMINATION</u>

17    <u>BY MR. O'KONEK:</u>

18    **Q.**   Mxxxx, can I have you please pull the microphone as close

19    to you as possible?  Thank you.

09:27  20             Can you please state your full name for the Court?

21    **A.**   Mxxxx Sxxxxxxxx.

22    **Q.**   Okay.  And, Mxxxx, you understand the difference between a

23    truth and a lie?

24    **A.**   Mm-hmm.

09:27  25    **Q.**   And you understand that you're only to talk about things

1  that are true in here?

2  **A.**   Yep.

3  **Q.**   And so if I were to tell you that this pen was red, what

4  would you tell me?

09:27  5  **A.**   That it's blue.

6  **Q.**   Okay.  So to say that it's red would be a lie?

7  **A.**   Yeah.

8  **Q.**   Okay.  Now, how old are you here today?

9  **A.**   I'm 13.

09:27  10  **Q.**   And what is your date of birth?

11  **A.**   12/30/03.

12  **Q.**   I didn't catch that part.  Can you say that again?

13  **A.**   12/30/03.

14  **Q.**   2003?

09:27  15  **A.**   Yeah.

16  **Q.**   And where do you currently live?

17  **A.**   Bismarck, North Dakota.

18  **Q.**   And who do you live with?

19  **A.**   My mom and my sister and my mom's boyfriend.

09:28  20  **Q.**   Okay.  I want to take us through who those people are.

21  Can you just give us the names of the people that are in your

22  family?

23  **A.**   Like everybody?

24  **Q.**   Your mom, your dad, brother, sisters?

09:28  25  **A.**   Well, Meranda Marcellais, Brad Sanderson, River Sanderson,

1   and Brayden Sanderson.

2   Q.   Okay.  So Meranda Sanderson is your mom?

3   A.   Yeah.

4   Q.   Brad Sanderson is your dad?

09:28   5   A.   Yeah.

6   Q.   And who were your -- I believe you had mentioned a brother

7   and a sister.  Who are they?

8   A.   Well, River and Brayden.

9   Q.   Brayden is your brother?

09:28   10   A.   Yeah.

11   Q.   And he's 17 years old, I believe?

12   A.   He's 18.

13   Q.   He's 18 now.  And then there's River, who is eight or

14   nine?

09:28   15   A.   Nine.

16   Q.   And where do you currently go to school?

17   A.   Wachter Middle School.

18   Q.   What grade are you in?

19   A.   Eighth.

09:29   20   Q.   What's one of your favorite subjects?

21   A.   English.

22   Q.   What do you like about English?

23   A.   I like to like read, and stuff, so I like -- I don't know.

24   Q.   What kind of stuff do you like to read?

09:29   25   A.   Like biographies almost.

1    **Q.**   Okay.  Any ones that you like in particular?

2    **A.**   Not really.

3    **Q.**   Did you recently have an injury due to a volleyball

4    accident?

09:29    5    **A.**   Yeah.

6    **Q.**   Can you just briefly tell the Court a little bit about

7    that?

8    **A.**   Well, I was playing volleyball, and I went up to hit, and

9    I came down, and I like rolled my ankle.

09:29    10    **Q.**   Okay.  And what happened after you rolled your ankle?

11    **A.**   I got a boot and crutches.

12    **Q.**   Okay.  How long ago did that happen?

13    **A.**   Like two or three weeks ago.

14    **Q.**   Was that kind of a scary experience?

09:29    15    **A.**   Kind of.

16    **Q.**   And I'm going to just ask you kind of upfront, are you

17    kind of nervous being here today?

18    **A.**   Yes.

19    **Q.**   You told me you really didn't want to testify, didn't you?

09:30    20    **A.**   Yep.

21    **Q.**   And as we go through some of this, you remember that you

22    got to -- you have to tell the truth, right?

23    **A.**   Yeah.

24    **Q.**   Okay.  So I want to talk to you a little bit about some

09:30    25    people that are your cousins.  Do you know somebody named

232

1   Sxxxxxx?

2   **A.**   Yeah.

3   **Q.**   Who's she?

4   **A.**   Well, she's my cousin.  I don't know.

09:30   5   **Q.**   Okay.  And what about Nxxxx?

6   **A.**   I think she's my cousin too.

7   **Q.**   Are you closer to Sxxxxxx or Nxxxx?

8   **A.**   Sxxxxxx.

9   **Q.**   And what about a cousin named Haylon?

09:30   10   **A.**   Oh, Haylon, yeah, he's my cousin too.

11   **Q.**   What's his age in relationship to you?

12   **A.**   He's 13, I think, and -- I don't know.  He's my Uncle

13   Morley's son.

14   **Q.**   Okay.  And how are you related to Lonnie Spotted Bear?

09:31   15   **A.**   I think I'm double-related.  I don't know.

16   **Q.**   Did you consider him to be like a grandfather?

17   **A.**   Yeah.

18   **Q.**   And did you ever used to spend time in Twin Buttes, North

19   Dakota?

09:31   20   **A.**   (Nodding.)

21   **Q.**   Is that a yes?

22   **A.**   (Nodding.)

23   **Q.**   I'm sorry.  What we can, if you need to, take a little bit

24   of a break, and we'll just ask a couple more questions, okay?

09:31   25   So why did you go to Twin Buttes, just in general?  Who -- what

1   would be the reasons to go to Twin Buttes?

2   A.   Well, we had like family reunions and Thanksgiving, and

3   stuff.

4   Q.   Okay.  And who would go with you from your family to Twin

09:31   5   Buttes?

6   A.   My dad.

7   Q.   That was Brad?

8   A.   (Nodding.)

9   Q.   Yes?  And I'm sorry.  We're going to have to keep asking

09:31   10   for verbal records, but I can indicate -- if you shake your

11   head, I'll just say that you shook your head, but can you try

12   to answer verbally?

13   A.   Yeah.

14   Q.   And I know this is tough, but I appreciate that.  Did you

09:32   15   ever spend time with your cousin, Haylon, in Twin Buttes?

16   A.   Yes.

17   Q.   Did you ever spend time with Haylon when you were roughly

18   seven years old?

19   A.   Yeah.

09:32   20   Q.   Can you take us through what you remember when you were

21   hanging out with Haylon when you were seven?

22   A.   Like what do you mean?

23   Q.   Well, I guess I'll just ask upfront.  Did Lonnie Spotted

24   Bear ever touch you inappropriately?

09:32   25   A.   Yeah.

234

1    **Q.**   Did that happen in Twin Buttes?

2    **A.**   Mm-hmm.

3    **Q.**   And I'm sorry to go into detail, but can you just describe

4    what happened?

09:32    5    **A.**   Like -- like the whole -- like from like --

6    **Q.**   Start wherever you feel comfortable.

7    **A.**   Well, our grandmas -- like all the grandmas were in the

8    kitchen, and me, Haylon and Lonnie were wrestling in the living

9    room.  And I don't know why, but we went upstairs and like we

09:33    10    all -- there's like a couch in Daylon's house, in the upstairs.

11    And like we sat down, and like it was me and Lonnie.  And then

12    Haylon was coming up the stairs, and he had to go get something

13    downstairs, so he went down there, and then that happened.  And

14    it was only like a minute, so like he came back upstairs

09:33    15    because he had his DS and he had to get something for it.

16    **Q.**   And I appreciate you telling me that, and I want to go

17    into a little bit more detail, okay?  Can you do that for me?

18    I know it's tough, but I promise I won't spend too much more

19    time on it, okay?

09:33    20    **A.**   (Nodding.)

21    **Q.**   So when you said that you were in Twin Buttes with Haylon,

22    where were you at?  Were you at Lonnie's house, Uncle Daylon's

23    house, somewhere else?

24    **A.**   Daylon.

09:33    25    **Q.**   Okay.  And who's Uncle Daylon?

1   **A.**   He's my uncle.

2   **Q.**   Okay.  And where was your father at this time?

3   **A.**   He was hunting.

4   **Q.**   Okay.  And do you know what he was hunting for?

09:34   5   **A.**   Deer.

6   **Q.**   Do you know where he was going hunting or who he was going

7   with?

8   **A.**   It was Darby.  That's all I remember, because he got hurt.

9   **Q.**   Okay.  And so at some point you had mentioned that you,

09:34   10   Haylon, and Lonnie were wrestling?

11   **A.**   Yeah.

12   **Q.**   And -- but at some point you went upstairs?

13   **A.**   Yeah.

14   **Q.**   Can you just describe Daylon's house for us so we can get

09:34   15   a better idea of what it looked like?

16   **A.**   Well, you walk in and it's like really wide and open.  And

17   to the right there's -- you just go upstairs, and it's not very

18   high upstairs, so you just walk upstairs.  And then there's

19   like a little patio almost, and like you can see the living

09:34   20   room from the upstairs, and that's why there's like a couch

21   there, I'm pretty sure.

22   **Q.**   Okay.  And so at some point you mentioned something about

23   a couch.  Where was Daylon when you and Lonnie were on a couch

24   together?

09:35   25   **A.**   I don't know where he was.

236

1  Q.   Do you know where Haylon went to?

2  A.   He went downstairs to get something for his DS.

3  Q.   What's -- is a DS like a Game Boy, like a portable gaming

4  console?

09:35  5  A.   Yeah.

6  Q.   So when you and Lonnie were, I guess, alone upstairs on

7  the couch, what happened?

8  A.   Like he -- I don't feel like putting it into like detail.

9  Q.   Okay.  Well, let me ask it this way.  When you guys were

09:35  10  on the couch, where are -- or how close are you guys sitting

11  together?

12  A.   Close.  It was a really small couch.

13  Q.   Okay.  And as you're sitting close together -- you already

14  said that Lonnie had touched you inappropriately.  Just tell

09:35  15  us, what did he use?  Did he use his hands or something else?

16  A.   His hands.

17  Q.   And what did Lonnie do with his hands?

18  A.   What?

19  Q.   What did Lonnie do with his hand or hands?

09:36  20  A.   I don't --

21  Q.   Did --

22       MR. BOLINSKE:  Your Honor, can we approach for a

23  minute?

24       THE COURT:  Sure.

09:36  25       (At the Court bench with counsel, out of the hearing

1   of the jury.)

2          MR. BOLINSKE:  Your Honor, I guess I think he's

3   gotten what he's wanted.  And I know what he's doing and

4   everybody knows what he's doing, but it's just too leading.

09:36   5   Sorry, but it is.

6          MR. O'KONEK:  I haven't gotten her to say where he

7   touched her yet, on the vagina, which is an element of the

8   offense.  I can lead.  I'm trying to ask more open-ended

9   questions, but she's having difficulty.  She told me she didn't

09:36   10  want to do this, and it's a bit hard for her, so I can lead if

11  that would be easier, and I can get in and out.

12         THE COURT:  Well, I'm going to give him a little bit

13  of leeway, a leading question.  I don't think Mr. O'Konek is

14  going to belabor the point.  I think --

09:37   15         MR. BOLINSKE:  No, he's doing it nice.  I appreciate

16  that, but I just don't -- you know, I have to make the

17  objection.

18         THE COURT:  Understood, so I'm going to overrule, but

19  I'll give you a little more leeway, and then let's try to move

09:37   20  on.

21         MR. O'KONEK:  Yes, Your Honor.

22         (In open court with the defendant, counsel, and the

23  jury present.)

24  Q.   (MR. O'KONEK CONTINUING)  Mxxxx, I'm sorry about that.  At

09:37   25  this time were you -- what were you wearing when this was going

238

1   on?

2   A.   I was -- I was wearing a shirt and red shorts, like

3   basketball shorts.

4   Q.   And did Lonnie touch your private parts with his hand over

09:37   5   your basketball shorts?

6   A.   Yeah.

7   Q.   Did he touch your vaginal area?

8   A.   Yeah.

9   Q.   Did he try to move his hand up your shorts as well?

09:37   10   A.   No.

11   Q.   What did he try to do after he touched your --

12        MR. BOLINSKE:   Your Honor, can we approach again?  I

13   mean, same objection.  We don't need to approach, but --

14        THE COURT:   All right.  It's understood you have a

09:38   15   standing objection to these last few questions, which I will

16   overrule at this stage.

17   Q.   (MR. O'KONEK CONTINUING)   After Lonnie had touched you on

18   your vaginal area over your shorts, what did he do next?

19   A.   He just stopped.

09:38   20   Q.   Okay.  And what happened after he stopped?

21   A.   We went downstairs, and then I went to -- I went to the

22   bathroom, and I came back out, and then we just like listened

23   to music.

24   Q.   Okay.  And did you ever tell anybody about this?

09:38   25   A.   No.  I told someone when I was nine.

1    **Q.**   Okay.  Did you ever tell your mom?

2    **A.**   Yeah, that's who I told.

3    **Q.**   Okay.  And when you were nine, why did this come up?

4    **A.**   My mom was talking to us about like if anybody ever did

5    something to you, to tell her.  And I started crying, and then

6    -- yeah, and then I told her.

7    **Q.**   And you had told her that Lonnie had touched your vagina

8    over the clothing?

9    **A.**   Yeah.

10           MR. O'KONEK:  Those are the only questions I have,

11   Your Honor.

12           THE COURT:  Mr. Bolinske.

13                      <u>CROSS-EXAMINATION</u>

14   <u>BY MR. BOLINSKE</u>:

15   **Q.**   Is it fair to say that you're -- you're friends with

16   Sxxxxxx, right?

17   **A.**   Yeah.

18   **Q.**   And you're friends with Nxxxx?

19   **A.**   Yeah.

20   **Q.**   And have you discussed these things with Sxxxxxx?

21   **A.**   No.

22   **Q.**   You've never discussed these things with Sxxxxxx?

23   **A.**   Hmm-mm.

24   **Q.**   Have you discussed them with Nxxxx?

25   **A.**   No.

1   **Q.**   Did you discuss them ever with Ivetta Spotted Bear?

2   **A.**   No.

3   **Q.**   You discussed them -- who have you discussed them with?

4   **A.**   Basically just my mom.

09:40   5   **Q.**   Do you remember going to what's called -- do you know what

6   a forensic interview is?

7   **A.**   No.

8   **Q.**   Do you remember going to a place where they asked you a

9   bunch of questions?

09:40   10   **A.**   Yeah.

11   **Q.**   And you test -- you mentioned earlier that your -- this

12   was a deer hunting trip at whose house, or a reunion or a --

13   **A.**   Daylon.

14   **Q.**   At Daylon's house.  And your grandmothers were in the

09:40   15   kitchen?

16   **A.**   Yeah.

17   **Q.**   And is the kitchen upstairs?

18   **A.**   Upstairs?

19   **Q.**   Where's the kitchen?

09:40   20   **A.**   It's downstairs.

21   **Q.**   Okay.  But your grandmothers were at the house during this

22   event?

23   **A.**   Yeah.

24            MR. BOLINSKE:  Okay.  Thank you.  That's all I have.

09:40   25            THE COURT:  Any other questions?

241

1      MR. O'KONEK:  No, Your Honor.

2      THE COURT:  All right.  Mxxxx, you may step down.

3  Thank you.

4      MR. O'KONEK:  The United States would call Meranda

09:41  5  Sanderson.

6                       MERANDA SANDERSON,

7  having been first duly sworn, was examined and testified as

8  follows:

9                       DIRECT EXAMINATION

09:41  10  BY MR. O'KONEK:

11  Q.    Good morning.  I just have a couple of background

12  questions.  Could you please just start by stating your full

13  name for the Court?

14  A.    Meranda Marcellais.

09:42  15  Q.    And you're the mother of Mxxxx?

16  A.    Yes.

17  Q.    And can you basically just take us through who's all in

18  your family, who lives in your household?

19  A.    It's myself and my two daughters and, well, my son,

09:42  20  Brayden, Mxxxx, River.

21  Q.    And you were formerly married to Brad Sanderson?

22  A.    Yes.

23  Q.    And I believe -- and correct me if I'm wrong, but Brad is

24  -- Brad Sanderson's mother is, I believe, the sister of

09:42  25  Lonnie's wife?

1  **A.**   Yes.

2  **Q.**   And what is your relationship to Lonnie Spotted Bear?

3  **A.**   He is my uncle.  His dad and my grandpa were first

4  cousins, and that's our relation, known him my whole life.

09:42    5  **Q.**   And are you kind of nervous to testify here today?

6  **A.**   I'm just really upset.

7  **Q.**   Okay.  I'll try to be as quick as possible.  Can you take

8  us through just briefly Mxxxx's age?  That's okay.  You can

9  take a minute if you need to compose yourself.

09:43   10  **A.**   She's 13.

11  **Q.**   And what's her date of birth?

12  **A.**   December 30, 2003.

13  **Q.**   And where does she go to school?

14  **A.**   Wachter.

09:43   15  **Q.**   And what grade is she in?

16  **A.**   Eighth.

17  **Q.**   What are some of Mxxxx's favorite activities?

18  **A.**   She loves volleyball, and she sings.  She dances.  She's

19  just a very outgoing kid, you know, but volleyball is her

09:43   20  favorite.

21  **Q.**   And what is Mxxxx's relationship with Lonnie Spotted Bear?

22  **A.**   She doesn't have one with him right now.

23  **Q.**   But is he -- does she consider him a grandfather?

24  **A.**   At one time, yeah.

09:44   25  **Q.**   And did you -- or I should say this, but did Mxxxx ever

1   spend time in Twin Buttes when she was younger?

2   **A.**   Yep.

3   **Q.**   And who would she go and visit in Twin Buttes?

4   **A.**   She would go visit them, their family.

5   **Q.**   And by "them" -- and by "them," you mean?

6   **A.**   Lonnie and Diana, and it would usually be for Thanksgiving

7   or something going on, you know, family-wise, brandings.

8   They'd go with their dad.

9   **Q.**   And when you say "brandings," what do you mean by that?

10  **A.**   Cattle brandings.  They ranch, and so they would go out

11  there for that.

12  **Q.**   And how often would you say -- and you don't -- if you

13  don't know an exact number, you can just kind of approximate,

14  but how often would you say that Mxxxx would go and spend time

15  with Daylon -- Uncle Daylon or Haylon -- her cousin, Haylon?

16  **A.**   It wasn't -- it wasn't a lot, not too often.  I mean, a

17  few times a year maybe.  I mean, just for holidays or when

18  they'd see them -- because every family event they have,

19  birthdays or Christmas or whatever, they always were going to

20  be around each other because Brad would take the kids, you

21  know, during holidays.  And then they would go either to their

22  Grandma Vetta's, who's Diana's mother in Keene, or they would

23  go to Twin Buttes, you know, like for Thanksgiving, or like I

24  said, for the brandings in May.  You know, it just depended on,

25  you know, when Brad had them.

244

1   **Q.**   And I want to talk to you a little bit about a

2   conversation that Mxxxx had with you.  At any point did you

3   ever give a talk with Mxxxx about places that people shouldn't

4   touch on her body?

09:45   5   **A.**   Yes.

6   **Q.**   And do you remember approximately when this happened, or

7   if you don't know that, what age Mxxxx would have been?

8   **A.**   Well, I've always, you know, had a -- I've had a talk with

9   her in the past, and -- but when this came -- are you talking

09:45   10   about when this came up?

11   **Q.**   Yes, ma'am.

12   **A.**   She had to be around -- I moved up here in 2011, and so it

13   was the second year.  She had to be around nine, third or

14   fourth grade.  And I was having a conversation with her and

09:46   15   River about if anybody ever messes with her, does anything to

16   them or touches them in any way, or anything, that they could

17   always tell me, that it's okay, because I had just gotten -- I

18   had just heard about -- I had seen something about another --

19   something happened to some kids, you know, because I'm a nurse.

09:46   20   I work with a lot of difficult things sometimes and come across

21   things, and it just didn't sit right with me, so I had this

22   conversation with them.

23           And Mxxxx just broke down at that time.  She just

24   started crying, and I didn't really understand why, what -- you

09:46   25   know, and it took her a little bit to tell me.  And then she

245

1  said that something had happened to her, that somebody had done

2  something like that to her.

3  **Q.**   And did you ask who had done that to her?

4  **A.**   Yeah.

09:46   5  **Q.**   And what did Mxxxx say?

6  **A.**   She said it was Lonnie.

7  **Q.**   Did she say -- and tell us as much detail as she actually

8  told you, but did she say what had happened?

9  **A.**   She wouldn't -- she wouldn't -- Mxxxx is very -- I mean, a

09:47   10  very -- it's really hard for her to talk about stuff like this,

11  and -- but what she told me was that they were there for -- she

12  was saying in her mind she's remembering a family reunion, but

13  I know it had to have been Thanksgiving at the time.

14  **Q.**   Why do you say it had to have been Thanksgiving?

09:47   15  **A.**   Because that's when they were there, and their dad -- they

16  were there with him by themselves.  They were left with Lonnie

17  while they went hunting, and then the grandmas and all them

18  went to Black Friday shopping, or whatever.  It's what they

19  like to do, and that's when that took place.

09:47   20  **Q.**   And you've known your daughter all your life, obviously?

21  **A.**   Mm-hmm.

22  **Q.**   And is she a truthful person?

23  **A.**   Yes.

24       MR. O'KONEK:  Thank you.  Those are the only

09:47   25  questions I have.

246

1          THE COURT:  Mr. Bolinske.

2          MR. BOLINSKE:  I think I just have a couple.

3                       CROSS-EXAMINATION

4    BY MR. BOLINSKE:

09:47   5    **Q.**   So at this Thanksgiving, the grandmothers were not home

6    during this event?

7    **A.**   I don't know for sure.  They -- I know they went Black

8    Friday shopping, and I don't know if this happened when they

9    were gone or if it happened when they were there because, I

09:48   10   mean, Mxxxx was so little, you know, so I don't know if her --

11   in her mind, if it was -- if people were -- what she's

12   remembering -- you know, she remembers what happened, but as to

13   who was all there and the details of it, it's pretty hard to,

14   you know, determine if they were there or not.

09:48   15   **Q.**   Okay.  So you don't know who was at the house at that

16   time?

17   **A.**   Not everybody, no.

18   **Q.**   And were you at the house at that time?

19   **A.**   No.

09:48   20   **Q.**   Were you shopping or --

21   **A.**   No, they were with their dad.  We were divorced.  We were

22   divorced in 2008.

23   **Q.**   Okay.

24   **A.**   So he went there with them -- or she went there with them.

09:48   25   **Q.**   So Brad would be -- he'd be a better guy to know about who

247

1  was there?

2  **A.**   He would know who was there specifically.

3            MR. BOLINSKE:  Okay.  Thank you.  That's all I have.

4            MR. O'KONEK:  Just one brief question, Your Honor.

09:48   5                    REDIRECT EXAMINATION

6  BY MR. O'KONEK:

7  **Q.**   So the last question I'll ask you, ma'am, is why didn't

8  you report this to the police when Mxxxx had disclosed?

9  **A.**   It had been -- like I said, it was probably three, four

09:49   10  years after it had happened, and I didn't know that anything

11  could even be done anymore.  I didn't know -- I mean, I didn't

12  -- I didn't know what I could do, to be honest, and all I could

13  do was just not ever let her go back there again, and she was

14  never allowed to go back around him again, or any of my kids to

09:49   15  go back there and be around that place or anybody, and they

16  haven't been, so that's all I could do.

17            And then, you know, and I love this family.  This was

18  my family, you know.  Like I was close to Lonnie and his kids

19  and everybody, and I trusted him with my kids, so this is

09:50   20  really hard on a lot of people.

21  **Q.**   And you didn't want Mxxxx to have to testify here today?

22  **A.**   No.  No.

23            MR. O'KONEK:  Those are the only questions I have.

24  Thank you.

09:50   25            THE COURT:  Anything else?

1          MR. BOLINSKE:  No.

2          THE COURT:  All right.  Thank you, ma'am.  You may

3    step down.

4          MR. O'KONEK:  The United States calls Mr. Brad

09:50   5    Sanderson.

6                        BRADLEY SANDERSON,

7    having been first duly sworn, was examined and testified as

8    follows:

9                        DIRECT EXAMINATION

09:52   10   BY MR. O'KONEK:

11   Q.   Mr. Sanderson, can I have you pull the mike as close as

12   possible to you just so it amplifies the sound?

13          Can you just state your full name for the Court?

14   A.   Bradley Gene Sanderson.

09:52   15   Q.   And you are Mxxxx Sanderson's father?

16   A.   Yep.

17   Q.   And you were formerly married to Meranda Sanderson?

18   A.   Yes.

19   Q.   What is your relationship to Lonnie Spotted Bear?

09:52   20   A.   He's my uncle.

21   Q.   And let's talk a little bit about Mxxxx.  She's 13 years

22   old?

23   A.   Yes.

24   Q.   And what's her date of birth?  Is she born in 2003?

09:53   25   A.   Yeah, December 31st, I believe.

1   Q.   And where is Mxxxx -- where does Mxxxx live, here in

2   Bismarck, somewhere else?

3   A.   Yep, Bismarck, with her mom and with me.

4   Q.   Okay.  And do you guys share --

09:53   5   A.   Off and on.

6   Q.   -- share custody?

7   A.   Yep.

8   Q.   Now, what is your relationship to Ivetta Spotted Bear?

9   A.   Through marriage, I guess.  My mom's sister, Diana, is

09:53   10   married to Lonnie, so --

11   Q.   And I just have a couple of brief questions.  In November

12   of 2009, did you visit Mr. Spotted Bear's -- Mr. Spotted Bear

13   with Mxxxx to go on a hunting trip?

14   A.   Yeah, we go there to go hunting and then have

09:53   15   Thanksgiving, get together as a family.

16   Q.   Okay.  And when you say we do this, is that like a normal

17   occasion, like every Thanksgiving?

18   A.   Mm-hmm.

19   Q.   And take us through kind of what you guys do.  Who do you

09:54   20   go hunting with when you go hunting at Thanksgiving?

21   A.   Usually the guys, we'll go out, whoever is there.  It's

22   usually, you know, Morley and Darby and Lonnie and my dad.

23   And, you know, the guys like to go hunting together and get

24   away from the girls, I guess, and then they go and do their

09:54   25   shopping.

250

1   **Q.**   Okay.  And at some point Mxxxx had been with you when --

2   not hunting, but she had gone with you to stay with Uncle

3   Daylon, I believe?

4   **A.**   Yeah.

09:54   5   **Q.**   And who's -- who's Daylon?

6   **A.**   Daylon is my cousin.

7   **Q.**   Okay.  And would Mxxxx ever spend time with her cousin,

8   Haylon?

9   **A.**   Yeah.

09:54   10   **Q.**   Okay.

11   **A.**   We're family.

12   **Q.**   And they're around the same age?

13   **A.**   Yeah.

14   **Q.**   And they hang out a lot together?

09:54   15   **A.**   Not a lot.  It's just, I guess, family events.

16   **Q.**   Okay.  And in November 2009, do you remember if Mxxxx had

17   said anything to you when you guys were leaving Twin Buttes?

18   **A.**   Excuse me?  Come again.

19   **Q.**   When you were leaving Twin Buttes, did Mxxxx say anything

09:55   20   to you about anything that happened over Thanksgiving?

21   **A.**   No.

22   **Q.**   Okay.  But there was a time when you had left Mxxxx at

23   Daylon's place to go hunting?

24   **A.**   Yes.

09:55   25   **Q.**   Okay.

251

1   **A.**   We usually leave -- try to leave early, when it's still

2   dark, so, yeah, we just kind of do our own thing and, I guess,

3   pretty much let the ladies or whatever -- whoever takes care of

4   the kids.  We just kind of worry about going and getting a

09:55   5   deer, I guess.  You know, that's what we do.

6           MR. O'KONEK:  Okay.  Those are the only questions I

7   have, Your Honor.

8           THE COURT:  Mr. Bolinske.

9           MR. BOLINSKE:  I don't have any questions.  Thank

09:56   10   you.

11          THE COURT:  All right.  Thank you, sir.  You may step

12   down.

13          THE WITNESS:  Okay.

14          THE COURT:  You may call your next witness.

09:56   15          MR. O'KONEK:  The United States would call Christal

16   Halseth.

17                          CHRISTAL HALSETH,

18   having been first duly sworn, was examined and testified as

19   follows:

09:56   20                        DIRECT EXAMINATION

21   BY MR. O'KONEK:

22   **Q.**   All right.  Good morning.  Could you please state your

23   full name for the Court?

24   **A.**   Christal Halseth.

09:57   25   **Q.**   Okay.  And where do you currently work?

1  **A.**   At the Northern Plains Children's Advocacy Center.

2  **Q.**   Okay.  And what is the Northern Plains Children's Advocacy

3  Center?

4  **A.**   We -- what we do there is we respond to allegations of

5  child abuse.

6  **Q.**   Okay.  And what is your job or position at the advocacy

7  center?

8  **A.**   I'm the executive director.

9  **Q.**   And how long have you held that position?

10  **A.**   Three years.  Before that I was the forensic interviewer.

11  **Q.**   And for how long have you been a forensic interviewer?

12  **A.**   Six years altogether.

13  **Q.**   What are some of your job responsibilities at the advocacy

14  center?

15  **A.**   I conduct forensic interviews.  I oversee the daily

16  operations of the agency.  I seek funding for the agency and

17  write grants, and I coordinate multidisciplinary teams.

18  **Q.**   And when we refer to a forensic interview, what is a

19  forensic interview?

20  **A.**   A forensic interview is a -- it basically means gathering

21  information, so what we're doing is gathering -- gathering a

22  statement from a child.

23  **Q.**   And we'll go into that in just a second.  I'd like to go

24  into some more about your, I guess, education and experience.

25  Take us briefly through your education and history.

253

1  **A.**   I graduated from Minot State University in 2008 with a --

2  with a degree in social work.  And then I graduated from

3  Florida State University in 2011 with a Master's degree in

4  clinical social work.

09:58
5  **Q.**   And what kind of training did you get on how to conduct

6  forensic interviews?

7  **A.**   We went -- I went through the training through the

8  National Children's Advocacy Center in Huntsville, Alabama, in

9  2011.

09:59
10  **Q.**   Do you have to do any continuing educational requirements?

11  **A.**   Yes, at the center we strive for 30 hours per year.

12  **Q.**   And did you also get any education or experience on things

13  like why victims of sexual abuse might have a delayed outcry?

14  **A.**   Yes, throughout -- throughout my education, yes.

09:59
15  **Q.**   And how many forensic interviews would you say you've

16  completed?

17  **A.**   Approximately 1,200.

18  **Q.**   And is your child advocacy center accredited by any

19  organization?

09:59
20  **A.**   Yes, by the National Children's Alliance.

21       MR. O'KONEK:  Permission to approach, Your Honor?

22       THE COURT:  You may.

23       MR. O'KONEK:  I'm handing the witness Government's

24  Exhibit 4.

09:59
25  **Q.**   (MR. O'KONEK CONTINUING)  I know this kind of sounds like

1    a silly question, but is this your curriculum vitae?

2    **A.**    Yes.

3    **Q.**    And how do you know that?

4    **A.**    It looks like my academic history and experience.

10:00    5    **Q.**    And you wrote it, I imagine?

6    **A.**    Yes, I did.

7    **Q.**    Can you take a look at it and just tell me if that's a

8    fair and accurate depiction of your curriculum vitae?

9    **A.**    Yes.

