UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

<u>REDACTED</u>

| | |
|---|---|
| United States of America, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   File No. 1:16-cr-179 |
| | ) |
| Lonnie Dale Spotted Bear, | ) |
| | ) |
| Defendant. | ) |

<u>TRANSCRIPT OF SENTENCING</u>

Taken at
United States Courthouse
Bismarck, North Dakota
December 20, 2017

BEFORE THE HONORABLE DANIEL L. HOVLAND
-- UNITED STATES DISTRICT COURT JUDGE --

<u>APPEARANCES</u>

MR. JONATHAN J. O'KONEK
U.S. Attorney's Office
220 E. Rosser Ave
P. O. Box 699
Bismarck, North Dakota 58502-0699

FOR THE UNITED STATES

- - - - - - - - - -

MR. ROBERT V. BOLINSKE
Bolinske Law Firm
402 East Main, Suite 100
Bismarck, North Dakota 58501

FOR THE DEFENDANT

- - - - - - - - - -

<u>GOVERNMENT WITNESSES</u>

<u>Page No.</u>

<u>Brad Sanderson</u>
   Direct Examination by Mr. O'Konek                5

<u>Ivetta Spotted Bear</u>
   Direct Examination by Mr. O'Konek                8

- - - - - - - - - -

Certificate of Court Reporter                      28

- - - - - - - - - -

1           (The above-entitled matter came before the Court, The

2   Honorable Daniel L. Hovland, United States District Court

3   Judge, presiding, commencing at 2:34 p.m., Wednesday, December

4   20, 2017, in the United States Courthouse, Bismarck, North

5   Dakota.  The following proceedings were had and made of record

6   in open court with counsel and the defendant present.)

7                   - - - - - - - - - - -

8           THE COURT:  We'll open the record in the case of

9   *United States of America versus Lonnie Spotted Bear*.  Here on

02:34    10   behalf of the federal government is Assistant U.S. Attorney

11   Jonathan O'Konek.  Representing the defendant here is Attorney

12   Bob Bolinske from Bismarck.  Mr. Spotted Bear, how are you

13   today?

14           THE DEFENDANT:  Fine.  Thank you.

02:34    15           THE COURT:  This is scheduled as a sentencing hearing

16   on multiple charges of aggravated and attempted aggravated

17   sexual abuse of a child.  There was a trial last fall.  There

18   was a jury verdict on September 14, 2017, in which the

19   defendant was found guilty of -- on four counts.

02:35    20           Before today I have reviewed the Presentence

21   Investigation Report a couple of times.  I reviewed the

22   Government's Sentencing Memorandum and Sentencing Memorandum

23   Supplement.  I reviewed a victim impact statement from Nxxxx

24   Hxxxxxx Exxxx.  And I've gone back and reviewed all of my trial

02:35    25   notes pretty carefully.

3

1          Mr. Spotted Bear, were you given the opportunity to

2    review the Presentence Investigation Report?

3          THE DEFENDANT:  Yes, I did, Your Honor.

4          THE COURT:  And you visited with your attorney,

02:36    5    Mr. Bolinske, about that report and what it means for you?

6          THE DEFENDANT:  Yes, he did, Your Honor.

7          THE COURT:  Very well.  Either counsel have any

8    objections to the facts set forth in the Presentence Report or

9    the sentencing guideline calculations?

02:36   10          MR. O'KONEK:  No, Your Honor.

11          MR. BOLINSKE:  I guess, Your Honor, I realize it's

12   kind of of no consequence, but Mr. Spotted Bear does disagree

13   with the characterizations and accusations from 40 years ago

14   that were not included at the trial, that are included in the

02:36   15   PSI.

16          And, secondly, the characterizations of the

17   obstruction of justice, he does and I do, frankly, disagree

18   with all of that, so it's of no consequence, but we do.

19          THE COURT:  Well, those objections don't affect the

02:36   20   sentencing guidelines and the mandatory minimum penalties in

21   this case, so they're noted for the record.  I don't feel I

22   need to make any specific factual findings on those matters

23   because, again, they don't impact the sentence to be imposed.

24          Are there witnesses that intend to testify here

02:37   25   today?

4

1          MR. O'KONEK:  Yes, Your Honor.  We have two

2     witnesses.

3          THE COURT:  Do you have any witnesses, Mr. Bolinske?

4          MR. BOLINSKE:  I do not, Your Honor, no.

02:37    5          THE COURT:  Then the government may call the

6     witnesses that you have identified.