10:00    10    MR. O'KONEK:  At this time, Your Honor, government

11    would move Government's Exhibit 4 into evidence.

12    MR. BOLINSKE:  No objection.

13    THE COURT:  Exhibit 4 is received.

14    **Q.**    (MR. O'KONEK CONTINUING)  Now, ma'am, I want to talk a

10:00    15    little bit about a forensic interview kind of in general.  Does

16    your agency follow any guidelines when conducting child

17    forensic interviews, any protocols?

18    **A.**    Yes.

19    **Q.**    Can you briefly take us through what those are?

10:01    20    **A.**    Well, there's several stages in the protocols that we

21    follow.  The first stage is the -- it's a stage where we build

22    rapport with the child.  It's very brief.  We talk to the child

23    about a -- about, you know, just a subject that's unrelated to

24    why we're interviewing them.  And during that time we're kind

10:01    25    of gauging their developmental level.  And we go through the

255

1    guidelines of the interview and the equipment of the interview.

2           And then from there we go into the practice

3    narrative, and again, we're still talking about something

4    that's neutral and just so that the child understands that

10:01    5    we're going to be asking questions.

6           Then we go through the disclosure stage, and that's

7    where the child at that point is disclosing or not disclosing

8    regarding the incident.

9           After that we go back to the clarification stage,

10:02    10    where we clarify anything that -- any parts of the interview

11    that needs to just be clarified, like body parts and things

12    like that.

13           And then after that we go through the closure stage,

14    where we talk about safety and then talk again about a neutral

10:02    15    subject.

16    Q.    And that's kind of like an example of a forensic interview

17    from start to finish?

18    A.    Yes.

19    Q.    Now, who is -- what kind of guidelines do you follow in

10:02    20    terms of who certifies those guidelines or who created them?

21    A.    That's the National Children's Advocacy Center.

22    Q.    And what's the purpose of -- I should ask -- the first

23    question is, do you follow those guidelines in every interview?

24    A.    Yes.

10:02    25    Q.    And what is the purpose of those guidelines from the

256

1   advocacy alliance?

2   A.    The purpose of that is just -- you know, we don't want to

3   just go in there and interview a child.  Those protocols

4   include that we're not asking leading questions, things like

10:03   5   that, and it just -- it then elicits narrative from the child

6   regarding an event.

7   Q.    Now, you mentioned that you try to prevent -- you know,

8   you don't -- you guys don't ask leading questions, you had

9   mentioned?

10:03   10   A.    Right.

11   Q.    Is it also to try to, I guess, avoid any maybe potential

12   contamination before the interview, planting information that

13   the child may not know about?

14   A.    Yes, we do not -- we do not bring in information.

10:03   15   Q.    How do you receive a referral for a child to be

16   interviewed at the advocacy center?

17   A.    We receive referrals from either law enforcement or Child

18   Protection Services.

19   Q.    Okay.  And where is your agency located?

10:03   20   A.    Our -- the agency I work for is in Minot, and it's located

21   in the second floor of an office building.

22   Q.    Okay.  So before you do an interview, how -- how do the --

23   do you separate the child from the guardian or something else?

24   Can you briefly take us through how the child actually ends up

10:04   25   in the interview room?

A.   Well, upon -- when the family and the child come into the
interview -- or the Children's Advocacy Center, the family
advocate provides a tour for both the family and the child of
the center.  They then go into the family room, and then I come
and get the child and bring the child into the interview room,
and the family waits in the -- in the waiting room during the
interview.

Q.   Okay.  Now, when you are doing these interviews, do you
record the interviews you do in that -- the room where you
actually do the interview?

A.   Yes.

Q.   And how do you do that?  What kind -- I guess not maybe
what software, but what kind of device do you use to record the
interviews?

A.   Ours is called Encore, but it's -- it's a -- it's a video
system.  The monitor is in an observation room down the hall,
and the cameras are inside the interview room.

Q.   And when you first come into -- what do you tell the
children about the room and the devices that are there?

A.   The family advocate will point out where the camera and
microphone is in the room and explain to the child that -- that
somebody named Christal will be speaking with them in the room.

Q.   And when you first speak with the child, you mentioned the
rapport-building phase, but are you trying to avoid any sort of
like subjectivity that might come from that, from the interview

258

1    -- I guess implanting ideas, things like that?

2    A.    Yeah, we only -- we really only speak about general or a

3    neutral subject.  Usually I ask about school, or something.

4    Q.    Now, in this case you conducted two forensic interviews,

5    first of Nxxxx Hxxxxxx Exxxx and then of Sxxxxxx Hxxxxx?

6    A.    Yes.

7    Q.    I believe that was on, and correct me if I'm wrong,

8    March 25th of 2016?

9    A.    Yes.

10   Q.    And how did you learn about the case?  How did you get the

11   referral?

12   A.    I believe we got the referral from the victim specialist,

13   Paula Bosch, from the FBI.

14   Q.    And so I don't want to go into the interviews, themselves.

15   We'll see them, I guess, for ourselves, but when you first

16   spoke with Nxxxx, did you tell her what questions you were

17   going to be asking before you got into the interview room?

18   A.    No.

19   Q.    And when you spoke first with Sxxxxxx, did you tell her

20   what questions you'd be asking?

21   A.    No.

22   Q.    Did the children ever, when you do an interview, know what

23   questions you're going to ask?

24   A.    No.

25   Q.    And when you initially did the forensic interview -- I

259

1   want to start first with Nxxxx.  Was she made aware that the

2   interview would be recorded?

3   **A.**   The family advocate would have done that.

4   **Q.**   And was your recording software working properly during

10:06  5   that time?

6   **A.**   Yes.

7        MR. O'KONEK:  Approach the witness with Government's

8   Exhibit 6.

9   **Q.**   (MR. O'KONEK CONTINUING)  Is this the forensic interview

10:07  10  that you had conducted with Nxxxx Hxxxxxx Exxxx?

11  **A.**   Yes.

12  **Q.**   Is that a fair and accurate depiction of your interview

13  that you conducted with her?

14  **A.**   Yes.

10:07  15  **Q.**   And have you reviewed the video?

16  **A.**   Yes, I did.

17  **Q.**   Did you put your initials and date when you reviewed it?

18  **A.**   I did.

19       MR. O'KONEK:  Okay.  At this time, Your Honor, we'd

10:07  20  request that Government's Exhibit 6 be admitted into evidence.

21       MR. BOLINSKE:  No objection.

22       THE COURT:  Exhibit 6 is received.

23       MR. O'KONEK:  Permission to publish, Your Honor?

24       THE COURT:  You mean play the video?

10:07  25       MR. O'KONEK:  Yes.

1          THE COURT:  And it's how long?

2          MR. O'KONEK:  This one, I think, is about 35 minutes,

3   Your Honor.

4          THE COURT:  All right.  We'll watch that, and then

10:07   5   we'll take a break.

6          (Government's Exhibit 6 is played in open court.)

7          MR. O'KONEK:  And if I could have you just pause real

8   quick here.

9   Q.   (MR. O'KONEK CONTINUING)  Before we get started with the

10:07   10   video, can you just briefly describe what is all located in the

11   room?  I know you might go through that in the video, just so

12   we're kind of aware before anybody comes in.

13   A.   You can see the small plate on the wall.  That's the

14   microphone.  The camera is up in the ceiling, pointing down at

10:08   15   the two chairs.  I sit in the chair that's to the right of the

16   screen, and the child sits in the other chair, and there's a

17   table with Kleenex on it.

18          MR. O'KONEK:  And you can play the video.

19          (Government's Exhibit 6 is played in open court.)

10:43   20          THE COURT:  Mr. O'Konek, we'll take a break at this

21   time.  Members of the jury, we'll stand in recess for about

22   20 minutes.  We'll try to reconvene about five minutes after

23   11:00.

24          MR. BOLINSKE:  Your Honor, can we meet for two

10:44   25   minutes after the jury leaves?

261

1          THE COURT:  Oh, sure, that's fine.  But please don't

2     visit amongst yourselves during the break, and we'll see

3     everyone back in about 20 minutes.

4          (The jury exits the courtroom.)

10:44      5          THE COURT:  We're outside the presence of the jury

6     now.  Mr. Bolinske?

7          MR. BOLINSKE:  I guess, Your Honor, I'm not quite

8     sure how to handle this, but the redacted CD is missing a big

9     part of what I talked about in my opening statement.  It's

10:45      10     Sxxxxxx's conversation with Nxxxx and the other witnesses that

11     the government had that's extremely relevant to this case.

12          THE COURT:  You're entitled to play that.

13          MR. O'KONEK:  And I've given -- I let the defense

14     know on Friday which portions we'd be taking out.  My fear was,

10:45      15     I didn't want to prejudice the defendant by having that

16     statement in and then, say, Sxxxxxx gets up on the stand and

17     freezes and doesn't say anything.  Then we have this hearsay

18     statement saying that he molested another child, so I -- we're

19     trying to balance, I guess, the protection of the accused, but

10:45      20     also I have no objection to playing those portions if the

21     defense -- we have the time.

22          THE COURT:  We've got the rule of completeness.  The

23     exhibit -- any portions of that interview can be played that

24     were not played, so --

10:45      25          MR. BOLINSKE:  Okay.  And I would request that, Your

262

1  Honor, and if I play them, or if they play them, or --

2      THE COURT:  And how do you intend to do that, play

3  the whole video again?

4      MR. BOLINSKE:  Well, it's not necessary, but I just

5  -- however you think you can do it, just play -- because I

6  think it starts about 23 minutes or 22 minutes in, and there's

7  a --

8      MR. O'KONEK:  We have the time hacks of everything we

9  took out, so we can just play those time hacks.  It should be

10  pretty easy.

11      THE COURT:  But do you want to do that when we come

12  back right away, or --

13      MR. BOLINSKE:  Sure.  Yeah.

14      MR. O'KONEK:  That's fine.

15      THE COURT:  I mean, we can do it that way, or we can

16  wait until you get to your cross-examination and play it at

17  that time.

18      MR. BOLINSKE:  Well, I mean, I don't have my stuff

19  here.  I mean, can I ask them to play it?

20      THE COURT:  Oh, sure.

21      MR. O'KONEK:  Absolutely.  No problem.

22      MR. BOLINSKE:  Yep, that's fine.  Let's do it during

23  the cross then.

24      THE COURT:  Okay.  And are you about done with your

25  questions?

263

1          MR. O'KONEK:  Of her, I have the second interview of

2     the second child.  The only issue with that one is there was an

3     allegation in that second interview where Sxxxxxx says she

4     believes another child was molested by the defendant, where she

10:46   5     says they're wrestling and he grabbed her crotch, and so I took

6     that part out.  And I think that that's one of those that we

7     didn't want to include in the record.

8          So there have been redactions, along with

9     conversations she had with other people like about Nxxxx, in

10:47   10    case Nxxxx didn't say something.  So we can certainly use the

11    rule of completeness for that one as well, but that's the

12    concern.  I didn't want an appellate issue if another uncharged

13    victim was disclosed during a forensic interview.

14         THE COURT:  Well, the two of you work it out about

10:47   15    what redacted portions that Mr. Bolinske wants played, and

16    we'll play them whenever he wishes to do so during his

17    cross-examination.

18         MR. O'KONEK:  Yes, sir.

19         MR. BOLINSKE:  Thank you.

10:47   20         THE COURT:  All right.  Thank you.

21         (A recess was taken from 10:47 a.m. to 11:08 a.m.,

22    the same day.)

23         THE COURT:  We are back on the record in this case,

24    and as soon as Ms. Halseth gets comfortable, you can continue

11:09   25    with your questioning, Mr. O'Konek.

1          MR. O'KONEK:  Ms. Halseth, I just want to remind you

2     you're still under oath.

3          And at this time, Your Honor, we'd request to move

4     Government's Exhibit 12.  We just marked it.  It's the complete

11:09   5     copy of the interview that includes dead space and a

6     couple-minute conversation between Nxxxx and Sxxxxxx.  Talked

7     with defense.  They don't have any objection.  Just to complete

8     the record, we thought we would do that at this time.

9          THE COURT:  This is a complete interview of --

11:09  10          MR. O'KONEK:  Of Nxxxx, so it's -- it has all the

11     dead space included, and then there's one conversation --

12          THE COURT:  All right.  Mr. Bolinske?

13          MR. BOLINSKE:  That's great.

14          THE COURT:  Exhibit 12 will be received then.

11:09  15  Q.  (MR. O'KONEK CONTINUING)  All right.  Ms. Halseth, I just

16     have a couple of questions about your interview with Ms.

17     Sxxxxxx Hxxxxx.  Did you conduct that interview on the same day

18     as you conducted the Nxxxx Hxxxxxx Exxxx interview?

19  A.  Yes.

11:10  20  Q.  And do you remember which order you did them at this

21     point?

22  A.  I believe Sxxxxxx was first, but I'm -- I would have to

23     look back on that to check.

24  Q.  And when you first interviewed -- I guess before you

11:10  25     interviewed Sxxxxxx, was she informed that the interview would

265

1   be recorded?

2   **A.**   That would -- the family advocate would have done that.

3   **Q.**   And ultimately when -- you've talked about the guideline

4   kind of procedures that the CAC follows.  Did you follow those

11:10   5   same procedures when you interviewed Sxxxxxx?

6   **A.**   Yes.

7   **Q.**   Oh, I guess before I do that, I forgot one thing.  I

8   apologize.  When you did your interview of Nxxxx Hxxxxxx Exxxx,

9   there was a point where she had actually circled something on a

11:10   10   body diagram.  Do you remember that?

11   **A.**   Yep.

12   **Q.**   Okay.  I'm going to approach here with Government's

13   Exhibit 7.  Do you recognize this document?

14   **A.**   Yes.

11:11   15   **Q.**   What is it?

16   **A.**   This is the anatomical drawing that we used during the

17   interview.

18   **Q.**   And when you say "we used during the interview," could you

19   be more specific?

11:11   20   **A.**   The one I introduced to Nxxxx.

21   **Q.**   And is that the diagram that Nxxxx circled the crotch

22   portion of where she was touched?

23   **A.**   Yes.

24   **Q.**   Is that a fair and accurate depiction of where Nxxxx

11:11   25   circled on that diagram?

266

1  **A.**   Yes.

2          MR. O'KONEK:  At this time, Your Honor, we would move

3  Government's Exhibit 7 into evidence.

4          MR. BOLINSKE:  No objection.

11:11   5          THE COURT:  Exhibit 7 is received.  And, members of

6  the jury, you'll get all of these exhibits when you go back to

7  deliberate.

8  **Q.**   (MR. O'KONEK CONTINUING)  All right.  I apologize for kind

9  of going out of order, but going back to Sxxxxxx, when you did

11:11  10  the recorded interview with her, you mentioned she knew it was

11  recorded, but was your system working correctly?

12  **A.**   Yes.

13  **Q.**   And what kind of a system do you use again to record

14  interviews?

11:11  15  **A.**   It's an Encore system, and it's a camera system inside of

16  the interview room, and the monitor is in the observation room.

17  **Q.**   And how did you first get referred?  How did Sxxxxxx get

18  referred to your agency?

19  **A.**   That was, again, by Victim Specialist Paula Bosch.

11:12  20  **Q.**   I'm approaching with Government's Exhibit 8.  Is this the

21  interview that you had conducted with Sxxxxxx?

22  **A.**   Yes.

23  **Q.**   And there have been some edits regarding dead space and

24  things like that to that interview?

11:12  25  **A.**   Mm-hmm.

267

1   **Q.**   Have you reviewed that interview?

2   **A.**   Yes, I did.

3   **Q.**   And is that a fair and accurate depiction of the interview

4   that you conducted with Sxxxxxx?

11:12   5   **A.**   Yes.

6   **Q.**   Are those your initials and date of when you reviewed it?

7   **A.**   Yes.

8         MR. O'KONEK:   Okay.   At this time, Your Honor, we'd

9   request Government's Exhibit 8 be moved into evidence.

11:12   10         MR. BOLINSKE:   No objection.

11         THE COURT:   Exhibit 8 is received.

12         MR. O'KONEK:   Permission to publish?   It's

13   approximately 25 minutes.

14         THE COURT:   Very well.

11:12   15         (Government's Exhibit 8 is played in open court.)

16   **Q.**   (MR. O'KONEK CONTINUING)   All right.   Christal, I just

17   have a couple of last questions.   In addition to some of the

18   training you talked about earlier for forensic interviews, you

19   said you'd also received training on typical behavior and -- or

11:38   20   behavior that is common to child victims of sexual abuse?

21   **A.**   Mm-hmm.

22   **Q.**   What kind of -- can you just briefly describe what kind of

23   training you've received on that?

24   **A.**   Ongoing -- or we go to ongoing trainings throughout the

11:39   25   year in San Diego and Washington D.C., and so forth.   And when

268

1   we go to those trainings, we go to different sessions that are

2   specific to different things that relate to children who are

3   abuse.

4   Q.   And in addition to that, maybe going to trainings,

11:39   5   learning about this information, do you also gather information

6   based upon the -- I think you said 1,200 forensic interviews

7   that you have done?

8   A.   Yes.

9   Q.   So I want to talk about roughly seven different things,

11:39   10   and could you briefly talk to me a little bit about disclosure

11   for children who are abused, sexual abuse specifically?  Is it

12   common for them to disclose right away, or is it also common

13   for them to disclose later in life?

14   A.   It's -- it's more common for them to disclose later.  We

11:39   15   rarely see kids who disclose right away.

16   Q.   And why is that, in the course of your experience?

17   A.   Well, a lot of it has to do with guilt or shame or fear.

18   It's -- you know, kids sometimes feel guilty for what happened.

19   They feel like they had some part in the -- in the abuse that

11:40   20   occurs.  They're afraid people won't believe them.  They're

21   also afraid of what it would do to their families, or, you

22   know, sometimes the -- usually the person -- the subject or the

23   alleged offender is somebody that the child knows and they do

24   generally care for them.

11:40   25   Q.   And in your experience from your interviews and your

269

1    education and training, have you ever encountered times where

2    children are reluctant to talk about family members to

3    strangers?

4    A.    That they -- they don't want to talk about family members

5    to strangers?

6    Q.    Their family members to a stranger, like somebody like you

7    -- yourself?

8    A.    Yes.

9    Q.    And what about sex?  Is that a topic that you find that

10   children have a hard time discussing to a stranger?

11   A.    Yes, adults have trouble talking about that to strangers,

12   children probably much more so.

13   Q.    And why is that?

14   A.    It's -- that topic is very personal.  It's personal for

15   everybody, and it can be shameful too depending on if it was an

16   unwanted sex act.  That can be just very embarrassing for the

17   person or child to talk about.

18   Q.    And I know you mentioned something earlier, sometimes it's

19   somebody they know.  Is -- in your experience, is it common for

20   child sexual abuse victims to be molested by somebody that

21   they're close with?

22   A.    Yes, it's -- it's usually somebody who has access to the

23   child and who the child and child's caregivers trust.

24   Q.    And in terms of disclosures that children make, do -- in

25   your experience, do they make it all at once, or do they give

11:40

11:41

11:41

11:41

11:41

11:42

270

1   bits and pieces over time?  Can you just kind of describe how
2   -- how children disclose sexual abuse?
3   A.    It depends.  A lot of times children will tend to tell
4   peers before they tell parents, and it does come in pieces
5   because -- because it is such a sensitive topic to talk about.
6   A lot of times children will only talk about what they -- what
7   they're asked about, so they often minimize what's happened to
8   them.
9   Q.    And what do you mean by that, they only talk about what
10  they're asked about?
11  A.    Well, I mean, if you think about talking about
12  embarrassing subject, you're going to talk about it as little
13  as possible, so your -- a child most likely is not going to go
14  and describe every detail of something that's happened to them,
15  especially if it's to a caregiver, and it's just very -- it's
16  very -- they can be very fearful of what could happen and very
17  ashamed of what happened.
18  Q.    And is it common for child victims of sexual abuse to have
19  behavioral changes?
20  A.    Yes.
21  Q.    And what changes have you noted either -- or noticed
22  either through your interviews or your education and training?
23  A.    Just through my experience, children react in many
24  different ways.  You know, they -- they may be doing worse in
25  school.  They might -- they might -- you know, loss of sleep,

11:42
11:42
11:42
11:43
11:43

271

1  bedwetting sometimes when the children are younger.  They could

2  act out more.  It's just -- it's a wide range of different

3  things that can -- that happens with them.

4  Q.   And is that wide range of things kind of dependent on the

5  child and where they're living and with whom they're living?

6  A.   Yes.

7  Q.   And we were talking about potential inconsistencies.  Is

8  it common to have inconsistencies when a child victim of sexual

9  abuse is telling the story multiple times?

10  A.   Yes.

11  Q.   And why is that?

12  A.   Well, it depends on who the person -- who the child is

13  talking to.  If you think about when you're describing an event

14  of -- event, you're going to tell -- talk about the event

15  differently to your best friend than you would if you were

16  telling your mother about it.  It also depends on the questions

17  that are being asked, so it is very common for different things

18  to be said when they're asked to describe what happened to

19  them.

20  Q.   And when children victims of sexual abuse are interviewed

21  or potentially might have to testify, do they always have an

22  emotional reaction or sometimes do they have another type of

23  reaction?

24  A.   No, most children that I've interviewed do not have any --

25  not an emotional reaction.

1  **Q.**  And do you know, is there any research, or in your

2  experience, why is that that children don't have an emotional

3  reaction at that time?

4  **A.**  I think just in my experience, a lot of it has to do with

11:45     5  the child just minimizing what's happened to them, but it just

6  -- everybody is different.  Everybody reacts to trauma in a

7  different manner.

8  **Q.**  And what sort of coping strategies do child victims of

9  sexual abuse display?

11:45     10  **A.**  Well, it depends.  Minimize -- minimization of the abuse

11  is often something they do to cope, but it really depends on

12  the support that they have from their caregivers and family.

13  Some do well and don't really display those types of things,

14  but others -- some might overachieve.  Some might use drugs or

11:45     15  alcohol, so it's really dependent on the case.

16        MR. BOLINSKE:  Thank you.  I have no further

17  questions, Your Honor.

18        THE COURT:  Mr. Bolinske.

19                 CROSS-EXAMINATION

11:45     20  BY MR. BOLINSKE:

21  **Q.**  Is it fair to say that the point of your job is to try to

22  get to the truth of whatever happened?

23  **A.**  Yeah, it's just gathering information, yes.

24  **Q.**  Okay.  And so let's talk about that a little bit.

11:46     25  Gathering information, is information brought to you or do you

273

1   go gather it?

2   **A.**   I'm only gathering information through the interview.

3   **Q.**   Okay.  And so other investigators bring you stuff, and

4   then you ask the children questions about the stuff they bring

5   you, or is it more complicated than that?

6   **A.**   No, it's not.  It's -- I usually see a 960, a child abuse

7   report.  And then from there I just follow the protocols for

8   the interview.

9   **Q.**   Okay.  So it's not your job to go out and interview other

10   people or gather witnesses or gather documents or things like

11   that.

12   **A.**   No.

13   **Q.**   Okay.  People --

14        THE COURT:  So you mentioned "960."  You better tell

15   everybody what that is.

16        THE WITNESS:  Oh, a 960 is a report of suspected

17   child abuse or neglect.

18        THE COURT:  From a teacher or other person required

19   to report.

20        THE WITNESS:  Yes.  Yep, usually submitted by a

21   mandated reporter.

22   **Q.**   (MR. BOLINSKE CONTINUING)  Okay.  And in your interview of

23   Sxxxxxx -- we just watched it -- she talks about hitting,

24   kicking, scratching, things like that.  Were any records

25   brought to you, any medical records, any independent

274

1    verification that that occurred?

2    **A.**    I wouldn't even ask for that, no.

3    **Q.**    Okay.  So somebody else would do that.

4    **A.**    Yes.

11:47    5    **Q.**    Okay.  So somebody else would be better to ask about

6    records relating to injuries, things like that?

7    **A.**    Yes.

8    **Q.**    Okay.  And I'd like to go back to Nxxxx's interview.  You

9    were here when that was played, right, the first interview?

11:47    10    **A.**    Yes.

11    **Q.**    And was that the entire interview that you did?  Are you

12    aware or not?

13    **A.**    No, I'm aware it was redacted.

14    **Q.**    Okay.  So somebody took part of that interview out?

11:47    15    **A.**    Yes.

16    **Q.**    And do you remember what that part was or one of the parts

17    was?

18    **A.**    No.

19    **Q.**    Do you remember any -- do you remember anything in your

11:48    20    report about a conversation Sxxxxxx had with Nxxxx at a Boys

21    and Girls Club or something like that?

22    **A.**    I remember something about that, yes.

23    **Q.**    Okay.  And other friends who may have been there at that

24    time?

11:48    25    **A.**    I don't remember that.

1   **Q.**   Okay.

2   **A.**   I just don't recall that.

3   **Q.**   If we played it, would that maybe refresh your memory?

4   **A.**   Yep.

11:48   5            MR. BOLINSKE:  Could we play just --

6            MR. O'KONEK:  It would be Government's Exhibit 12.

7            (Government's Exhibit Number 12 was played in open

8   court.)

9            MR. O'KONEK:  And just one moment.  I think we're

11:49   10   having some technical difficulties.  We were playing the

11   redacted interview, and now we're going to play Government's

12   Exhibit 12 that has the brief things we took out.

13            THE COURT:  In its entirety, or what?

14            MR. O'KONEK:  No, just the portions that they wanted,

11:50   15   but we were going off of the edited one, and now we've got

16   everything --

17            THE COURT:  All right.

18            (Government's Exhibit 12 is played in open court.)

19            MR. BOLINSKE:  Okay.  Thank you.

11:51   20   **Q.**   (MR. BOLINSKE CONTINUING)  And so that was part of the

21   video that we didn't see the first time, right?

22   **A.**   Yes.

23   **Q.**   And in that video or that portion of the video we heard

24   the name Jada Appel, right?

11:52   25   **A.**   Yes.

1        MR. BOLINSKE:  Okay.  Thanks.  That's all I have.

2        THE COURT:  Anything else?

3        MR. O'KONEK:  The only thing I would do at this time,

4    Your Honor, is I'd approach with Government's Exhibit 10.

11:52    5                      REDIRECT EXAMINATION

6    BY MR. O'KONEK:

7    Q.   Approaching with Government's Exhibit 10, we talked about

8    a 960 report.  Is this a 960 report I'm handing you?

9    A.   Yes.

11:52   10    Q.   Is that the 960 report regarding Sxxxxxx Hxxxxx?

11    A.   Yes.

12    Q.   And is that a fair and accurate copy of how this case got

13    referred for you to do an interview?

14    A.   Yes.

11:52   15        MR. O'KONEK:  At this time, Your Honor, we'd request

16    Government's Exhibit 10 be admitted into evidence.

17        MR. BOLINSKE:  No objection.

18        THE COURT:  Exhibit 10 is received.

19        MR. O'KONEK:  And I'd ask that you just read the

11:52   20    portion for the referral in that block section.

21        Permission to publish, Your Honor?

22        THE COURT:  You may.

23        MR. O'KONEK:  And can you just read that out loud for

24    us?

11:53   25        THE WITNESS:  It states, "This therapist met with

277

1    Sxxxxxx for her initial appointment for therapeutic service and

2    was accompanied by her parents.  Father reported that Sxxxxxx

3    had discussed sexual abuse by her uncle.  No name was reported

4    to the -- no name was reported to this therapist.  Father

11:53    5    reported that the incident had occurred five years ago."

6           MR. O'KONEK:  Thank you.  And I have no further

7    questions, Your Honor.

8           THE COURT:  Anything else, Mr. Bolinske?

9           MR. BOLINSKE:  No further questions.

11:53    10          THE COURT:  All right.  Thank you.  You may step

11    down.  You are excused.

12          THE WITNESS:  Thank you.

13          THE COURT:  And I think we'll -- well, do you have

14    another witness?

11:53    15          MR. O'KONEK:  We have one more witness, I believe.

16          THE COURT:  All right.  So then we'll take our noon

17    break here rather than start with another witness five to

18    12:00.  So, members of the jury, we'll recess until 1:15.

19    Please don't visit with anyone about this case over the noon

11:54    20    hour, and we'll see everyone back here at quarter after 1:00.

21          (The jury exits the courtroom.)

22          THE COURT:  Well, we are outside the presence of the

23    jury.  I received a note that there -- somebody who had

24    testified said -- told the clerk's office that somebody else

11:54    25    that was going to testify has been in the courtroom, so I don't

1    -- I don't know who's going to testify.  I don't know who came

2    into the courtroom, but if there's any witnesses here, that --

3    and counsel know them more than I, but if there's any persons

4    that are going to be testifying in this case, they are excluded

11:55    5    from the courtroom during the trial, and it's up to the

6    attorneys to make sure that that's taken care of.

7                MR. O'KONEK:  Yes, Your Honor.

8                MR. BOLINSKE:  I didn't see anyone.

9                MR. O'KONEK:  Neither did I.

11:55    10                THE COURT:  Anything else we can take care of here?

11                MR. O'KONEK:  The only thing is just, we'll be

12    calling Shannon Hilfer just to introduce the recorded interview

13    of Mxxxx, but wanted to take that -- before we called her in

14    case the defense had any objections to the recorded interview.

11:55    15                MR. BOLINSKE:  Say that -- what?

16                THE COURT:  Say that again.

17                MR. O'KONEK:  We're going to be calling Shannon

18    Hilfer.  She was the one that interviewed Mxxxx Sxxxxxxxx, and

19    we'd be introducing that video, and so in case the defense had

11:55    20    any objection, I wanted to raise it outside the presence of the

21    members.

22                MR. BOLINSKE:  Your Honor, I have no objection.

23                THE COURT:  And how long is the video?

24                MR. O'KONEK:  Eighteen minutes, I think.

11:56    25                THE COURT:  Okay.  And then the government will be

279

1  resting after that?

2      MR. O'KONEK:  Probably, yes.

3      THE COURT:  All right.  Anything else, counsel?

4      MR. O'KONEK:  No, Your Honor.

11:56  5      MR. BOLINSKE:  No.

6      THE COURT:  All right.  We'll see you back at 1:15

7  then.

8      (A lunch recess was taken from 11:56 a.m. to

9  1:16 p.m., the same day.)

11:56  10      (In open court with the defendant, counsel, and the

11  jury present.)

12      THE COURT:  Welcome back.  We are back on the record

13  in the case of *United States versus Lonnie Dale Spotted Bear*.

14  All parties and the defendant are present, along with the

01:18  15  entire jury.  We'll continue with the government's case.

16      MR. O'KONEK:  The United States would call Ms.

17  Shannon Hilfer.

18                      SHANNON HILFER,

19  having been first duly sworn, was examined and testified as

01:18  20  follows:

21                  DIRECT EXAMINATION

22  BY MR. O'KONEK:

23  Q.  Ms. Hilfer, I know you just briefly stated your name, but

24  could you state your name -- your full name for the Court?

01:19  25  A.  Shannon Hilfer.

1   Q.   Okay.  And where do you currently work?

2   A.   I work for the Dakota Children's Advocacy Center.

3   Q.   And where is that located?

4   A.   It's located at 200 East Main in Bismarck.

01:19   5   Q.   And for how long have you worked there?