7          MR. O'KONEK:  Yes, Your Honor.  The United States

8     would call Mr. Brad Sanderson.

9                          BRAD SANDERSON,

02:37   10     having been first duly sworn, was examined and testified as

11     follows:

12                       DIRECT EXAMINATION

13     BY MR. O'KONEK:

14     Q.   Brad, I'm just going to start off by kind of going through

02:38   15     some of your factual -- or your background.  So you're the

16     father of Mxxxx Sxxxxxxxx?

17     A.   Yep.

18     Q.   And you testified at the September 2017 trial that we've

19     referenced in this case?

02:38   20     A.   Yes.

21     Q.   Now I want to ask you just a couple of basic questions.

22     How has Mr. Spotted Bear's conduct affected you and Mxxxx

23     specifically?

24     A.   I guess to tell you the truth, it's -- it's not been easy.

02:38   25     I didn't want to be here, actually, you know, but Brayden

5

1   wanted me to come and speak --

2   **Q.**    And who's --

3   **A.**    -- for his sister.

4   **Q.**    Who's Brayden?

02:38   5   **A.**    My son.

6   **Q.**    And he wanted you to come speak today?

7   **A.**    Yeah.  He's down in treatment in Arizona for chemical

8   dependency, or whatever you want to call it, and it's a dual

9   diagnosis for mental disorders, and stuff.

02:39   10   **Q.**    And so after Brayden kind of had asked to you speak, what

11   did he want you to convey and what do you want to convey to the

12   Court about how this has affected you and Mxxxx?

13   **A.**    You know, I guess I can only say, I guess everything that

14   I do is for my children.  I love my children.  And I didn't

02:39   15   believe Mxxxx at the beginning, and that really hurt her,

16   because I knew Lonnie as a second father.  You know, that was

17   my second home, and it was hard to take.

18        But I had to separate my feelings and what -- what --

19   you know, how it hurt me to how it affected my daughter, you

02:40   20   know, and how it's going to affect the rest of her life.  And

21   that's what -- that's what it's all about, is my children's

22   future, so I got to just come up here and say whatever it is

23   God wants me to say, I guess.

24   **Q.**    And to your knowledge, how has it affected Mxxxx?

02:40   25   **A.**    What affected her the most is when people didn't believe

6

1   her and she had to go to a family event, and how she felt that

2   she was alienated and no one believed her.  And then she had to

3   take pictures and smile and act like nothing happened, I guess,

4   and that really hurt her, and she really started crying when

02:40   5   she said that, that she -- it's not her family anymore.  It

6   hurts.

7   **Q.**   And how has this affected, I guess, the extended family?

8   **A.**   It was just disbelief at first, you know.  It was -- just

9   the holidays ain't the same.  You know, we used to go to

02:41   10   Grandma Vetta's and everybody would go there, and it's

11   separating -- it's separating us.  It's -- some -- some people

12   believe it and some people don't, you know, and it's tearing --

13   it's tearing me apart.  It's tearing Mxxxx apart, and it's --

14   you know, we just wish it wouldn't be happening, but in all

02:41   15   reality, it is what it is, you know.

16          And we -- we're not here to hate and blame and treat

17   each other bad.  We're here to love, you know, and that's --

18   just need to move on.  And, you know, I just would ask Lonnie,

19   you know, if this shit happened, man, just admit to it, you

02:41   20   know, get help or whatever you got to do, because I love you,

21   man.

22   **Q.**   Do you have anything else you'd like to add, sir?

23   **A.**   I love my children too.  I love my children more, and I

24   ain't never going to not believe my girl again because of this.

02:42   25   So in a way I can thank you for bringing me closer to my kids

7

1  because that's what it's really about, is a future for my

2  children.  And I'll never, ever not believe them again, not

3  hear what they have to say to me.

4            MR. O'KONEK:  Thank you.  I have no further

02:42   5  questions, Your Honor.

6            THE COURT:  Any questions, Mr. Bolinske?

7            MR. BOLINSKE:  I have no questions.  Thank you.

8            THE COURT:  All right.  Thank you, sir.  You may step

9  down.

02:42  10            MR. O'KONEK:  And, Your Honor, the United States

11  would call Ivetta Spotted Bear as its final witness.

12                  IVETTA SPOTTED BEAR,

13  having been first duly sworn, was examined and testified as

14  follows:

02:43  15                  DIRECT EXAMINATION

16  BY MR. O'KONEK:

17  Q.   Ivetta, I just have a couple of background questions.  You

18  are the grandmother for Nxxxx Hxxxxxx Exxxx?