6   A.   For 11 years.

7   Q.   And what are -- what's your job title?

8   A.   I'm a forensic interviewer.

9   Q.   What are some of your responsibilities as a forensic

01:19   10  interviewer?

11  A.   My main responsibility as a forensic interviewer is to

12  talk to kids about what happened to them when there have been

13  allegations of abuse.

14  Q.   Now I want to back up just a little bit.  You said you

01:19   15  worked for the Dakota Children's Advocacy Center.  What -- what

16  is the purpose of the Dakota Children's Advocacy Center?

17  A.   Advocacy centers kind of came about as a way to be more

18  child friendly when there are allegations of abuse.  Prior to

19  children's advocacy centers, kids had to talk to multiple

01:20   20  professionals multiple times about what happened to them, and

21  when kids have been traumatized, that's not good for them.

22       So advocacy centers kind of developed to coordinate

23  that whole multidisciplinary response when there are

24  allegations so that the child can come to the advocacy center,

01:20   25  and any professional who has some vested interest in the case

281

1  participates that day at the advocacy center, so it's like one

2  interview, one time, one place with everybody present and

3  participating in that.

4  **Q.**   And you mentioned multiple -- multidisciplinary function.

5  Can you describe that a little bit more?

6  **A.**   Children's advocacy centers pull together a

7  multidisciplinary team, so the main kind of people we work with

8  are law enforcement, social services, medical professionals,

9  mental health professionals, advocacy people, prosecutors, and

10  then just our staff.

11  **Q.**   Okay.  And can you just -- we heard from Christal Halseth

12  a little bit, but can you describe in your own words briefly,

13  what is a forensic interview?

14  **A.**   A forensic interview really is a structured

15  developmentally sensitive conversation with a child that is

16  meant to elicit information that will either corroborate or

17  refute allegations of abuse.

18  **Q.**   Okay.  I want to talk a little bit about your education.

19  Can you just give us just a brief summary of your education?

20  **A.**   Sure.  I have a Bachelor's degree in psychology and a

21  Master's degree in mental health counseling.  And then I've had

22  an additional initial training in forensic interviewing of

23  children and five or six advanced trainings.

24  **Q.**   Okay.  And do you have to maintain any continuing

25  education requirements?

01:20

01:21

01:21

01:21

01:21

282

1   **A.**   Yes.

2   **Q.**   And how often do you have to participate in that?

3   **A.**   For my mental health license there's a requirement for

4   continuing education credits every -- every two years, and then

01:22   5   as well as every year there's a -- there's a certain amount of

6   credits that are required for the forensic interview position.

7   **Q.**   And when you -- you said you got your initial training and

8   it was how to do a forensic interview according to the correct

9   guidelines?

01:22   10   **A.**   Correct.

11   **Q.**   And what kind of guidelines are you -- are you using?  Are

12   they accredited by any institution?

13   **A.**   When we interview kids, we use a protocol from the

14   National Children's Advocacy Center.

01:22   15   **Q.**   And how many forensic interviews would you say you've done

16   just by estimate?

17   **A.**   I've probably done close to 2,300.

18        MR. O'KONEK:  I'm approaching the witness with

19   Government's Exhibit 5.

01:22   20   **Q.**   (MR. O'KONEK CONTINUING)  Is this a copy of your

21   curriculum vitae?

22   **A.**   Yes, it is.

23   **Q.**   And weird question, but how do you know that?

24   **A.**   I made it.

01:22   25   **Q.**   Can you briefly take a look through it and tell me if that

283

1  is an accurate reflection or depiction of your curriculum

2  vitae?

3  **A.**   It is.

4         MR. O'KONEK:  Okay.  At this time, Your Honor, we'd

5  request to move Government's Exhibit 5 into evidence.

6         MR. BOLINSKE:  No objection.

7         THE COURT:  Exhibit 5 is received.

8  **Q.**   (MR. O'KONEK CONTINUING)  All right.  And I want to talk a

9  little bit more about the protocols that you earlier described

10  about forensic interviewers.  Just briefly take us through a

11  general forensic interview from start to finish, kind of where

12  you start and how you end and kind of take us through that

13  process.

14  **A.**   Okay.  If you watch a number of forensic interviews,

15  they'll all look very similar.  They kind of have that same

16  protocoled structure to them.  Usually it starts with the

17  interviewer introducing themselves, kind of giving a very brief

18  explanation of their role, talking about that there is

19  recording equipment in the room, because we do tell the kids

20  that they're being recorded.

21         Then we do some basic just guidelines for the

22  conversation with kids because it's a very different

23  conversation than they're used to having with adults.  So we

24  tell them it's okay to say "I don't know" if they don't know,

25  that we don't want them to guess at things, that it's okay to

284

1  tell us if we're using words they don't know or if they don't

2  understand what we're asking, that it's okay to correct me if

3  I'm getting something wrong, because I want to make sure I'm

4  understanding what they're saying, and that we only talk about

01:24   5  things that are true, so we kind of go through those.

6          There's a brief like rapport-building stage just kind

7  of to get them comfortable in the room.  It gives me a chance

8  to kind of get to know them a little bit, listen to how they

9  talk.  You know, do they answer questions with one word or two

01:24   10  paragraphs, where they're at developmentally.  All of those

11  kind of things I can kind of glean just from that neutral

12  conversation.

13          Then there's a transition question, just do they know

14  why they're there to talk today.  There's a chance for them to

01:24   15  talk about what happened or not talk about what happened.  And

16  then it's just usually just reverting very briefly back to a

17  neutral topic.

18  Q.   Okay.  And when you go through this forensic interview, do

19  you ask open-ended questions?

01:25   20  A.   Yes.

21  Q.   Is that part of your protocol and guidelines?

22  A.   Yes, the gold standard is to ask the open-ended questions,

23  the tell me about what happened, what happened next, tell me

24  more about that kind of question, and then follow up with like

01:25   25  who, what, when, where kind of question, and kids will answer

285

1   just according to where they are developmentally.

2   **Q.**   And are you also trying to avoid influence or

3   subjectivity?

4   **A.**   Yes.

01:25   5   **Q.**   Now, we talked about a general forensic interview, but I

6   want to talk a little bit about where your building is located.

7   You kind of gave us the address, but is it all one building?

8   Is that the whole advocacy center, or is it part of a building

9   or something else?

01:25   10   **A.**   No, we're on the third floor of that building, so we have

11   the entire floor of it.  It's just like an office building on

12   the corner of Main.

13   **Q.**   Okay.  So how does your office get referrals about child

14   abuse or child sexual abuse?

01:25   15   **A.**   For forensic interviews and for forensic medical exams, we

16   take referrals from law enforcement, social services,

17   prosecutors, so there has to be some kind of open investigation

18   for that.  For the advocacy, mental health services, those kind

19   of things can be referred by any person or professional in the

01:26   20   community.

21   **Q.**   So when somebody -- a child is brought in to be part of a

22   forensic interview, take us through how the child ends up

23   actually in the room to get the interview.  Take us through the

24   steps that happen from when the child or guardian enter the

01:26   25   building to when the child ends up in the room with you.

286

**A.**   When they come through the front door, they're greeted by

our receptionist, who kind of checks them in.  And then from

that point an advocate will engage with them, make sure they

have like water, juice, snack, that they're comfortable, things

like that.

There's a brief meeting of the professionals that are

there, and then the advocate will take the family back and show

them that -- the room that they're going to be in and just kind

of explain the room, answer any questions they have.

Then we get parents to sign paperwork, answer

questions before we get started for them.  Then we talk to the

child.  And then we meet briefly again with parents at the end,

before we say good-bye to the kids.

**Q.**   And the parents or guardians aren't in the room when you

speak with the child about the interview.

**A.**   No, parents do not observe the interview.  While -- while

we're interviewing the child, the parents are meeting with that

advocate just for support, referrals for services, that kind of

stuff.

**Q.**   And are your interviews -- you child forensic interviews

recorded?

**A.**   Yes.

**Q.**   Video recorded, I should say?

**A.**   Yes.

**Q.**   And how are they recorded?  What kind of software device?

287

1   A.   They are recorded onto -- we have a system called V2, and

2   it just -- it will record the interview onto a hard drive, and

3   then it's burned onto a DVD.

4   Q.   Okay.  And just kind of the cut to the chase, you did a

01:27   5   forensic interview of Mxxxx Sxxxxxxxx on January 9th of 2017?

6   A.   Yes.

7   Q.   And we talked about some of the guidelines and protocols.

8   You followed those guidelines and protocols during that

9   interview?

01:28   10   A.   Yes.

11   Q.   And when you met with Ms. Sanderson, did she know that the

12   interview would be recorded?

13   A.   Yes.

14   Q.   And have you had a chance to review the recording?

01:28   15   A.   Yes.

16        MR. O'KONEK:  Okay.  May I approach, Your Honor?

17        THE COURT:  You may.

18        MR. O'KONEK:  I'm handing the witness Government's

19   Exhibit 9.

01:28   20   Q.   (MR. O'KONEK CONTINUING)  Now, is this the forensic

21   interview that you had conducted with Mxxxx Sxxxxxxxx?

22   A.   Yes.

23   Q.   And you've reviewed that because your initials and the

24   date that you reviewed is included on the sleeve of that CD?

01:28   25   A.   Correct.

288

1  Q.   And there's been some edits for various reasons, for times

2  and things like that.

3  A.   Correct.

4       MR. O'KONEK:  Okay.  Thank you.  At this time we

01:28  5  would move Government's Exhibit 9 into evidence.

6       MR. BOLINSKE:  No objection.

7       THE COURT:  Exhibit 9 is received.

8       MR. O'KONEK:  Permission to publish?

9       THE COURT:  You may.  And it's how long?

01:28  10      MR. O'KONEK:  Eighteen minutes, Your Honor.

11      THE COURT:  All right.

12      (Government's Exhibit 9 is played in open court.)

13      MR. O'KONEK:  And I have no further questions, Your

14  Honor.

01:48  15      THE COURT:  Mr. Bolinske.

16      MR. BOLINSKE:  I just have a couple.

17                        CROSS-EXAMINATION

18  BY MR. BOLINSKE:

19  Q.   Ms. Hilfer, you wrote a report as a result of this

01:48  20  forensic interview, is that right?

21  A.   Correct.

22  Q.   And in that report you include some background information

23  of people you talked to and things like that?

24  A.   A brief paragraph on the first page, is that what you're

01:48  25  referring to?  Yes.

1    Q.   Kind of, yeah.  And have you reviewed that report recently

2    in order to come testify here today?

3    A.   Yes.

4    Q.   And do you have that report with you?

01:48    5    A.   No.

6    Q.   Okay.  Do you remember part of that report -- or when you

7    did this interview, when asked how this came out or how Mxxxx

8    -- this came out now, that Sxxxxxx's dad had called Mxxxx's

9    mother and said something had happened to her, and Travis

01:49   10    needed to strengthen his case for Sxxxxxx.  Do you remember

11    that?

12    A.   Yes.

13    Q.   Okay.  And that's in your report, right?

14    A.   Correct.

01:49   15         MR. BOLINSKE:  Okay.  Thank you.  That's all I have.

16         THE COURT:  Anything else?

17         MR. O'KONEK:  No.

18         THE COURT:  All right.  Thank you.  You may step

19    down.  You are excused.

01:49   20         THE WITNESS:  Thank you.

21         MR. O'KONEK:  United States rests.

22         THE COURT:  Very well.  Members of the jury, the

23    government has rested its case, which means you've heard all of

24    the evidence that they intend to present here.  There's some

01:49   25    legal matters, legal issues that I need to take up with the

1  attorneys, so we're going to take about a 20-minute break.

2  That's a little earlier than usual, but it's probably going to

3  take us that long to take care of some of these preliminary

4  matters.  So don't visit amongst yourselves during this break,

01:49  5  and if it's -- if we get things done quicker than that, I'll

6  bring you back in the courtroom sooner than 20 minutes from

7  now.

8            (The jury exits the courtroom.)

9            THE COURT:  We're back on the record outside the

01:50  10  presence of the jury.  At this time I'll take care of any

11  Rule 29 motions for judgment of acquittal that need to be made.

12            MR. BOLINSKE:  Make the standard motion for judgment

13  of acquittal.

14            MR. O'KONEK:  Your Honor, for all the counts, I

01:50  15  believe first we've stipulated to Indian country and Native

16  American status, so we don't need to address that any further.

17            But in each one of the counts the respective girls --

18  in Count 1, Sxxxxxx came in, testified that the defendant

19  licked her vagina.  There was also the recorded interview where

01:51  20  she stated the same thing.  In both her testimony and recorded

21  interview she said she was -- I think in testimony it was five

22  or six, but in the interview it was six, so she was under the

23  age of 12.

24            Count 2, Nxxxx came in here and testified, said that

01:51  25  the defendant licked her -- licked her vagina when she was

291

1    four.   The interview we introduced, she had said it was five,

2    but both in her in-court testimony and her interview she stated

3    that she was under 12 and that the defendant had licked her

4    vagina by, in the video, identifying the area of the crotch

01:51   5    that she circled, I believe, which is Government 7.

6           For Count 3, in both her testimony and the forensic

7    interview, Nxxxx stated that the defendant pulled down her

8    pants and essentially she was afraid he might lick her vagina

9    again, but her hands were holding up her pants while her

01:52   10   underwear were still on.   It demonstrates his attempt was to --

11   that was a substantial step to attempt to touch her vaginal

12   area again.

13          And then for Count 4 for Mxxxx Sxxxxxxxx, she came in

14   here today, stated that the defendant touched her vagina over

01:52   15   the clothing while she was wearing basketball shorts, and the

16   same thing was presented -- as far as her forensic interview,

17   she stated the same thing, and at the time she said she was

18   seven, so under the age of 12.

19          THE COURT:  Mr. Bolinske, anything else you wish to

01:52   20   say?

21          MR. BOLINSKE:  No argument, Your Honor, no.

22          THE COURT:  All right.  Well, it's the Court's

23   finding in this case that there has been sufficient evidence to

24   sustain a verdict on all counts.

01:52   25          As to Count 1, the testimony of Sxxxxxx Hxxxxx proved

292

1     up all of the essential elements of the crime, along with the

2     stipulation as to Native American status.  Sxxxxxx Hxxxxx's

3     testimony was further corroborated by the forensic interview,

4     which is Exhibit 8.

01:53   5     As to Count 2 and Count 3, that was all addressed

6     through the testimony of Nxxxx Hxxxxxx Exxxx, and her testimony

7     alone established the essential elements of the -- of each of

8     those offenses, along with the stipulation as to Native

9     American status.  Ms. Eagle's testimony was corroborated by the

01:53   10    forensic interview, which is -- and diagram, which are

11    Exhibits 6 and 7.

12    And as to Count 3 (sic), the testimony of Mxxxx

13    Sxxxxxxxx, along with the stipulation previously mentioned,

14    established all of the essential elements of that count, and

01:54   15    her testimony was confirmed, corroborated by the forensic

16    interview, which is Exhibit 9.

17    The Eighth Circuit Court of Appeals has made it very

18    clear that the testimony of an alleged victim in and of itself

19    can be all the evidence that's needed to sustain a verdict on

01:54   20    these types of charges.  And the Court -- the Appellate Court

21    has also made it clear that issues of credibility of witnesses

22    are issues that a jury is to resolve, not a judge.

23    So there's been certainly sufficient evidence to

24    sustain a verdict as to all four counts.  The Rule 29 motion is

01:54   25    noted for the record and denied.

293

1           Mr. Bolinske, what do you intend to present?

2           MR. BOLINSKE:  I have, I think, six witnesses, Your

3  Honor.

4           THE COURT:  Okay.

01:54
5           MR. BOLINSKE:  And we can start right away here, I

6  mean, whenever we get back.

7           THE COURT:  When did we leave here, five minutes ago?

8           MR. BOLINSKE:  I think so.

9           THE COURT:  Well, we'll give them a 15-minute break

01:55
10  rather than a 20-minute break, so we'll come back at five after

11  2:00.  But you're ready to go with witnesses at that time?

12           MR. BOLINSKE:  Yep, we are.

13           THE COURT:  And can you tell us who those are?

14           MR. BOLINSKE:  Well, potentially Bruce Bennett,

01:55
15  Sommer Cummings, Kelly McGrady, Jerry Schneider, Jada Appel,

16  and Lonnie Spotted Bear.

17           THE COURT:  Okay.  And do you expect that you'll

18  complete all of that today or not?

19           MR. BOLINSKE:  It's certainly possible.

01:55
20           THE COURT:  Okay.

21           MR. BOLINSKE:  They're not going to be long.

22           THE COURT:  Anything else we can take care of?

23           MR. O'KONEK:  The only other thing is I think the

24  final instructions were e-mailed out.  I had e-mailed a

01:55
25  response with just two requested changes or additions, so other

294

1    than that, we don't have any other objections to the final

2    instructions.

3              THE COURT:  Or the verdict form?

4              MR. O'KONEK:  Or the verdict form, that's correct.

01:55  5        THE COURT:  Mr. Bolinske, have you had time to review

6    those pleadings?

7              MR. BOLINSKE:  I'd like to look at them again, but --

8              THE COURT:  Yeah, that's fine.  All right.  We'll see

9    you back in about ten minutes.

01:56  10             (A recess was taken from 1:56 p.m. to 2:08 p.m., the

11   same day.)

12             (In open court with the defendant, counsel, and the

13   jury present.)

14             THE COURT:  Welcome back.  We are back on the record.

02:08  15   Mr. Bolinske.

16             MR. BOLINSKE:  Your Honor, the defense would call

17   Agent Bruce Bennett.

18                  SPECIAL AGENT BRUCE BENNETT,

19   having been first duly sworn, was examined and testified as

02:08  20   follows:

21                      DIRECT EXAMINATION

22   BY MR. BOLINSKE:

23   Q.   Would you just tell us your name, please, sir?

24   A.   Bruce Bennett.

02:09  25   Q.   And what is your occupation?

1   **A.**   I'm a special agent with the FBI.

2   **Q.**   And is this a little odd, me call you to the witness stand

3   and the government not calling you?

4   **A.**   Is it?

02:09   5   **Q.**   A little odd?

6   **A.**   Yes.

7   **Q.**   Okay.  And were you the lead investigator in this case?

8   **A.**   Yes.

9   **Q.**   And how long a time period did you work on this case, if

02:09   10   you can -- your best estimate?

11   **A.**   From the initial disclosure until now --

12   **Q.**   Okay.  Do you know --

13   **A.**   -- which would be --

14   **Q.**   Sorry.

02:09   15   **A.**   -- February of 2016, I believe.

16   **Q.**   Okay.  And how come you didn't testify for the government?

17   **A.**   I have no idea.

18   **Q.**   Did you discuss why you weren't called?

19   **A.**   No, I didn't.

02:09   20   **Q.**   Is this a rare occasion, that you're not called as a lead

21   investigator?

22   **A.**   It is a rare occasion, yes.

23   **Q.**   Okay.  And describe the types of things you do as an

24   investigator to do a thorough job.  Describe your training and

02:10   25   experience, if you would?

1   **A.**   My training, of course, the FBI academy.  Prior to that I

2   was in the Marine Corps, a Los Angeles County Sheriff's deputy.

3   I've been with the FBI now for almost 18 years.

4   **Q.**   Okay.  And this is an obvious question, but you want to do

02:10   5   a thorough job when you investigate cases, right?

6   **A.**   Yes.

7   **Q.**   And getting to the truth is or should be a priority, true?

8   **A.**   Yes.

9   **Q.**   And in doing that as an investigator, is it fair you get

02:10   10   information, then you follow leads that that information

11   provides?

12   **A.**   Yes.

13   **Q.**   And the process is to hopefully arrive at what actually

14   happened, right?

02:11   15   **A.**   Yes.

16   **Q.**   And you reviewed all the materials then in this case.  Did

17   you then gather the materials, review them, things like that?

18   **A.**   Yes.

19   **Q.**   Did interviews?  You did interviews?

02:11   20   **A.**   Yes.

21   **Q.**   And in these interviews, there are three accusers here,

22   right?

23   **A.**   Correct.

24   **Q.**   And you sat here during the whole trial, right?

02:11   25   **A.**   Yes.

1   Q.   And did the versions of events continue to change

2   throughout this trial that they claimed?

3   A.   There are what we would consider to be minor

4   inconsistencies, but the actual main version of events did not

02:11   5   change, in my opinion.

6   Q.   Okay.  And so you were here.  You know who Nxxxx is,

7   correct?

8   A.   Yes.

9   Q.   And you were here when she testified?

02:12   10   A.   Yes.

11   Q.   And you were here when a CD was played in her case, right?

12   A.   Yes.

13   Q.   And part of that CD was redacted, wasn't it?

14   A.   Yes.

02:12   15   Q.   And part of the redaction that we played later -- that I

16   played later contained a conversation Sxxxxxx had with Nxxxx,

17   right?

18   A.   Yes.

19   Q.   And where did that occur, if you remember?

02:12   20   A.   At a Boys and Girls Club.

21   Q.   And did it involve any other people that were at this Boys

22   and Girls Club, if you remember?

23   A.   I believe Jada Appel.

24   Q.   And to get to the truth in cases of this type, is

02:12   25   credibility important?

298

1   **A.**   Yes.

2   **Q.**   Is consistency important?

3   **A.**   Yes.

4   **Q.**   Are the surrounding cast, say friends, teachers, relatives

02:12   5   of the people saying these accusations, what they have to say,

6   is that important?

7   **A.**   To a certain degree, yes.

8   **Q.**   Okay.  And you had Jada Appel's name, didn't you?

9   **A.**   Yes, I did.

02:13   10   **Q.**   And did you ever go and talk to her?

11   **A.**   No.

12   **Q.**   And she was one of Sxxxxxx's good friends, right?

13   **A.**   I did not know her to be a good friend.  I knew that she

14   was mentioned.

02:13   15   **Q.**   And was she one of Nxxxx's friends?

16   **A.**   I don't know.

17   **Q.**   In the DVD that was played, they were in kind of a group

18   talking about things, right?

19   **A.**   Yes, but I don't know that she was friends with Nxxxx.

02:13   20   **Q.**   Okay.  You never found that out?

21   **A.**   No, I did not.

22   **Q.**   Did you try to find that out?

23   **A.**   No.

24   **Q.**   Okay.  Who of Nxxxx's friends -- or I'll back up -- of

02:13   25   Sxxxxxx's friends did you talk to about her potential

299

1  truthfulness or lack of truthfulness?

2  **A.**   None.

3  **Q.**   Who of Nxxxx's friends did you talk to about their

4  truthfulness or lack of truthfulness?

02:13  5  **A.**   None.

6  **Q.**   Who of Mxxxx's friends did you talk to about their

7  truthfulness or lack of truthfulness?

8  **A.**   None.

9  **Q.**   Do you think that may have been important?

02:14  10  **A.**   No.

11  **Q.**   You don't think that could be important.

12  **A.**   No.   There are four counts charged in this case, and none

13  of these people were present when the subject did what he did

14  to our victims.

02:14  15  **Q.**   Okay.

16  **A.**   So they did not have what we would call direct evidence of

17  what happened.   It was done in private.   So for me to go out

18  to, say, a seventh grade class and say, "Who here is friends

19  with Nxxxx, please raise your hands," it's just not something

02:14  20  that I'm going to do to detect or learn the credibility of one

21  of my victims.   I would not do that in, say, a -- if somebody

22  was a victim of a robbery, I would not go and get a list of our

23  victim's friends and go ask them, "Is this person truthful?"

24  It's just not something that we do.

02:15  25  **Q.**   If someone accused you of something, would you like that

300

1   person's credibility explored?

2   A.   The person doing the accusing?

3   Q.   Of you.

4   A.   Yes.

5   Q.   And you just testified you didn't do that in this case

6   when somebody accused someone else of something wrong, right?

7   A.   I'm sorry?

8   Q.   If someone accused you of horrible, terrible things, would

9   you like that person's credibility explored or propensity for

10   truthfulness?

11   A.   If the subject was accusing me of something?

12   Q.   Right.

13   A.   Yes, I would.  I'd want the subject's credibility

14   ascertained.

15   Q.   Okay.  Thank you.  And in Sxxxxxx's interview, are you

16   aware -- or you're familiar with the forensic interviews in

17   this case?

18   A.   Yes.

19   Q.   Have you reviewed them recently or reviewed them at all?

20   A.   I watched them today.

21   Q.   Okay.  And in Sxxxxxx's interview, she talks about

22   hitting, kicking, and scratching Mr. Spotted Bear.  Do you

23   remember that?

24   A.   Yes.

25   Q.   And as part of an investigation to be thorough, you

02:15
02:15
02:15
02:15
02:15
02:16

301

1    probably would interview people surrounding incidents like that

2    to see if there are witnesses who can corroborate that story,

3    right?

4    **A.**    I was told that there were no witnesses.

02:16    5    **Q.**    Did you go look for any?

6    **A.**    Other than the two that were there, no.

7    **Q.**    How about -- did you go check on any medical records of

8    Lonnie Spotted Bear to see if he'd gone to the doctor for being

9    hit, kicked or scratched?

02:16    10   **A.**    From five or six years ago, no.

11   **Q.**    You didn't -- you didn't check, though?

12   **A.**    No.

13   **Q.**    Did you talk to anyone around that timeframe that may have

14   seen Lonnie with black-and-blue marks, scratches, cuts,

02:16    15   anything of that nature?

16   **A.**    I was not told that he had black-and-blue marks, cuts.  He

17   had a scratch.

18   **Q.**    Okay.  Might that be important to determine if somebody --

19   boy, they saw a scratch.  This corroborates her story.  Might

02:17    20   that be important?

21   **A.**    There's also the problem with cooperation.  We attempted

22   to talk to people closer to Mr. Spotted Bear, but we did not

23   get their cooperation.

24   **Q.**    Okay.  And let's go to Nxxxx's interview.  Some of this

02:17    25   involved a tractor tire, something like that?

302

1   A.   Yes.

2   Q.   And did you go out and -- do you have any pictures of a

3   tractor tire?

4   A.   No.

02:17   5   Q.   Do you have any pictures of the shop?

6   A.   No.

7   Q.   Do you have any pictures of anything related to the scene

8   where this allegedly occurred?

9   A.   No.

02:17   10   Q.   And do you know if that shop is still there?

11   A.   No, I don't.

12   Q.   You haven't checked?

13   A.   I saw a shop there when I was out there near the property,

14   but I did not have permission to go on the property.

02:18   15   Q.   Okay.  Could you have gotten permission?

16   A.   I do not believe I could have gotten a search warrant,

17   which would have been required.

18   Q.   You couldn't have gotten a search warrant in a crime like

19   this?

02:18   20   A.   I doubt that I would have been able to, to go out --

21   Q.   Why is that?

22   A.   Because I have no idea of the -- first of all, the

23   staleness issue.  This happened three years ago.  I have no

24   idea to go in front of a judge and swear that I had reason to

02:18   25   believe that that tire is still there.

303

1   **Q.**   Okay.  But you didn't try.

2   **A.**   No.

3   **Q.**   Okay.  And do you remember Nxxxx talking about a cell

4   phone that she had purportedly on her person when this

02:18   5   occurred?

6   **A.**   Yes.

7   **Q.**   And did you attempt to get the cellphone records from

8   Nxxxx's cell phone from that time?

9   **A.**   I believe I looked into that, yes.

02:18   10   **Q.**   Okay.  Did you find any?

11   **A.**   First, I have to have the telephone number and the

12   subscriber information, and I believe she had a different phone

13   or had a couple of different phones since that time, so I was

14   unable to get subscriber records.  And on top of that, all that

02:19   15   would have shown would be that she had contact with her

16   grandfather, who she had frequent contact with anyway.

17   **Q.**   Do you --

18   **A.**   So I understand people believe that the FBI can just ask

19   for phone records, and that's not accurate.

02:19   20   **Q.**   Did you try to trace back which phone or phone number this

21   might have been through, you know, Verizon, AT&T, records like

22   that?

23   **A.**   No.

24   **Q.**   And the phone call was purportedly made to somebody by the

02:19   25   name of David Holding Eagle, is that right?

304

1  **A.**   Yes.

2  **Q.**   And he had had a phone then too, right?

3  **A.**   Yes.

4  **Q.**   Did you look at his phone or try to get his phone?

02:20  5  **A.**   No.

6  **Q.**   Did you try to get records from his phone?

7  **A.**   No.

8  **Q.**   Would it have been possible to get records from his phone?

9  **A.**   It could have been possible, but again, the same -- the

02:20  10  same thing.

11  **Q.**   And that potentially would have or could have corroborated

12  her version of calling to get a ride home or calling because

13  there was some sort of an emergency, right?

14  **A.**   It would have shown that she had contact with her

02:20  15  grandfather, and that's -- that's it, which she had frequent

16  contact with him anyway, so --

17  **Q.**   And did you talk to David Holding Eagle?

18  **A.**   No.

19  **Q.**   You never did speak with him?

02:20  20  **A.**   No.

21  **Q.**   You didn't interview him about this?

22  **A.**   No.

23  **Q.**   You didn't think that was important?

24  **A.**   No.

02:20  25  **Q.**   To corroborate a story of something this bad?

1  **A.**   If it was to corroborate if he would have been present at

2  the time that Mr. Spotted Bear did what he did, absolutely, I

3  would talk to him.  However, to talk to him and say, "Do you

4  remember receiving a phone call from your granddaughter three

5  years ago" --

6  **Q.**   Might he have --

7  **A.**   -- it doesn't seem reasonable.

8  **Q.**   If he's got to get -- all right.  I'll back up.  You

9  watched Nxxxx's video.  You were here, right?

10  **A.**   Yes.

11  **Q.**   And initially do you remember Nxxxx saying that David

12  Holding Eagle came and picked her up on a motorcycle?

13  **A.**   Yes.

14  **Q.**   And then she said later that he got in his car and came

15  and picked her up?

16  **A.**   I believe so.

17  **Q.**   And did you explore that with Mr. Holding Eagle?

18  **A.**   No.

19  **Q.**   Just these details, you could have corroborated and just

20  put a little more solidity to this, but you chose not to, is

21  that right?

22  **A.**   Correct.

23  **Q.**   Okay.  With Nxxxx again, you wrote reports or generated

24  reports in this case, right?

25  **A.**   Yes.

1    Q.    And in lots of cases, and particularly in this case,

2    information kept coming in and kept changing as to what

3    happened, right?

4    A.    The main idea of what happened did not change, but other

02:22    5    information did come in.

6    Q.    Okay.  And you were here when Ivetta Spotted Bear

7    testified?

8    A.    Yes.

9    Q.    And do you recall her saying that she really didn't talk

02:22    10    to Nxxxx about this and didn't talk details and -- you know, do

11    you remember that?

12    A.    Yes.

13    Q.    And on March 30, 2017, you wrote a report in which Ivetta

14    Spotted Bear contacted you on the phone.  Does that sound

02:22    15    right?

16    A.    Yes.

17    Q.    And in that phone call, what did she tell you if you

18    remember?

19    A.    If it's the report that I believe you're referring to, she

02:22    20    said that Nxxxx had come to the U.S. Attorney's Office, and

21    when she returned, she was very upset, that she said that she

22    had not been completely truthful, that there were eight to ten

23    other times that this had happened, and I believe that was the

24    -- most of it.