19  A.   Yes, I am.

02:43  20  Q.   And you previously had testified on September -- I believe

21  around 14th of this year in the trial of *U.S. v Spotted Bear*?

22  A.   Yes.

23  Q.   And I know this is difficult, but I'm going to ask, how

24  has this affected you?  How has Mr. Spotted Bear's conduct

02:44  25  affected Nxxxx, to your knowledge, and you and your family?

8

1   **A.**   Oh, it has just been -- ever since we very first were

2   informed of it, you know, it's -- it's been a nightmare, you

3   know, a real living nightmare of all of the things that we've

4   gone through.

02:44   5   **Q.**   And specifically have you noticed any effects and changes

6   in Nxxxx?

7   **A.**   Yes.  And I do have a statement that I will -- and I'll

8   read part of that, but, you know, I would like to talk to

9   Lonnie directly, you know, and from the heart -- from my heart,

02:44   10   Lonnie.  You know, the last time we really got to talk was the

11   morning we found out, and you were over for coffee that morning

12   with us.  You know, we were so close.  You know, you helped us

13   whenever we needed help, and I helped you whenever you needed

14   anything.  You know, you knew you could count on us, and I knew

02:45   15   we could count on you for -- for everything, you know.

16           And I, you know, was -- I've never -- hate -- I've

17   never hated you.  Hate has not been a part of -- I've never,

18   ever said, you know, that I hate him.  I do hate what we had to

19   go through and what we've been through.  But, you know, I've

02:45   20   always looked up to you.  We were hurt and angry and felt so

21   betrayed, so betrayed because we trusted you.  You know, you're

22   her godfather, and you were supposed to help us take care of

23   her and watch over her.

24           You know, and when we were first, you know, told that

02:46   25   the FBI wanted to talk to us -- when I went and asked Nxxxx,

9

1   when I went -- you know, I didn't go immediately.  I finished

2   making supper, and then I went and asked Nxxxx if something had

3   happened.  And when Nxxxx started crying and turned away and

4   wouldn't look at me and said yes, you know, I knew immediately

02:46

5   something had happened that should not have happened.

6          And at first she only -- she told me -- she only told

7   me twice.  She said once when she was five and once when she

8   was nine, and -- you know, and I wanted to believe that so bad.

9   You know, and then after a few months when she came back and

02:46

10  said, you know, there were multiple times in there, you know,

11  in between those -- the five and the nine and how -- she told

12  me how she felt whenever you would come over, you know, Nxxxx,

13  how she -- she didn't -- you know, she would go to her room and

14  wouldn't come out of her room, you know, and how we didn't

02:47

15  realize what was going on.

16          Could I get some water?  I'm sorry.

17  **Q.**   And, ma'am, you had said that you had kind of a statement

18  that you'd written that you wanted to read?

19  **A.**   Yes.  And, you know, it's -- it is -- it's been so

02:47

20  difficult, you know, really difficult to get through this.  But

21  this was the statement that I wrote to the Court.  And, you

22  know, they talked about family, and I said since Lonnie is my

23  brother, we pretty much have the same family.  Lonnie's wife

24  and sons are suffering immensely because they believe he's

02:47

25  innocent.  Lonnie says he didn't do anything, and they totally

10

1    believe him.

2         Lonnie needs to man up and admit the girls are

3    telling the truth.  His wife and sons believe he has been

4    unjustly -- unjustly tried and convicted because Lonnie

02:48    5    continues to deny what he's done.  He needs to be strong and

6    accept responsibility for his actions and admit he needs help

7    for what he's -- for his problem he has.

8         Diana, my sister-in-law, has not been back in church

9    since the trial.  Morley hasn't been able to go back to work.

02:48   10    Morley, Lonnie's son, hasn't been able to go back to work, and

11    he's taken extended leave from his job.  They will continue to

12    be in limbo, suffering and unable to start the healing process

13    until Lonnie admits the girls are telling the truth.

14         You know, now I can move on to the impact that this

02:48   15    had on our family and our household.  When my husband and I

16    first learned of the allegations that Nxxxx had been sexually

17    molested by Lonnie, we were shocked and absolutely devastated,

18    to say the least.  We trusted him totally and completely with

19    Nxxxx.  Lonnie was her godfather.  He was the one person that

02:49   20    was supposed to help us watch out for her, protect her, and to

21    help keep her safe.