02:23    25    Q.    Okay.  And that hadn't previously been disclosed to

1   anyone, had it?

2   A.   No.

3   Q.   And she'd given a forensic interview and had an

4   opportunity to tell her story, right?

5   A.   Yes.

6   Q.   And been asked if she was being truthful?

7   A.   Yes.

8   Q.   Several times?

9   A.   Yes.

10  Q.   By several people?

11  A.   Correct.

12  Q.   Including you?

13  A.   I'm not sure that I've ever asked her that.

14  Q.   Okay.  And did you then explore these approximately eight

15  to ten other times that she brought up?

16  A.   We did bring her in again and talked to her, and that is

17  when she disclosed that she was touched multiple times while

18  driving the truck, and we asked her what it was about.  And we

19  can't use leading questions.  She did not disclose to us the

20  details of the eight to ten other times that he did it because

21  she did not want to go into details about any of this and

22  she -- she said that she only wanted to say the first time and

23  the last time.

24  Q.   Okay.  And could you have tried to corroborate that if you

25  wanted to?

308

1   **A.**   If I had more information, yes.

2   **Q.**   And you could've gotten more information, right?

3   **A.**   If it exists, yes.

4   **Q.**   You could have explored it?  You could have looked into

02:24  5   it?

6   **A.**   That's what we did when we interviewed her.

7   **Q.**   Okay.  But did you then go out and re-interview witnesses

8   to see if anyone recalled anything about these new events?

9   **A.**   Re-interview witnesses?

02:25  10  **Q.**   Right.

11  **A.**   To what?

12  **Q.**   To see if they knew anything about other incidents, dates,

13  times, places, you know?

14  **A.**   But they would have to be a witness to something that

02:25  15  happened in private.

16  **Q.**   How about anyone who suspected anything?  Did you go out

17  and interview family members?  Hey, do you suspect Lonnie is

18  doing anything?  Did you try that?

19  **A.**   Yes.

02:25  20  **Q.**   Okay.  And how did that turn out?

21  **A.**   And we did not get cooperation.

22  **Q.**   Okay.  And, in fact, people told you that, no, we don't

23  think he -- he's not a guy like this, right?

24  **A.**   The people that I spoke to, yes.

02:25  25  **Q.**   And did you write reports that indicated that?

**A.**   No, I did not do an interview of these people.  I asked

for their cooperation to speak with me and to let me speak to

certain members of the family.

**Q.**   Okay.  Do you remember who you -- did you talk to them on

the phone or in person, or how did that work?

**A.**   Almost very soon after the girls had disclosed we went out

to -- I believe it was Twin Buttes and spoke to Sommer Cummings

and Morley Spotted Bear, I believe is his last name.

**Q.**   So you did speak with Sommer?

**A.**   Yes.

**Q.**   And you did speak with Morley?

**A.**   Yes.

**Q.**   And they provided information to you that was helpful to

Mr. Spotted Bear, right?

**A.**   You may say that they -- I did not do an interview of

them, but they said that they would not let us talk to their

children because they did not believe that he did it.

**Q.**   Okay.  You may have -- not have done an interview, but you

got information from them, right?

**A.**   Yes.

**Q.**   And it was helpful to Mr. Spotted Bear, right?

**A.**   It was their opinion, yes.

**Q.**   And you did not write a report about that.

**A.**   I did not write reports about opinion.

**Q.**   Okay.  But you got information that was helpful to him,

310

1   and that's written nowhere, is it?

2   **A.**   No.

3           MR. BOLINSKE:  Thank you, sir.  That's all I have.

4           THE COURT:  Mr. O'Konek, any questions?

5           MR. O'KONEK:  Briefly.  Your Honor.

6                    <u>CROSS-EXAMINATION</u>

7   <u>BY MR. O'KONEK:</u>

8   **Q.**   Now, throughout the time that you've been the

9   investigator -- I started after this investigation had

10  happened, is that right?

11  **A.**   Yes.

12  **Q.**   But since you've been the case agent and I've been at the

13  U.S. Attorney's Office, we've talked about your potential

14  testimony kind of throughout the investigation, right?

15  **A.**   Yes.

16  **Q.**   And when it comes to calling witnesses, that's my

17  decision, not yours.

18  **A.**   Correct.

19  **Q.**   Okay.

20  **A.**   And as far as had we discussed, we have discussed me --

21  whether I would be testifying or not, but we did -- in answer

22  to the first question, I was not provided the answer why.

23  **Q.**   So I want to talk a little bit about your investigation.

24  When you were looking into -- after you got the disclosures

25  from Sxxxxxx and Nxxxx, was there anybody else that either of

311

1   those girls said was in the room when Lonnie touched them?

2   **A.**   No.

3   **Q.**   What about Mxxxx, when that came up?  Anybody disclose

4   somebody -- Lonnie was -- or somebody else was in the room

02:28     5   watching Lonnie do this?

6   **A.**   No.

7   **Q.**   And part of the -- part of the rationale for redacting

8   part of the statement was to keep certain other victims out in

9   the event that those victims had trouble testifying.

02:28    10   **A.**   Correct.

11   **Q.**   And in order to essentially not prejudice the accused.

12   **A.**   Correct.

13   **Q.**   Now, in terms of Jada Appel, do you think you should have

14   interviewed her?

02:28    15   **A.**   In hindsight, yes.

16   **Q.**   Okay.  But ultimately what would that have required for

17   you to go and speak with a classmate?  Do you often go to

18   schools and talk with victim's classmates about sexual assault

19   allegations?

02:28    20   **A.**   In 18 years I've never done it.

21   **Q.**   Why not?

22   **A.**   Why?

23   **Q.**   Yeah.  Why wouldn't you do that?

24   **A.**   As an FBI agent I'm supposed to have the child witness's

02:29    25   parents' permission, so I can't just go to a school and drag a

312

1    child out of the class and interview them.

2  Q.   And Twin Buttes or New Town, those are small towns?

3  A.   Yes.

4  Q.   Does word spread fast when you start talking with people?

02:29   5  A.   Yes.

6  Q.   Is that something that you've seen in your experience?

7  A.   Particularly in this investigation it was -- it was

8  tearing the family apart, and I have to take into consideration

9  the privacy of not only Mr. Spotted Bear, but also of our

02:29  10  victims in this case.  If I go and I ask one child a question

11  of the nature that I have to ask, it's going to -- it's going

12  to spread around the school.  And I've seen how the kids are

13  ostracized and tormented by each other, and that's just not --

14  it's not something I want to put them through.

02:30  15  Q.   And sometimes when you give information to people about

16  the case, does that lead to rumors spreading as well?

17  A.   Yes.

18  Q.   Have you seen that in your 18 years?

19  A.   Absolutely.

02:30  20  Q.   So we talked a little bit on -- I think on direct

21  examination the defense counsel had asked who -- about people

22  you interviewed.  Who did you try to speak with who was

23  uncooperative?

24  A.   Well, I spoke with the parents, Sommer Cummings and Morley

02:30  25  Spotted Bear.

Q.    And they're the parents of who?

A.    Of Haylon and Ashley (sic).

Q.    Okay.  And just take us through, what was their demeanor like when you spoke with them?

A.    They were inevitably -- or eventually they were uncooperative and did not let us.  Initially I wanted to speak to Ashley, and then after that I wanted to speak to Haylon.  I'm not sure if we discussed Haylon at that time, but we wanted in particular to speak to Ashley.  They're nice, cordial, good people, but ultimately they did not want to let us talk to the kids.

Q.    And what was Sommer's relationship with Mr. Spotted Bear?

A.    She's -- I believe she's married to his -- one of his sons.

Q.    Okay.  Now, we talked about -- they talked about going out and trying to get photographs.  Now, could you get photographs of Lonnie Spotted Bear's home?

A.    No.

Q.    Why not?

A.    It burned down.

Q.    And the shop that you went there that -- the workshop that you went to -- you talked a little bit about staleness.  What does that mean when you're trying to do a search warrant?

A.    Well, first, I did not go to his shop.  I did not go onto his property.

314

Q.   And why didn't you go onto his property?

A.   Because I did not have permission to be there --

Q.   Okay.  And --

A.   -- on his property.  I was on a public road.

Q.   And it might be illegal to go on private property without permission.

A.   Correct.

Q.   So take us through -- you mentioned something about staleness.  What does that mean when you're trying to go to a judge for a search warrant?

A.   Meaning that I have to show that the items that I am searching for, I can describe with particularity and that they are currently located at the place that I want to search.  And if, for example, there's an item in the machine shed, I need to be able to explain why I think that tire may still be there, because it was -- it's been three years -- two or three years.

Q.   Okay.  And I just want to give you an example.  So, for instance, if you had suspected that somebody was dealing drugs out of a house here in Bismarck and you had information that they would -- a supply had come in 30 days prior, could you go -- would you go and try to get a search warrant?

A.   No.

Q.   Why not?

A.   Because it's 30 days.  I have -- I would have to articulate what reason I had that those drugs were still where

1    they were initially thought to be.

2    **Q.**   And in these types of cases, when you get a delayed

3    report, oftentimes information -- or, excuse me, where things

4    are can change, can't they?

02:33   5    **A.**   Yes.

6    **Q.**   Now, the last thing I want to go over is, we talked about

7    Jada Appel.  Now, ultimately Jada Appel was not in the room

8    with either Sxxxxxx or Nxxxx when Lonnie touched them?

9    **A.**   No.

02:33   10    **Q.**   And in terms of anybody else that was involved or a part

11    of the family or anybody else in this case, were you able to

12    identify anybody else that had correct knowledge, that was an

13    eyewitness to any of the abuse?

14    **A.**   No.

02:33   15    **Q.**   And if you would have found one, would you have talked

16    with them?

17    **A.**   Absolutely.

18           MR. O'KONEK:  No further questions.

19           THE COURT:  Anything else?

02:34   20           MR. BOLINSKE:  I have nothing further.

21           THE COURT:  All right.  Thank you, sir.  You may step

22    down.

23           You may call your next witness.

24           MR. BOLINSKE:  I'd call Sommer Cummings, Your Honor.

25           ///

1                           <u>SOMMER CUMMINGS</u>,

2     having been first duly sworn, was examined and testified as

3     follows:

4                         <u>DIRECT EXAMINATION</u>

02:35   5     <u>BY MR. BOLINSKE</u>:

6     Q.    Okay.  Good afternoon.  Could you just tell us your name,

7     please?  I know you just did it, but can you do it again,

8     please?

9     A.    Sommer Cummings.

02:35   10    Q.    And what is your relationship to Mr. Lonnie Spotted Bear?

11    A.    I date his son.

12    Q.    Okay.  And how long have you dated his son?

13    A.    Well, since 2001.

14    Q.    So a long time.

02:35   15    A.    Yep.

16    Q.    Sixteen years, or so?

17    A.    Yep.

18    Q.    And can you just give us a little bit about your personal

19    background, just who you are, where you're from, just so the

02:35   20    jury knows you a little bit?

21    A.    Sure.  I'm from New Town, North Dakota.  I grew up -- we

22    -- I first lived in Bismarck until about the fourth grade.  I

23    moved to Belcourt, North Dakota, went all through high school

24    there.  And then I moved to New Town again, worked in a casino,

02:36   25    and then started to hang out with Morley Spotted Bear.

1          Then I moved to Twin Buttes, and there I worked at a

2    Boys and Girls Club for 12 years, up until 2015.  And then I

3    switched jobs to -- I am now a housing manager for 20-unit --

4    20 housing units and two six-unit apartments.

02:36    5    Q.   Okay.  And you've known Lonnie for a long time then too

6    because you dated his son?

7    A.   Oh, yep.  I had -- one of my favorite uncles used to date

8    his sister, Alice Spotted Bear, so the Spotted Bears were

9    always kind of in our lives in some way, shape or form.  I only

02:37   10    knew Lonnie in passing, never really had a conversation with

11    him.  I was younger.  I think I was about eight years old when

12    my Uncle Arson (ph) passed away that used to date his sister.

13    Q.   So prior to 2001, even before his son --

14    A.   Oh, yeah.  Yep, and I knew -- I mean, I knew -- I thought

02:37   15    Alice was my aunt.  She was so kind.  He had another sister

16    that passed away.  Her name was Gertzie.  I thought she was my

17    aunt because she was amazing to us.  She was a really great

18    gal.

19    Q.   Okay.  And how many -- do you have children?

02:37   20    A.   I do.  I have a 20-year-old daughter.  I have a

21    13-year-old son with Morley.  The 20-year-old is with a

22    previous relationship.  I have a ten-year-old daughter with

23    Morley, and I have a soon-to-be three-year-old son with Morley.

24    Q.   Okay.  And these kids or some of these kids growing up,

02:38   25    were they around Lonnie and --

318

**A.**   My daughter was two --

**Q.**   I'm sorry.  Just wait one second.

**A.**   Okay.

**Q.**   Just to make everybody -- you can just wait, please, until I finish the question, and then you --

**A.**   Sorry.

**Q.**   -- do the answer.  No problem, but we just want people to be able to write it down, and stuff.

So you've had your children at family events that Lonnie has either been at or put on.  Just describe that.

**A.**   Yes.  So the funnest part to me about living in Twin Buttes -- Lonnie and his dad are ranchers, and one of the funnest things there is a branding.  Sometimes it turns into a little bit of hard work for myself and some of the other family involved just because it turns into a community event.  We have to feed everybody, but we're thankful for all their help wrestling the calves and doing a lot of the hard work.  And then after, we get to eat and hang out and have a really good time.  Not only my kids are there, but the friends of my kids.

**Q.**   How many people typically would be at an event like this?

**A.**   I would say any given year, 30 to 50 people.  The smallest amount of people, I would say maybe in the twenties --

**Q.**   And this is --

**A.**   -- ever.

**Q.**   And this is at Lonnie's place, or where's this at?

319

1  **A.**   This is annually in May usually, depending on the weather,

2  right -- he has some horse corrals just near his house.

3  **Q.**   Okay.  And you obviously know why we're here, right?

4  **A.**   Yep.

02:39  5  **Q.**   You know what this case is about.

6  **A.**   I do.

7  **Q.**   And you're aware that people have made accusations against

8  Lonnie, right?

9  **A.**   Yes.

02:39  10  **Q.**   And have you been around the events or grown up or been at

11  the events where these three girls have been at?

12  **A.**   Oh, yes, not only brandings, holidays, family gatherings.

13  Thanksgivings are at Uncle Daylon's house, and Christmas we

14  usually have at the hall.  I'm trying to think of other family.

02:40  15  **Q.**   And is it kind of common to gather at Lonnie's place?  Is

16  that where people come?  I mean to his son's place and his

17  place and --

18  **A.**   Yep.

19  **Q.**   -- things like that?

02:40  20  **A.**   Oh, yeah.

21  **Q.**   Okay.

22  **A.**   Yeah.

23  **Q.**   Those are the centers or the hubs of sort of --

24  **A.**   Yep.

02:40  25  **Q.**   -- entertainment --

320

1   **A.**   Absolutely.

2   **Q.**   -- where people go?

3   **A.**   Yep.

4   **Q.**   And did you ever observe Lonnie do anything to any young

02:40   5   girls --

6   **A.**   Never.

7   **Q.**   -- that's terrible?

8   **A.**   Not since I've been there.

9   **Q.**   Okay.  You've never observed him in your life --

02:40   10   **A.**   I have not in my life seen him do anything inappropriate.

11   **Q.**   Okay.  And you have taken your children to his place

12   throughout the years, right?

13   **A.**   I absolutely have.  My oldest daughter was introduced to

14   Lonnie when she was two years old.  Morley and I were quite a

02:41   15   bit younger then, and we definitely liked to have alone adult

16   time, go out or wherever we decided to do, hang out with

17   friends.  Weekends, Morley was a avid softball player, weekends

18   away from the house.

19        And my daughter, Raven, would probably be mad at me

02:41   20   for saying this, but she would leave a trail of clothes from

21   the entryway to the living room, and she just liked to run

22   around in her underwear, and if -- I mean, she just had

23   absolute comfort there.  There was never amiss where she felt

24   like grandma and grandpa were not her grandma and grandpa.

02:41   25   **Q.**   Okay.  So is it fair to say you trusted Lonnie?

321

1   **A.**   I trust Lonnie with everything.

2   **Q.**   Okay.  And there's been -- I know you haven't been in

3   here, but there's been a lot of talk about an iPad in this

4   case.  Do you know anything about an iPad?

02:42
5   **A.**   The only thing that I know about an iPad is I budget my

6   money as best I can.  When I started hanging out with Morley,

7   he's like, "Why don't you use your paychecks and buy a

8   vehicle?"  I think when I moved there, I had a -- kind of a

9   beat-up '91 Chevy pickup, but he said just invest your money in

02:42
10  a new vehicle, so that's what I decided to do, but budgeted

11  very wisely.

12         We had just -- Haylon was coming up into technology

13  and kind of into games, and I had a little bit of money set

14  aside.  And in -- I wanted it before Christmas, but I was able

02:42
15  to buy him an iPad in January of 2012.

16  **Q.**   Okay.  And why is that important?  I mean, does -- does --

17  **A.**   Well, okay.

18  **Q.**   What's going on with this iPad?

19  **A.**   From what I can tell, as an important part of the girls

02:43
20  saying that -- okay.  So if we want to reverse just a bit,

21  Haylon is the same age as one of the girls.

22  **Q.**   Okay.

23  **A.**   Two of them, maybe.  Well, I think they're all the same

24  age, actually.

02:43
25  **Q.**   And Haylon is who again?

**A.**   Haylon is my son.

**Q.**   Okay.  And one of the allegations here was Sxxxxxx claiming that Lonnie wanted to go look for Haylon's iPad.  Does that sound right?

02:43

**A.**   Yep.

**Q.**   And go ahead.  I interrupted you.

**A.**   No, that's fine.  And the years and -- their ages don't match with the year that the iPad actually existed.

**Q.**   Okay.  So the allegations against Lonnie, if I told you

02:44

they're saying between August 23, 2010, and August 23, 2011, that this happened with Sxxxxxx, does that sound right?

**A.**   Mm-hmm.

**Q.**   And was Haylon's iPad even in existence?

**A.**   No, Haylon's iPad was ordered -- I don't know when it was

02:44

ordered, actually, but I did not receive it in the mail until January 2011, because -- I mean 2012, because like I said, I wanted it before Christmas, but it just didn't happen that way.

**Q.**   Okay.  If I showed you a receipt for that, would that help you out?

02:44

**A.**   Yes.

        MR. BOLINSKE:  I guess could I mark it?

**Q.**   (MR. BOLINSKE CONTINUING)  Okay.  I'm going to show you what's been marked as -- I don't have my mike on -- as Defendant's 50, and can you just take a look at that for a

02:45

second?  Does that look like something that you provided to me?

323

1    **A.**   It looks exactly like what I provided to you.

2    **Q.**   Okay.  And before you tell me what's on it, what is that?

3    **A.**   This is a iPad receipt -- Apple iPad receipt.

4         MR. BOLINSKE:  Okay.  I'd offer Defendant's 50.

02:45   5         MR. O'KONEK:  No objection.

6         THE COURT:  Exhibit 50 is received.

7    **Q.**   (MR. BOLINSKE CONTINUING)  And could you just tell us what

8    that is?  Just read on there the dates and what was ordered,

9    when it was ordered, stuff like that?

02:45   10   **A.**   "Apple Store, order acknowledged, ordered on December 31,

11   2011, personalized iPad 2, 64 gig with Wi-Fi, 3G for Verizon,

12   black, $829, engraving, Haylon Neci Spotted Bear.  This is way

13   better than a PS3."

14   **Q.**   Okay.

02:46   15   **A.**   Smiley face.

16   **Q.**   What's the date in the top right again that it was

17   ordered?

18   **A.**   Ordered on December 31, 2011.  Where does it say shipped?

19   **Q.**   But, I mean, in any event, it was ordered after

02:46   20   August 23rd?

21   **A.**   Oh, sorry.  Yep, before the engraving it says delivered --

22   delivers January 9th through January 10th.

23   **Q.**   Of what year?

24   **A.**   It doesn't have a year, but it was ordered on December 31,

02:46   25   2011, so January --

1    Q.   Okay.  So, I mean, December 31, 2011, is after August 23,

2    2011, is that accurate or fair to say?

3    A.   Yep.

4    Q.   Chronologically?

02:46    5    A.   Yep.

6         MR. BOLINSKE:  Okay.  Thank you, Sommer.  I think

7    that's all the questions I have.

8         THE COURT:  Mr. O'Konek.

9         MR. O'KONEK:  Yes, Your Honor.

02:46    10                   CROSS-EXAMINATION

11   BY MR. O'KONEK:

12   Q.   Good afternoon.

13   A.   Hi.

14   Q.   I just have a brief few questions, ma'am.  You are dating

02:47    15   Lonnie's son?

16   A.   Yes.

17   Q.   That was Morley?

18   A.   Yes.

19   Q.   You had mentioned that you had a son named Haylon, who is

02:47    20   roughly the same age as Sxxxxxx?

21   A.   Yep.

22   Q.   And you have a daughter, Ashlynn?

23   A.   I do.

24   Q.   Okay.  And when you were around Lonnie's home or Daylon's

02:47    25   home, did Sxxxxxx ever spend time with Haylon?

325

1    **A.**    Not so much at Daylon's.

2    **Q.**    Okay.  But did she ever spend -- did -- Haylon spent time

3    with Sxxxxxx, didn't they?

4    **A.**    Yeah.

02:47  5    **Q.**    Because they were close in age?

6    **A.**    Yes.

7    **Q.**    They were good friends.

8    **A.**    Yeah.

9    **Q.**    They were almost neighbors, I think, based upon kind of

02:47  10   where everybody lived in Twin Buttes?

11   **A.**    Yes.

12   **Q.**    And you weren't around Sxxxxxx all the time that she was

13   in Twin Buttes, were you?

14   **A.**    Only when she would come to Boys and Girls Club.

02:47  15   **Q.**    Right, but when she would come, let's say, to Twin Buttes,

16   you weren't around her every single second, were you?

17   **A.**    No.

18   **Q.**    You weren't around Haylon every single second?  You wanted

19   your alone time?

02:48  20   **A.**    That was when my daughter, Raven, was the only one that we

21   had.  With Haylon, you have to realize he is the firstborn

22   grandchild to Lonnie and Diana.  He's -- Haylon was doted on

23   quite a bit.

24   **Q.**    Okay.  And you're close with Lonnie?

02:48  25   **A.**    Sure.

1    **Q.**    You don't want him to get in any trouble, do you?

2    **A.**    No.

3    **Q.**    When was the last time you spoke with Lonnie?

4    **A.**    Oh, probably right before lunch.

02:48   5    **Q.**    Okay.  And do you live on Lonnie's property?

6    **A.**    No.

7    **Q.**    Where do you currently live?

8    **A.**    I live on his son's property.

9    **Q.**    Okay.  And at some time after the -- Nxxxx and Sxxxxxx had

02:49   10   said that Mr. Spotted Bear had molested them, Special Agent

11   Bennett approached you to try to speak with Ashlynn and Haylon?

12   **A.**    No.

13   **Q.**    That never happened?

14   **A.**    No.  Can I tell my side --

02:49   15   **Q.**    Please.  Yeah.

16   **A.**    -- what happened?  Yep, so I had learned of these

17   allegations quite a few months before Special Agent Bennett and

18   Special Agent Paula Bosch and Anna Old Elk came to see me in

19   Twin Buttes.  It was basically bar talk that it got to me.  And

02:49   20   the person that revealed it to me, what the mother of one of

21   the young girls had said, just said, you know, "Well, there's

22   no truth to it.  Don't tell anybody anything.  We don't want to

23   get anybody's feelings hurt over these lies."

24              So then Anna Old Elk from social services in New

02:49   25   Town, North Dakota, contacted me and said she needed to talk to

1    me because my daughter, Ashlynn, had been named in a report.

2    And I just got sick to my stomach and I'm like, what could be

3    going on?  Three days had passed.  Ms. Old Elk called me and

4    said, "Well, it has to do with somebody who lives in your

02:50   5    home."  At the time Lonnie and Diana lived in our home because

6    their house burnt down in February, and this was the beginning

7    of April.

8          So I was greeted by Ms. Old Elk, and then I didn't

9    know right away that Special Agent Bennett and Special Agent

02:50   10   Paula Bosch were actually FBI until they revealed that later.

11   Special Agent Bennett asked if my daughter, Ashlynn, would have

12   an interview, and I said, "Absolutely not.  She will not do a

13   forensic interview because you guys are barking up the wrong

14   tree and you need to consider your source."  They didn't knew

02:50   15   -- they didn't know I knew who this was.

16         And Special Agent Paula Bosch asked me, "How do you

17   know term 'forensic interview'"?  And then after she introduced

18   herself, I knew a forensic interview because my sisters faced

19   something similar with -- my half-sisters faced something

02:51   20   similar with their step-dad.  And Paula Bosch went into --

21   Special Agent Paula Bosch went in to assure me or reaffirmed to

22   me that, oh, I just want you to know that the FBI is better

23   than they were with that case at that time.  I felt like --

24   **Q.**   And I'm sorry that you had to go through that.

02:51   25   **A.**   So -- so to answer your question, he never asked if Haylon

328

1   could be interviewed.

2   **Q.**   Okay.

3   **A.**   He did ask if Ashlynn could be interviewed, and I said,

4   "Absolutely not because it's absolute nonsense to me."

02:51   5   **Q.**   Okay.  And I promise this will be brief, but you mentioned

6   something about an iPad earlier.  Sxxxxxx would come over and

7   play with the iPad with Haylon, right?

8   **A.**   Not to my house.

9   **Q.**   Okay.  They would potentially go to Daylon's house,

02:52   10   potentially?

11   **A.**   No, she -- if Sxxxxxx spent any time with Haylon, it was

12   possibly after church or it was at Lonnie and Diana's house.

13   **Q.**   Okay.  So Sxxxxxx would spend time at Lonnie's house.

14   **A.**   After 2011.

02:52   15   **Q.**   Okay.  But the day --

16   **A.**   Many times --

17   **Q.**   The day is --

18   **A.**   Before then, after --

19          (The witness was admonished by the court reporter to

02:52   20   wait for the entire question before answering.)

21   **Q.**   (MR. O'KONEK CONTINUING)  But regardless of the date,

22   there were times when, let's say, Sxxxxxx was young and around

23   obviously the same age as Haylon that she would spend time

24   together with Haylon at Lonnie's house.

02:52   25   **A.**   I wasn't always there, so I'm not quite sure.

329

1   **Q.**   So you weren't over at Lonnie's house when they would --

2   Haylon and Sxxxxxx would spend time there.

3   **A.**   Right.

4          MR. O'KONEK:   I have no further questions.

02:53   5          THE COURT:   Anything else?

6                      <u>REDIRECT EXAMINATION</u>

7   <u>BY MR. BOLINSKE:</u>

8   **Q.**   Did -- I just want to clarify.  Did you just say that

9   Sxxxxxx was at Lonnie's house many times after this -- after

02:53   10  this purportedly happened?

11  **A.**   Lonnie's house, the lake with no parents, always with us

12  always around, yes, up until two thousand -- when she

13  transferred to New Town.

14  **Q.**   What year was that, if you know?

02:53   15  **A.**   2016.

16  **Q.**   Okay.  And last question, if you thought that this

17  happened to these girls, would you be here testifying today on

18  Lonnie's behalf?

19  **A.**   Absolutely not.

02:53   20  **Q.**   Why not?

21  **A.**   I feel like I have a intuition or a gut instinct when it

22  comes to people.  When I was young, somebody assaulted me.  I

23  was -- I don't think I was even in Head Start yet, but I know

24  that something did happen to me, and it -- I didn't say

02:54   25  anything.  I didn't do anything.  I don't know who did this to

1    me.  I would never -- I'm a tough mother.  I'm a hard mother.

2    I'm a mean mother to my kids, but the number one thing that I'm

3    going to do is protect them.

4    **Q.**   And you're -- you're not here just to protect Lonnie,

02:54    5    right?

6    **A.**   Absolutely not.  If there was a truth -- an ounce of truth

7    to --

8            MR. O'KONEK:  Objection, calls for speculation.

9            THE COURT:  Sustained.

02:54    10    **Q.**   (MR. BOLINSKE CONTINUING)  Okay.

11    **A.**   If I felt like --

12            MR. O'KONEK:  Objection.

13            MR. BOLINSKE:  Thank you.  That's all I have.

14            THE WITNESS:  Yep.

02:55    15            MR. BOLINSKE:  Appreciate it.

16            THE COURT:  Anything else?

17            MR. O'KONEK:  No, Your Honor.

18            THE COURT:  All right.  Thank you.  You may step

19    down.

02:55    20            THE WITNESS:  Thank you.

21            MR. BOLINSKE:  Kelly McGrady.

22                           <u>KELLY MCGRADY</u>,

23    having been first duly sworn, was examined and testified as

24    follows:

02:55    25        ///

1                    DIRECT EXAMINATION

2     BY MR. BOLINSKE:

3     Q.   Would you just tell us your name, please?

4     A.   Kelly McGrady.

02:56   5     Q.   And how do you fit into all this?  How do you fit in

6     relation-wise?

7     A.   Grandpa Lonnie.

8     Q.   Okay.  What relation?

9     A.   He's Sommer's father-in-law, but in relation to us, he's

02:57   10    Grandpa Lonnie.

11    Q.   Okay.  And why is that, or how is that?  Can you just

12    explain to me the connection?

13    A.   Sommer is my sister, and we hung out for the past 18, or

14    so, years that we've known him.

02:57   15    Q.   Okay.  And I'm going to back up just a little bit.  Could

16    you just tell us your background, just briefly where you grew

17    up, where you went to school, what you went to school for, what

18    you do, things like that?

19    A.    I grew up beginning years on the Fort Berthold Indian

02:57   20    Reservation.  We moved here to Bismarck.  We lived at the

21    Riverside -- or we went to school at Riverside Elementary, and

22    I think in third grade we went to Turtle Mountain, and then

23    from there, White Shield, Mandaree, New Town, and I graduated

24    from Turtle Mountain.

02:58   25                 And then I joined the military, and I did the

332

National Guard, and I was a combat medic there, healthcare

specialist.  And had babies early, but I still succeeded and

graduated with my nursing degree.  And so currently I am the

nurse at the New Town Public Schools, a bus driver, their

at-risk mentor, a cheer coach, and --

**Q.**   Okay.  Thank you very much.  And do you have children?

**A.**   Yes, I have six.

**Q.**   What ages, if you can remember them all?

**A.**   Yes.  My bonus daughter is 22.  She comes from Hawaii.

And then I have an 18-year-old, a 20-year-old, a 15-year-old, a

seven and eight.

**Q.**   Okay.  Girls or boys?

**A.**   I have four girls and two boys.

**Q.**   Okay.  And you said you've known Lonnie for about 18

years?

**A.**   Yes.

**Q.**   And your kids are in the age range then where if you hung

out with Lonnie, your kids would be with you at Lonnie's?

**A.**   Yes.

**Q.**   And tell us about those years, just kids growing up and

going to Lonnie's, what you do, where you'd go, things of that

nature.

**A.**   Both grandpa Lonnie and Grandma Diana, just extremely

welcoming.  Like I said, there's no relationship or blood

relationship there, but we would go down for branding,

333

1   holidays.  We'd see them for birthdays, just every year

2   throughout the year.