22         We were heartbroken.  We could not believe he had

23    betrayed us like this.  My husband cried because he thought he

24    failed in his job to protect her.  I cried every day for about

02:49   25    two months straight.  I just couldn't believe what we were

11

1   going through.  It was a living nightmare.  I was angry that my

2   brother was making my family go through this.  There were no

3   words in my vocabulary to describe the emotional pain I felt.

4   My heart truly felt a deep pain in it.  My stomach always felt

02:49   5   like it had a knot in it.

6          I felt sick.  I just felt sick a lot of the times.

7   The mind becomes so consumed -- so consumed that you -- you're

8   thinking about this when you fall asleep at night.  You wake up

9   during the night.  This is all you're thinking about.  First

02:50   10   thing when you wake up in the morning, it's all you're thinking

11   about.

12          I wish Sommer wouldn't be sitting back there smiling.

13   This is not funny.

14          I'm driving -- I'm driving around, but I'm not

02:50   15   sure --

16   **Q.**   And, ma'am, I apologize, but if I could have you focus on

17   the -- on the statement.  I know this is tough.

18   **A.**   Okay.

19   **Q.**   I'm sorry.

02:50   20   **A.**   Well, she's sitting there, just sitting there smiling, so

21   it's --

22   **Q.**   I know, ma'am.

23   **A.**   It's hard for me.  You know, I'm trying to talk to my

24   brother, and I see her just sitting back there smirking.  You

02:50   25   know, I'm trying to have a -- this is a heartfelt to my

12

1  brother.

2  **Q.**   Yes, ma'am.  I understand.  I just want to make sure that

3  we keep on track.

4  **A.**   Anyway, you know, this is -- it's so consuming in the

02:50  5  mind, all that's -- all that's on the mind all the time.  I

6  told my husband, I said, I hear him talking to me, but I don't

7  know what he's saying.  I'm not listening because my mind is

8  thinking of the -- thinking about what's going on.  I said I'm

9  driving, but I don't know for sure where I'm at because I'm

02:51  10  thinking about this all the time.

11       I said this has to be -- this is the hardest thing

12  that I've ever went through in my life.  It's been an emotional

13  roller coaster.  You know, some days seems like it's getting

14  better.  Then there's days of sadness about how many people's

02:51  15  lives that this has affected.

16       Now I'm going to talk -- go over what Nxxxx -- when

17  -- we started caring for Nxxxx when she was 18 months old.  Her

18  birth mom is one of my husband's daughters from his first

19  marriage.  Nxxxx was the youngest of three children that she

02:51  20  asked us to take care of because she was going to jail.  And

21  Nxxxx was a very affectionate and happy little girl.  She was

22  always smiling.  She was four when we started keeping a new

23  baby girl named Avery.  That was our niece.  Nxxxx loved Avery.

24  She -- and she was always happy to see Avery when she came home

02:52  25  from Head Start.

13

1          Then Nxxxx started to change a little bit when she

2    was about seven or eight.  She didn't seem as happy anymore, so

3    I sent her back to live with her mom, and she didn't like

4    living how her mom's lifestyle was, so Nxxxx came back to live

02:52   5    with us again, and it was then when she really started to

6    change.  She didn't seem happy anymore.  She always seemed

7    angry at everybody.  She was mean to Avery and was always

8    making her cry.  She was no longer affectionate.  She didn't

9    want anyone to hug her anymore.  She didn't want to hug

02:52   10   anybody.  She started -- she started talking back.  She started

11   to stay in her room all the time with her door closed.

12          And when she was 11 she didn't want to go to school

13   anymore.  She wanted to be home-schooled, so I home-schooled

14   her.  Then she didn't -- then she wanted to move away.  She

02:52   15   wanted to move to Arizona.  We told her we didn't want to move

16   to Arizona, but maybe Bismarck.  My husband didn't even want to

17   move to Bismarck.  He didn't want to -- he didn't want to move

18   any place.  I couldn't even talk to Nxxxx anymore without her

19   snapping at me and making me cry.

02:53   20          Then just about a week before we had heard about

21   this, before we found out that the FBI wanted to talk to us, I

22   was crying and I said to Nxxxx, "You've changed.  I don't know

23   what happened to you, but you've changed.  You make me feel

24   like you hate me."  And once we found out what had happened,

02:53   25   all her actions made sense.  She was hurting deeply, and she

14

1   was in pain.