3           And then my kids would go down and help fix fence.

4   He taught my boys how to be boys sometimes because we come from

5   a blended family, and he taught them invaluable lessons.  My

6   daughter, who is 18, actually went to school and lived with

7   Sommer, Morley, Grandpa Lonnie and Grandma Diana, and the

8   22-year-old would go down there every summer, every Fourth of

9   July.  We were there constantly.

10  **Q.**   So this was year after year after year after year --

11  **A.**   Yes.

12  **Q.**   -- starting about what year?

13  **A.**   When I initially moved home from Virginia back in -- I

14  want to say '03, Sommer and Morley were in the trailer they had

15  been fixing up, and I think we would go down there for

16  branding, to see what hard workers Grandpa Lonnie and Morley

17  are.  And the womenfolk have to be just as hard, so we would

18  help with cooking or whatever we had to do.

19  **Q.**   Okay.

20  **A.**   And every summer since then.

21  **Q.**   And, again, you had your kids --

22  **A.**   Yes.

23  **Q.**   -- at Lonnie's place, right?

24  **A.**   Yes.

25  **Q.**   And strange questions, but did you ever suspect Lonnie of

334

1  doing anything inappropriate with your kids?

2  **A.**   No.

3  **Q.**   Did you ever see Lonnie do anything inappropriate with

4  your kids?

03:01  5  **A.**   Nope.

6  **Q.**   Did he have access to your kids if he had wanted to?

7  **A.**   Yeah, we were always there.

8  **Q.**   Okay.  And had you ever heard any allegations of Lonnie

9  doing anything to kids until this?

03:01  10  **A.**   Nope.

11  **Q.**   Okay.  And do you know Nxxxx?

12  **A.**   I don't know her.

13  **Q.**   Do you know Sxxxxxx?

14  **A.**   I know who she is, but I don't know her know her.

03:01  15  **Q.**   Okay.  Do you know Mxxxx?

16  **A.**   I know who she is, but I don't know her.

17  **Q.**   Okay.  So you don't have any testimony regarding their

18  truthfulness?

19  **A.**   No.

03:01  20       MR. BOLINSKE:  Okay.  Thank you, ma'am.  That's all I

21  have.

22       THE WITNESS:  Thank you.

23       THE COURT:  Any questions?

24       MR. O'KONEK:  Briefly, Your Honor.

03:01  25     ///

335

<u>CROSS-EXAMINATION</u>

<u>BY MR. O'KONEK</u>:

**Q.**   Ma'am, I just have a couple of questions.  Where do you currently live in Fort Berthold?

**A.**   In New Town.

**Q.**   In New Town?

**A.**   Yes, sir.

**Q.**   Okay.  And you mentioned your relationship with -- it's Grandpa Lonnie, I think is how you refer to him?

**A.**   Yes.

**Q.**   He's somebody that you care about?

**A.**   Deeply.

**Q.**   And you wouldn't want him to get in any trouble, would you?

**A.**   Nobody wants to be in trouble.  But, yeah, I care about him deeply.

**Q.**   When was the last time you talked with him?

**A.**   Today at lunch.

**Q.**   And just to kind of go into some questions involving the children, you mentioned that you really -- you know of, but don't know the three girls who stated that Lonnie had molested them?

**A.**   Yes.

**Q.**   So you weren't there -- have you ever really been around any of these three girls?

336

1   A.   They're there at the lake.  They're there at branding.

2   It's not like I go and -- if they come around -- I'm Auntie

3   Kelly to a majority of these kids.  Just these ones I haven't

4   gotten to know.  The rest of the Boys and Girls Club, yeah.

03:02   5   Q.   And the lake, that's in Twin Buttes near Lonnie's --

6   A.   Yes.

7   Q.   -- property?  And that would be -- when you're there,

8   you're not always around them, though, when they're visiting

9   Twin Buttes?

03:03   10   A.   Not around those specific girls, no.

11        MR. O'KONEK:  Okay.  I don't have any other

12   questions.  Thank you.

13        THE COURT:  Anything else?

14        MR. BOLINSKE:  Just one or two.

03:03   15                    REDIRECT EXAMINATION

16   BY MR. BOLINSKE:

17   Q.   Are you just making this stuff up?

18   A.   No.

19   Q.   Are you here to protect Lonnie?

03:03   20   A.   No.

21   Q.   Would you protect him if you thought he did this?

22   A.   Oh, no, definitely not.  I -- I see kids on a daily basis.

23   I -- as the at-risk worker, I have multiple kids in any office

24   telling me, and we're seeking the assistance and we're doing

03:03   25   what we can to help children such as myself.  I'm a survivor,

1    and -- like many of my sisters are.  We know the character or

2    the feeling of who not to be around or who to be around, and my

3    kids feel the very same.  And if we did not feel comfortable, I

4    wouldn't even address him as Grandpa Lonnie.

03:04    5    **Q.**    So you feel safe and comfortable around Lonnie.

6    **A.**    Absolutely.

7            MR. BOLINSKE:  Thank you.  That's all I have.

8            MR. O'KONEK:  Nothing else, Your Honor.

9            THE COURT:  All right.  Thank you.  You may step

03:04    10    down.

11            You may call your next witness.

12            MR. BOLINSKE:  Can I have just two minutes, because I

13    think I'm going to change it up here?  Can I have just one

14    minute?

03:04    15            THE COURT:  All right.  That's fine.  You folks can

16    stand and stretch if you wish.  We'll take a break in

17    15 minutes, or so.

18            MR. BOLINSKE:  Okay.  Thank you, Your Honor.  I'd

19    call -- are we ready?  Okay.  I'd call Lonnie --

03:05    20            THE COURT:  We're back on the record.  Go ahead.

21            MR. BOLINSKE:  I'd call Lonnie Spotted Bear.

22                        LONNIE SPOTTED BEAR,

23    having been first duly sworn, was examined and testified as

24    follows:

03:06    25        ///

338

<u>DIRECT EXAMINATION</u>

<u>BY MR. BOLINSKE</u>:

Q.   Okay.  Even though everyone knows this, would you just
tell us your name, please?

A.   Pardon?

Q.   Are you having trouble hearing?  Even though everyone
knows this, would you just tell us your name, please?

A.   Lonnie Dale Spotted Bear.

Q.   And I guess just like most of the other people, I'd like
you to give kind of a chronological or biological background,
where you grew up, where you went to school, where you lived.
Can you just start grade school and just go not in detail, but
just through some of that?

A.   Okay.  I was born in Elbowoods.  That's under water now,
but my dad was a full-blooded Indian, and my mother was a
full-blooded Norwegian.  I'm a half-breed.  And I went to
school one year in Elbowoods, and then they took the bridge
out, and so they sent us away to a boarding school in South
Dakota, Stephan, South Dakota, so I went there for four years.
It's a Catholic school.  Then I come back and went three years
back at Twin Buttes, then back to South Dakota for another four
years.  I graduated down there.

     Then I went to two years of trade school in Chilocco,
Oklahoma, and then I come back.  I got a job up in New Town on
the rigs.  Then I -- that's where I met my wife, Diana.  She

1    was from Keene, North Dakota.  We got married.  Then we lived

2    in Keene, and then -- and then we moved to Dickinson.  We

3    stayed there for four or five years.

4              Then we moved back to Twin Buttes and I start

5    ranching.  Got cows and horses, and that's what I'm doing now.

6    We got about 200 head of cows and, oh, I'd say about 25 horses.

7    That's in Twin Buttes, me and my boy, Morley.

8    Q.   Okay.  And you have a ranch in or around Twin Buttes?

9    A.   Yes.

10   Q.   And what -- can you just describe the ranch, what size,

11   what --

12   A.   We run on -- I got about 1,300 acres.

13   Q.   That you rent or own?

14   A.   That I own.  Then we rent to -- they call them range

15   units.  They got a -- that run all the way to the river, so we

16   got two of them.  My boy's got one and I got one that -- we're

17   about three miles up.  Then we got the range units to the

18   river.

19   Q.   What's a range unit?  Is that where the cattle go?

20   A.   Yeah, that's where you run your cows and --

21   Q.   Okay.  And how long have you ranched?

22   A.   Oh, I think we moved back about in sixty -- late -- late

23   sixties.

24   Q.   Moved back to where?

25   A.   Twin Buttes from Dickinson.

340

1  **Q.**   Okay.  And do you or have you had over the years family

2  events at your place in Twin Buttes or your ranch?

3  **A.**   Yes, we do our branding there.  Then we -- we got a cabin

4  down by the river -- or a trailer, I should say.  Everybody

03:10  5  goes -- in the summertime they go down there.  We boat and fish

6  and have fish fries and --

7  **Q.**   Okay.  When you say "everybody," just your immediate

8  family or extended family, or how -- how many people are we

9  talking on any given occasion?

03:11  10  **A.**   It's mostly family, but if anybody else wants to come

11  down, they're welcome, you know.

12  **Q.**   Okay.  And these are your places?  It's your cabin or

13  trailer down there?

14  **A.**   Yeah.

03:11  15  **Q.**   Okay.

16  **A.**   A lot of them bring trailers down for -- they'll camp a

17  few days and go back up like Fourth of July or Labor Day

18  weekends and -- or just go down there on some weekend when it's

19  real nice.

03:11  20  **Q.**   Okay.  And has this gone on for -- how many years that you

21  remember family get-togethers at those locations?

22  **A.**   Oh, I'd say about the last -- I'm 73 years old now, and

23  I'd say about the last 30 years or better.

24  **Q.**   Okay.  And I'm going to just get right to the point here.

03:12  25  You know why we're here, right?

341

1  **A.**   Yes.

2  **Q.**   You've been accused of child molestation.  You're aware of

3  that?

4  **A.**   Yes.

03:12  5  **Q.**   And I'm going to start with Sxxxxxx.  Did you

6  inappropriately touch or molest Sxxxxxx?

7  **A.**   I did not touch or molest her.

8  **Q.**   Did you molest or inappropriately touch Nxxxx?

9  **A.**   I did not do that to Nxxxx.

03:12  10  **Q.**   How about Mxxxx?  Did you do that to Mxxxx?

11  **A.**   No, I -- I wrestled all three of these girls and bit their

12  necks, bit their ears, you know.  And Haylon was the

13  instigator.  You know, he'd start picking on me and doing

14  something to me.  I'd take him down and just -- you know, I

03:12  15  always wrestled him, and he'd holler, and then these girls,

16  when they were there, they'd come running over and jump in

17  and --

18  **Q.**   So you do what -- you do what a grandfather would do.  You

19  wrestle and you play and things like that.

03:13  20  **A.**   Yeah.

21  **Q.**   And throughout these camping trips or family events, would

22  people bring their children?  Was that common, for families to

23  bring their children to these events?

24  **A.**   Yes.

03:13  25  **Q.**   And was that the same for many, many years?

342

1  **A.**   Yes, it was.

2  **Q.**   And has that continued to be the same even after these

3  allegations?

4  **A.**   Yes.

03:13  5  **Q.**   People still bring their kids to your places.

6  **A.**   A lot of these allegations -- some of them, what they said

7  against me, they -- the same girls were down to my place after

8  that, what they said, you know, happened way down there.  Then

9  they come back and they're still -- they're still around there

03:13  10  for the last couple years, I guess, until this come up.  Then

11  they quit coming down.

12  **Q.**   And how about sitting on a lap, driving a car?  Tell us

13  about that.

14  **A.**   Yeah, so they were sitting between my legs.  I did that

03:14  15  with Haylon.  He used to drive, you know, and I'd -- I'd run

16  the foot feed and the brake and make sure he stayed on the

17  road.  And like Nxxxx said, I'd let her do that, you know.

18  **Q.**   So that's true.  You did let kids sit on your lap --

19  **A.**   Yeah.

03:14  20  **Q.**   -- and pretend to drive the car.

21  **A.**   Mm-hmm.  I had that -- I bought that '71 that Morley and

22  Sommer owned, that car, and that's what they'd drive.  They're

23  trying to say it was my pickup, but it was the '71 pickup.

24  **Q.**   Okay.  And can you look the jurors in the eye and tell

03:14  25  them that these things did not occur?

343

1   A.   No, these things did not occur.

2   Q.   You're under oath here, right?

3   A.   Yep.

4   Q.   And you're telling the truth?

03:14   5   A.   Yes.

6   Q.   And you've maintained this truth the entire time.

7   A.   Yes.

8        MR. BOLINSKE:  Okay.  Thank you, Lonnie.  That's all

9   I have.

03:14   10       THE COURT:  Mr. O'Konek.

11       MR. O'KONEK:  Yes, Your Honor.

12                    CROSS-EXAMINATION

13   BY MR. O'KONEK:

14   Q.   Sir, I just have a couple of background questions.  You

03:15   15   said you're currently married to Diana Spotted Bear?

16   A.   Could you talk up?

17   Q.   Yes, sir.  I apologize.  Are you -- you're currently

18   married to Diana Spotted Bear?

19   A.   Yes.

03:15   20   Q.   And for how long have you been married?

21   A.   Fifty years.

22   Q.   Fifty years.  Okay.  And Ivetta Spotted Bear is your

23   sister?

24   A.   Yes, she is.

03:15   25   Q.   And she was your younger sister.

344

A.   She was what?

Q.   She was your younger sister?  You're older than she is?

A.   Yeah, I'm older than her.

Q.   Travis Hallam is your nephew?

A.   Yes.

Q.   And Crystal Hallam was married to Travis at one point?

A.   Yes.

Q.   And you're Nxxxx's godfather?

A.   I guess you could say that I was her godfather too, but --

Q.   But you were her godfather.  I apologize, not grandfather, but godfather.

A.   Yeah, godfather.

Q.   Are you Sxxxxxx's godfather?

A.   Am I what?

Q.   Sxxxxxx's godfather?

A.   No, I'm not Sxxxxxx's godfather.

Q.   But Sxxxxxx and Nxxxx, they consider you like a grandfather.

A.   I suppose, yeah.

Q.   And what was your relationship to Mxxxx Sxxxxxxxx?

A.   My relationship to what?

Q.   Mxxxx Sxxxxxxxx.

A.   She's -- I'm related to her through Clyde Baker.  Him and my dad were first cousins, and so -- so me and her mom would be second cousins.

345

1    **Q.**    Okay.  And her mom --

2    **A.**    She'd be my niece or -- through Indian way.

3    **Q.**    When you say "her mom," Meranda would be your niece.

4    **A.**    Yeah.

03:16    5    **Q.**    And what's your relationship to Brad Sanderson?

6    **A.**    He's my nephew.

7    **Q.**    Now, you're also the -- you talked about some people that

8    are in your family.  Now, we heard from Sommer, and she's

9    dating one of your sons?

03:17    10    **A.**    Yes.

11    **Q.**    That's Morley?

12    **A.**    Yes.

13    **Q.**    And you have a grandson named Haylon?

14    **A.**    Yes.

03:17    15    **Q.**    Same age as roughly all three of the girls?

16    **A.**    Yeah, pretty close.

17    **Q.**    And roughly how long have you lived in Twin Buttes?  I

18    think you kind of gave us some background, but for how long

19    have you lived in Twin Buttes?

03:17    20    **A.**    About -- about all my life.  You know, I grew up there.

21    Then after high school, then I went to -- got a job in New Town

22    in the oil fields.  I worked -- I worked on work-over rigs

23    there for ten years, or so.  Then I went back to -- when I got

24    back to Halliday, I rough-necked for about another 10, 15

03:18    25    years.

346

1   **Q.**   Okay.  And --

2   **A.**   I was a driller on the rig, or --

3   **Q.**   Yes, sir.  I didn't mean to interrupt.  Sir, you -- but

4   you lived there between 2009 and 2014?

03:18   5   **A.**   Yes.

6   **Q.**   But at that time you lived in a different home than you

7   live in now.  Is that fair to say?

8   **A.**   I lived in the home that burnt down, yeah.

9   **Q.**   You lived in a home that had burned down.  When did that

03:18   10   home burn down?

11   **A.**   Last -- about last year, a little bit over a year ago.

12   **Q.**   And so this home that you -- that had burned down, that

13   was on your property?

14   **A.**   Pardon?

03:18   15   **Q.**   You had owned the property where this house was.

16   **A.**   Yeah.

17   **Q.**   And you had property that was on or near a lake?

18   **A.**   I have --

19   **Q.**   I apologize.  I'll try to talk louder.  You have property

03:18   20   that's on or near a lake?

21   **A.**   The -- where we got our trailer and that, that there is

22   Corps -- Corps land, but they give it back to the tribe now, so

23   it's tribal land.

24   **Q.**   And I think you'd said on direct examination that people

03:19   25   would kind of come over to your house for family gatherings?

1  A.   Yeah, they'd come over there or we'd go to Daylon's.

2  Q.   Okay.  And you --

3  A.   He had a big house.

4  Q.   And Daylon, he has the big house.  How far was that away

03:19   5  from the house that had burned down?

6  A.   Just about three-quarters of a mile.

7  Q.   Okay.  And when these family gatherings would happen,

8  people would spend time at the lake, right?

9  A.   Yeah.

03:19   10  Q.   Okay.  And you would have people on your property.

11  Sometimes Mxxxx would come over to your home?

12  A.   Who would come over?

13  Q.   Mxxxx, she'd come and visit you or visit Haylon?

14  A.   She was over there -- there's a Thanksgiving when she said

03:19   15  that happened to her.  She was there.

16  Q.   So Mxxxx was at your home?

17  A.   Then she was back to our place again about three years

18  ago, or so, something like that.  They got pictures of it.

19  Q.   Okay.  And Nxxxx would sometimes spend time at your home?

03:20   20  A.   Yes, she did.

21  Q.   She'd sleep overnight?

22  A.   Yes, she would.

23  Q.   And Ivetta would leave Nxxxx with you for periods of time

24  because Nxxxx would play with Haylon.

03:20   25  A.   Yeah, she'd -- Nxxxx stayed with us more than any of them,

348

1   but she'd -- Ivetta would leave her maybe when she went to

2   Denver or someplace.

3   **Q.**   Okay.

4   **A.**   She'd leave her there about two or three days.

5   **Q.**   And, sir, Sxxxxxx would also visit you on your property or

6   Daylon's house?

7   **A.**   Yes, but she never stayed over.

8   **Q.**   Okay.  But she spent time with Haylon.  She was playing

9   with Haylon.

10  **A.**   Yeah.

11  **Q.**   And this occurred between 2009 and 2014.

12  **A.**   That she stayed over?

13  **Q.**   Well, these were the time -- around that time range, that

14  five-year time range, those three children would spend time at

15  your property.

16  **A.**   Two of them would.

17  **Q.**   Okay.

18  **A.**   Mxxxx -- Mxxxx was probably only there twice, you know.

19  She wasn't at -- probably just at my house twice -- or once.

20  She was at Daylon's once.  She -- she hardly ever comes around.

21  **Q.**   But Sxxxxxx and Nxxxx were at your homes multiple times

22  during that time period.

23  **A.**   Nxxxx was, but Sxxxxxx, she'd come over every once in

24  awhile.

25  **Q.**   Okay.

349

1   **A.**   Like it would be on a Sunday.  She'd want to come over

2   after church.

3   **Q.**   Okay.

4   **A.**   So then I'd take them down to the river, and --

03:21   5   **Q.**   Okay.  And I want to talk a little bit about that, if

6   that's okay?

7   **A.**   Yeah.

8   **Q.**   Okay.  So, sir, when you say you took them down to the

9   river after church, are you referring to Nxxxx or Sxxxxxx?

03:21   10   **A.**   A lot of times they'd both come.

11   **Q.**   Okay.  And so take me through how you --

12   **A.**   Then I had the two Benson boys, and I'd pick up, you know,

13   all the kids, or --

14   **Q.**   And I think you mentioned a --

03:22   15   **A.**   -- Joey.

16   **Q.**   -- truck.  It was a '71 pickup that you had?

17   **A.**   A '71 that one summer I was talking about.

18   **Q.**   And you had that at the time, though, when these children

19   were young?

03:22   20   **A.**   Did I have that what?

21   **Q.**   Did you have it at the time when, let's say, Sxxxxxx

22   and --

23   **A.**   I still got it.

24   **Q.**   Okay.  You still have it.

03:22   25   **A.**   Yeah.

350

1   **Q.**   And you had mentioned that you let the girls -- or you let

2   people sit on your lap when you would drive?

3   **A.**   They didn't sit on my lap.  They sit between my legs right

4   here, and --

03:22   5   **Q.**   Yes, sir.

6   **A.**   -- I'd move the seat back, and then they drive.

7   **Q.**   And, sir, I just have -- the question I have is, who would

8   actually sit between your legs, which -- which people?

9   **A.**   Haylon would.  He'd do it.  And Sxxxxxx wouldn't, but

03:22   10   Nxxxx would.

11   **Q.**   Okay.  So Nxxxx would?

12   **A.**   Just Nxxxx and Haylon, the only ones I know.

13   **Q.**   And would you -- would you ever pick up Nxxxx at Ivetta's

14   home to take her someplace?

03:23   15   **A.**   I'd pick her up after church, yeah.

16   **Q.**   Okay.

17   **A.**   And then I'd be taking her home, and she'd say, "Can I go

18   -- can I go back with you?  Can I go back with you guys?"  I'd

19   say, "Well, you got to ask your folks."  And then she'd say,

03:23   20   "You ask them because they won't let me go if I ask them."  So

21   we'd pull in, and Ivetta come out, and I'd just tell her, you

22   know, she wants to go to our place.

23   **Q.**   And were there -- there were times where you would ask

24   Ivetta if Nxxxx could go play with Haylon, right?

03:23   25   **A.**   How many times I asked her that?

351

1  **Q.**   No, but you -- you'd asked, at least sometime, for Ivetta

2  to allow Nxxxx to play with Haylon, right?

3  **A.**   Yeah, she always let her go over there.

4  **Q.**   But you would ask for that to happen.

03:23   5  **A.**   Sometimes she'd ask.  And, yeah, then when she didn't want

6  to, why, she'd say, "You ask.  You ask."

7  **Q.**   And it was the same way with Sxxxxxx.  You would ask

8  Travis or Crystal if Sxxxxxx could play with Haylon.

9  **A.**   Sxxxxxx would usually ask herself.

03:24   10  **Q.**   Okay.  But was there ever a time --

11  **A.**   Once in awhile when --

12  **Q.**   I'm sorry, sir.  I didn't mean to interrupt.  Please

13  continue.

14  **A.**   Well, maybe once in awhile, you know, I'd ask her when she

03:24   15  wanted me to.

16  **Q.**   Okay.

17  **A.**   She'd say, "You go ask if I can go with you."  If we're

18  going to the river, so I'd say, "Hey, I'm going to the river.

19  I'm taking them with me."  They knew where she was going.

03:24   20  **Q.**   Okay.  So when you say "they," who are you referring to?

21  **A.**   Travis and Crystal.

22  **Q.**   And at some point did Travis and Crystal leave Sxxxxxx

23  with you when they went to Cancun?

24  **A.**   They never left her with me when I went to canteen (sic).

03:24   25  They left Cheyenne with us.

352

1   Q.   Okay.

2   A.   They keep saying they left her.  She never stayed with us.

3   Q.   Okay.  Did she ever stay with Daylon that you know of?

4   A.   She ever what?

03:25   5   Q.   Stay with Daylon.

6   A.   Not that I know of.  Cheyenne stayed with us, the oldest

7   one, because she had bad grades, and they left her there that

8   one year.  They didn't take her.

9   Q.   And I think you had mentioned, just kind of going back,

03:25   10   that Nxxxx had slept over at your home, right?

11   A.   She what?

12   Q.   Had slept over at your house?

13   A.   Yeah.

14   Q.   Where would -- where would she sleep?

03:25   15   A.   Pardon?

16   Q.   Where in the house would Nxxxx sleep?

17   A.   Sometimes she'd sleep on the couch, and sometimes she'd

18   sleep on the floor.  A lot of times Haylon was sleeping there

19   on the couch, and she'd sleep on the floor.

03:25   20   Q.   Okay.  And during those times, where would -- where were

21   you sleeping during these times, which room of the house?

22   Which room of the house were you sleeping in when -- whenever

23   Nxxxx was sleep over?

24   A.   Oh, they got a -- I slept in my bedroom.

03:25   25   Q.   Okay.

353

1  A.   I got my own room.

2  Q.   And you -- you still have a workshop on your property,

3  sir?

4  A.   Yes, I do.

03:26   5  Q.   What kind of a workshop is it?

6  A.   It's just a little Quonset kind of where you could keep

7  your tractor in the wintertime and work on it and -- or put

8  your pickups in there and change the oil and --

9  Q.   Okay.  Is it --

03:26  10  A.   It's a little -- it ain't too big.  It's, oh, I'd say

11  about a 40-by-30.

12  Q.   Okay.  A 40-by-30.  And how far is it away from the house

13  that had burnt down?

14  A.   It's about, oh, 25 yards.

03:26  15  Q.   Okay.  So at some point did you -- you asked Nxxxx to help

16  you at the workshop?

17  A.   What she's talking about is I was doing a field over by

18  their place, and when I was doing that field, well, my blades

19  on the -- it's a swather.  It's a rotary, but we just got it,

03:27  20  and it spins in circles.  They got a bunch of little blades on

21  all these deals and it spins in circles.  And when I was

22  watching them, it wasn't cutting good, so I was going to change

23  those blades, so I got out and went under there and I start

24  changing the blades, and -- but every time I'd pull on one, it

03:27  25  turned.  It kept turning.

354

1        So Ivetta and Dave's house was only about a half mile

2   away, so I drove in my pickup to go get Anthony.  And when I

3   got over there, they said Anthony is at his girlfriend's place

4   in Killdeer.  Then Ivetta said, "Take Nxxxx.  She could -- she

03:27   5   cold hold that."  So I -- so I said okay, she could probably do

6   it.  I had a big wrench over there, so she come out.

7        We got over to the fields, and then she was trying to

8   hold the wrench.  And then I was pulling on the bolts, trying

9   to loosen them to change that, and it was still kind of

03:27   10  spinning because she couldn't hold it.  So then I said, "Well,

11  we'll just take it back down."  We left our pickup there.  That

12  tractor has got a double seat in there, so she sat down here

13  and we drove my swather back down there to change the blades.

14       Then I put a cardboard down underneath and crawled --

03:28   15  you could lift those flaps up and crawl under there.  And I

16  went and got a bigger wrench, like a pipe wrench where you

17  could put on there.  And she was holding that, and I was taking

18  the blades off and changing them.  And finally she got tired

19  and she said, "I'm going to get out and get a drink of water."

03:28   20  You know, it's all dirty and dusty under there.  It's like,

21  yeah, go ahead.  So she got out, and then I got out too.  I got

22  a drink.  And we was out in front of the shop.

23       And then I says -- well, we only had about maybe four

24  left to do, so I went out and said, "Well, let's go, if you

03:28   25  could hold that."  And then she said, "No, you know, I don't

355

1  want to go back under there."  So I was like, "Come on."  I

2  grabbed her hand.  I said, "Come on."  I said, "It won't take

3  long."  Then she jerked it back and she kind of stumbled a

4  little bit and she said, "No, I ain't going back under there."

03:29  5  I couldn't blame her because it was all dirty and dusty, and

6  that, so she -- I said okay.

7          Then I just went under there, and I found a bar and I

8  stuck it down in one of those holes, and that's how I -- you

9  know, so I finished.  She went up to the house.  She walked up

03:29  10  to the house.  Well, when I tried to grab her hand, that's when

11  she pulled out her phone.  She did try to call.

12  **Q.**   Okay.

13  **A.**   But her dad -- or her grandpa didn't answer.

14  **Q.**   Okay.  And I want to go back up a little bit.  I

03:29  15  appreciate you --

16          THE COURT:  Mr. O'Konek, I think we're going to take

17  a break here.

18          MR. O'KONEK:  Yes, sir.

19          THE COURT:  My court reporter has been going quite a

03:29  20  while as well.  We're going to take just a 15-minute break, and

21  then we'll continue with the questioning.  So please don't

22  visit amongst yourselves during the short break, and we'll see

23  everyone back in about 15 minutes.

24          (A recess was taken from 3:29 p.m. to 3:46 p.m., the

03:46  25  same day.)

356

1      THE COURT:  We're back on the record.  We'll continue

2  with the questioning of Mr. Spotted Bear.  Mr. O'Konek.

3      MR. O'KONEK:  Thank you, Your Honor.

4  Q.   (MR. O'KONEK CONTINUING)  Mr. Spotted Bear, where we just

03:48  5  left off is you were talking about Nxxxx at your workshop and

6  that she had made a phone call to her grandfather.  Could you

7  kind of briefly describe what happened?

8  A.   Yeah, after she got her drink of water, and that, and I

9  got mine, I tried -- tried to get her to go back, you know, to

03:48  10  hold that, and she didn't want to.  So I just grabbed her hand

11  and said, "Yeah, come on.  Help me out here, finish up.  We

12  ain't got much to do," I said, and I grabbed her.

13      And then that's when she pulled out her phone and

14  start -- she pulled it back and she said, "No, no, I don't want

03:49  15  to," and she start, you know, speed dialing, I guess.  But

16  she'd dial, and that, and so I just let her go.  Then I

17  thought, well, okay, but -- and she -- her grandpa didn't

18  answer her or -- like she said he didn't, you know.

19      And so I just went back under there myself.  And she

03:49  20  said, "I'm going up to the house."  And I said, "Okay."  I

21  said, "I'll finish up," and I put that bar in there.  Then I

22  finished changing all the blades.  I had to use that bar and

23  then stop the thing from turning.

24  Q.   Okay.

03:49  25  A.   So then I got to finish all my blades, and then I went up

357

1    -- then I walked up to -- then she was sitting outside on the
2    swing when I got there.  Then when I went in the house, all she
3    said, "I'm hungry," she said.  I said, "What do you want, a
4    sandwich?"  She said, "Yeah."  So I went in and made her a
5    sandwich, and I give her pop to drink and probably some chips
6    or something with it.

7            Then the phone rang, so I went over and answered the
8    phone, and it was my sister, Ivetta.  She -- I talked to her.
9    She said, "What did -- what's Nxxxx speed dialing her grandpa
10   for?"  I said, "Oh, she wants a ride home.  She don't want to
11   -- she's tired of working."  And she was eating at the table
12   then when I was talking to Ivetta.  She said, "Well, he's
13   coming over on the bike," she said.  So I said, "Okay."  Then I
14   put it down and I told her, "Your grandpa is coming to get
15   you."  I said, "So you go on."

16           That's when I give her $50 because, you know, she's
17   helping me out.  She got all dirty.  And I pay all -- all the
18   -- anybody that helps me like that.  You know, I give them good
19   money.  I pay them, and so I paid her that $50.  And he came,
20   and I went to the door, let him in, and we talked and -- while
21   she was eating, but then when she got done eating, then she
22   went outside and they left.

23   Q.   Okay.  And just to stop you there, Mr. Spotted Bear, at a
24   certain point, though, you said that you grabbed Nxxxx.

25   A.   Pardon?

358

1  **Q.**  You said you had grabbed Nxxxx.

2  **A.**  I had her hand, yeah.  I said, "Come on," tried to, you

3  know --

4  **Q.**  Why were you grabbing Nxxxx?