2           When I asked if her godfather had done something to

3   her and she started crying and she turned away, you know, I

4   knew something happened.  I held her, and we both cried.  I

02:53   5   told her she was safe and that I was sorry for whatever had

6   happened to her.

7           And we took her to the Children's Advocacy Center and

8   Nxxxx got counseling, and she still -- she's still having

9   trouble with school, and she's still having trouble trying to

02:54   10   relate to girls her own age.  And she said she always --- now

11   she feels a lot like -- she feels like a loner because she

12   feels she's been through something that nobody else her age has

13   been through.

14           There's -- there's no physical scars, but, you know,

02:54   15   how do we know when she's going to be emotionally healed?

16   Nxxxx -- Nxxxx has cried and said she has to live with this the

17   rest of her life, that she's never going to be able to forget

18   what happened to her.  And I told her that maybe some day she

19   can speak to other children about not being afraid to come

02:54   20   forward if something like this ever happens to -- ever happens

21   to them.  We have a strong faith in God, and I said he -- he

22   will help heal us.  He'll help heal us.

23           And in conclusion, you know, I think one thing --

24   it's very unfortunate that I was directly involved in this

02:54   25   because I would have helped you, Lonnie.  I would have helped

15

1   you.  You know, I would have helped you do the right thing.  I

2   would have helped, you know, right away.  You know, there's

3   help for people that -- that this happens to.  There's help for

4   people that do these things.  I would have helped you to get --

02:55   5   try to get help.  I wouldn't have helped you to try to deny it

6   or try to cover it up.  I wouldn't have -- I would have told

7   you, Lonnie, you don't want to make those girls go to trial.

8   You don't want to put them through this again or their

9   families.  You don't want to put your family through this.  I

02:55   10   would have helped you.  I would have told you those things, you

11   know, to do the right thing.

12          Unfortunately, I have to read this.  It's unfortunate

13   that Lonnie listened to Sommer Cummings, Morley's girlfriend.

14   She gave him a false hope that she could help him beat this

02:55   15   charge.  Lonnie might have been duped by her.  She's like a

16   coyote in sheep's clothing.  She may have just wanted Lonnie

17   out of the picture so he can't tell Morley what to do anymore.

18   She tried her best to cause a lot of trouble in our family time

19   and again, but everyone knows how she is.

02:56   20          Sommer didn't like the parents of any of the three

21   girls involved, so she was probably just trying to get back at

22   us through this -- making us go through all this trial and

23   everything.  If Sommer really believed Lonnie was innocent,

24   then why wouldn't she let her ten-year-old be interviewed?

02:56   25          So, you know, I -- Lonnie, mom always taught us to do

16

1  the right thing, and I had to do the right thing.  We had to do

2  the right thing for Nxxxx, for -- so that she can turn out to

3  be a healthy adult, you know, even though what she's been

4  through.  But I don't hate you, but I do hate what we had to go

02:56    5  through.

6            MR. O'KONEK:  Thank you.

7            THE COURT:  Mr. Bolinske, do you have any questions?

8            MR. BOLINSKE:  No questions.

9            THE COURT:  All right.  Thank you.  Ma'am, you may

02:56   10  step down.

11           MR. O'KONEK:  The United States doesn't have any

12  other witnesses, Your Honor.

13           THE COURT:  All right.  Then I will give both

14  attorneys an opportunity to outline their recommendations for a

02:57  15  sentence in this case.  We'll start with the government.  And

16  when the attorneys are done, Mr. Spotted Bear, I'll give you an

17  opportunity to speak, as I am required to do under the law.

18  Mr. O'Konek.

19           MR. O'KONEK:  Thank you, Your Honor.  As Your Honor

02:57  20  is well aware -- you were present during trial, so I won't

21  rehash a lot of the factual information, but our recommendation

22  is that this Court sentence the defendant to serve 360 months

23  imprisonment on Counts 1 through 4, to run concurrent with one

24  another, serve a lifetime term of supervised release, pay

02:57  25  restitution in the amount of $1,795.76 to Medicaid, $1,090 to

1    the North Dakota Crime Victims Compensation, for a total of

2    $2,885.76, and pay the $400 special assessment.

3           On September 14th of this year a jury found the

4    defendant guilty of Counts 1 through 4 of the Indictment for

02:58    5    molesting three girls between the ages of five and nine.  The

6    defendant's crimes are unconscionable.  However, the United

7    States takes into consideration that the defendant is 73 years

8    old.  He -- the mandatory minimum of 30 years or 360 months is

9    a life sentence, and we don't believe that anything more than

02:58    10   the 30 years is necessary, and under the 3553(a) factors would

11   ask that the Court impose that mandatory minimum sentence on

12   all counts to essentially reflect the defendant's age.