03:51    5  **A.**  Why did I grab her?  I needed help.

6  **Q.**  Okay.  And what --

7  **A.**  I wasn't trying to molest her like she said.

8  **Q.**  Okay.  But how --

9  **A.**  I didn't pull down her pants at all.

03:51    10  **Q.**  And, sir, just so --

11  **A.**  We ain't got no big tractor tires in the garage.  We got

12  maybe, you know, a truck tire or something like that, but we

13  ain't -- I call Cenex and them guys to come out and change my

14  big tires.

03:51    15  **Q.**  Okay.  But you have tires in the workshop, right?

16  **A.**  There might have been tires in my shop, you know.  There's

17  tires in everybody's shop.

18  **Q.**  And if I can ask, so when you grabbed Nxxxx by the hand,

19  how did she react?

03:52    20  **A.**  She just pulled back, like I said.  Then she grabbed her

21  phone and she start just, you know, speed dialing or whatever

22  they call it.

23  **Q.**  And this is when she was nine.

24  **A.**  This is when she was done?

03:52    25  **Q.**  When she was nine years old.

1   **A.**   Oh, I don't know how old she was.

2   **Q.**   Well, what would be your best guess as to how old she was

3   at this point?  It might -- I know it might be hard, but just

4   what would be your best guess as to how old she was?

03:52   5   **A.**   Probably nine because that's what she said, nine or ten.

6   **Q.**   Was this in the spring, summer, something else?

7   **A.**   Pardon?

8   **Q.**   Was this in the springtime, fall, summer?

9   **A.**   It was in July.  That's when we cut our hay.

03:52   10   **Q.**   And you mentioned that you gave Nxxxx $50.  Was that for

11   the work that she had done at the shop that day?

12   **A.**   Yes.

13   **Q.**   Okay.

14   **A.**   Or in the field too.  We worked out there trying to get it

03:52   15   -- like I said, it was all dirty, and she crawled under one of

16   those swathers.  There's dirt and itchy stuff, and you get

17   dirty.

18   **Q.**   And I want to talk about Sxxxxxx a little bit.  At some

19   point you -- when Sxxxxxx was about six, Haylon would have been

03:53   20   about six.  You helped Sxxxxxx find her iPad, didn't you?

21   **A.**   Sxxxxxx?

22   **Q.**   Yeah, Sxxxxxx or Haylon's iPad.  There's a point where you

23   helped her try to find it, didn't you?

24   **A.**   Helped her buy it?

03:53   25   **Q.**   Helped her find it, locate where it was.

1  **A.**   Oh, I thought you said buy it.

2  **Q.**   No, I apologize.  I sometimes talk too fast when --

3  **A.**   When me and Haylon and Sxxxxxx was -- we were down the

4  river, and those guys were swimming, and I was walking around

03:53  5  just by the bank, what I usually do, look -- kind of look for

6  rocks, and that.  And then I wanted to go to the next bay, so

7  just like I told them, I said, "Let's go to the next bay," I

8  said.

9       So we were driving around.  We went down in the --

03:54  10  it's kind of a little dip there, a coulee, and I got stuck, so

11  then I couldn't go forward, couldn't go back.  I was bogged

12  down there, so then I said, "Well, we got to walk home, I

13  guess."  So we start walking, and it started kind of

14  sprinkling, raining.

03:54  15      So when I got on a little -- kind of high hill,

16  because we're down in a coulee, and then I called Morley, my

17  boy.  So he said, "Yeah, I'll be down."  He said, "I'll come

18  down, pick you guys up."  He said, "Well, where you going to be

19  at?"  "We'll be walking on the road."  So we walked -- I

03:54  20  suppose we walked about three-quarters of a mile, and then we

21  met him.

22      Then when we were getting in the pickup, she lost --

23  she said, "I lost my" -- and I don't know what it was, her iPad

24  or a phone.  She's got a little pink one, so -- but it was kind

03:55  25  of raining, so we wanted to get out of there because it gets --

1 those roads get slick, so we went on home.

2 And then when -- when Travis and them were in Cancun,

3 I used to go over and check on Cheyenne.  I'd go over there

4 and, you know, make sure she's all right because a diabetic and

5 that, and -- and their house was pretty dirty, and I told

6 Cheyenne, "You ought to, you know, take some of this stuff and

7 clean it up, and that."  So then she said, "Yeah."  I said, "If

8 you put it in garbage cans, I'll come back and pick it up."

9 She said okay, so I was going back there later on, and then

10 I -- you know, she had about maybe two garbage cans full, and

11 that.

12 **Q.**   But going back to the iPad --

13 **A.**   Then we went down looking for her iPad.

14 **Q.**   Okay.  Can you take me through what you did to help

15 Sxxxxxx find the iPad?

16 **A.**   Yeah, I took her down and I asked her, I said, "Well, do

17 you want to go get that iPad?"  And she said, "Yeah."  So she

18 came with me.  We went and got -- jumped on my four-wheeler and

19 we went down there.  And I told her to look on this side, and

20 I'll look on that side when we got where we thought we were

21 going.

22 And we were going, and then she hollered, "There it

23 is," she said, and so I stopped and backed up, and she run and

24 got it.  It was in a couch or a -- it was down in the couch, so

25 she went and got it, jumped back on, and then -- then I took

362

1   her back home.  We went right in her house and I told Cheyenne,

2   I said, "Well, we found her iPad."  And she said, "Oh, good,"

3   and that was it.  What she said, I never did that.

4   Q.   Okay.  But the time that this happened, the search for the

03:56   5   iPad, was when Travis and Crystal, Sxxxxxx's parents, were in

6   Cancun.

7   A.   Were in Cancun?

8   Q.   That's what you had -- you had just said that Travis and

9   Crystal were in Cancun when you were looking for --

03:56   10   A.   I think that's where they were.

11   Q.   Okay.  Now I want to go a little bit into -- we talked a

12   little bit about Mxxxx.  You said that she would come over on

13   Thanksgiving.  Do you remember if Brad ever went hunting and

14   left Mxxxx alone with Haylon and you?

03:57   15   A.   Yeah, they'd always go hunting in the mornings, and that,

16   and I usually go with them, but that morning I -- I got up late

17   or did something.  I don't know.  I wasn't there, though, I

18   mean, go with them then.

19         But Haylon -- I was laying on the couch and watching

03:57   20   TV.  Here come Haylon and start messing with me, so I grabbed

21   him and took him down and start kind of beating on him and give

22   him -- kind of hit his chest.  Here's the Indian torture, like

23   that, and then he start hollering for Mxxxx.  "Mxxxx.  Mxxxx."

24   There was a bunch of other kids there too, but she just come

03:57   25   running and grabbed my neck and start pulling me off.  And I

1    said -- later I said, "She must have been wrestling with her

2    brother," you know.  She wrestled like a boy, but I -- you

3    know, I just reached around and pulled her over and put her

4    down, you know.  Then I made them quit, you know, give them

5    snake bites or --

6    **Q.**   You were horsing around with them?

7    **A.**   So, yeah, just trying to make them leave me alone.

8    **Q.**   But you were wrestling with Mxxxx.

9    **A.**   And Haylon.

10   **Q.**   Okay.  But you were wrestling with both of them?

11   **A.**   Yeah.

12   **Q.**   And Mxxxx was probably seven years old.

13   **A.**   She was what?

14   **Q.**   Probably seven years old.

15   **A.**   Oh, I don't know.

16   **Q.**   Well, what would -- what would you say?  What would be

17   your best guess?

18   **A.**   Okay.  I'll say seven years old.

19   **Q.**   Okay.  And at any point did you go upstairs alone with

20   her?

21   **A.**   Yes, I did.  I went up there after they quit, and I laid

22   down on the couch up there, and here they come again.

23   **Q.**   Okay.

24   **A.**   They come up there and they start pulling the -- and I had

25   a blanket behind my head.  They went and pulled that, and they

1   start bugging me again, you know, both of them.

2   Q.   But you were alone with Mxxxx at some point.

3   A.   No, I wasn't.  Haylon was right there.

4   Q.   Okay.

03:59   5   A.   She said, "Yeah, he went up the steps and turned around."

6   That there is -- she probably said that just to help Travis

7   out.

8   Q.   Okay.  And, sir --

9   A.   They were both right there, and I made them quit again.

03:59   10   Q.   Okay.  But I want to go --

11   A.   And that --

12   Q.   I want to go into --

13   A.   That balcony, that you can look right down there.  It's

14   all open and --

03:59   15   Q.   And, sir, you'll get a chance to answer some of the

16   questions, but I'd ask that you just respond to the questions

17   I'm asking.  I don't want to interrupt you, sir.  But you had

18   mentioned earlier that you wrestled the girls.  Were you

19   talking about wrestling with all three girls, Nxxxx, Sxxxxxx

03:59   20   and Mxxxx?

21   A.   Not all at the same time.

22   Q.   But at certain times you'd wrestle with those three

23   individuals.

24   A.   Yeah, they'd stay over, and like I said, Haylon would be

03:59   25   the instigator, and as soon as he hollers, they'd run over and

365

1   jump in.

2   **Q.**   Okay.  And you'd mentioned something about that you bit

3   the girls on the neck.

4   **A.**   You know, just make -- they'd scream and holler and, "Are

5   you going to quit?  Are you going to quit?"  "Yeah, yeah,

6   yeah."

7   **Q.**   And you bit the girls on the ear.

8   **A.**   I didn't bite them.  I just, you know, like I was going

9   to.

10   **Q.**   Okay.  When you were doing this, you were alone with them.

11   **A.**   The house was -- my boy was there.  Haylon was there.

12   Ashlynn was probably there and other kids.

13   **Q.**   Okay.

14   **A.**   I wasn't alone with them.

15   **Q.**   Let me ask it this way --

16   **A.**   That was at Thanksgiving.

17   **Q.**   Mr. Spotted Bear, there were times where you were alone

18   with Nxxxx.

19   **A.**   No.

20   **Q.**   You've never been alone with Nxxxx your entire life.

21   **A.**   When I took her home.

22   **Q.**   Okay.  So when you took her home.  Were there any other

23   times where you've been alone with Nxxxx, just the two of you

24   in a room?

25   **A.**   Not that I know of.

366

1   **Q.**   Okay.  And what about Sxxxxxx?  Have you ever been alone

2   in a room in a house with Sxxxxxx?

3   **A.**   Nope.

4   **Q.**   Okay.  But you said earlier that you -- I believe I heard

5   you say that you were alone with Mxxxx, but Haylon had come in

6   as well, upstairs during the Thanksgiving time.

7   **A.**   I've never said I was alone with Mxxxx.

8   **Q.**   Okay.  Well --

9   **A.**   I said Haylon and Mxxxx was up there.

10  **Q.**   Okay.

11  **A.**   Haylon won't leave until -- he's the last one to leave.

12  When you're wrestling with him, he stays there until the end.

13  **Q.**   Okay.  And, now, you saw the photographs of the girls that

14  we admitted as Government's Exhibit 3?  We published --

15  **A.**   Yes.

16  **Q.**   -- it?  Okay.  Now, those girls were on your property on a

17  trampoline together, right?  That was what was --

18  **A.**   That wasn't my property.  That's a -- Corps of Engineers

19  had it then.

20  **Q.**   But you had said earlier that you guys used the lake

21  that's -- the Corps of Engineers land, they kind of lease it

22  for --

23  **A.**   I said we got a cabin on there where they come, on Corps

24  land.  The Corps said we could keep that land there -- or that

25  cabin, and that, until --

1  Q.   And so, sir, you said that you can keep that land, but

2  that's --

3  A.   To use it, you know --

4  Q.   But that's --

04:02
5  A.   -- for our area because that's the only place that we

6  really had to go to the -- they blocked Number 8 off, so that's

7  the only place you could go to the lake, was right down through

8  that road there.

9  Q.   And, Mr. Spotted Bear, that picture depicted all three

04:02
10 girls in Twin Buttes, didn't it?

11 A.   Yeah, that was taken down there.

12 Q.   And that was one of the family gatherings where all three

13 girls were on or near your property.

14 A.   The Corps property, yeah, they were down there.

04:02
15 Q.   And the Corps property is near your land.

16 A.   No.

17 Q.   Okay.  Well, let's talk about what happened after the

18 girls had disclosed that you had molested them.  You called

19 Travis, didn't you?

04:02
20 A.   Yeah.

21 Q.   Okay.  And you called Travis, and you were upset.

22 A.   I said, "what's going on?"

23 Q.   Well, but I guess question was, you were upset, weren't

24 you?

04:03
25 A.   Yeah.

368

**Q.**   And you wanted to know who the other child was who was
saying that you molested her.

**A.**   Yeah.

**Q.**   And you told them that those allegations could send you to
prison.

**A.**   I said, "What you're saying is slander."  I said, "And
that could send me to prison, yeah, what you're saying about me
doing that to them."

**Q.**   And that made Travis upset, didn't it?

**A.**   Well, he's always upset.

**Q.**   Okay.  Well, I guess my question was, at that time was he
upset?

**A.**   Yeah, he start -- said, "I got nothing to do with it.
It's in the Feds' hands now."  He said, "I got -- me and
Crystal got nothing to do with it."

**Q.**   Okay.  And then in April of 2016, shortly after Easter,
you went to Ivetta Spotted Bear's home to speak about Nxxxx's
disclosure of you molesting her, didn't you?

**A.**   No, I didn't know she was at -- the girl at the time --
when Ivetta quit coming to church, well, I figure, well, maybe
it was one of her -- you know, over there, Nxxxx or one of
them.  So I went over there and knocked on the door, and the
door was open.  It was, you know, about that far open
(indicating).  I knocked, and nobody answered, and I hollered,
and nobody answered.

369

1        So I pushed the door in a little bit, and Ivetta was

2   standing there.  And I said, "Hey," because she -- first thing

3   she said, "Leave.  You got to leave.  I'll call the cops."  I

4   said, "Well, talk to me."  I said -- she said, "I'm going to

5   call the cops."  I said, "Well, can't you talk to me?"  She

6   said, "I'm going to call the cops," she said, so I just turned

7   around and walked away.

8   Q.   Okay.  And -- but that wasn't the only time.  You've been

9   out to try to speak with Ivetta or Nxxxx before and after that,

10  haven't you?

11  A.   I was up there what?

12  Q.   You've gone over there to try to talk to Nxxxx on other

13  times, haven't you?

14  A.   No.

15  Q.   You never have.

16  A.   After that?

17  Q.   Yes.

18  A.   No.

19  Q.   Okay.  What about --

20  A.   She was over there again.

21  Q.   What about Sxxxxxx?

22  A.   No, I didn't go to Sxxxxxx's either.

23  Q.   Okay.  Where did you go?

24  A.   Was I what?

25  Q.   Where did you go?  At any point did you try to speak with

1   Sxxxxxx and her family?

2   **A.**   No.

3   **Q.**   Okay.  Now, I want to go back to a few more things.

4   You've been in trial the entire time, is that right?

04:05   5   **A.**   Yeah, I was in trial before.

6   **Q.**   Well, no, I meant in -- today you've been in trial, right?

7   You've been able to view --

8   **A.**   Yeah.

9   **Q.**   -- and hear all the other witnesses.  That's right?

04:05   10   **A.**   Yeah, I was here.

11   **Q.**   And I want to talk about the first thing that Nxxxx had

12   stated.  She had stated that you licked her vagina, came under

13   the covers, essentially licked her vagina.  You're telling me

14   that that didn't happen.

04:05   15   **A.**   That didn't happen.

16   **Q.**   Okay.  But Nxxxx was sleeping in your living room.

17   **A.**   But --

18   **Q.**   Nxxxx was sleeping in your living room, wasn't she?

19   **A.**   Yeah, she slept there a lot of times.

04:06   20   **Q.**   Okay.  And there were times where you would get up in the

21   middle of the night and go and watch Nxxxx, right?

22   **A.**   Go watch her?

23   **Q.**   Yeah, sitting in a chair and watch her.

24   **A.**   Never did.

04:06   25   **Q.**   Okay.  Well, and then when Nxxxx was nine, you mentioned

371

1  that you had grabbed her, but you also placed her on top of a

2  tire, didn't you?

3  **A.**   Never did.

4  **Q.**   Okay.  You never did.  You -- you never pulled down her

04:06   5  pants?

6  **A.**   No, I just told -- told you that story a little while ago.

7  **Q.**   I know, and I'm asking the questions about what we're

8  ultimately here to determine.

9  **A.**   No --

04:06   10  **Q.**   So I have to ask --

11  **A.**   -- I never did that.  I told you the answers.

12  **Q.**   Okay.  Well, and when you were driving with Nxxxx between

13  your legs, you touched her vagina with your hand, didn't you?

14  **A.**   No.

04:06   15  **Q.**   Okay.  And Mxxxx -- you had mentioned Mxxxx was there at

16  your place during ultimately Thanksgiving, and you and Haylon

17  and her were up there.  Did you ever sit on a couch next to

18  Mxxxx?

19  **A.**   No.

04:07   20  **Q.**   You never sat on a couch next to her.

21  **A.**   Nope.

22  **Q.**   Okay.

23  **A.**   When we wrestled, we was on the floor.

24  **Q.**   Okay.  But you --

04:07   25  **A.**   They come up there.

1  Q.   But at a point you did put your hand on her leg, right?

2  A.   I don't know.  When you're wrestling, they're all over.

3  You're trying to push them away and get away and --

4  Q.   Okay.  So there's --

5  A.   And they're jumping on your back and pulling your neck

6  and --

7  Q.   But it's possible you touched her on the leg?

8  A.   Possibly touched her on the leg.

9  Q.   It's possible you might have touched her in the groin

10  area.

11  A.   I never did that.

12  Q.   Okay.  And, sir, the last few questions I have, when --

13  this entire event has kind of broken your family apart, hasn't

14  it?

15  A.   I suppose, yeah.

16  Q.   People have taken sides.

17  A.   They're what?

18  Q.   People have taken -- your family -- your extended family

19  have taken sides.

20  A.   Yeah.

21       MR. O'KONEK:  Okay.  That's all the questions I have,

22  Your Honor.

23       THE COURT:  Anything else, Mr. Bolinske?

24       MR. BOLINSKE:  Nothing else.  Thank you.

25       THE COURT:  Pardon?

1          MR. BOLINSKE:  Nothing else.

2          THE COURT:  All right.  Thank you, sir.  You may step

3   down.

4          THE WITNESS:  You're welcome.

04:08   5          MR. BOLINSKE:  I have one last witness.

6          THE COURT:  All right.

7          MR. BOLINSKE:  Jada Appel.

8                              <u>JADA APPEL</u>,

9   having been first duly sworn, was examined and testified as

04:09   10   follows:

11                      <u>DIRECT EXAMINATION</u>

12   <u>BY MR. BOLINSKE:</u>

13   **Q.**    Okay.  Would you just tell us your name, please?

14   **A.**    My name is Jada Appel.

04:09   15   **Q.**    Maybe you could pull the microphone just a little closer.

16   It looks like -- is that -- okay.  Jada Appel?

17   **A.**    Yes.

18   **Q.**    Okay.  And how old are you?

19   **A.**    I'm 13.

04:09   20   **Q.**    And do you go to school?

21   **A.**    Yes, I do.

22   **Q.**    Where do you go to school?

23   **A.**    Killdeer, North Dakota.

24   **Q.**    And what grade are you in?

04:10   25   **A.**    I'm in eighth grade.

1    **Q.**   And do you know why you're here today?

2    **A.**   Yes.

3    **Q.**   Do you know Nxxxx?

4    **A.**   Yes, I do.

04:10    5    **Q.**   Do you know Sxxxxxx?

6    **A.**   Yes, I do.

7    **Q.**   And why don't just tell us how you know Nxxxx and Sxxxxxx.

8    **A.**   I know Nxxxx (sic) from school.  I went to school with her

9    since pre-K, until fifth grade, I believe.

04:10    10    **Q.**   And that's Nxxxx?

11    **A.**   No, Sxxxxxx.

12    **Q.**   Oh, Sxxxxxx.  Okay.  So --

13    **A.**   And Nxxxx was a grade younger than me, so I also just knew

14    her too.

04:10    15    **Q.**   So for how many years have you known Sxxxxxx?

16    **A.**   I'm not sure how many years, but I remember just knowing

17    her from pre-K.

18    **Q.**   Pre-K until what grade?

19    **A.**   Fifth grade.

04:10    20    **Q.**   Fifth grade, so maybe five years?

21    **A.**   Yeah.

22    **Q.**   Something like that.  And Nxxxx would be about the same

23    amount of years?

24    **A.**   Yeah.  She was a grade younger, so --

04:11    25    **Q.**   And did you -- while you were in school with them or

1   around them, did you have -- were you around them at certain

2   times in your life?

3   **A.**   Recess, sometimes Boys and Girls Club.

4   **Q.**   Okay.  And tell us about the Boys and Girls Club.  I mean,

5   you know why you're here.  Tell us about an event that occurred

6   at Boys and Girls Club if you would?

7   **A.**   We were playing outside.

8   **Q.**   Now, describe "we."  I'm sorry.

9   **A.**   Me, Nxxxx and Sxxxxxx.

10  **Q.**   Okay.

11  **A.**   We were outside, and it was kind of cold so we were

12  standing by the tallest slide, and Sxxxxxx --

13  **Q.**   Do you know when this was?  I'm sorry.  I'll keep

14  interrupting, but month or year?

15  **A.**   Maybe the summer of 2014.

16  **Q.**   Okay.  Go ahead.

17  **A.**   We were by the tallest slide, and we were cold, so we were

18  just standing there.  And Sxxxxxx tells us that she has to tell

19  us something, and we were like okay, and so -- and I asked

20  her -- I was like, "Is this the thing you told us at the

21  Minnesota trip?"  And she said, "Yeah."  And so I was like

22  okay.

23         So she was like -- she was telling the story of when

24  she was with Haylon at Daylon's house -- Daylon Spotted Bear's

25  house, and his Grandma Diana wanted some -- no.  Daylon wanted

376

1  something from Lonnie's house, so Haylon and Sxxxxxx walked to

2  Lonnie's house and they went to go grab something.  Sxxxxxx

3  went and sat on the couch while Haylon went and got whatever

4  they needed.  I don't know what was needed, though.  They were

04:13  5  -- Sxxxxxx sat on the couch, and Lonnie walked over, sat by her

6  and started just talking to her and then started rubbing her

7  leg and --

8  **Q.**   And this -- this is what Sxxxxxx is telling you, the

9  story.

04:13  10  **A.**   Yes, the story at the park.

11  **Q.**   Okay.  Continue.

12  **A.**   He was rubbing her leg and her arm and her chest area.

13  **Q.**   Okay.  And did she say anything more?

14  **A.**   Afterwards she was just like that she felt like -- she

04:13  15  felt uncomfortable.  And afterwards Haylon had said that he'd

16  got whatever Daylon wanted, so as soon as he said that,

17  supposedly Lonnie stopped whatever he was doing, and Haylon and

18  Sxxxxxx walked back to Daylon's.

19  **Q.**   And were you with Sxxxxxx on another occasion when she

04:13  20  said a different version of this story?

21  **A.**   Yes, the Minnesota trip, May 2014, for the end of the year

22  school field trip.  She had told me, Taylor Morsette, Kaydence

23  Little Owl, Lexi Starr.  We were all in a room telling stories,

24  and Kaydence had told a story, and then Sxxxxxx is like, "Okay,

04:14  25  I'm going to tell you guys a story," and we're like okay.

377

1    So she had told us her and Haylon were at Daylon's,

2    and then Haylon wanted to go get his iPad at Lonnie's house, so

3    then they walked to Lonnie's house to go get the iPad.  And

4    Sxxxxxx was looking underneath the cushion, and Haylon was in

04:14    5    another room, and Lonnie came over and pushed her and then kind

6    of like sat by her and then started rubbing her leg and

7    touching her in areas she didn't like to be touched.

8    Q.   Okay.  And was this the same story that she had told

9    before?

04:15    10    A.   No.  The first time she told the story was in Minnesota.

11    And then the second time she told was at a Boys and Girls Club

12    at the park, but it was different.

13    Q.   And was Nxxxx at either of these events?

14    A.   At the park at the Boys and Girls Club.

04:15    15    Q.   And so Nxxxx then heard this story.  Is this the second

16    story Sxxxxxx told or first?

17    A.   The first story was the Minnesota trip, where it was just

18    me, Lexi Starr, Taylor Morsette, and Kaydence.

19    Q.   Okay.  And the second trip then Nxxxx was at?

04:15    20    A.   Yes.

21    Q.   And that's when Sxxxxxx told a different version of the

22    story you heard earlier?

23    A.   Yeah.

24    Q.   And --

04:15    25    A.   In my mind I was like --

378

1  **Q.**   Okay.

2  **A.**   -- this is kind of different, but I didn't want to say

3  anything.

4  **Q.**   And did Nxxxx say anything at that time that you remember?

04:16   5  **A.**   She just said that she had always felt uncomfortable

6  around him, but nothing more.

7  **Q.**   Okay.  So she didn't say anything against Lonnie other

8  than, well, kind of validated Sxxxxxx's story.

9  **A.**   Yeah, she just said that she felt uncomfortable.

04:16   10  **Q.**   And you've been around Sxxxxxx for, you said, about five

11  years.

12  **A.**   Five, six years, yeah.

13  **Q.**   And can you tell us, do you think Sxxxxxx is a truthful

14  person?

04:16   15  **A.**   Well, there's always drama, and lies would always be made

16  up in school.  And we'd always have talks about like different

17  lies and rumors about other girls.

18  **Q.**   And Sxxxxxx would be part of these lies and rumors?

19  **A.**   Yeah, there'd be like Sxxxxxx and another girl against a

04:16   20  whole bunch of other girls.

21  **Q.**   Okay.  And so do you think what Sxxxxxx is saying about

22  Lonnie is true?

23         MR. O'KONEK:  Objection, calls for speculation.

24         THE COURT:  Sustained.

04:16   25  **Q.**   (MR. BOLINSKE CONTINUING)  Do you believe Sxxxxxx?

379

1          MR. O'KONEK:  Objection, calls for -- irrelevant.

2          THE COURT:  Sustained.

3   **Q.**   (MR. BOLINSKE CONTINUING)  Did Nxxxx appear to be telling

4   the truth to you, your observation?

5          MR. O'KONEK:  Objection, calls for speculation.

6          THE COURT:  We need to move on to more appropriate

7   questions.  I sustained the objection.  We can't vouch for

8   credibility of witnesses through any witness, layperson or

9   expert.

10  **Q.**   (MR. BOLINSKE CONTINUING)  You've mentioned this before,

11  but do you think Sxxxxxx is an honest person?

12  **A.**   Not most of the time, no.

13         MR. BOLINSKE:  Okay.  Thank you.  That's all I have.

14         MR. O'KONEK:  No questions, Your Honor.

15         THE COURT:  All right.  Thank you.  You may step

16  down.

17         MR. BOLINSKE:  The defense would rest, Your Honor.

18         THE COURT:  All right.  Mr. O'Konek, do you envision

19  any rebuttal?

20         MR. O'KONEK:  No, Your Honor, no rebuttal from the

21  United States.

22         THE COURT:  So the government rests.

23         MR. O'KONEK:  Yes, Your Honor.

24         THE COURT:  All right.  So, members of the jury,

25  you've heard all the testimony and the evidence that you're

going to hear in this case.  We're at that point in time where

we're going to recess for the day.  I need to visit with the

attorneys about the final jury instructions and a verdict form,

all of which we'll take care of between now and the end of the

workday.

       When you -- we'll reconvene until 9 o'clock tomorrow

morning, and at 9 o'clock, what's going to happen is that I'll

first read to you these final instructions.  That will take

15 minutes, or so.  And then the attorneys will present their

closing arguments to you, and then you will begin your

deliberations.

       Please this evening don't visit with anyone about the

case.  Don't attempt to do any research on your own about this

case or anyone that's testified in this case or any issues that

have surfaced throughout the trial here.  Have a pleasant

evening.  We'll see you back at 9 o'clock tomorrow morning.

       (The jury exits the courtroom.)

       THE COURT:  We're outside the presence of the jury,

back on the record here.  I'll address renewal of any Rule 29

motions for judgment of acquittal and --

       MR. BOLINSKE:  The same motion.

       MR. O'KONEK:  It would've been the same response,

Your Honor.

       THE COURT:  And for the reasons that I previously

enumerated after the government had rested its case, the

1    Rule 29 motion for judgment of acquittal is denied.  There's

2    sufficient evidence from the testimony of the three young

3    ladies alone to sustain a verdict on all four counts, and I

4    enumerated in much more detail in my previous ruling my

5    conclusions for that reasoning.  I'll incorporate all of those

6    previously stated reasons into my decision renewing the -- or

7    the denial of the motion at the close of all the evidence.

8    This is a case for a jury to resolve, not a judge, and I will

9    let the jury decide all four counts.

10        In terms of the final jury instructions, has

11    everybody had a chance to look at those, or do you need some

12    time?  We can reconvene and meet tomorrow morning before trial

13    if you need more time.  I haven't included anything in the

14    final instructions out of the ordinary.  They're all rehashed

15    and a re-summary of the four elements.  And all of the other

16    instructions are pattern Eighth Circuit pre-approved

17    instructions that I've used in virtually every criminal case

18    that I've tried over the last 15 years.

19        MR. O'KONEK:  Yes, Your Honor.  I have no objection

20    to the instructions.

21        MR. BOLINSKE:  Yeah, they -- they look good to the

22    defense, Your Honor.  The only thing is --

23        THE COURT:  We'll delete the instruction about the

24    defendant not testifying and renumber all of the other

25    instructions accordingly.

382

1          MR. BOLINSKE:  Yep, no objection.

2          THE COURT:  All right.  And as to the verdict form?

3          MR. O'KONEK:  No objection.

4          MR. BOLINSKE:  It's easy enough, yep.

04:21     5          THE COURT:  All right.  So no objections --

6          MR. BOLINSKE:  No objections.

7          THE COURT:  -- or exceptions?  Very well.

8          In terms of the closing arguments, I don't put time

9   constraints on lawyers.  You've all been around long enough,

04:21    10   tried enough cases, read all the studies.  You know how long

11   juries can pay attention to closing arguments, and if you

12   choose to make it long, you always are at risk of putting a

13   jury to sleep, so do whatever you feel that you need to do in

14   closings.

04:21    15          I'll read the instructions to them first, and then

16   you're free to use any of those instructions in your closing

17   arguments.  You're free to use the verdict form as you see fit

18   in closing arguments.  Any questions about what you can and

19   what you cannot do in closing arguments in front of me?

04:22    20          MR. O'KONEK:  No, Your Honor.

21          MR. BOLINSKE:  No, Your Honor.

22          THE COURT:  All right.  Just to get a ballpark gauge

23   of how long each of you think that you will take on your

24   closings, can you give me your best guesstimate?

04:22    25          MR. O'KONEK:  About 20 minutes, Your Honor.

1          MR. BOLINSKE:  I would think that would be about the

2     same.

3          THE COURT:  All right.  And in terms of all the

4     exhibits that go back to the jury, I let them take everything.

04:22   5     We usually have an IT specialist set up a laptop computer if

6     they wish to watch DVDs or -- anyone have a problem with that?