13          The defendant did something horrific multiple times,

14   and ultimately he needs to pay and be accountable for the

02:58    15   actions that he committed, and we'd ask that the Court sentence

16   him to those 360 months on all counts and lifetime supervised

17   release.  Thank you.

18          THE COURT:  So the government is advocating a

19   variance from the guidelines.

02:59    20          MR. O'KONEK:  Yes, Your Honor.  The guideline range,

21   I believe, is 43, with a lifetime range.  We believe that the

22   30-year sentence or the downward variance is -- the mandatory

23   minimum is sufficient but not greater than necessary under

24   3553(a).

02:59    25          THE COURT:  And what were the plea negotiations

1  before trial?

2      MR. O'KONEK:  Your Honor, I think it was 10- or

3  20-year maximum offense, with a two-year -- we'd recommend two

4  years if he didn't make the children go through the trial.

02:59   5      THE COURT:  Mr. Bolinske.

6      MR. BOLINSKE:  Yes, Your Honor.  In this position,

7  nothing I can or will say --

8      THE COURT:  Can you --

9      MR. BOLINSKE:  -- has any legal significance or

02:59   10  consequence.  Mr. Spotted Bear and Sommer Cummings and I did

11  have meetings many times about the minimum mandatory, about the

12  sentence offer, about the pros of the case, the cons of the

13  case, about all of those things, and ultimately decided to go

14  to trial.

03:00   15      That being said, that nothing I say legally will mean

16  anything.  Lonnie and I talked about this.  And what I will say

17  and what we've discussed is throughout this entire process,

18  Lonnie has been a perfect gentlemen.  He's been respectful.

19  He's been considerate.  He's been kind.  He's been thoughtful.

03:00   20  That completely flies in the face, I know, of the things that

21  he's been convicted of.

22      I'm sorry that the whole process -- to everyone here,

23  I don't know what happened.  I sort of wish I did in this

24  circumstance because it would either make it easier or harder.

03:00   25  I don't.  I understand what the law is.  I understand what

19

1   happened at trial, and I respect that, but knowing Lonnie and

2   what I've observed and been around, I've appreciated getting to

3   know him, and that's what I told him I was going to say, and I

4   mean that, so --

03:00   5   THE COURT:  All right.  Mr. Spotted Bear, I am

6   required to give you an opportunity to speak at this hearing.

7   If there's anything you wish to say or any questions that you

8   have, you're free to speak at this time.

9   THE DEFENDANT:  No, Your Honor, I don't got nothing

03:01   10   to say, but -- no.  No, nothing more.

11   THE COURT:  All right.  Well, I've reviewed the

12   Presentence Investigation Report.  I accept the facts set forth

13   in that report, as well as the sentencing guideline

14   calculations.  In this case the Presentence Report established

03:02   15   an offense level of 43 and a criminal history category of I.

16   Under the advisory sentencing guidelines, that provides for a

17   life sentence.

18   The government has moved for a downward departure

19   under -- well, they moved for a variance, I guess, based on the

03:02   20   sentencing factors set forth in 18 USC, Section 3553(a).  I am

21   well aware of all of those sentencing factors.  I have

22   sentenced thousands of defendants over the years, and I'm

23   required by the law to give those sentencing factors

24   consideration in every case, and I have given all of the

03:02   25   3553(a) factors consideration.

20

1            The Eighth Circuit Court of Appeals, which oversees
2    hearings that are conducted in a federal district court such as
3    this, has repeatedly instructed sentencing judges that we are
4    entitled to rely upon factual information contained in the
5    Presentence Report that may address the 3553(a) factors.  We're
6    entitled to rely upon information contained in sentencing
7    memorandums, letters of support, arguments of counsel,
8    statements or lack of statements made by defendants.  I'm also
9    entitled to rely upon my trial notes.  All of those items and
10   pleadings and arguments and letters have addressed the 3553(a)
11   factors in this case.
12           The government has recommended a downward departure
13   to the 30-year mandatory minimum -- or a variance, I should
14   say, to that range, and the Court will adopt that
15   recommendation.  There's a 30-year mandatory minimum on all of
16   these -- well, three of the counts, I guess, and not more than
17   life imprisonment on Count 4, the abusive sexual contact of a
18   child conviction.
19           It's hard for me to understand, Mr. Spotted Bear, why
20   anybody would turn down a plea agreement in which the
21   government recommended -- would recommend two years, your
22   attorney would have an opportunity to recommend anything below
23   that when you're looking at a case or charges that involve
24   30-year mandatory minimums.  It's insane.
25           Maybe if you've got one victim that's testifying

21

1   against you in a trial involving a charge of aggravated sex

2   abuse, you got a 50/50 chance of prevailing in front of a jury.