7          MR. O'KONEK:  No, Your Honor.

8          MR. BOLINSKE:  No.

9          THE COURT:  Okay.  Any other legal issues, motions,

04:22   10    concerns of any sort that either of you have?

11         MR. O'KONEK:  No, Your Honor.

12         MR. BOLINSKE:  Nothing, Your Honor.  Thank you.

13         THE COURT:  All right.  Then we will stand in recess

14    until 9 o'clock tomorrow morning.

04:23   15         (A recess was taken from 4:23 p.m., Wednesday,

16    September 13, 2017, to 8:56 a.m., Thursday, September 14,

17    2017.)

18                    - - - - - - - - - -

19

20

21

22

23

24

25

1          (The above-entitled matter came before the Court, The

2     Honorable Daniel L. Hovland, United States District Court

3     Judge, presiding, commencing at 8:56 a.m., Thursday, September

4     14, 2017, in the United States Courthouse, Bismarck, North

5     Dakota.  The following proceedings were had and made of record

6     in open court with counsel and the defendant present, but out

7     of the presence of the jury.)

8                - - - - - - - - - - -

9          THE COURT:  We'll open the record in the case of

08:56    10   *United States versus Lonnie Spotted Bear*.  We're outside the

11     presence of the jury with both counsel and the defendant.  Mr.

12     O'Konek.

13         MR. O'KONEK:  Yes, Your Honor.  So I apologize.  I

14     caught this morning as I was going through everything that we

08:57    15   always charge in the conjunctive in the Indictments, and I --

16         THE COURT:  Right.

17         MR. O'KONEK:  -- noticed that two of the counts,

18     Counts 3 and 4, had conjunctive versus disjunctive language,

19     the "and" versus the "or."  And since the sexual contact

08:57    20   language and sexual act languages contain the "or" language, in

21     order to match that up and not confuse the jury, I just

22     requested that it match those definitions with the "or" instead

23     of the "and."

24         MR. BOLINSKE:  I can't disagree with that.  No

08:57    25   objections.

385

1          THE COURT:  All right.  So is this -- is the one that

2     I have here the one with new changes, or --

3          THE CLERK:  That's before changes.

4          (A brief discussion was had off the record.)

08:58   5          THE COURT:  Those just on Counts 3 and 4?

6          MR. O'KONEK:  I believe so, because I think Counts 1

7     and 2 only just have contact between the mouth and the vulva,

8     so it doesn't have an "or" for either -- or an "and" for either

9     of those.

08:58   10          THE COURT:  So that we're all on the same page about

11    the changes, when we turn to F-6, Element 1, the fourth line,

12    it's -- the "ands" are going to be deleted and replaced with

13    "ors," there's two "ors," correct?

14          MR. O'KONEK:  Yes, Your Honor.

08:58   15          MR. BOLINSKE:  Yes.

16          MR. O'KONEK:  "Or arouse or gratify," yes, Your

17    Honor.

18          THE COURT:  And you agree, Mr. Bolinske?

19          MR. BOLINSKE:  Yes, Your Honor.

08:59   20          THE COURT:  And then on Count 4, Element 1, the

21    second sentence, it'll read "directly or through the clothing"

22    rather than "and through the clothing," right?

23          MR. O'KONEK:  Yes, Your Honor.

24          THE COURT:  And then the fourth line should also be

08:59   25    changed where there's an "and" before "aroused or," and also

1   "or" on gratify -- before gratify, right?

2            MR. O'KONEK:  That is correct, Your Honor.

3            MR. BOLINSKE:  That is correct.

4            THE COURT:  Okay.  And those are the only changes

5   that I believe are necessary.  Do both of you agree?

6            MR. O'KONEK:  Yes, Your Honor.

7            MR. BOLINSKE:  Yes, Your Honor.

8            THE COURT:  So it's going to take a little time to

9   make the changes and then photocopy 12 copies or 14 or 15

10  copies.  So anything else?

11           MR. O'KONEK:  No, Your Honor.

12           MR. BOLINSKE:  No, Your Honor.

13           THE COURT:  All right.  So we'll get those changes

14  made, and as soon as we can get photocopies made for all the

15  jurors, we'll get everybody in here.

16           MR. O'KONEK:  Yes, Your Honor.

17           THE COURT:  We're off the record now.

18           (A recess was taken from 9:00 a.m. to 9:19 a.m., the

19  same day.)

20           (In open court with the defendant, counsel, and the

21  jury present.)

22           THE COURT:  Good morning to all of you.  Apologize

23  for the delay, but we will go back on the record in this case.

24  All parties, the defendant, the entire jury is present.  We've

25  set on each of your chairs a copy of the Final Instructions.

387

1  And, again, I'm required to read those to you.  You're welcome

2  to follow along if you wish.  After I finish reading those

3  instructions, then the attorneys will present their closing

4  arguments to you.

09:21  5  (The Judge reads the Final Instructions in open

6  court, pages 1 through 20.)

7  THE COURT:  These last few pages are general

8  instructions that I'll read to you after the closing arguments

9  have been presented to you.

09:32  10  Mr. O'Konek, you may present your closing argument at

11  this time.

12  MR. O'KONEK:  Thank you, Your Honor.  May it please

13  the Court, opposing counsel.  My job during closing argument is

14  to take the law that Judge Hovland just provided you and

09:33  15  explain how the elements of each of these counts relates to the

16  facts, the witness testimony, and the evidence you've heard

17  throughout this trial.

18  Now, as I stated at the beginning of the trial in

19  opening statement, this is a case about Mr. Spotted Bear

09:33  20  isolating three young girls, ages between six and nine -- or,

21  excuse me, four and nine, and after he isolated them, he

22  accosted them roughly in similar fashions.  And I ask that you

23  pay attention to the age of the children both now and at the

24  time that this happened, the access that Mr. Spotted Bear had

09:34  25  to these children, and the manner in which he accosted them.

388

1          But before I go into any of the elements, there's
2     been a lot of dates, a lot of times that have been thrown
3     around, a lot of names, and that can be confusing at times, so
4     I'd like to present a brief timeline about where we are.  And
09:34  5     this may be a little hard to read, but we've started roughly in
6     the 2009-2010 period.  And if you look at the right-hand side,
7     you see the dates of births of all of these three girls.  The
8     charges mirror in most cases the dates of the birth in a
9     one-year period.

09:34 10          And as the Judge instructed you in the Preliminary
11     Instructions, the date is not an element of the offense.  "On
12     or about" just means that it's reasonably close to when it
13     happened.

14          And as you look at what happened, Mr. Spotted Bear
09:34 15     first accosts Nxxxx in a living room when she's four or five.
16     The evidence of that is not only Nxxxx's testimony, but the
17     fact that we have the forensic interview.  The defendant
18     corroborates that she stays there and sleeps in the living
19     room.

09:35 20          Roughly around that time period or a year later Mr.
21     Spotted Bear accosts Mxxxx.  Again, you have the testimony of
22     Mxxxx.  You have the forensic interview that she did.  And,
23     furthermore, the defendant corroborated that he was with Mxxxx
24     in November, Thanksgiving time period, of 2009, went upstairs
09:35 25     with her and wrestled with her.

In 2010 to 2011, Mr. Spotted Bear accosts Sxxxxxx. The evidence you have is Sxxxxxx's testimony, her forensic interview, and corroboration from the defendant, who stated, "I helped her look for her iPad," when in 2009, roughly around this same time period, her family left her there when she went to Cancun.

In 2010 to 2011, Mr. Spotted Bear is accosting Nxxxx roughly when she's five or six by placing her on his lap or between his legs, touching her vagina.

In 2013, Mxxxx discloses this to her mother.  She discloses that, when I was seven, the defendant, he touched my -- my vagina over the clothing.  And she discloses that well before any of the other girls disclose it.  And I ask that you consider, why would Mxxxx tell her family this at that time if it didn't happen?  Why would she go through all this to testify, go through a forensic interview if it didn't happen?

Because in 2013 to 2014, Mr. Spotted Bear doesn't stop and he accosts Nxxxx, and this is in the workshop.  And the evidence you heard from this case is not only her testimony, but the forensic interview and the corroboration from the defendant.  He admits he took her to the workshop.  He admits she was working on the tractor.  Admits to grabbing her. He admits that she calls her grandfather, and, furthermore, admits that he paid her $50 after she wanted to leave.

And finishing the timeline, in 2015, in the fall,

1  Sxxxxxx discloses to Nxxxx when she's 11, "Mr. Spotted Bear
2  molested me."  In 2015, Christmas timeframe, early 2016,
3  Sxxxxxx discloses to her family.  You heard from Cheyenne.  You
4  heard from Travis.  She tells them that the defendant licked
5  her vagina.

6       And in February of 2016, Travis, the mother -- or,
7  excuse me, the father of Sxxxxxx is so distraught, he wants his
8  daughter to get help, but he doesn't want the police to be
9  involved.  He just wants help for his daughter.  So as you can
10 see from the 960 report in February, he takes his daughter to
11 counseling, says her great uncle has molested her, and that's
12 how this whole thing gets started.

13      After that happens in February in 2016, in March
14 of 2016, both Nxxxx and Sxxxxxx give forensic interviews where
15 they describe in detail how the defendant molested them.  And
16 then go back to January of 2017, Mxxxx does the same thing,
17 describes in detail how the defendant molested her.  And then
18 coming to today, yesterday and the day before, these three
19 girls got on -- they come into this courtroom with all of these
20 people.  They testify on that witness stand, and they
21 ultimately tell you in detail how Mr. Spotted Bear molested
22 them.

23      And as we look through the counts, I ask that you pay
24 attention to the timeline because it's important.  This isn't
25 an isolated incident.  This isn't something that happened one

391

1  time.  These girls had disclosed early.  They disclosed, and

2  sometimes people didn't believe them.  In Mxxxx's case, people

3  might not have believed they could get help.  They might have

4  believed their daughter, but didn't think law enforcement could

5  do anything.  In Sxxxxxx's case, her father just wants her to

6  get help.

7         And Nxxxx's case, as you heard from the defendant,

8  she's the one that was there all the time with him.  She's the

9  one that has the most trouble on the stand.  She's the one that

10 is going through a lot when all of this is going on.  And I ask

11 that you consider that because as we go through the counts, we

12 have to look at not just the elements, but what is the evidence

13 that corroborates the elements?  And I'd like to take a minute

14 to go through each of the different counts.

15        In Count 1, aggravated sexual abuse of a child -- for

16 all of these counts as we go through it, two of the elements

17 have already been proved through the stipulation.  That's the

18 Indian country nature and the Indian status.  That's been

19 stipulated to.  I won't go into that any further.

20        In terms of Count 1, though, that the defendant

21 engaged in a sexual contact, contact between the mouth and

22 vulva, vulva being the external genitalia of a female,

23 otherwise known as the vagina, the evidence that you got is

24 that the defendant licked Sxxxxxx's vagina, that he did it

25 because she was looking for an iPad.

392

1        And how does he do it?  He knows that she's six.  He

2   knows her family is away.  He isolates her by having her go

3   from Uncle Daylon's house to his house, pushes her down, pulls

4   down her pants, and licks her vagina.  And how do we know that

09:40    5   she's under the age of 12?  Well, she said she's six years old

6   on the stand.  She could have been five or six, and you heard

7   the forensic interview.

8        And there was a lot of talk in the opening statement

9   that there wasn't corroboration, and I want to go through that

09:40   10   now, so let's start with Number 1.  First, Mr. Spotted Bear, he

11   admits that Sxxxxxx spent time with her cousin on or near his

12   property.  Mr. Spotted Bear, when he testified -- or, excuse

13   me.  Mr. Spotted Bear asked Travis and Crystal for Sxxxxxx to

14   come out and play.  You have that from Travis, from Crystal.

09:41   15   They testified to that.

16        Point 3, Mr. Spotted Bear admitted to spending time

17   alone with Sxxxxxx.  He said that on the stand.  Travis and

18   Crystal stated that they left Sxxxxxx with Mr. Spotted Bear

19   when they went to Cancun in 2009.  Mr. Spotted Bear, when he

09:41   20   was on the stand, confirmed that Sxxxxxx was in Twin Buttes

21   when Travis and Crystal went to Cancun.  Mr. Spotted Bear

22   confirmed in detail that he helped Sxxxxxx find her iPad.

23        The defense made a big deal about this iPad, when it

24   was bought, but the defendant testified and said, "Oh, yeah, I

09:41   25   remember helping her find that iPad."  Why would he remember

393

1   that specific detail?  What was so important that he remembers

2   something that happened eight years ago, nine years ago?

3            You've also heard from Travis and Crystal.  They've

4   noticed changes in Sxxxxxx's demeanor.  You heard from Travis

09:42   5   and Crystal that Sxxxxxx is a truthful person.  Sxxxxxx

6   previously told Cheyenne.  She broke down and cried and told

7   her that Mr. Spotted Bear had licked her vagina.  And then,

8   finally, she tells a forensic interviewer.  She decides she's

9   going to tell them again.  She's going to go through this whole

09:42   10   process, keep talking with people about what happened.

11            Why -- what reason does Sxxxxxx have to lie about

12   this?  What reason does she have to lie by talking to Nxxxx

13   about what happened, talking to Cheyenne, her sister; her

14   parents, a forensic interview?  And then to get in this

09:42   15   courtroom and take that witness stand and say what happened as

16   a kid in front of all of these adults, what reason would she

17   have to lie?

18            So I ask that when you look at corroboration,

19   remember those ten points, because these instances, they

09:42   20   happened in private.  They happened when no one is around to

21   watch.  The United States was open at the beginning.  There's

22   no eyewitnesses.  There's no injuries.  There's no DNA

23   evidence, and that's because of the nature of the crime.

24            You heard that from Christal Halseth.  She told you

09:43   25   about how these instances happen and the effects on children.

1   And I ask that you look not just at the child's testimony, but

2   the effects that have happened to them, who they've told

3   before, how they've reacted.  It's important.

4          What also is important is we go to Count 2.  We look

09:43   5   at Nxxxx Hxxxxxx Exxxx, and this is the count that involves Mr.

6   Spotted Bear licking her vagina.  The first element is that he

7   engaged in a sexual act, contact between the mouth and the

8   vulva, again, outer organs of the female genitalia, also known

9   as the vagina.

09:43   10          She got on the stand and stated that the defendant --

11   she's sleeping in her grandfather's or Mr. Spotted Bear's home

12   in Twin Buttes on a mattress.  He -- she's in the living room.

13   Her grandfather is in a different room.  Haylon, her cousin, is

14   in a different room, and all of a sudden she wakes up to the

09:44   15   defendant under the covers, pulling down her pants, licking her

16   vagina.  She says she was four.  In the interview she says

17   five, but she's roughly four or five, so she's under the age of

18   12.

19          And what's important is there's corroboration for all

09:44   20   of that as well.  First, Mr. Spotted Bear admits that Nxxxx

21   spent time with her cousin on or near his property.  He said

22   that yesterday.  You heard from Ivetta that Mr. Spotted Bear

23   often would ask for Nxxxx to come over and play with Haylon,

24   much like he did with Sxxxxxx.  Mr. Spotted Bear testified

09:44   25   yesterday that Nxxxx stayed over at his house all the time.

395

1   She was there the most.  And when she was there alone, without

2   Ivetta, she would sleep in the living room on a mattress.  It

3   corroborates what Nxxxx -- what has happened to Nxxxx.

4           Most importantly, on the next count, which we'll get

09:45   5   to in just a second, Mr. Spotted Bear admits to taking Nxxxx to

6   his workshop, grabbing her on the arm.  He says she tries to

7   call using a phone.  He says she's got an app on her phone and

8   that he (sic) pushes it.

9           Prior to that the defense made a big deal about phone

09:45   10   records.  The defendant on the stand admitted that that call

11   had been made by her and the exact way Nxxxx said it happened.

12   And it might have sounded weird that she asked for $50, but the

13   defendant said, "I gave her $50."  And the way it sounded like

14   it happened was Nxxxx was trying to leave.  He grabbed her

09:45   15   hand, pulled her away, something bad happened, and he gave her

16   $50.

17           And that's an incident where, as you heard from

18   Nxxxx, he has her on a tire, tries pulling her down on the

19   pants.  Why is the defendant remembering this incident, all of

09:45   20   those details from something that would have happened four or

21   five years ago if nothing major happened?  Why would somebody

22   remember all of those details for something that was just a

23   regular day?  Just like with Sxxxxxx, why would he remember

24   about the iPad?  Why is he remembering this regarding the

09:46   25   workshop?  It's because he tried -- as he pulled down her

396

1   pants, he attempted to touch her genitalia.  That's what she

2   was afraid of because he had done it before.

3          And what's also important as we go through this, as

4   you can see in some of the other points, is that Ivetta

09:46   5   remembers Mr. Spotted Bear asking him (sic) to work at the

6   workshop, and the defendant specifically stated, "Yes, I came

7   over.  I asked for her to work, and she did."

8          Ivetta has noted changes in Nxxxx's demeanor.  Ivetta

9   testified that Nxxxx is a truthful person.  Ivetta remembers

09:46   10   that Nxxxx, when she was five or six, stated that Mr. Spotted

11   Bear had sat her on his lap or between her (sic) legs and let

12   her drive while he was in a truck.  Mr. Spotted Bear confirmed

13   that he did that.  And, again, Nxxxx previously told a forensic

14   interviewer that Mr. Spotted Bear molested her.

09:47   15          Why would Nxxxx get on the stand, testify in front of

16   all these strangers, go to a forensic interview before that?

17   When all this came out, it came out and she had to talk about

18   it.  You heard from Ivetta.  The moment that it comes up, she

19   asks, "Did this happen?"  Nxxxx can't even look at her.  She

09:47   20   looks away and just starts crying.

21          And as we look at Count 3, we've already gone through

22   some of them, but the first element is -- it's an attempt.

23   It's a different type of a charge.  It shows that the defendant

24   had to take a substantial step to engage in a sexual act.  In

09:47   25   this case the sexual act was to touch the genitalia.  And when

1   you hear not over the clothing, it means he would have

2   attempted to go -- touch skin to skin.

3              And at that point what is the evidence to show?

4   Well, the evidence is the defendant's own corroboration.   That

09:48   5   is important.   Although the defendant denied that he went any

6   further, he got exactly to where Nxxxx said it happened except

7   for that part where he did it.   He admitted everything except

8   the part where he said he did it.   Why are their details so in

9   sync if nothing happened?

09:48   10              And why that's important is the substantial step in

11   that case is he pulled down her pants.   She had to hold up her

12   underwear.   And as we know, after that happened, she calls her

13   grandfather by pushing a button on her app, and then he gives

14   her $50.   That's not in dispute.

09:48   15              And at that time she said she was nine.   She was

16   under the age of 12.   And everybody remembers that she was nine

17   at that time.   Mr. Spotted Bear remembered that.   Ivetta

18   remembers that.

19              And, finally, Count 4, that's involving Mxxxx

09:49   20   Sxxxxxxxx.   The first thing we asked is whether she wanted to

21   be here.   She didn't.   She didn't want to testify.   She didn't

22   want to be involved in this case.   And you heard from Meranda,

23   this was hard on her family.

24              And Mxxxx was the first person to disclose.   Her

09:49   25   family had to deal with the fact that Mxxxx says, "My

grandfather touched me on top of the clothing on my genitalia."
And how did that come out?  It came out through a talk that
Meranda, her mother, had.  Don't touch people in certain parts
of your body, and then she breaks down crying and says, "Mr.
Spotted Bear did this to me."  Why would she say that at that
time?

            And then she doesn't go over there again.  The family
doesn't want her to.  And what's important about that is at
that time she says she's seven, and that detail that was
presented about when this happened is confirmed by almost all
of the parties.

            Specifically, in terms of corroboration, again, Mr.
Spotted Bear admits that he -- that Mxxxx spent time with her
cousin, Haylon, near -- on or near his property.  Brad
Sanderson, Mxxxx's father, said he went on a hunting trip and
left Mxxxx with Mr. Spotted Bear.  Mr. Spotted Bear admitted,
yes, Mxxxx visited him during Thanksgiving when she was seven
years old.  He went on further and said, "Yes, Brad went
hunting.  He left Mxxxx with us."

            Fifth, he admitted that he wrestles with Mxxxx and
going upstairs with Mxxxx.  And that's important because what
does Mxxxx say happens?  She says she's with Haylon, they're
playing downstairs, they're wrestling.  Then they all go
upstairs, and Mr. Spotted Bear tells Haylon to go downstairs.
They sit on the couch.  He puts his hand on top of her

1    genitalia, on top of her basketball shorts, and tries to go

2    underneath, and she stops.

3            Again, everything is in step.  Every person who's

4    testified is in agreement to the details, including the

5    defendant.  And he admits to all of the corroborating

6    information except for the point -- he doesn't say, "I molested

7    Mxxxx."  But, again, why would he remember that detail for

8    something that happened eight, nine years ago?

9            He seems to have pretty good memory about everything

10   that these girls are saying except for the part where they

11   molested -- where he molested them.  That's corroboration.  And

12   although the defendant denied it, the very fact that he

13   remembers all of that shows it must have been an important

14   event for him to have that kind of a memory in each of these

15   different cases.

16           And, finally, as we go through some of these

17   corroboration items, Mxxxx's -- when she was nine or ten, she

18   discloses to her parents, and her initial disclosure is three

19   years before these other girls.  The defense is trying to argue

20   that there was some sort of collusion.  Why would this get

21   reported, the family say I don't want anything done?  It

22   negates that.

23           And ultimately Mxxxx told a forensic interview almost

24   verbatim what she told you on the stand, and she was shook up.

25   She was crying.  She didn't want to testify.  She didn't want

1    to be brought into this because it's ripping their family

2    apart.  And ultimately you heard from Meranda that Mxxxx is a

3    truthful person.

4              And what was most important from Mr. Spotted Bear's

5    testimony is that he admits to biting the girls on the necks

6    and ears when he wrestles with them.  Now, that was a piece of

7    information that came out on direct examination, I believe.

8    And why is that important?  I mean, is that normal behavior,

9    five to seven -- or five- to nine-year-old girls?

10             In all of these cases, at least especially in

11   Mxxxx's, they're talking about potentially wrestling and things

12   like that.  What is going on is that the defendant has taken

13   these girls, who are young, he's isolating them.  He's getting

14   them comfortable, and he takes it to a step that they don't

15   understand, whether he's licking their vaginas, whether he's

16   pulling down their pants and trying to touch their vaginas, or

17   he's isolating them when their father goes on a hunting trip

18   and puts his hand -- kind of testing the waters.  And it just

19   so happens that Mxxxx was the only one that didn't have to go

20   back there.  She told her family, and that's important.

21             And we talked a little bit about the propensity

22   evidence.  That's what you heard with the instruction about, if

23   you -- all of you agree, a lower standard of proof, then you

24   can potentially apply the incident involving the driving on the

25   lap.  Now, that has been corroborated by almost all of the

401

1  parties.  No one is disagreeing that the defendant put Nxxxx in

2  between his legs when he drove.  Ivetta heard Nxxxx talk about

3  it and thought that's weird.  Nxxxx is saying, "He touched me."

4  Again, the defendant corroborates a lot of it up and to the

5  point where he says, "I touched her."

6          And in terms of intimidation, if you look at F-14, I

7  believe it is, which is your instruction about influencing

8  witnesses, you can use that to determine consciousness of

9  guilt.  You heard what the defendant did.  As soon as he finds

10 out, he goes and he calls -- he calls Travis, the father of

11 Sxxxxxx.  He's angry with him.  He's trying to intimidate him.

12 You heard from Travis.  He's an intimidating type of guy.  And

13 he doesn't deny the allegations.  He just simply says, "I want

14 to know who this other girl is."

15         And then guess what ends up happening.  He goes over

16 to his sister's house.  And he doesn't just go over.  That

17 might be reasonable, going over, wanting to have a talk.  He

18 attempts to break into the property.  He even admitted it, "I

19 went through the doggy door, opened the door."  That's not

20 rational behavior.  And you heard from Ivetta that he looked

21 suicidal.  You can look at it and determine all of that to

22 determine whether or not that's consciousness of guilt.

23         And you heard expert testimony in the form of

24 Christal Halseth from the Northern Plains Child Advocacy

25 Center, somebody who's interviewed thousands of children,

1  gotten training on forensic interviews on child sexual abuse,

2  about the behaviors that child sexual abuse -- what victims of

3  child sexual abuse will display in terms of behaviors.

4          And she told you -- I ask that you remember this --

5  that it's common for children not to disclose sexual abuse

6  right away, but to delay because they're scared, because they

7  don't understand what happened.  They don't want the person to

8  get in trouble.  You heard from Nxxxx.  She loves her grandpa.

9  She still loves him.  She doesn't want the bad thing to happen,

10  essentially.  She didn't want it to happen, but she doesn't

11  know how to process it at that time.

12          You also heard from Christal, children aren't

13  supposed to talk about family business to strangers.  They're

14  not supposed to talk about sexual activity.  Sexual activity

15  almost always occurs in private.  Kids don't understand sex.

16  Why would they talk -- want to talk about it with strangers?

17          She testified that it's common for children to be

18  accosted by a close relative or people that children trust.

19  Yes, strangers can molest children, but it's common -- it's not

20  always strangers because somebody that they trust can isolate

21  them, knows their ages, knows what they like.  That's what

22  happened in this case.

23          She said it's common for children to have changes in

24  their behavior after the abuse.  You've heard from Sxxxxxx's,

25  Nxxxx's guardians of the changes.  That's corroboration.

403

1        You heard that it's common for children not to
2   disclose everything at once.  Everybody has different people
3   that they talk to.  You talk to your co-workers different than
4   you talk to your significant others.  You talk to them
5   different than you do your friends.  You go to work and
6   somebody -- you're having a bad day, and someone says, "How are
7   you doing?"  You're probably going to say, "Fine," just kind of
8   how you do it.

9        When you get home, you might talk to your spouse and
10  say, "I can't believe this day I've had."  But we talk to
11  different people differently, and kids especially.  They'll
12  talk to their friends differently.  They'll talk to the adults
13  differently.

14       But what's most important is that forensic interview.
15  That's when the child is most comfortable.  That's when that
16  child is getting asked neutral questions, trying to avoid
17  subjectivity.  They're trying to figure out what happened.
18  Those girls at that time did not know what questions would be
19  answered -- or asked, I should say.  You heard that from
20  Christal.  They didn't know.  They just knew they were supposed
21  to talk to somebody.  These girls didn't know that this was
22  going to be going to trial, and they certainly didn't want to
23  have to testify.  You could see it in their eyes.

24       And you heard that it's common for there to be
25  inconsistencies in children when they repeat the incident, and

404

that a lot of times is the person to whom they're talking to.
And it's common for children to have potentially a flat affect
when they testify, to be not emotional because they've had to
talk about it so much, because people react to trauma
differently.  And this incident, from the time that they gave
their forensic interview to trial, 16, 17 months.

        And what I want to leave you with, Government's
Exhibit 3.  Now, I know you've seen this photo, and I'm not
putting it up there to say look how vulnerable these children
are.  That's not the purpose.  The purpose is to show that
these three children were together around six years old, all of
them, on Mr. Spotted Bear's property.  He was a big part of
their life.  He isolated them.  When he isolated them, he took
advantage of them by either licking their vaginas, pulling down
their pants to try to touch their vaginas, putting their (sic)
hands on their vaginas.  And he admits he even bites their
necks and ears.

        But these are the three girls, and that's how they
looked at the time.  That's important because the people you
heard from were not those girls at the time.  They were the
people that had to figure out what was happening to them.  And
a six-year-old, as you heard, may not understand that.

        And I ask, what are motivations to lie?  There's been
a lot of talk that there's just allegations.  These aren't
allegations.  The girls told you what happened to them, and why

405

1   would they lie?  Why would they go through this whole process?

2   What do they have to gain?  What is there to gain?  Is it so

3   that they can relive the moment over and over again?  Is it so

4   that they can be ostracized, so their family can split apart?

09:59   5   There is nothing for these children to gain to go through this

6   whole process.

7           There is no reasonable doubt in this case.  There is

8   none, because as the Judge instructed you, proof beyond a

9   reasonable doubt is proof that leaves you firmly convinced of

10:00   10   the defendant's guilt.  Proof beyond a reasonable doubt does

11   not mean proof beyond all doubt.

12           And as you look at this, just to recap, each of the

13   girls got in here and testified about what exactly had

14   happened, and the defense has tried to discount that and almost

10:00   15   seem to think that doesn't matter.  But three children, 13 and

16   younger, got on that stand and said, "Mr. Spotted Bear molested

17   me."  They had -- before that they gave a forensic interview

18   that was corroborated, very, very similar to what they said on

19   the stand.

10:00   20           And they've talked to other people about it as well.

21   You've heard from their family members that Mr. Spotted Bear

22   had access to them, whether they were left alone in his

23   custody, whether they were playing with Haylon, and also from

24   Mr. Spotted Bear with his incredible memory of what otherwise

10:00   25   would be mundane details from seven to nine years ago about

406

1    everything that happened that these girls told you except for

2    the fact that he says he didn't molest them.

3              Use your common sense in the ways of the world.

4    You're allowed to do that.  You are the only judge of the

10:01    5    credibility in this case.  That is your sole province, not for

6    me to judge, not for any other witness to judge a witness's

7    credibility.  That is your consideration.  I ask that you judge

8    Mr. Spotted Bear's credibility, to those three girls, those

9    three interviews, all of the family members that testified

10:01   10    about the changes and the access that Mr. Spotted Bear had.

11             Because if you look at all that, these aren't just

12    three girls saying it happened and the defendant saying it

13    didn't happen.  This is the defendant isolating and taking

14    advantage of three young girls who at the time had no idea what

10:01   15    was happening to them.  Thank you.

16             THE COURT:  Mr. Bolinske.

17             MR. BOLINSKE:  Your Honor, counsel, members of the

18    jury.  In the beginning of this case I got up here and told you

19    that Lonnie Spotted Bear was not guilty.  I told you that he

10:02   20    would get up on the witness stand, look you in the eye and tell

21    you that he didn't do these terrible things that he was accused

22    of.  He got up there, sincerely, truthfully looked everyone in

23    the eye and said that he did not commit these acts.

24             Then he was cross-examined or questioned by the U.S.

10:03   25    Attorney, a professional questioner.  It's your job to

1   determine whether he was scathed, whether there were any

2   breaking moments, whether anything amazing was revealed,

3   whether any -- you know, his credibility, how he looked when he

4   was testifying.  I submit to you that he didn't break.

10:03

5         He talked about wrestling with kids.  He talked

6   about, you know, doing things on the neck, things like that.

7   The inferences that you can infer from those things can be very

8   innocent on one side and very sinister on the other side.

9   They're open to interpretation, and that's where you come in to

10:03

10  determine the credibility.

11        I also told you in my opening statement that this

12  case -- the government's case was conclusion-driven with all

13  kinds of inconsistent statements and that the investigation

14  wasn't much of an investigation as names of potential witnesses

10:03

15  -- very important witnesses were included in their own

16  investigation and not pursued or explored.