3   When you got three victims, all of whom were good witnesses,

4   but three victims testifying against you, your odds go down

03:05   5   remarkably.

6          But I've had other defendants that have made the

7   ill-advised decisions to go to trial with multiple victims and

8   an opportunity to argue for a significantly lesser sentence.

9   They chose to do it, and every case involving charges of

03:05   10   aggravated sex abuse that I've tried, the juries aren't very

11   sympathetic towards defendants, and they tend to believe the

12   young victims who are forced to go to trial, but remarkably

13   hold up well under direct and cross-examination.  I thought

14   these young ladies were very credible.  The stories were very

03:05   15   consistent, and they were confirmed by forensic interviews.

16          Faced with that overwhelming evidence, to turn down a

17   two-year or less sentence is, again, insane, but it is what it

18   is.  My hands are tied as a judge.  You go to trial and you get

19   convicted on a charge of aggravated sex abuse, Congress has

03:06   20   decided that that offense carries a 30-year mandatory minimum,

21   so I have no discretion, none whatsoever.  When people enter

22   plea agreements, then I usually have some discretion, but I

23   have none in this case.  But the fact that this case went to

24   trial is a -- is a travesty for everybody because nobody wins

03:06   25   when these cases go to trial.  Everybody loses.  Families are

1    torn apart, and young kids' lives are destroyed forever.

2              So pursuant to the Sentencing Reform Act of 1984,

3    it's the judgment of the Court, Mr. Spotted Bear, that you

4    shall be committed to the custody of the Bureau of Prisons to

03:07    5    be imprisoned for a period of 360 months or 30 years, the

6    statutory mandatory minimum sentence.  That sentence is imposed

7    on Counts 1, 2, 3 and 4.  Count 4 carries a statutory maximum

8    of a life sentence, but I'm imposing the same 30-year sentence

9    on all four counts, to run concurrent.

03:07    10              I'm placing you on supervised release for a term of

11    life on all four counts, to run concurrent with one another.

12    I'm ordering that you pay a special assessment of $400.  I'm

13    ordering restitution in the amount of $2,885.76.  I am not

14    imposing any fine.

03:07    15              You do have a right to appeal, sir, if you feel that

16    you haven't been treated fairly.  If you and/or your family

17    feel that the whole case was unjustly tried and you were

18    unjustly convicted, then you can take it up on appeal to the

19    Eighth Circuit Court of Appeals.  You have a right to appeal

03:08    20    the decision of the jury, and you have a right to appeal the

21    sentence that you've been ordered to serve.

22              The time period to appeal, however, is extremely

23    short in the federal criminal justice system.  The time period

24    to appeal is 14 days by statute.  The 14 days to appeal starts

03:08    25    to run today, when I sign the judgment or the judgment of

23

1    conviction, and I'll be signing that before the end of the

2    workday.  And when I sign it, it gets electronically filed, and

3    the attorneys are electronically notified of that.  But it will

4    all take place before 5 o'clock today, and that's what triggers

03:08    5    the 14-day time period to appeal, as soon as I sign it and it's

6    docketed, so you need to move quickly if you wish to appeal.

7             All that you need is tell Mr. Bolinske that that's

8    what you intend to do, and he can very quickly and easily file

9    a one-page document called a notice of appeal, and that

03:09    10    protects your appeal rights.  But that notice of appeal needs

11    to be filed within 14 days from today or you have lost your

12    right to appeal forever.  Do you understand that?

13             THE DEFENDANT:  Yes, Your Honor.

14             THE COURT:  All right.  In terms of the appeal, most

03:09    15    of this case hinged, like nearly all of these cases, on issues

16    of credibility, who the jury believes, who they don't believe.

17    Those aren't decisions for judges to make.  Those are decisions

18    for jury to -- juries to make.  And the Circuit Courts of

19    Appeals around the country don't generally overturn jury

03:10    20    verdicts that were based on issues of jury credibility.  The

21    appellate court judges don't judge the credibility of

22    witnesses.  That's only for the jury to decide.