17        Then fast-forward a couple of days, what happened?

18  The forensic interview -- I believe it was Nxxxx -- is shown,

19  and there's a part edited out.  Which part was edited out?  It

10:04

20  was the section about a conversation between Sxxxxxx and Nxxxx

21  and a Jada Appel where they -- where Sxxxxxx at miscellaneous

22  times gave different versions of this story.  I then had to

23  play the minute-and-a-half of that video that was left out that

24  related directly to this conversation between Sxxxxxx and Nxxxx

10:04

25  that I discussed in my opening statement that involved Jada

408

1    Appel.

2              Expanding upon that, the main investigator, the lead

3    investigator, Mr. Bennett over here, I've got nothing against

4    Mr. Bennett, but he did not testify.  Then there was the other

5    FBI investigator, Paula Bosch.  She did -- he testified.  He

6    didn't testify for the government.  I had to call him and

7    question him.  Paula Bosch didn't come in and testify.  There

8    was mention of her.  They didn't come in and explain away the

9    holes in the gaps in this investigation.  The main person, the

10   main investigator, Mr. Bennett, built this case, was not called

11   as a government witness.  I called him as our witness.

12             I didn't mean to be rude.  I didn't mean to be

13   disrespectful.  I -- that's -- I hope I didn't come off that

14   way, but one of the most telling exchanges in that conversation

15   or questioning that I had of him was that, you know,

16   "Mr. Bennett, if you were personally accused of something this

17   bad, would you want the credibility of the accuser explored?"

18   To that question he answered, "Yes."

19             Then I said, "Well, did you explore the credibility

20   of these accusers?"  No.  Did he have this information about

21   Jada Appel?  Yes.  And so I think we can expect that of

22   investigations and investigators in circumstances like this

23   where the stakes are so high and the importance level is so

24   high, and the Judge talked about that in the jury instructions,

25   life's most important decisions.

1          This case ultimately begins with Sxxxxxx.  Her

2     version of events, her story, that Lonnie knocked her down

3     looking for Haylon's iPad and -- excuse me if I don't -- and

4     licked her crotch.  And she says that she kicked him, hit him,

10:06    5     scratched him.  And after all of this, one would have expected

6     corroborating evidence of people that were around that would

7     have seen black-and-blue marks, scratches, things like that

8     that could have corroborated this.

9          There was stuff put up on the board about

10:07   10     corroborating evidence.  I submit to you that corroborating

11     evidence was normal life evidence that, you know, kids were at

12     his house, that they may have gone upstairs at one point, they

13     may have gone downstairs, in a shop.  All of these things were,

14     I submit to you, just normal life corroboration.  They weren't

10:07   15     real solid evidence corroboration.

16          And then Sommer Cummings testified and came in, and

17     there was a lot of talk about this Haylon's iPad, the forensic

18     interview, and a lot of the testimony was looking for Haylon's

19     iPad.  Mr. Spotted Bear, I think, cleared that up.  There was

10:07   20     some sort of a tablet, or something, but Haylon's iPad that

21     they were -- allegedly were looking for that they stuck firm to

22     was not even purchased until after the dates in this case.  The

23     dates for the allegations for Sxxxxxx were August, I believe,

24     23rd of 2010, to August 23rd, 2011.  The iPad arrived --

10:08   25     there's a receipt in evidence -- in early 2012.  It was

ordered, I believe, December 31, 2011, after this.

Then there's Jada Appel, who testified, who they had access to.  Didn't interview.  Didn't talk to.  Didn't do anything.  She -- she got up here.  She's not connected to this case.  She's not a family member.  She's an independent person.  She's got no agenda.  She's at the Boys and Girls Club, and Sxxxxxx says, "I've got a story to tell."  The story is that Lonnie had done something to her, that he had, you know, touched her or something like that, never anything -- excuse me.  It didn't include licking a crotch.  I don't want to talk like that, but I have to say that.  The story didn't include that.

Then at another Boys and Girls Club event, I think it was, the story changed.  There were different details, different things.  Still didn't include anything about licking a crotch.  At one of those events Nxxxx was there.  Nxxxx didn't say anything.  She did say -- she testified Nxxxx felt uncomfortable around Lonnie, but didn't say anything, no details, no corroboration of what they testified to or what they claim happened.

Then I think it was Cheyenne who testified that in Cancun, Sxxxxxx had gone to someone named Cole and said that something had happened to her.  Well, that's the first I'd heard of that.  There was no Cole here that testified.  I didn't see any Cole, and there -- I don't know what that was

411

1    about, and that wasn't apparently explored or true or one of

2    the things.  That's for you to determine, the credibility and

3    if all these pieces fit together.

4          Then we've got Nxxxx's claims of sleeping in the

5    living room out in the open of Lonnie's house and Lonnie coming

6    in and, out in the open -- excuse me again -- licking her

7    crotch.  How these events occurred and whether they occurred

8    and supporting evidence or lack of supporting evidence, that's

9    for you to determine.

10         Then you've got the stuff about the shop and the

11   phone and calling David Holding Eagle to come pick her up,

12   first on a motorcycle, then in a car.  And, again, there's no

13   records of anything.  Lonnie does remember something in a shop.

14   Believe me, he's been charged with a bunch of serious crimes

15   here, and he's wracked his brains for a long time trying to

16   figure out what is going on here and what -- what happened.  He

17   does remember an incident in his shop.  It didn't involve any

18   of the allegations, but maybe she got mad at him for him

19   getting mad at her for not doing the work.  I don't know.

20   That's not -- that's just speculation here, but that's a lot of

21   this case, is just speculation.

22         Then after that, to follow that up, either Nxxxx or

23   Ivetta Spotted Bear kept adding to and changing the number of

24   incidents that allegedly occurred and how this occurred.

25   You've got -- I think Mr. Bennett testified about this --

412

1    Ivetta Spotted Bear calling the FBI.  I think it was March 31,
2    2016, and saying, "Oh, yeah, by the way, this happened, you
3    know, eight to ten more times.  Nxxxx told me."  Then there was
4    no testimony of Nxxxx ever saying this.  It wasn't
10:11    5    investigated.  It wasn't proven.  It wasn't anything.  Was that
6    Ivetta Spotted Bear?  Was that Nxxxx?  There were no forensic
7    interviews.  There was nothing else explored in relation to
8    that.  That doesn't add up.
9         And remember Nxxxx hadn't said any of these things
10:11    10   until Sxxxxxx started telling these stories at the Boys and
11   Club events -- Boys and Girls Club events, and that their
12   stories, quote, licking the crotch mirror each other.
13        Then we have Mxxxx's allegations of touching, Lonnie
14   touching her leg, not doing it to -- the forensic interview
10:12    15   says that it was an attempt, that he didn't do it.  She came in
16   here and testified that he did do it.  The forensic interview
17   says she pushed the hand away.  I don't know what happened.  I
18   wasn't there.  Lonnie Spotted Bear testified about wrestling,
19   things like that, people jumping on him.  That can happen.
10:12    20   That does happen.
21        Then years later, if your mother is talking to you
22   about inappropriate touching or where to touch, I submit to you
23   that things can come to people that just aren't accurate, that
24   just aren't true.  But Lonnie Spotted Bear testified he did not
10:12    25   intentionally or unintentionally, or anything, touch any of

413

1    these children or do anything inappropriate.  That's for you to

2    determine, the credibility of these witnesses and the

3    credibility of Lonnie Spotted Bear.  I don't think he wavered.

4    That's not for me to determine.  That's for you to determine.

10:13

5    Then also what is very interesting in this situation

6    with Mxxxx is that Travis, Sxxxxxx's dad, was involved in this.

7    And right in the forensic interview -- again, it was a part

8    that was left out, that was edited out, that I had to bring up

9    on cross-examination with the forensic interviewer, and I have

10:13

10   to quote this part, "When asked how it came out now about

11   Mxxxx, she said that her cousin said Lonnie did something to

12   her, so that girl's dad called and said he knew what happened

13   to Mxxxx and asked Mxxxx to help strengthen the case."  All

14   these things don't add up.  They're all just too odd, and the

10:14

15   stakes here are too high.

16   Then on Mr. Spotted Bear's behalf we had several

17   witnesses come in.  It was just yesterday.  I don't need to say

18   everything that they said.  We were all here.  Talked about

19   Lonnie as a good man, a generous man, a kind man, that they

10:14

20   didn't believe any of these things happened, that they've had

21   daughters, they've had kids, they've had them out at Lonnie's

22   place, they've had them at the place where everyone goes for

23   brandings, for Fourth of July, for Labor Day, things of that

24   nature, and that they've never observed anything strange.

10:14

25   And if they had, they wouldn't have ever had their

1   kids around there because things had happened to them, and they
2   had feelings about things, and they just wouldn't have had kids
3   around Lonnie if they thought anything was untoward or bad.

4         Again, I said in my opening statement that Lonnie
5   Spotted Bear is a generous man.  He's a good man.  He's a kind
6   man.  He's a man with integrity.  I think that was shown by
7   everyone.  I don't think people even on the other side disputed
8   that.

9         Then we go to the Judge's instructions and the law.
10  That's not the U.S. Attorney.  That's not me.  That's the law.
11  That's what you, as jurors, have to follow, and that's what we
12  talked about in jury selection, the burden of proof and the --
13  the burden of proof and then reasonable doubt defined.

14        In the opening statement and in jury selection we
15  talked about whose burden it was.  It's the government's
16  burden.  It's the United States' burden to prove every
17  essential element of the offenses charged and to prove the
18  case, all the charges, all of the elements beyond a reasonable
19  doubt.

20        And the language is in there.  It's on page 16 and
21  page 17 of the jury instructions.  "If, after carefully and
22  impartially considering all of the evidence, you do not feel
23  convinced that a defendant is guilty of the charge, you must
24  acquit the defendant whether or not he has offered any
25  evidence."  There's doubt all over in this case.  There's

415

1  inconsistency all over in this case.  There's lack of

2  corroboration, lack of physical evidence, years and years that

3  have gone by, motives, changing stories, credibility issues

4  with one of the witnesses that was the main witness to start

10:16  5  all this stuff.

6          And the law is that proof beyond a reasonable doubt,

7  if that's not proven, you must.  That's not me.  That's not the

8  United States.  That's just the law, and that's what was talked

9  about in jury selection.  People have been accused of something

10:16  10  that they -- that they didn't do, and how did that make you

11  feel?

12          We tried to come in and -- and it's hard to, you

13  know, disprove a negative or disprove something that you can't

14  -- you know, no witnesses to things like that.  Mr. Spotted

10:17  15  Bear did his best to testify.  We brought in character

16  witnesses.  We brought in a witness to -- you know, I'm not

17  attacking these girls.  That's not my -- I'm sorry if I've

18  offended anyone doing that, but credibility has to be explored.

19  It wasn't explored.  It should be, and it has to be when the

10:17  20  stakes are this high.

21          Reasonable doubt defined, "A reasonable doubt may

22  arise from careful and impartial consideration of all of the

23  evidence or from a lack of evidence.  Proof beyond a reasonable

24  doubt is proof of such convincing character that a reasonable

10:17  25  person, after careful consideration, would not hesitate to rely

1    upon and act -- rely upon and act upon that proof in life's

2    most important decisions.  Proof beyond a reasonable doubt is

3    proof that leaves you firmly convinced of the defendant's

4    guilt."

10:17   5         All of these factors through cross-examination and

6    through witnesses that we put on create doubt.  I submit to you

7    that it's reasonable doubt.  The government has to prove the

8    case and all of these charges and the elements beyond a

9    reasonable doubt, beyond if you have a doubt and if it's

10:18  10    reasonable.  These doubts are reasonable.

11         After the case started, there were more doubts even

12    created yet.  It got more confusing.  I don't know the truth.

13    I wasn't there.  Is there doubt here?  Do we think, well, geez,

14    I don't know.  These girls said something happened.  Something

10:18  15    might have happened.  Gosh, I'm not quite sure.  That's an

16    honest feeling.  That's not good enough.  All of these doubts

17    are reasonable, and they have to prove the case beyond all of

18    these doubts.

19         I'm about done here, and the government is going to

10:18  20    get a chance to come back up here and try to, you know, say

21    what I said wasn't accurate, but Lonnie's life is on the line

22    here.  The stakes are so high.  The importance level of the

23    decision that all of you make are so high.  Please consider all

24    of that.  Please follow the duty to uphold the law, and if you

10:19  25    have a doubt and it's reasonable, to stick to your guns and

417

1   find Mr. Spotted Bear not guilty.

2          I submit to you that I think we've -- you know, we

3   don't have to prove innocence.  That's not what this is about.

4   We talked about that in jury selection, and I remember one man

5   talked about how, you know, he thought we probably had to prove

6   innocence, that we had a burden of proof.  We don't.  The

7   government has all of the burden of proof.

8          We submitted evidence.  Maybe we didn't prove

9   innocence.  We don't know what happened.  I submit to you his

10  testimony was credible.  We don't have to show that.  They've

11  got the burden of proof, and they've got to show it beyond a

12  reasonable doubt.

13         I know I keep repeating myself, but it's just so

14  important here.  And that's always my fear, that I've forgotten

15  something or I've left something out, and it's so hard to let

16  go in these cases because the consequences, the stakes are so

17  high.

18         So please take this case, decide it fairly.  Take

19  your time.  Think about these things.  Try to put the evidence

20  together and see where it doesn't add up.  Think of the

21  situations that involve doubt, the inconsistencies, the

22  credibility issues, the stakes to Mr. Spotted Bear.  Thank you

23  so much.  I appreciate your time.

24         THE COURT:  Mr. O'Konek, do you wish to present any

25  rebuttal?

418

1           MR. O'KONEK:  Yes, sir.  Well, it seems that the

2   defense wants you to forget that there were three children that

3   came in the courtroom, sat in that witness chair, and testified

4   in a room full of strangers, including family members, and they

5   just must be mistaken, or that this must be some collusion,

6   that all of them got together and, oh, well, they're very

7   consistent, so that must be collusion.

8           But that doesn't account for Mxxxx.  Mxxxx reported

9   long before Sxxxxxx, long before Nxxxx.  Collusion doesn't make

10  any sense because you heard from Mxxxx's parents.  They didn't

11  want this to go forward anyway, so what's the -- what's the

12  collusion here?  What's the reason to lie?

13          There's talk about, he's a kind man, he's a gentle

14  man.  They talked about witnesses that they called.  Those

15  witnesses said that they weren't around those children all the

16  time.  They weren't there.  They don't know what happened.

17  They saw Mr. Spotted Bear with the kids.

18          But what's important is when they were talking with

19  Agent Bennett -- you heard Agent Bennett.  He talked about how

20  he didn't want to go to the school in a small town and just

21  talk about a kid being molested, because word travels fast, and

22  those kids can have a hard time if everybody in their class

23  knows that they've been molested.  That could ostracize them.

24          And Jada Appel did come in here.  Okay.  And so it

25  might have been a little bit different, but -- so what we

419

learned from Jada Appel is Sxxxxxx came in, talked to her and
said Lonnie touched her inappropriately, touched her body,
touched her chest, pushed her down.  Okay.  So that is what she
said.  She still said that Lonnie -- or, excuse me, Mr. Spotted
Bear had done this.

And I think what's important is they want to gloss
over some of these facts, like, oh, what about this iPad, what
about this -- all this stuff involving medical records and all
this stuff involving everything about corroboration.  The
defendant corroborated everything.  Where's the -- where's the
iPhone?  He talked about it and said, "Yep, the -- there was an
iPad."  He talked about for the phone, yep, Nxxxx called on her
phone.  He's corroborated everything that they're trying to say
is reasonable doubt.

He can't say it happened and have it also be
reasonable doubt.  Those two things cannot make sense together.
How can it be that he remembers all of these things and then
say, yeah, but where's that corroboration about the phone call?
Mr. Spotted Bear remembers Nxxxx making that phone call.  He
remembers Sxxxxxx making the -- trying to find the iPad, and he
remembers he and Mxxxx wrestling, which if you want to watch
the forensic interviews, I ask that you re-watch them.  That's
very consistent with what those children say.  It's very
consistent with what they testified about what happened to them
on the stand.

420

10:23

1          And there's -- and there's some sort of insinuation
2     that this was an accident or something along those lines, that
3     it couldn't be.  You heard from the kids.  They didn't say it
4     was an accident.  They said it over and over again.  They
5     didn't want this, that this was not something that they
6     enjoyed.  This was something scary, something that didn't feel
7     good.

10:23

8          And I think what's most important is when the defense
9     was questioning Agent Bennett, they made a big deal about how
10    they called him, they had to call him and asked him, "Well, why
11    -- why didn't you interview these people?"  And he said, "Well,
12    I tried to.  I tried to talk to Sommer.  She wouldn't let me
13    talk to the kids."  And then they were like, ah, that can't be
14    true.

10:24

15         And then they called Sommer, and literally the same
16    thing came out.  Agent Bennett went and tried to talk to
17    Sommer, the mother of Haylon, who is the person that's been
18    hanging out with all three of these kids when these incidents
19    happened, and they're told they can't speak with Ashlynn.  And

10:24

20    they're very upset about it because they don't want to be
21    involved.  So what is Agent Bennett to do?  I mean, they were
22    uncooperative and they were biased.

23         And that's why it's important when you consider all
24    the testimony about all the things that you didn't hear,

10:24

25    consider that fact.  Consider why those witnesses weren't here

421

is potentially because, as Sommer said, she didn't want to have
one of her daughters be forensically interviewed.  She didn't
want that.  She lives on Lonnie's property, dating Lonnie's
son.  Take that for what it's worth.

When you're talking about credibility, look at Mxxxx.
I said it before, but I'll say it again, Mxxxx is the odd man
out.  If the defense wants to argue some sort of collusion or
if they want to talk about all of these different things and
these inconsistent statements, what about Mxxxx?  What was
different about hers?  She came in and testified consistent
with what was on her forensic interview.  She disclosed earlier
than the other girls and had absolutely no reason to lie when
she doesn't want it to be reported anyways, and that's
according to her mom.

You know, and that's the one where we heard that that
happened around Thanksgiving 2009.  We have a very firm date
there, and Mr. Spotted Bear remembers Thanksgiving 2009.  Mxxxx
was there.  They were wrestling.  Bit her on the neck.  Went
upstairs with her with Haylon.  The only thing that's not in
agreement on that incident is that Mr. Spotted Bear said,
"Well, I didn't molest her."  But does that make sense?  Is
that the common sense that you all have?

Listen to the interviews and listen -- or remember
the testimony you heard from Mr. Spotted Bear, because for --
they talked about how this was a big moment for the defendant,

422

1   and it is, but it was also a big moment for these girls.

2   That's something that the defense doesn't want you guys to

3   consider, that this was in some way not a big deal, that this

4   is all some sort of plan or these kids got it wrong or, you

10:26   5   know, the word of a child is not enough, we need more than

6   that.  But you heard from Cristal.  These things happened in

7   private with close friends, and we were honest -- or close

8   family members, and the United States was honest.

9       Something that happened four, seven years ago, is

10:26   10   there going to be evidence out there of injury?  No, not now.

11   But what is there going to be?  There's going to be the

12   testimony of the children, their willingness to get up and take

13   the stand.  There's going to be the corroboration from their

14   guardians, the corroboration from the defendant.  And

10:27   15   ultimately we have a case where the defendant and his -- the

16   person that's dating his son denied access to people that could

17   have gotten more information, and that's important too.

18       Because as you look at all of this, reasonable doubt

19   does not mean any doubt.  It means a reasonable doubt, and

10:27   20   there's no reasonable doubt where these three kids would have

21   had to go through this with no reason to lie.  What reason does

22   an 11-year-old have to say that the person that they love

23   molested them?  What possible reason would there be to speak

24   with so many people, give so many interviews, whether it's

10:27   25   speaking with your family, forensic interview, testifying in

423

1   court, what possible motivation could they have, all three of
2   them?  I ask that you consider that because that is not a
3   reasonable doubt.  That demonstrates, along with all the other
4   evidence, that Mr. Spotted Bear is guilty.  Thank you.

10:28   5       THE COURT:  Members of the jury, at this time I'm
6   going to read you the final few pages of the closing
7   instructions, and then you will begin your deliberations.
8   Again, you're welcome to follow along.

9       (The Judge reads the General Closing Instructions
10:28   10   from the Final Instructions in open court, pages 21 through
11   23.)

12       THE COURT:  Members of the jury, I'm now going to
13   release you to begin your deliberations.  The clerk will be
14   providing you with all of the exhibits that have been received
10:31   15   in evidence here, along with the instructions and a special
16   verdict form.

17       You are now largely in control of your schedule.
18   I've been dictating when you appear in court and when we take
19   breaks, but now you're in control of that.  If you wish to take
10:31   20   a break at any time, all that you need to do is tell the deputy
21   marshal or the bailiff that's outside your jury room that
22   you're going to take a break.  Let them know approximately how
23   long you're going to break, and that's all that you need to
24   say.  The same holds true for lunch breaks.  You can take one.
10:32   25   You can choose not to take one.  You can take as long a break

424

1   as you wish.

2          The only restraints that I ever put on juries is that

3   I don't allow juries to deliberate into the evening hours

4   because we've got serious concerns about security issues and

10:32   5   having people in this courthouse after the normal working

6   hours.  But you need to take as much time as you feel is

7   warranted to deliberate and reach a decision in this case.

8          If you haven't reached a decision at the end of any

9   given workday, then you return the next day at a time that all

10:32   10   of you can agree upon to continue with your deliberations.  So

11   there are no time constraints on your deliberations other than

12   not allowing you to go into the evening hours on any given day.

13          With that, I'm going to excuse you now to return to

14   the jury room to begin your deliberations.  And, again, all the

10:33   15   evidence is going to be in your hands within a few minutes.

16   Thank you.

17          (The jury exits the courtroom.)

18          THE COURT:  We're outside the presence of the jury.

19   I would just ask that counsel go through the exhibits, make

10:33   20   sure that only exhibits that have been received in evidence go

21   back to the jury.

22          As I mentioned before, we have an IT specialist that

23   has probably already set up a laptop computer in the jury room,

24   and if they wish to watch any of the exhibits that are on DVD,

10:34   25   they're welcome to do that.  If they need help operating any

425

1    equipment, I just send an IT person in to assist them.

2          Please let Judy know where you can be reached.  If

3    there's any questions that the jury presents to me, you'll be

4    first to be notified, and I will solicit your input on how to

5    respond to any such questions.  We'll let you know when they

6    break and when they plan on returning throughout the day.

7          Is there anything else that either party feels that

8    we need to take care of?

9          MR. O'KONEK:  No, Your Honor.

10          MR. BOLINSKE:  No, Your Honor.

11          THE COURT:  I want to thank both parties,

12    particularly both attorneys for the manner in which you've

13    conducted yourself and the professionalism that you've shown to

14    one another.  I appreciate the presentations made by both

15    parties, and we'll leave this case in the hands of the jury.

16    We'll stand in recess while the jury deliberates.

17          (A recess was taken from 10:35 a.m. to 11:58 a.m.,

18    the same day.)

19          (In open court with the defendant, counsel, and the

20    jury present.)

21          THE COURT:  We are back on the record.  All parties

22    are present, along with the defendant and the entire jury

23    panel.  It's my understanding the jury has reached a verdict.

24    Who has been selected as the foreperson?

25          THE FOREPERSON:  I have, Your Honor.

426

1          THE COURT:  Has the jury reached a unanimous

2     decision?

3          THE FOREPERSON:  We have.

4          THE COURT:  Then I'll have you deliver the envelope

12:01   5     to my clerk, and we'll have it opened here shortly.

6          (The verdict is delivered to the Court.)

7          THE COURT:  At this time I would ask that the clerk

8     please read the verdict form.

9          THE CLERK:  The jury will please listen to the

12:02  10     verdict as it is returned and as it shall be recorded.  We, the

11     jury, find the defendant, Lonnie Spotted Bear, guilty of the

12     offense of aggravated sexual abuse of a child as set forth in

13     Count 1 of the Indictment.

14          We, the jury, find the defendant, Lonnie Spotted

12:02  15     Bear, guilty of the offense of aggravated sexual abuse of a

16     child as set forth in Count 2 of the Indictment.

17          We, the jury, find the defendant, Lonnie Spotted

18     Bear, guilty of the offense of attempted aggravated sexual

19     abuse of a child as set forth in Count 3 of the Indictment.

12:02  20          We, the jury, find the defendant, Lonnie Spotted

21     Bear, guilty of the offense of abusive sexual contact of a

22     child as set forth in Count 4 of the Indictment.  Dated this

23     14th day of September, 2017, and signed by the foreperson.  So

24     say you all, members of the jury?

12:03  25          THE COURT:  Does either party request that the jury

427

1   be polled?

2           MR. O'KONEK:  No, Your Honor.

3           MR. BOLINSKE:  I would, Your Honor.

4           THE COURT:  Very well.

12:03   5           THE CLERK:  Mr. Nichols, is that your verdict as

6   read?

7           MR. NICHOLS:  Yes, it is.

8           THE CLERK:  Ms. Brucker, is that your verdict as

9   read?

12:03   10           MS. BRUCKER:  Yes, it is.

11           THE CLERK:  Mr. Stahl, is that your verdict as read?

12           MR. STAHL:  Yes, it is.

13           THE CLERK:  Ms. Blinsky, is that your verdict as

14   read?

12:03   15           MS. BLINSKY:  Yes.

16           THE CLERK:  Mr. Dvorak, is that your verdict as read?

17           MR. DVORAK:  Yes.

18           THE CLERK:  Ms. Yearsley, is that your verdict as

19   read?

12:03   20           MS. YEARSLEY:  Yes.

21           THE CLERK:  Ms. Gebhardt, is that your verdict as

22   read?

23           MS. GEBHARDT:  Yes.

24           THE CLERK:  Mr. Laub, is that your verdict as read?

12:03   25           MR. LAUB:  Yes.

1            THE CLERK:  Mr. Lill, is that your verdict as read?

2            MR. LILL:  Yes.

3            THE CLERK:  Mr. Ternes, is that your verdict as read?

4            MR. TERNES:  Yes.

12:03    5            THE CLERK:  Mr. Friesz, is that your verdict as read?

6            MR. FRIESZ:  Yes.

7            THE CLERK:  Mr. Schaaf, is that your verdict as read?

8            MR. SCHAAF:  Yes.

9            THE COURT:  The record should reflect that the

12:04    10   verdict is unanimous.  It will be docketed with the federal

11   district court on this date.

12            Members of the jury, on behalf of the federal

13   district court of North Dakota, I want to thank you for your

14   service and for your participation in this case and for your

12:04    15   deliberations.  These are never easy cases, but your service as

16   jurors is of critical importance to our criminal justice

17   system.

18            I also want to tell you that I'm going to excuse you

19   from these proceedings, but I want you to hold on for a few

12:04    20   moments because I always come back and talk to jurors

21   afterwards and answer any questions that they may have.  I'm

22   not going to impose too much of my time on you, but I would ask

23   that you hang tight back in the jury room, and I'll be back in

24   just a few moments.  I need to take care of some things with

12:05    25   the parties here.

1    I also want you to know that all of the instructions

2    that I've been giving you throughout this trial no longer are

3    in effect.  With respect to that, you're free to visit with

4    anyone about this case if you choose to do so.  If

5    representatives from either of the attorneys' offices contact

6    you to get impressions about the case, you're free to visit

7    with them, just as you're free to visit with friends or family

8    members if you wish, and you're not violating any Court orders

9    if you visit with anyone about this case after a verdict has

10   been received.

11   But you're also free to simply tell people you don't

12   want to visit about the case.  You're not obligated to talk to

13   anyone if you choose not to.  The decision is yours.

14   But, again, I want to thank you.  I'll be back in

15   five minutes or less to visit with you, and I will excuse you

16   now from this courtroom.

17   (The jury exits the courtroom.)

18   THE COURT:  What happens now, Mr. Spotted Bear, in

19   federal court after a jury has reached a verdict in a case or

20   after a defendant has pled guilty to anything, before a

21   sentencing hearing is held there's a report prepared by the

22   United States Probation Office called a presentence

23   investigation report.  It's a report that's prepared in every

24   case in this country in federal court, and it's primarily used

25   for sentencing purposes.

430

1          There will be a probation officer that will be

2     getting in touch with Mr. Bolinske shortly.  They'll try to set

3     up an interview within a couple of weeks.  The interview is not

4     a police interrogation.  The sole purpose is just to compile

12:07    5     background information about you that will go into this report.

6          Also included in the report is a history of any prior

7     convictions in your past, if you have any.  And there's also a

8     lengthy discussion in the report about the federal sentencing

9     guidelines and how they impact you.

12:07   10          It generally takes a couple of months to put those

11     reports together, but before they're finalized and before

12     they're ever presented to me, both you and your attorney will

13     have an opportunity to review the reports.  We want to make

14     sure the reports are accurate, so when it comes into your

12:07   15     hands, both you and your attorney, please read it over

16     carefully.

17          If you notice errors, it's important that you contact

18     the probation officer that wrote the report and make sure they

19     get it corrected.  I won't see that report until shortly before

12:08   20     the sentencing hearing.  There are some mandatory minimums in

21     this case.

22          And in terms of your status between now and the

23     sentencing hearing -- and we're going to set a sentencing

24     hearing for December 20th, at 2:30.  But between now and then I

12:08   25     believe that the law is crystal clear in that you are to be

431

1    mandated into the -- and held in custody by the U.S. Marshal

2    Service until the time of sentencing, unless either party is

3    aware of any exception to that strict provision of the law.

4              MR. O'KONEK:  No, Your Honor.

12:08    5              MR. BOLINSKE:  I'm not aware of any exceptions, but I

6    would ask the Court to at least consider releasing him.  He's

7    been fine released.

8              THE COURT:  Well, I don't disagree with you of that.

9    I'm not aware of any problems that have been created with the

12:09   10    United States Probation Office, but the law is crystal clear.

11    It requires immediate remand into custody.  There are no

12    exceptions.

13              I've been confronted with this hundreds of times over

14    the years, and I guess, Mr. Bolinske, I'm going to have to

12:09   15    remand Mr. Spotted Bear into custody.  If you want to look and

16    research the law and can find any exceptions or exclusions, I'm

17    open to considering those, but I've been at this 15 years, and

18    I haven't been apprised of any exceptions to that mandatory

19    remand provision.

12:09   20              So, Mr. Spotted Bear, the law requires that I remand

21    you into the custody of the U.S. marshals.  Do you have any

22    questions, sir?

23              THE DEFENDANT:  No.

24              THE COURT:  All right.  Anything else, counsel, that

12:10   25    we need to take care of before I close these proceedings?

1          MR. O'KONEK:  No, Your Honor.

2          MR. BOLINSKE:  No.

3          THE COURT:  Very well.  Then we are adjourned.

4          (Proceedings concluded at 12:10 p.m., the same day.)

5                    - - - - - - - - - -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          CERTIFICATE OF COURT REPORTER

2          I, Sandra E. Ehrmantraut, a Certified Realtime

3    Reporter,

4          DO HEREBY CERTIFY that I recorded in shorthand the

5    foregoing proceedings had and made of record at the time and

6    place hereinbefore indicated.

7          I DO HEREBY FURTHER CERTIFY that the foregoing

8    typewritten pages contain an accurate transcript of my

9    shorthand notes then and there taken.

10          Dated:  January 22, 2018

11

12                          /s/ Sandra E. Ehrmantraut
                            Certified Realtime Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25