23             In terms of the other issues on appeal, everybody can

24    argue that the jury instructions were not appropriate or

03:10    25    somehow they were flawed.  But my recollection is both parties

24

1   agreed on the jury verdict and the instructions.  I just used

2   pattern, pre-approved, Eighth Circuit Court of Appeals

3   instructions, so if the Eighth Circuit Court of Appeals tells

4   me the instructions are appropriate, I never hesitate to give

03:10   5   them.  And that's all that I really gave in this case, was

6   standardized, unobjected to pattern jury instructions.

7            And in terms of the sentence, everybody can appeal

8   the sentence, but if there's a conviction on aggravated sex

9   abuse or attempted aggravated sex abuse, there's a 30-year

03:11   10   mandatory minimum.  There's no room for debate.  There's nobody

11   that can question the appropriateness of the sentence, so you

12   can appeal, but you've got a thousand and one hurdles to

13   overcome on appeal.

14            And the best thing that could happen if you're

03:11   15   successful on appeal is they send it back and we try it again.

16   And we can try this case again, but you can run this scenario

17   by a number of juries, and you're going to get the same

18   consistent verdict, I believe, in virtually every case.  Why do

19   I know that?  Because I try a lot of these cases,

03:11   20   unfortunately.

21            Either counsel have any objections to the sentence

22   that's been imposed?  I guess I've got to order the conditions

23   of supervision, so I'll outline those first of all.

24            In terms of the conditions of supervised release that

03:12   25   you'll be required to comply with, you'll be required to follow

25

the standard conditions of supervised release that are uniform

throughout this country.  Those standard conditions essentially

require that you live a law-abiding lifestyle.  You're

prohibited from possessing firearms or ammunition for the rest

of your life now.  And you'll be assigned a probation officer

when and if you're released from prison.

Special conditions that I'm ordering are that you

shall have no contact with the victims in this case, directly

or indirectly, by any means whatsoever.

You'll be required to participate in any form of

psychological or psychiatric counseling and/or sex offender

treatment programming that might be recommended.

I'm ordering that you shall have no contact with

anyone under the age of 18 except in the presence of the parent

or legal guardian and on the condition that the parent or legal

guardian has been made aware of these convictions.

And last of all, while on supervised release, if that

occurs, you'll be subject to being searched, as is everybody in

this country on federal supervision.

Having ordered those conditions, does anyone have any

objections that they wish to voice on the record here to the

sentence or the conditions of supervised release?

MR. O'KONEK:  No, Your Honor.

THE COURT:  Mr. Bolinske?

MR. BOLINSKE:  I have no objections, Your Honor.

26

1          THE COURT:  All right.  Do you have any questions,

2   Mr. Spotted Bear?

3          THE DEFENDANT:  No, Your Honor.

4          THE COURT:  Where have you been held in custody now

03:14    5   since the trial?

6          THE DEFENDANT:  I'm in Rugby.

7          THE COURT:  Pardon?

8          THE DEFENDANT:  Rugby.

9          THE COURT:  All right.  And have you been treated in

03:14   10   a respectful manner?

11          THE DEFENDANT:  Yes, Your Honor.

12          THE COURT:  All right.  And, finally, to the family

13   members and the victims that were involved in this, I hope that

14   you'll take advantage of the services that are made available

03:14   15   through the United States Attorney's victim advocate.

16          I want to convey my thanks to the victims for coming

17   forward.  And it takes a lot of courage for anybody to testify

18   in a federal criminal case, but it probably takes more courage

19   for young people to do so, but hopefully they and their family

03:14   20   members can start to heal.  But there are services available

21   through the U.S. Attorney's Office for counseling and other

22   care and treatment.  I hope that you'll take advantage of those

23   services to hopefully start to mend.

24          With that, we are adjourned.

03:15   25          (Proceedings concluded at 3:15 p.m., the same day.)

27

1       <u>CERTIFICATE OF COURT REPORTER</u>

2           I, Sandra E. Ehrmantraut, a Certified Realtime

3   Reporter,

4           DO HEREBY CERTIFY that I recorded in shorthand the

5   foregoing proceedings had and made of record at the time and

6   place hereinbefore indicated.

7           I DO HEREBY FURTHER CERTIFY that the foregoing

8   typewritten pages contain an accurate transcript of my

9   shorthand notes then and there taken.

10          Dated:  January 22, 2018

11

12                          <u>/s/ Sandra E. Ehrmantraut</u>
                            Certified Realtime Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25